# 26-616

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**IME WatchDog, Inc.,**
Plaintiff-Counter-Defendant-Appellee,

**v.**

**Safa Abdulrahim Gelardi, Vito Gelardi,**
Defendants-Third-Party-Plaintiffs-Counter-Claimants-
Counter-Defendants-Appellants,

**IME Companions LLC, Gregory Elefterakis, Roman Pollak, Anthony Bridda, Nicholas Elefterakis, Nicholas Liakis, Carlos Roa, Daniella Levi, Client Exam Services LLC, IME Management & Consulting LLC, Direct IME Services LLC,**
Defendants-Third-Party-Plaintiffs-Counter-Claimants.

On Appeal from the United States District Court
for the Eastern District of New York
No. 1:22-cv-01032-PKC-JRC - Hon. Pamela K. Chen

## APPENDIX VOLUME I OF II FOR DEFENDANTS-APPELLANTS

Safa Abdulrahim Gelardi, pro se
Vito Gelardi, pro se
26118 Crosswood Trails Lane
Cypress, Texas 77433
safagelardi@gmail.com | vitogelardi@gmail.com

# Table of Contents


| Tab | Document | Pages |
|---|---|---|
| A | Memorandum & Order (Dkt. 616) - Feb. 9, 2026 | A-3-A-43 |
| B | Second Judgment (Dkt. 617) - Feb. 10, 2026 | A-44-A-45 |
| C | Certificate of Default (Dkt. 618) - Feb. 11, 2026 | A-46 |
| D | March 31, 2025 Memorandum & Order (Dkt. 448) | A-47-A-105 |
| E | March 13, 2024 Amended Memorandum & Order (Dkt. 299) | A-106-A-143 |
| F | May 30, 2025 Order to Show Cause / CRIS Order (Dkt. 500) | A-144-A-147 |
| G | May 5, 2025 Order to Show Cause (Dkt. 482) | A-148-A-154 |
| H | Warner Declaration / Exhibit (Dkt. 590-1) | A-155-A-164 |
| I | Jan. 17, 2026 Clarification Letter re Discovery Limitation | A-165-A-178 |
| J | Deposition Notice for Adam Rosenblatt (May 10, 2023) | A-179-A-181 |
| K | Warner Email Re Depositions (May 10, 2023) | A-182 |
| L | 9 Woods Materials / Orders Packet | A-183-A-240 |
| M | Notice of Appeal (Dkt. 619) | A-241 |
| N | District-Court Docket Excerpt | A-242-A-244 |
| O | Second Circuit ACMS Docket Report | A-245-A-250 |
| P | Deposition Notice for Carlos Roa (May 10, 2023) | A-251-A-253 |
| Q | Deposition Notice for Daniella Levi (May 10, 2023) | A-254-A-256 |
| R | Aug. 6, 2025 Cho Correction Email | A-257-A-258 |
| S | Daniella Levi Deposition Excerpts | A-259-A-276 |
| T | Carlos Roa Webpage | A-277 |
| U | Dkt. 254 Excerpts | A-278-A-281 |
| V | Dkt. 199 Hearing Excerpts | A-282-A-286 |
| W | Rosenblatt Email Re March 2017 Materials | A-287 |
| X | Rosenblatt Email Re WatchDog P&Ls | A-288-A-290 |
| Y | Zariz Certificate of Incorporation | A-291 |
| Z | Zariz Registry Extract | A-292-A-293 |
| AA | Levi Criminal-Record Excerpts | A-294-A-296 |
| AB | Damages-Response Excerpts | A-297-A-302 |

# SUPPLEMENTAL TABLE OF CONTENTS

Final curated appendix keyed to the final brief. Original A-/B- page labels are preserved exactly as cited in the brief.

**A-305-A-315** Final Response excerpts re 9 Woods chronology, counsel notice, and damages objections.

**A-368-A-380** Motion to Strike excerpts re Rosenblatt's voluntary transmissions and the BRG / no-coercion point.

**A-467-A-470** Supplemental Affirmation excerpts re Rosenblatt texts and related forensic narrative.

**A-573-A-576** July 17, 2025 letter excerpts re Roa's embedded litigation role and 'working on the case every day.'

**A-581-A-584** Additional Dkt. 199 hearing excerpts re trade-secret overbreadth and public-availability points.

**B-1-B-11** Appendix Addendum: March 3 minute entry, March 9 order, March 23 Roa declaration excerpts, March 29 Morgan & Morgan motion excerpts, April 10 order, and damages-response excerpt.

Unused duplicate and placeholder material from earlier working compilations has been omitted from the final appendix assembly.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IME WATCHDOG, INC.,

Plaintiff,

- against -

SAFA ABDULRAHIM GELARDI, *et al.*,

Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

This case began nearly four years ago as a lawsuit for misappropriation of trade secrets between competitors in the personal injury litigation business. Since then, the case has devolved beyond recognition into a case not about trade secrets, but about contempt and abuse of the litigation process. For the reasons set forth below, the Court orders case-ending sanctions against the remaining Defendants in this case.

**BACKGROUND**

The Court assumes the parties' familiarity with the extensive factual and procedural history of this case, and so only sets forth those facts relevant to this Memorandum and Order.

**I. Pre-Litigation Background**

In this case, Plaintiff IME Watchdog, Inc. ("Watchdog") has sued Defendants Safa Abdulrahim Gelardi ("Safa"), Vito Gelardi ("Vito"), IME Companions LLC ("Companions"), Client Exam Services LLC ("CES"), and IME Management & Consulting LLC ("IME M&C") (collectively, "Defendants").[1]

[1] The corporate Defendants—Companions, CES, and IME M&C—are all unrepresented by counsel and are therefore in default. *See* 28 U.S.C. § 1654; *Lattanzio v. COMTA*, 481 F.3d 137, 139–40 (2d Cir. 2007) (interpreting 28 U.S.C. § 1654 to require an LLC to be represented by a licensed attorney to appear in federal court); (*see also* 10/30/2025 Dkt. Order (deeming

Watchdog and Companions are competitors in the personal injury litigation business. *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 232 (E.D.N.Y. 2024). When a plaintiff brings a personal injury lawsuit, the defendant in that lawsuit can obtain an independent medical examination, or IME, of the plaintiff to evaluate their alleged injuries. *Id.* Both Watchdog and Companions provide third-party services to personal injury attorneys, in which Watchdog or Companions associates (or "observers") accompany plaintiffs to IMEs, observe the IME, take notes, and help plaintiffs fill out forms. *Id.* The observers produce reports of the IMEs for the plaintiffs' counsel to use in the personal injury lawsuits. *Id.*

Watchdog was established in May 2011 by Daniella Levi ("Levi"). *Id.* Companions was established in November 2017 by Safa and Vito (together, the "Gelardis"), who are married to one another. *Id.* Safa "got Companions off the ground" by using confidential materials and information misappropriated from Watchdog. *IME Watchdog, Inc.*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, at *3 (E.D.N.Y. May 13, 2022). More specifically, the Gelardis paid Watchdog's President, Adam Rosenblatt ("Rosenblatt"), to surreptitiously provide them with Watchdog's materials and information in or around April 2017. *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232–35, 239.

## II. Prior Contempt Findings by the Court

Plaintiff Watchdog initiated this action on February 25, 2022 against Safa, Vito, and Companions, alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief. (Compl., Dkt. 1, ¶ 1.) Throughout the pendency of this case, the Court has issued multiple temporary restraining orders ("TROs") and preliminary

---

Companions to be in default)). Additionally, while other defendants were previously named in this action, they have since been dismissed. (*See* Stipulation of Dismissal, Dkt. 131; 1/17/2023 Order Dismissing Parties; Stipulation of Dismissal, Dkt. 592; 9/4/2025 Order Dismissing Parties.)

injunctions ("PIs"), along with other orders directing the parties to act or refrain from acting in certain ways. Without detailing the extensive factual and procedural history leading to each, the Court summarizes the relevant orders and injunctions.

**A. Relevant Court Orders**

1. April 2022 PI

In April 2022, the Court issued its first preliminary injunction in this case, which enjoined Defendants from (1) using Plaintiff's trade secrets "in any manner whatsoever," (2) franchising Companions, and (3) contacting Plaintiff's current clients, employees, and agents. (*See* Mar. 2025 Mem. & Order ("M&O"), Dkt. 448, at 2 (quoting Apr. 2022 Inj., Dkt. 66-1, at 2).) The Court also ordered Defendants "to return to Plaintiff all originals and copies of documents, records, and information . . . that contain Plaintiff's trade secrets and confidential and proprietary information," including "customer information." (*Id.* (quoting same at 2–3).)

2. June 2022 Amended PI

In June 2022, the Court amended the portion of the injunction enjoining Defendants from contacting Plaintiff's current clients, employees, and agents to apply not only to Defendants but also to "their agents, officers and employees, and all other persons and entities in active concert or participation with them." (*Id.* at 3 (quoting Am. Inj., Dkt. 80, at 2; 6/8/2022 Dkt. Order).) Also as of that date, the Court prohibited both parties from making misleading or defamatory statements about one another. (*Id.* at 2–3; Am. Inj., Dkt. 80, at 3.)[2]

---

[2] Notably, the Court's expansion of the April 2022 PI was prompted by Plaintiff's motion for contempt based, in part, on the Gelardis' posting of a GoFundMe page that contained disparaging statements seemingly about Watchdog and Levi that Plaintiff claimed were "defamatory." (Pl.'s Mot. for Contempt, Dkt. 79, at 2.) Although the Court did not find that the statements met the legal definition of defamation as to Watchdog and Levi, (6/10/2022 Dkt. Order), the Court noted that such statements were barred by the Court's prior instruction, at the April 2022 show cause hearing, to refrain from making statements that could be construed as defamatory, (*see* Am. Inj., Dkt. 80). The Court warned Safa "that any further attempts to make

3. March 2023 TRO and Expanded PI

On March 10, 2023, the Court issued a TRO that temporarily restrained Defendants from operating Companions, or "any other business that unfairly competes with Plaintiff in violation of the law," pending a hearing on March 27, 2023. (Mar. 2023 TRO, Dkt. 156, at 2–3.) At the March 27 hearing, the Court converted the TRO into a PI that allowed Companions to resume operations but enjoined Defendants from "providing services to all customers as to whom there is evidence that Defendants misappropriated the customer from Plaintiff." (4/3/2023 Dkt. Order (summarizing ruling on the record at 3/27/2023 hearing); 3/27/2023 Min. Entry.) Those customers were listed on a spreadsheet filed in the case under seal (the "Enjoined Customers List"), (Enjoined Customers List, Dkt. 180-7).

4. Summary of Restrictions on Defendants' Conduct Since April 2022

As a result of the TROs and PIs issued by the Court in this case beginning in April 2022, Defendants have been prohibited from doing the following:

- Using Plaintiff's trade secrets in any manner (since April 2022);
- Retaining copies of any documents containing Plaintiff's trade secrets, including customer information (since April 2022);
- Contacting Plaintiff's current clients, employees, or agents (since April 2022);

statements regarding any parties in this action that can be interpreted as disparaging will result in sanctions—whether they are 'defamatory' or not." (6/10/2022 Dkt. Order.) The Court rejected Defendants' argument that Safa, as a layperson, "did not understand what 'defamatory' meant" because "Safa Gelardi [was] represented by counsel and it is counsel's responsibility to advise their client regarding proper compliance with Court orders and directives." (*Id.*) The Court also rejected the argument that "Safa Gelardi's statements [were] mere opinions," finding instead that had the statements "identified Watchdog or Levi in any manner, they would have been defamatory *per se*." (*Id*. (citing *Celle v. Filipino Reporter Enter. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) ("A writing which tends to disparage a person in the way of his office, profession or trade is defamatory per se . . . ." (internal quotation marks and citation omitted))).)

- Going through Defendants' agents to contact Plaintiff's current clients, employees, or agents (since June 2022);
- Making misleading or defamatory statements about Plaintiff (since June 2022);
- Operating Companions (between March 10–27, 2023); and
- Operating Companions to provide services to customers on the Enjoined Customers List (since March 27, 2023).

**B. Defendants' Contumacious and Otherwise Improper Conduct**

Defendants have repeatedly violated the Court's orders and injunctions, and the Court has already found them in contempt multiple times. In particular, the Court has found that Safa "understood the Court's Orders very well" and took steps "to conceal her efforts to violate them, including by making multiple successor entities and attempting to hide the related paper trails." (Mar. 2025 M&O, Dkt. 448, at 40.) "Indeed, Safa's only frustration appears to be that she was not more successful in violating this Court's Orders." (*Id.* (citing 7/29/2024 Hr'g Tr., Dkt. 437-1, at 55:14–18, 51:24–25).) Relatedly, the Court has found that Safa has directly lied to the Court while under oath throughout this litigation. (*See id.* at 13 ("Throughout this lengthy, hearing-filled lawsuit, the Court has found 'that Safa Gelardi has repeatedly perjured herself . . . .'" (quoting *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232 n.4)).) The Court has thus formed the opinion that Safa is "wholly uncredible as a witness." *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232 n.4.

1. Safa's Contempt as to the April 2022 PI: Retaining Plaintiff's Customer Information

Safa violated the April 2022 PI requiring Defendants to return all of Plaintiff's trade secrets, including customer information. In February 2023, Safa sent Watchdog's client list to a third party, proving that she had kept the client list in her possession after April 2022, in contravention of the April 2022 PI. (Mar. 2025 M&O, Dkt. 448, at 16 (citing 5/29/2024 Hr'g Tr.,

Dkt. 355-1, at 87:1–89:16).) In March 2025, the Court found that "Safa failed to comply with the Court's Orders by not deleting Watchdog's client list from her computer as of February 2023," (*id.*), and held her in contempt for this conduct, (*see id.* at 39–41).

2. Safa's Contempt as to the June 2022 Expanded PI: Contacting Carlos Roa

Safa violated the June 2022 expanded PI that prohibited her from initiating contact with Plaintiff's employees through Defendants' agents. In November 2022, Safa hired a private investigator to contact and track Plaintiff's employee, Carlos Roa. *IME Watchdog, Inc.*, 732 F. Supp. 3d at 236. Among other things, Safa paid the private investigator to place a GPS tracker on Roa's car. *Id.* The Court found Safa in contempt for this conduct. (Mar. 2025 M&O, Dkt. 448, at 5 (citing Sec. Am. Inj. M&O, Dkt. 254, at 26–32; Attach. & TRO M&O, Dkt. 284, at 3 n.3).)

3. The Gelardis' Contempt as to the March 2023 TRO: Continuing to Operate Companions as CES

After the March 10, 2023 TRO went into effect, preventing Defendants from operating Companions, the Gelardis went through Safa's nephew and a family friend to create CES, a Companions copycat using the "exact same" business model and client list as Companions. (Mar. 2025 M&O, Dkt. 448, at 4 (quoting 3/27/2023 Hr'g Tr., Dkt. 199, at 97–100, 106, 114–15, 118).) Based on an evidentiary hearing held on March 27, 2023, the Court determined that the creation of CES was "an effort to end run the condition of the [Court's prior order]," and found that Defendants had engaged in "contemptuous," "contumacious conduct." (*Id.* (quoting same).) As the Court stated on the record, "[i]t's clear . . . that it was [Safa] continuing [Companions] under a different name and using family members or a family member and a friend to perpetrate what I consider quite frankly a fraud on this court and very, very disturbing." (3/27/2023 Hr'g Tr., Dkt. 199, at 120:17–20.) The Court issued a written decision, dated October 20, 2023, memorializing its finding that the Gelardis and Companions were in contempt for starting or

helping to start CES in violation of the March 2023 TRO. (Mar. 2025 M&O, Dkt. 448, at 5 (citing Sec. Am. Inj. M&O, Dkt. 254, at 26–32; Attach. & TRO M&O, Dkt. 284, at 3 n.3).)[3] Despite denying this fact at the March 27, 2023 hearing, Safa later admitted that she had, in fact, "helped create" CES "for the purpose of [evading] the TRO." (*See* Defs.' Final Resp. to Order on Contempt & Sanctions ("Third Opp'n"), Dkt. 605, at ECF[4] 1, 54.)

4. Safa's Failed Effort to Violate the March 2023 TRO: Attempting to Continue Operating Companions as Accompanied Exam Services

Three days after the Court issued the March 2023 TRO, Safa's brother purchased the domain name for a company called "Accompanied Exam Services" ("AES"). (Mar. 2025 M&O, Dkt. 448, at 15 (quoting 7/29/2024 Hr'g Tr., Dkt. 437-1, at 45:14–48:3).) Safa initially lied to the Court about her involvement with AES, testifying under oath at a contempt hearing on May 29, 2024 that she had "heard of" a company called Accompanied Exam Services, but was "not familiar with who they [were]." (*Id.* at 14 (quoting 5/29/2024 Hr'g Tr., Dkt. 355-1, at 64:3–5).) Even after being confronted with an email she had sent three days after the March 10, 2023 TRO, explaining to a customer that Companions was "not allowed to service [their] law firm anymore" and "recommend[ed]" that the customer use "Accompanied Exams," (*see id.* at 14 (citation omitted)), Safa again denied owning or operating AES, (*id.* at 14 (citing 5/29/2024 Hr'g Tr., Dkt. 355-1, at 65:19–66:2)). Months later, however, at a contempt hearing on July 29, 2024, Safa admitted that

[3] The Court later amended its October 2023 order to clarify that it had found "Safa in civil contempt of the Amended Injunction and the March 2023 TRO," but reserved "making a final ruling on damages and imposing sanctions" until the parties briefed the issue of compensatory damages, including attorneys' fees, relating to the March 27, 2023 contempt proceedings. (Am. Sec. Am. Inj. M&O, Dkt. 299, at 33.) The amended order is reported at *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224.

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

her brother had purchased the AES domain name because Safa had "proposed to [her] brother to start a business with [her]." (*Id.* (alterations in original) (quoting 7/29/2024 Hr'g Tr., Dkt. 437-1, at 45:14–48:3).) Although Safa contended that AES never went into business, the Court found that, regardless, AES "was yet another attempt by Safa to circumvent this Court's Orders and to continue to provide IME services to customers on the Enjoined Customers List." (*Id.* at 15.)

5. Defendants' Contempt of the March 2023 Expanded PI: Continuing to Operate Companions as IME Legal Representatives

As of at least April 2023, Defendants operated yet another IME company, IME Legal Representatives ("IMELR"), with third party Eugene Liddie. (*See id.* at 16–23.) Again, at first, Defendants denied being involved with IMELR. (*Id.* at 6–7.) This time, they were initially successful in convincing the Court of the lie. (*See id.*) After a hearing in May 2023, the Court stated that "it found Liddie's claim that he had started IMELR on his own credible, and that the Court was not convinced that the Gelardis had used Liddie to 'end-run'" the Court's prior orders. (*Id.* at 6 (citing 5/4/2023 Hr'g Tr., Dkt. 219-1, at 147–48); *see also id.* at 6–7 (describing the Court's written decision reaffirming its findings at the evidentiary hearing (July 2023 M&O, Dkt. 231,[5] at 3)).)

However, Plaintiff continued to pursue its claim that Defendants were serving customers on the Enjoined Customers List through IMELR, which Plaintiff alleged was operating as a proxy/alter ego for Companions. (*See id.* at 8–11 (citing, *inter alia*, Dkts. 315, 317, 321, 348, 353–55, 411, 423, 429-1, and 429-2).) The Court held additional hearings in May 2024, July 2024, and September 2024 that addressed, *inter alia*, the allegation that Defendants were involved in IMELR. (*See id.*)

[5] The July 2023 M&O is reported at *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2023 WL 4532459 (E.D.N.Y. July 13, 2023).

Finally, in March 2025, after reviewing the extensive evidence presented to the Court through the parties' submissions and the four in-person hearings addressing this issue, the Court concluded that "at least as of April 2023, Defendants were, in fact, operating IMELR with Liddie, contrary to the Court's prior findings." (*Id.* at 17.) The Court specifically held that "it is clear that IMELR was Safa's creation, and that Liddie's role was to serve just as 'the face' of the business." (*Id.* at 39 (quoting Apr. 2023 Zoom Tr., Dkt 345-1, at 1).) Indeed, Safa eventually conceded, in effect, that she had attempted to work with Liddie through IMELR, and that, although she claimed her plan never came to fruition, she "would have loved for [the plan] to go through at the time," i.e., in April 2023. (*Id.* at 21–22 (quoting 7/29/2024 Hr'g Tr., Dkt. 437-1, at 51:24–25, 55:14–18).) Safa also admitted that "it would have been a blatant violation" of the Court's orders if the plan had succeeded. (*Id.* (quoting same).) The Court ultimately found Safa's and Liddie's denials of an attempted partnership uncredible, (*see id.* at 23), and that although Safa took the lead, "all three Defendants—Safa and Vito Gelardi and their company Companions—were involved in the plan to create and run IMELR as an IME business and solicit work from the Enjoined Customers List," (*id.* at 39 n.33). Notably, as of July 2024, 98% of IMELR's income came from customers on the Enjoined Customers List. (*Id.* at 23 (citing 7/29/2024 Hr'g Tr., Dkt. 437-1, at 128:23–129:1).)

6. <u>Failure to Pay the Forensic Examiner Berkeley Research Group, LLC</u>

In tandem with the June 2022 Expanded PI, the Court issued an order on June 27, 2022 appointing Berkeley Research Group, LLC ("BRG") to conduct a forensic examination of Safa's, Vito's, and Companions's personal and business digital electronic devices. (6/27/2022 Dkt. Order; Consent Order for Forensic Exam., Dkt. 90-1, at 2–3.) The Court required the parties to share equally in the cost of the examination. (Consent Order for Forensic Exam., Dkt. 90-1, at 7.) Defendants, however, failed to pay their portion of BRG's invoice, prompting the Court to issue multiple orders directing Defendants to pay. (*See, e.g.*, 9/11/2023 Dkt. Order for Dkt. 234 ("The

Court has been apprised . . . that [BRG] . . . is still owed almost $50,000 for its services, with Defendants owing $32,716.46, and Plaintiff owing $16,234.80. The Court orders both parties to resolve their share of the outstanding bill by 9/25/23 and confirm such resolution by that date, or risk sanctions."); 1/29/2024 Dkt. Order for Dkt. 271 (observing that BRG "is still owed by Defendants the full amount of $32,716.46" and ordering Defendants "to resolve their share of the outstanding bill by 2/9/2024 and confirm such resolution by that date or risk sanctions"); 2/14/2025 Dkt. Order for Dkt. 441 (ordering a show-cause hearing regarding sanctions because "BRG once again . . . has apprised the Court that Defendants Safa and Vito Gelardi still owe BRG").)

Ultimately, the Court has been forced to issue repeated civil contempt sanctions against Defendants based on their disregard of the Court's orders requiring them to pay. (4/2/2025 Min. Entry (ordering Safa to pay $2,000 to BRG by 4/4/2025, $500 on the first of each month after, imposing a $500 sanction per late or missed payment, and stating that "Defendants are again warned about the risk of criminal contempt, including jail, if these coercive sanctions do not result in their compliance with the Court's Orders"); 5/5/2025 Dkt. Order for Dkt. 482 (requiring Safa to pay $500 in sanctions because while she "paid the $2,000 payment the Court ordered . . . she did not pay BRG the $500 payment due May 1, 2025"); 7/7/2025 Dkt. Order for Dkt. 540 (imposing $500 in sanctions and ordering Safa to pay $500 to BRG after BRG informed the Court that it "did not receive a payment from Defendant Safa Gelardi by close of business on July 1, 2025"); 8/28/2025 Dkt. Order for Dkt. 589 (imposing "yet another $500 in sanctions" because "Individual Defendants have failed to make the $500 payments due on July 1 and August 1 [2025], and have failed to pay the additional $500 in sanctions the Court imposed for the missed July 1 payment"); 10/6/2025 Dkt. Order for Dkt. 599 ("BRG did not receive the $1,500 payment that was due [for July, August, and September 2025] . . . nor did [BRG] receive the additional $500 that was due on

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 14 of 300

October 1, 2025. . . . Individual Defendants still owe BRG $29,216.47 in unpaid fees, which goes up to $41,040.19 when accounting for interest owed as set forth in their engagement letter. . . . Individual Defendants [also] failed to pay the $1,000 in sanctions ordered by the Court . . . . The Court sanctions them an additional $500 for both [the September and October 2025] missed payments, for a total in sanctions of $2,000."); 1/28/2026 Dkt. Order for Dkt. 615 (imposing $1000 in civil contempt sanctions for the Gelardis' failure to timely pay BRG on December 1, 2025 and January 1, 2026).)

7. Summary of Contumacious Conduct

In sum, Defendants have repeatedly flouted the Court's orders by retaining Plaintiff's customer information; contacting Plaintiff's employees; continuing—or attempting to continue—Companions' IME work as AES, CES, and IMELR; and failing to pay BRG. Although the Court has already imposed sanctions for some of Defendants' contumacious conduct, it has yet to impose sanctions for its March 2025 findings of contempt. (Mar. 2025 M&O, Dkt. 448, at 54.)

**DISCUSSION**

There are several pending matters in this case that the Court addresses here. First, Plaintiff has brought new contempt allegations against Defendants. The Court will make findings of fact and issue conclusions of law as to those allegations, and, for the reasons stated below, the Court finds Defendants in contempt yet again. Second, the Court will discuss the appropriate sanctions for the contempt found here, as well as for the contempt found in the Court's March 2025 Memorandum and Order, (Dkt. 448). As discussed below, the Court finds that, based on Defendants' repeated and flagrant violations of the Court's orders and their willful efforts to dissipate assets that the Court ordered preserved for purposes of paying a potential judgment, case-ending sanctions, in addition to compensatory monetary sanctions for Plaintiff's attorneys' fees, are warranted.

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 15 of 300

## I. Plaintiff's Current Contempt Motion Based on the Gelardis' Dissipation of Assets

After Plaintiff filed this lawsuit, the Gelardis sold three of their properties: (1) a home in East Stroudsburg, Pennsylvania for $569,400 on April 29, 2022; (2) a home in Philadelphia, Pennsylvania for $229,000 on December 5, 2023; and (3) a home in Champions Gate, Florida for $760,000 on December 15, 2023. (Attach. & TRO M&O, Dkt. 284, at 8 (citing Levi Decl., Dkt. 279, ¶¶ 10–16).) In January 2024, Plaintiff informed the Court that the Gelardis were planning to sell a fourth property located at 148 Clay Pit Road in Staten Island, New York (the "Staten Island" property). (*Id.* at 3 (citing Pl.'s Attach. Mot., Dkt. 270, at 3).) Plaintiff requested an order of attachment on the Staten Island property and/or an order requiring the Gelardis to place the proceeds from the sale in escrow until the Court rendered a final decision on one of Plaintiff's earlier requests for contempt sanctions. (*Id.* at 3–4 (citing same).) The Court found that the Gelardis were selling their properties with fraudulent intent in order to frustrate Plaintiff's ability to enforce a potential judgment against them, and the Court therefore attached the net proceeds from any potential sale of the Staten Island property. (*Id.* at 8–10, 12.)

The following week, on March 8, 2024, the Court ordered the Gelardis to "notify the Court within three (3) days of entering into any contract to sell their ownership interest in any other property, including the identity(ies) of the buyers and an anticipated closing date." (3/8/2024 Dkt. Order (the "Property Sale Order").)

On May 2, 2025, Plaintiff filed a motion for contempt, (Dkt. 477), alleging that the Gelardis had violated the Property Sale Order by selling their property located at 9 Woods End, Lake Harmony, PA (the "Woods End" property) without notifying the Court, in order "to avoid having the net proceeds [of the sale] attached by this Court." (Pl.'s Mem. in Supp. Mot. for Contempt

("Contempt Mot."), Dkt. 478, at 1, 5.)[6] As evidence, Plaintiff attached public records obtained from the Carbon County, Pennsylvania recorder of deeds. (Roa Decl., Dkt. 479, ¶ 7; Deed, Dkt. 479-1.) Those records show that the sale of the Woods End property was, in fact, recorded on March 20, 2025. (Deed, Dkt. 479-1, at ECF 2.) The records also include an indenture agreement, dated February 27, 2025, between the Gelardis and Evermark Investments, LLC, for the sale of the Woods End property in the amount of $390,000. (*Id.* at ECF 3–5.) The indenture is signed by both Safa and Vito, and their signatures are notarized. (*Id.* at ECF 4.)

Based on this conduct, Plaintiff requests that the Court find Safa and Vito in *criminal* contempt and issue case-ending sanctions. (Contempt Mot., Dkt. 478, at 7–10.)[7]

**A. Procedural Background**

On May 5, 2025, the Court issued an Order to Show Cause "[i]n light of what appear[ed] to be the [Gelardis'] clear and direct defiance of the Court's March 8, 2024 Order, and the need to ensure that the proceeds of any property sales by the [Gelardis] are not dissipated, concealed, or rendered unattachable." (O.S.C., Dkt. 482, at 2.) The Court ordered the Gelardis to provide a summary of their financial information from the last two years, including details about the sales

[6] Plaintiff also alleged that the Gelardis had entered into a contract to sell their property located at 5265 Milford Road, East Stroudsburg, PA (the "Milford Road" property) without informing the Court for the same reason. (Contempt Mot., Dkt. 478, at 1, 5.) Safa responded that they had not sold the Milford Road property. (Dkt. 508 at ECF 3.) On June 26, 2025, the Gelardis filed an emergency motion asking the Court to allow them to sell the Milford Road property due to their severe financial distress. (Dkt. 516.) The Court ruled that the sale could go through, but that "each and every dollar and cent of the proceeds of that sale" were to be deposited into the Court Registration Investment System "*within one (1) business day of receipt of the proceeds of that sale*." (July 2025 M&O, Dkt. 561, at 5–6.)

[7] Plaintiff also requests that the Court issue an order of pre-judgment attachment for the Woods End property and "any other properties sold by the Gelardis." (*Id.* at 14.) The Court has already granted the request as to the Woods End property, (*see* May 2025 Attach. & O.S.C. M&O, Dkt. 500), and denied Plaintiff's request as to any other properties as moot given the Court's Order to Show Cause, (O.S.C., Dkt. 482), which is described next.

of any real property since March 8, 2024. (*Id.*) The Court further ordered the Gelardis to show cause "why they should not be required to deposit all proceeds from any sales of their properties since March 8, 2024, with the Court Registration Investment System ('CRIS') during the pendency of this case." (*Id.* at 3.) On May 19, 2025, the Gelardis filed a letter in response to the Court's Order to Show Cause, (Dkt. 485), along with various financial disclosures, (Dkts. 487, 489–91). They confirmed that they had sold the Woods End property, but argued that the proceeds should not be attached because they were financially destitute and needed those proceeds to avoid insolvency. (Dkt. 485, at 1–2.) Shortly thereafter, the Court ordered the Gelardis to deposit the proceeds of the Woods End property sale into CRIS by June 6, 2025. (May 2025 Attach. & O.S.C. M&O, Dkt. 500, at 1–2.) The Gelardis were further directed that, if they no longer had the entire proceeds from the sale, they must "(1) deposit <u>all</u> remaining proceeds into CRIS, and (2) submit a detailed, itemized summary . . . explaining what they have done with the outstanding proceeds." (*Id.* at 2.) On June 6, 2025, the Gelardis filed a letter explaining that they had spent all of the proceeds from the Woods End property sale. (*See* Dkt. 508, at 3.)

On May 28, 2025, the Gelardis submitted an opposition to Plaintiff's motion for contempt. (Defs.' First Opp'n to Contempt Mot. ("First Opp'n"), Dkt. 498.)[8] They argued that the Court should not hold them in contempt for selling the property without notifying the Court because they had "kept [their former] Attorney Jonath[o]n Warner fully informed at every step," including by updating him "once [they] had . . . a contract." (*Id.* at ECF 1–2.) Safa filed another opposition on June 9, 2025, which argued that the Gelardis should not be held in criminal contempt because "[t]he law does not permit incarceration for unproven civil claims, and this motion should be seen

[8] In their opposition, Defendants also asked the Court to "[v]acate the contempt for transferring the business" and "[d]rop the contempt for the PI investigation." (*Id.* at ECF 3.) The Court denied those requests. (May 2025 Attach. & O.S.C. M&O, Dkt. 500.)

for what it is—an act of intimidation." (Defs.' Second Opp'n to Contempt Mot. ("Second Opp'n"), Dkt. 509, at ECF 1.)

On May 30, 2025, the Court notified the Gelardis that "they ha[d], in effect, waived their attorney-client privilege regarding whether they told their former counsel about the impending sale" of the Woods End property. (May 2025 Attach. & O.S.C. M&O, Dkt. 500, at 3.) The Court ordered Attorney Jonathon Warner ("Warner") to submit a sworn affidavit by August 1, 2025, stating whether the Gelardis "ever advised him that they had sold the Woods End property and, if so, when and how that communication occurred." (7/18/2025 Dkt. Order.) On July 21, 2025, Warner submitted a letter requesting that the Court reconsider its finding that the Gelardis had waived their attorney-client privilege. (Warner Letter, Dkt. 566-1, at 1.) He repeated this request in another letter dated July 31, 2025. (Warner Letter, Dkt. 572, at 2.) On August 25, 2025, the Court denied Warner's requests and affirmed its finding that the Gelardis had waived their attorney-client privilege. (Aug. 2025 M&O, Dkt. 585, at 10.) The Court gave Warner a new deadline of September 2, 2025 to file a responsive affidavit. (*Id.*)

On August 29, 2025, Warner submitted the affidavit requested by the Court. (Warner Decl., Dkt. 590-1.) In it, he stated that the Gelardis had *not* informed him when they entered into a contract to sell the Woods End property. (*Id.* ¶¶ 3–5.) Instead, Warner swore that Safa told him about the contract for the first time on March 11, 2025, after the property had already been sold. (*Id.* ¶ 2.) Finally, he stated that "[a]fter [he] learned about the closing, [he] did not notify the Court that the closing had already occurred because [he] was specifically instructed by Safa not to do so." (*Id.* ¶ 7.)

On September 2, 2025, the Court ordered the Gelardis to respond again to Plaintiff's motion for contempt and to "explain why the Court should not hold them in criminal contempt

and/or issue case-ending sanctions" given their "clear violation" of the Court's Property Sale Order. (9/2/2025 Dkt. Order for Dkt. 590 (emphasis omitted).) On November 11, 2025, the Gelardis submitted a third response. (Third Opp'n, Dkt. 605.) They argue that the Property Sale Order was "ambiguous," that "any failure of notice . . . was counsel's duty and not attributable to [the Gelardis]," and that "the record shows continuous disclosure and good-faith compliance." (*Id.* at ECF 10, 13 (emphasis omitted).)

### B. The Court Finds Defendants Safa and Vito Gelardi in Civil Contempt of the Property Sale Order[9]

"A court may hold a party in [civil] contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016) (citing *Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004)). Here, the Court finds the standard for civil contempt has been met with respect to the Gelardis' sale of the Woods End property.

First, the Court's Property Sale Order was clear and unambiguous. An order "is sufficiently clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" *Id.* (quoting *Drywall Tapers & Pointers v. Loc.*

---

[9] Defendants have not requested a hearing on the contempt allegations per Local Civil Rule 83.6(b). Moreover, it is clear from "unchallenged documentary evidence before the [C]ourt," as well as the Court's prior findings of fact throughout this case, "that [Defendants] ha[ve] continually and wil[l]fully disobeyed court orders." *Sassower v. Sheriff of Westchester Cnty.*, 824 F.2d 184, 190 (2d Cir. 1987). Therefore, "a full-blown hearing is not required before [Defendants] may be held in [civil] contempt." *Id.* Additionally, because the Court ultimately declines to hold Defendants in criminal contempt (as discussed further below), they are not entitled to the procedural protections that a criminal contempt finding or conviction might otherwise require. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831–34 (1994).

*530*, 889 F.2d 389, 395 (2d Cir. 1989)). The exact language of the Court's Property Sale Order reads: "The Individual Defendants shall also notify the Court within three (3) days of entering into any contract to sell their ownership interest in any other property [besides the Gelardis' Staten Island property], including the identity(ies) of the buyers and an anticipated closing date." (3/8/2024 Dkt. Order.) This language could leave no doubt in the Gelardis' minds about precisely what they were required to do. *See CBS Broad. Inc.*, 814 F.3d at 98.

The Gelardis' response states, without any additional explanation, that "[t]he order was ambiguous as applied to [them]." (Third Opp'n, Dkt. 605, at 10.) Because this point was "'adverted to [only] in a perfunctory manner, unaccompanied by [any] effort at developed argumentation,' it must be 'deemed waived,'—or, more precisely, *forfeited*." *In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023) (alterations in original) (internal citations omitted); *Espinoza v. Foundry Workers LLC*, 792 F. Supp. 3d 344, 353 (E.D.N.Y. 2025) (same). Regardless, the argument is meritless, since the Property Sale Order's unambiguous directive was plainly addressed to the "Individual Defendants," Safa and Vito. (*See* 3/8/2024 Dkt. Order.)

Second, the evidence that the Gelardis violated the Court's order is clear and convincing. Proof of noncompliance is "clear and convincing" if it is "adequate to demonstrate a reasonable certainty that a violation occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (citation and internal quotation marks omitted). It is undisputed that on or around December 18, 2024, the Gelardis executed a contract to sell the Woods End property for $390,000. (Third Opp'n, Dkt. 605, at ECF 5.) It is also undisputed that on or around March 10, 2025, the Gelardis closed on the sale of the Woods End property. (*See id.* at ECF 5, 57.)[10] Finally, it is

[10] The Gelardis submitted to the Court an unsigned "Settlement Statement (HUD-1)" for the Woods End property dated March 10, 2025, with a contract sale price of $390,000. (*Id.* at ECF 57–59.)

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 21 of 300

undisputed that the Gelardis did not inform the Court that they had entered into a contract to sell or had sold the Woods End property.[11] (*See generally id.*) Therefore, the undisputed evidence demonstrates with a reasonable certainty—in fact, beyond any doubt—that the Gelardis violated the Court's order.

Third, the Gelardis did not diligently attempt to comply with the Property Sale Order in a reasonable manner. The Gelardis' claim that they kept their former attorney Warner informed about the status of the sale is directly refuted by Warner in a sworn affidavit; indeed, he states that he "was specifically instructed by Safa" *not* to advise the Court of the Woods End property sale, (*see* Warner Decl., Dkt. 590-1, ¶¶ 2–7). The Gelardis thus have put forth no credible evidence that they made any attempt to comply with the Property Sale Order, let alone a diligent attempt.

The Court therefore holds the Gelardis in civil contempt for violating the Property Sale Order by failing to notify the Court of the Woods End property sale.[12]

**C. The Court Declines to Initiate the Criminal Contempt Process at This Time**

"Unlike civil contempt, which is aimed at 'compel[ling] future compliance with a court order' and is 'remedial[] and for the benefit of the complainant,' criminal contempt is 'punitive' and meant to 'vindicate the authority of the court.'" *United States v. Donziger*, 38 F.4th 290, 305 (2d Cir. 2022) (alterations in original) (quoting *Bagwell*, 512 U.S. at 827–28). "Although the power of a court to punish for contempt may be 'inherent,' the power of a United States court

[11] The sale was first brought to the Court's attention on May 2, 2025, when Plaintiff filed its motion for contempt. (Dkts. 477–78.)

[12] Although the Gelardis attempt to blame their former attorney, Warner, for not notifying the Court of the Woods End property sale, (*see* Third Opp'n, Dkt. 605, at ECF 5–6), it is well-established that reliance on counsel is not a defense to an act of contempt, *see SEC v. Musella*, 818 F. Supp. 600, 606–07 (S.D.N.Y. 1993) (collecting cases). The Gelardis' purported reliance on their counsel may be considered only to determine the appropriate sanction. *See id.* The Court therefore addresses this issue in its discussion of sanctions below.

today to impose criminal penalties for contempt of court is provided by criminal statutes." *Mackler Prods., Inc. v. Cohen*, 146 F.3d 126, 129 (2d Cir. 1998) (first quoting *Ex Parte Robinson,* 86 U.S. 505, 510 (1873), and then citing 18 U.S.C. §§ 401, 402). The criminal statute provides:

> A court of the United States shall have the power to punish by fine or imprisonment, or both, at its discretion, such contempt of authority, and none other, as—
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions; [and]
>
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401.

For purposes of procedure, there are two recognized categories of criminal contempt. *See* 3A Wright & Miller's Federal Practice and Procedure Criminal §§ 701, 705 (4th ed. 2025). "Direct" contempt, which occurs in the presence of the court, can be prosecuted through a summary process. *Id.* § 706; Fed. R. Crim. P. 42(b) (the Court can "summarily punish a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies" by issuing an order that "recite[s] the facts, [is] signed by the judge, and [is] filed with the clerk"). "The summary contempt power is generally limited to cases in which 'immediate corrective steps are needed to restore order and maintain the dignity and authority of the court,' and in which there is an 'open, serious threat to orderly procedure.'" *United States v. Cooper*, 353 F.3d 161, 164 (2d Cir. 2003) (internal citations omitted) (first quoting *Johnson v. Mississippi* 403 U.S. 212, 214 (1971); and then quoting *Harris v. United States*, 382 U.S. 162, 165 (1965)).

For "indirect" criminal contempt that occurs outside the presence of the court, or where summary proceedings are otherwise inappropriate, the criminal prosecution must be pursued through a more formal process. *See Bagwell*, 512 U.S. at 833–34; 3A Wright & Miller's Federal

Practice and Procedure Criminal §§ 701, 705, 708; Fed. R. Crim. P. 42(a). The defendant must receive notice, which must "state the time and place of the trial," "allow the defendant a reasonable time to prepare a defense," and "state the essential facts constituting the charged criminal contempt." Fed. R. Crim P. 42(a)(1)(A)–(C). The court must appoint a prosecutor, which in most cases must be an attorney for the government. *See id.* 42(a)(2). Finally, the defendant has the right to a jury trial, and the court can only impose punishment after a guilty finding or verdict. *See id.* 42(a)(3).

Here, although Defendants—in particular, Safa—have committed acts of contempt in the Court's presence, such as lying under oath, to obstruct the administration of justice and disobey the Court's orders or commands, 18 U.S.C. §§ 401(1), (3), the Woods End property sale did not happen in Court's immediate presence, and was thus indirect contempt. This means that before the Court can punish the Gelardis for criminal contempt based on the Woods End sale, they must be afforded the procedural protections of the prosecution-on-notice process. Fed. R. Crim. P. 42(a). The Gelardis have not been afforded those protections, and therefore the Court cannot hold them in criminal contempt at this time. *See CBS Broad. Inc.*, 814 F.3d at 101 ("A district court cannot impose criminal sanctions without affording the defendant the constitutional procedural protections of a jury trial." (citing *Bagwell*, 512 U.S. at 837–38)). Because criminal contempt currently is not an option, the Court need not evaluate whether the evidence is sufficient to meet the substantive standard for criminal contempt. Plaintiff's request for the Court to hold the Gelardis in criminal contempt for selling the Woods End property is denied.

## II. Appropriate Sanctions for Defendants' Civil Contempt

The Court is now tasked with determining the appropriate sanctions for both the instant finding of civil contempt as well as the civil contempt described in the Court's March 2025 Memorandum and Order, as to which the Court has yet to determine sanctions. (*See* Mar. 2025

M&O, Dkt. 448, at 35, 41, 43–44.) In that order, the Court held that: (1) "Companions knowingly violated the March 2023 TRO and Expanded PI by performing IMEs for [a client on the Enjoined Customers List] through March 30, 2023," (*id.* at 38); (2) the Gelardis and Companions violated the Court's March 2023 TRO and Expanded PI "by attempting to partner with Liddie and helping to create IMELR," (*id.* at 38–39, 39 n.33); and (3) Safa violated the Court's April 2022 PI (and the June 2022 amended version of that PI) "by still possessing Plaintiff's customer list in February 2023, and then by emailing it" to a third party, (*id.* at 39–40).[13] Despite finding Defendants in civil contempt, the Court *could not* "enter an order finding them in civil contempt at [that] time because Plaintiff [had] not submitted the required affidavit 'set[ting] out with particularity . . . the claim, if any, for damages occasioned [by Defendants' contemptuous actions] and such evidence as to the amount of damages as may be available to the moving party.'" (Mar. 2025 M&O, Dkt. 448, at 41 (first two alterations added) (first quoting Loc. R. 83.6(a), and then citing Loc. R. 83.6(c)).) The Court ordered Plaintiff to file supplemental briefing setting forth the specific amounts of compensatory damages and attorneys' fees it was claiming. (*Id.* at 43–44, 54.) Plaintiff filed supplemental briefing on July 1, 2025, (Dkts. 521–24), which the Court denied as overbroad, (7/21/2025 Dkt. Order). Plaintiff filed revised supplemental briefing on August 25, 2025. (Dkts. 580–83.) The Gelardis responded on September 15, 2025. (Dkt. 595.)

Based on the Court's contempt findings from the March 2025 Memorandum and Order, Plaintiff seeks case-ending sanctions, lost profits, attorneys' fees, and an immediate entry of judgment. (*See* Contempt Mot., Dkt. 478; Pl.'s Am. Mem. Supp. Compensatory Damages

[13] The Court also found non-parties Liddie and IMELR in civil contempt. (*See* Mar. 2025 M&O, Dkt. 448, at 41–43.) Plaintiff has since entered a settlement agreement with Liddie and IMELR, and "does not seek damages from them in connection with the Court's contempt finding." (Levi Decl., Dkt. 584, at 1 n.1.)

("Compensatory Damages Mem."), Dkt. 582.) For the Woods End property sale, Plaintiff requests case-ending sanctions and attorneys' fees. (*See* Contempt Mot., Dkt. 478.)[14]

For the reasons set forth below, the Court finds that case-ending sanctions are warranted based on Defendants' continuous and brazen pattern of contumacious conduct, which has risen to the level of fraud upon this Court. While the Court finds that Plaintiff has failed to show that lost profits should be awarded as a sanction for Defendants' contempt, given the case-ending sanctions, Plaintiff will have an opportunity to seek lost profits as part of Plaintiff's overall damages request for the underlying conduct charged in its complaint. Finally, the Court awards Plaintiff $105,881.78 in attorneys' fees as a sanction for Defendants' civil contempt in connection with the Court's March 2025 Memorandum and Order.

**A. Case-Ending Sanctions**

1. Legal Standard

"[I]t is firmly established that the power to punish for contempts is inherent in all courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (internal quotation marks and alterations omitted); *see also* 11A Wright & Miller's Federal Practice and Procedure, § 2960 (3d ed. Sep. 2025) ("A court's ability to punish contempt is thought to be an inherent and integral element of its power and has deep historical roots."). This inherent authority is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–631 (1962)); *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991

[14] Plaintiff also requested that the Court find the Gelardis in criminal contempt, which the Court has denied *supra*, and that the Court issue a pre-judgment attachment order for the proceeds of any of the Gelardis' property sales, which the Court granted as to the Woods End property, (*see* May 2025 Attach. & O.S.C. M&O, Dkt 500; *see also* O.S.C., Dkt. 482 (denying Plaintiff's request as to other properties as moot)).

F.3d 361, 367 (2d Cir. 2021). The Court "has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process and assure a level playing field for all litigants." *Shangold v. Walt Disney Co.*, No. 03-CV-9522 (WHP), 2006 WL 71672, at *1 (S.D.N.Y. Jan. 12, 2006) (citing *Chambers*, 501 U.S. at 44), *aff'd*, 275 F. App'x 72 (2d Cir. 2008) (summary order); *see Potts v. Postal Trucking Co.*, No. 17-CV-2386 (ARR) (VMS), 2018 WL 794550, at *2 (E.D.N.Y. Feb. 8, 2018) (compiling cases). Additionally, the Second Circuit has made clear that Federal Rule of Civil Procedure ("Rule") 55(a) empowers district courts to enter a default against defendants that fail to "otherwise defend," which is a term broadly construed. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128–31 (2d Cir. 2011). A defendant can fail to "otherwise defend" by failing to comply with court orders. *Id.* (citing *Cotton v. Slone*, 4 F.3d 176, 179, 181 (2d Cir. 1993); *Eagle Assocs. v. Bank of Montr.*, 926 F.2d 1305, 1310 (2d Cir. 1991)). Similarly, under Rule 41(c), the Court may dismiss a defendant's counterclaims pursuant to Rule 41(b) if the counterclaimant has failed to "comply with . . . a court order." Fed. R. Civ. P. 41(b); *see id.* 41(c).

Harsh sanctions, such as the dismissal of a case or an entry of a default judgment, may be "appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party." *Shangold*, 275 F. App'x at 74 (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); *cf. S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 147–48 (2d Cir. 2010) (affirming district court's imposition of default as sanction under Rule 37 against defendants who acted "willfully and in bad faith" and whose conduct formed a "pattern of prolonged and vexatious obstruction" (citations and internal quotation marks omitted)).

"Fraud upon the court" is a paradigmatic example of extreme misconduct warranting harsh sanctions. *See McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 461

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 27 of 300

(S.D.N.Y. 2002) (acknowledging that case-ending sanctions are "only to be used in extreme situations," but holding that "[w]hen faced with a fraud upon the court, . . . such a[] powerful sanction is entirely appropriate"); *see also Chambers*, 501 U.S. at 42, 44 (affirming lower court's holding that the "wielding of that inherent power [to sanction] is particularly appropriate when the offending parties have practiced a fraud upon the court"). As recognized by other courts in this Circuit, examples of fraud upon the court include "improperly influenc[ing] the trier," "unfairly hamper[ing] the presentation of the opposing party's claim or defense," "l[ying] to the court and [the party's] adversary intentionally, repeatedly, and about issues that are central to the truth-finding process," and "knowingly submit[ting] fraudulent documents to the [c]ourt." *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) (internal citations, quotation marks, and alterations omitted). In these situations, "it can fairly be said that [the offending party] has forfeited his right to have his claim decided on the merits." *McMunn*, 191 F. Supp. 2d at 445. "This is the essence of a fraud upon the court." *Id.*

For the court to grant sanctions based on fraud upon the court, "it must be established by clear and convincing evidence that [the party at fault] has 'sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate' the action." *Scholastic, Inc. v. Stouffer*, 221 F. Supp. 2d 425, 439 (S.D.N.Y. 2002) (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989)), *aff'd*, 81 F. App'x 396 (2d Cir. 2003) (summary order). Courts in this Circuit generally consider the following factors when evaluating if case-ending sanctions for fraud upon the court are warranted: (1) "whether the misconduct was the product of intentional bad faith"; (2) "whether and to what extent the misconduct prejudiced the other party"; (3) "whether there is a pattern of misbehavior, rather than an isolated instance"; (4) "whether and when the misconduct was corrected"; and (5) "whether

further misconduct is likely to continue in the future." *McMunn*, 191 F. Supp. 2d at 446 (citing *Skywark v. Isaacson*, No. 96-CV-2815 (JFK) (NRB), 1999 WL 1489038, at *15 (S.D.N.Y. Oct. 14, 1999) (collecting cases)).

2. Plaintiff's Request for Case-Ending Sanctions

Here, the Court considers the extensive evidence of the Gelardis' willful, bad-faith, contumacious conduct. This "conduct was not isolated but rather formed a pattern of 'prolonged and vexatious'" behavior. *S. New England Tel. Co.*, 624 F.3d at 148 (quoting *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 388 (2d Cir. 1981)) (affirming imposition of default on defendants for bad-faith conduct). Indeed, the Gelardis' efforts to perpetrate a fraud on the Court began with the very first TRO hearing, during which Safa denied under oath that she and Vito had stolen Plaintiff's confidential information and customer list by paying Watchdog's President, Rosenblatt, to provide that information[15]—only to be flatly contradicted moments later by an audio recording of a call between the Gelardis and Rosenblatt confirming that they had been paying Rosenblatt for that information.[16] In a subsequent hearing, the Court admonished the Gelardis for

[15] (4/4/2022 Hr'g Tr., Dkt. 98, at 46:10–47:12 (Safa stating that "[Rosenblatt] took it upon himself to send [her] whatever it is he sent" but averring that she "never used the information" he sent to build her business); *id.* at 86:10–25 (Safa declaring that she "[a]bsolutely . . . did not pay [Rosenblatt] for any of the documents he sent," denying "ask[ing] him to send them," and claiming she did not give him "any reward or benefit of any kind for the documents that he sent to [her] in 2017"); *id.* at 124:7–125:16 (Safa attempting to "plead the Fifth" when asked whether she believed the information Rosenblatt sent her "was confidential business information of IME WatchDog," admitting she "paid Rosenblatt for this information," but denying doing so "pursuant to some agreement with Mr. Rosenblatt that he would give [her] this information in exchange for money").)

[16] The Court noted: "I just heard a recording where it is clear to me the defendants, Mr. and Mrs. Gelardi, are acknowledging that they have this ongoing relationship or had it with Mr. Rosenblatt where they were willing to pay him money to get information and then provide him safe haven by bringing him over to their company and possibly paying him $2500 in that moment . . . ." (4/4/2022 Hr'g Tr., Dkt. 98, at 154:21–155:3.) As a result, the Court concluded, "I don't believe for a moment that [Safa] thought that the information Rosenblatt was sharing with [her], even if it was volunteered in the beginning, was anything other than confidential. . . . I believe that [she] and [her] husband knew full well [they] were essentially stealing this information

attempting to "perpetrate . . . a fraud on this [C]ourt" by establishing CES as an attempt to get around the Court's TRO on Companions. (3/27/2023 Hr'g Tr., Dkt. 199, at 120:17–20.) The Gelardis' scheme with IMELR, which is described in detail in the Court's March 2025 Memorandum and Order and established by clear and convincing evidence, is an even more flagrant instance of fraud upon the Court. (*See* Mar. 2025 M&O, Dkt. 448, at 16–23, 54.) The Court has imposed many lesser sanctions, none of which have proven effective against the Gelardis' "undeterrable resolve to circumvent this Court's Orders and improperly use Plaintiff's trade secrets." (*Id.* at 51.) And the Court has given the Gelardis more than sufficient warning that their continued contemptuous conduct could result in case-ending sanctions. (*See, e.g.*, *id.* at 50 n.35 ("The Court might revisit Plaintiff's request for case-ending sanctions . . . ."); O.S.C., Dkt. 482, at 4–5 ("*Failure to timely comply with any direction in this Order could result in . . . additional sanctions, including case-ending sanctions—i.e., the issuance of a default judgment against Defendants* . . . .").)

The Gelardis argue that their noncompliance can be blamed on their former attorney Warner, and that the "record shows continuous disclosure and good-faith compliance." (Third Opp'n, Dkt. 605, at ECF 10.) The Court disagrees. Even if the Court were persuaded that Warner was responsible for the Gelardis' persistent, contumacious conduct, the law is clear that "a client-principal is 'bound by the acts of his lawyer agent,'" *Chevron*, 833 F.3d at 150 (quoting *Link*, 370

---

or buying it from Mr. Rosenblatt at least as of 2019. . . . [I]t makes sense to me that [Safa] started paying for this information to grow [her] business just as [she] said in the phone call with Mr. Rosenblatt, that in fact it sounds like [her] business took off from 2019, which coincided with when [she was] getting all this information from Mr. Rosenblatt." (*Id.* at 155:15–156:15.) Although the Court admitted the recording into the record, (*see id.* at 131:24), Plaintiff did not prepare a written transcript of the recording and the recording's contents were not transcribed as part of the hearing transcript, (*see id.* at 132:7 (noting only "Audio recording played")).

U.S. at 634), and "even innocent clients may not benefit from the fraud of their attorney," *id.* And here, the Court does not find that Warner was responsible.

The Woods End property sale provides the clearest example of why the Gelardis' reliance-on-counsel argument is disingenuous at best. The Gelardis claim that they provided "continuous written notice" to Warner about the status of the sale. (Third Opp'n, Dkt. 605, at ECF 13.) Despite offering several emails and texts between the Gelardis and Warner regarding the Gelardis' efforts to sell the Woods End property, (*id.* at ECF 61–63), these messages ended in January 2025 and none of them indicated that the Gelardis had entered into a contract to sell the Woods End property, which occurred in December 2024 and closed in March 2025. Contrary to Defendants' claim, these messages do nothing to "resolve[] this dispute" or show that "Warner had months of notice" that the Gelardis had entered into a contract of sale. (*Id.* at ECF 4.) Indeed, they conspicuously do not include any such messages. And, notably, the Gelardis do not allege that they ever affirmatively instructed Warner to inform the Court. (*See generally* First Opp'n, Dkt. 498; Second Opp'n, Dkt. 509; Third Opp'n, Dkt. 605; Warner Decl., Dkt. 590-1, ¶ 7.)

Given that Safa is "wholly uncredible as a witness," *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232 n.4, the Court credits Warner's sworn affidavit as a more reliable source of evidence than the Gelardis' unsupported, self-serving assertions. Warner explains that on March 11, 2025, the Gelardis informed him by phone that they had sold the Woods End property. (Warner Decl., Dkt. 590-1, ¶ 2.) On March 14, 2025, Warner forwarded the Gelardis a copy of the Court's Property Sale Order. (*Id.* Ex. 1, at ECF 6.) In his email, Warner stated:

> Judge Chen's March 8 Order below, which I sent to you on March 8, 2024, and which you replied to, required that you notify the Court within 3 days of entering into a contract for the sale of "any of" your properties. You have advised me that on Monday of this week you closed on the sale of one of the two PA properties, but you never sent me a copy of the contract, much less within "three days" of its being

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 31 of 300

> signed. How do you expect me to defend you when the next contempt motion is made (as it surely will)?

(*Id.*) The Gelardis did not respond to this email. (*Id.* ¶ 9.) On or around March 21, 2025, Warner's bank processed and cleared a $10,000 check from the Gelardis for "New York Coruption [sic]." (*Id.* at ECF 2–4.)[17]

Warner did not notify the Court that the property had sold because he "was specifically instructed by Safa not to do so." (Warner Decl., Dkt. 590-1, ¶ 7.) According to Warner, he was "unsure what to do . . . other than to move to be relieved as counsel at a time when such application would least prejudice [his] clients." (*Id.* ¶ 8.) On April 17, 2025, Warner filed a motion seeking to withdraw as counsel, along with his firm, Warner & Scheuerman. (*See* Warner Decl., Dkt. 464.) In his declaration in support of the motion, Warner stated that he could not, "in good conscience[,] continue to represent Defendants (and zealously advocate for them) while saddled with the concern that [his] continued representation [would] cause [him] to be accused of engaging in wrongdoing or in breaching any duties either to [his] clients or the Court." (*Id.* ¶ 10.)

Thus, contrary to the Gelardis' claim that they continuously disclosed and attempted to comply with the Court's order in good faith, (Third Opp'n, Dkt. 605, at ECF 10), the evidence shows that they in fact actively tried to evade the Court's order both by concealing information from their attorney and by instructing their attorney to withhold that information from the Court and Plaintiff after it was belatedly disclosed to him, (Warner Decl., Dkt. 590-1, ¶ 7).

Defendants' misconduct with respect to the Woods End property sale is emblematic of their conduct throughout this case and starting from the very beginning. (*See, e.g.*, 4/4/2022 Hr'g Tr.) Plaintiff and the Court have had to chase Defendants to get to the truth and to uncover and

---

[17] The check itself is dated October 13, 2025, but Defendants explain that this date was an error. (Third Opp'n, Dkt. 605, at ECF 64; Dkt. 564, at ECF 1–2.)

deter their pernicious non-compliance at every turn. Every motion and Court order has been met with obfuscation, deception, concealment, and defiance by Defendants. Defendants' persistent efforts to obstruct the progress of this matter, while simultaneously dissipating assets that might be used to pay a judgment, if allowed to continue, will almost certainly prevent this matter from reaching a fair and just resolution on the merits. Because Defendants' contumacious conduct has "infected the evidentiary record and continues to impair the search for truth," case-ending sanctions, "it turns out, represents the only fair resolution of this case." *Esposito v. Suffolk Cnty. Cmty. Coll.*, 517 F. Supp. 3d 126, 127 (E.D.N.Y. 2021).

Case-ending sanctions are a harsh remedy, but the Gelardis' misconduct is well within the range of conduct that other courts in this Circuit have deemed to warrant the harshest sanctions. *See, e.g.*, *McMunn*, 191 F. Supp. 2d at 446–62 (imposing case-ending sanctions where the plaintiff lied and convinced others to lie about issues material to the case); *Skywark*, 1999 WL 1489038, at *1–18 (finding case-ending sanctions appropriate where the plaintiff violated discovery order and lied throughout discovery); *Ptak Bros. Jewelry v. Ptak*, No. 06-CV-13732 (DC), 2009 WL 807725, at *7–11 (S.D.N.Y. Mar. 30, 2009) (issuing case-ending sanctions because the defendants demonstrated a history of failing to comply with court orders, made misrepresentations to the court, and refused to comply with discovery obligations); *Abbott Lab'ys v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2019 WL 3281324, at *4–15 (E.D.N.Y. May 2, 2019) (recommending case-ending sanctions where defendants purposefully withheld documents and lied in deposition testimony), *report and recommendation adopted*, 2020 WL 1429472 (E.D.N.Y. Mar. 24, 2020), *aff'd sub nom. Abbott Lab'ys v. H&H Wholesale Servs., Inc.*, No. 23-446-CV, 2024 WL 4297472 (2d Cir. Sep. 26, 2024) (summary order); *Lawrence v. City of New York*, No. 15-CV-8947 (WHP), 2018 WL 3611963, at *1–3, *6–8 (S.D.N.Y. July 27, 2018) (imposing

case-ending sanctions where the plaintiff staged photos of the incident alleged in the complaint and engaged in deceptive conduct that undermined her credibility); *Esposito*, 517 F. Supp. 3d at 127, 135–37 (issuing case-ending sanctions where the plaintiff "altered, forged and tampered with evidence, and repeatedly perjured herself to conceal these misdeeds").

Finally, while the Court strongly prefers that cases be resolved on their merits, the Court has no hesitation about imposing case-ending sanctions here because it has already found, many times, that Plaintiff is likely to succeed on the merits. That conclusion is based on the extensive findings of fact the Court has made for the numerous TROs, PIs, and contempt orders in this case. (*See, e.g.*, 4/5/2022 Dkt. Order (finding, after an in-person hearing in April 2022, that Plaintiff had "demonstrated likelihood of success on the merits of its claims against Defendants," and that Defendants "clearly and convincingly" appeared to have "wrongfully obtained [Plaintiff's] trade secrets"); 7/1/2024 Dkt. Order (noting that the Court would not require Plaintiff to post bond in connection with motion for TRO and preliminary injunction because the Court had "determined it very likely that Plaintiff[] will prevail on the merits of [its] claims"); Mar. 2025 M&O, Dkt. 448, at 53 (concluding that "Plaintiff is highly likely to prevail on the merits in this litigation")); *IME Watchdog, Inc.*, 2022 WL 1525486, at *6 (applying the general standard for preliminary injunctions and "reiterat[ing the Court's] finding, made at the close of the show-cause hearing, that Plaintiff has established a likelihood of success"); *IME Watchdog, Inc.*, 732 F. Supp. 3d at 240 (applying the heightened standard for mandatory injunctions and finding "that Plaintiff's customer lists constitute trade secrets and that Plaintiff is likely to succeed on the merits of their trade secret claims against Defendants," and that "there are volumes of undisputed evidence that Defendants did not gain Plaintiff's customers through publicly accessible databases, but rather, by paying Plaintiff's employee, Rosenblatt, to steal them for Defendants"). The Court has held at least *seven*

show cause or evidentiary hearings, at which both parties have had the opportunity to present documentary evidence and examine (and cross-examine) witnesses. (*See* 4/4/2022 Min. Entry; 3/27/2023 Min. Entry; 5/4/2023 Min. Entry; 5/29/2024 Min. Entry; 7/29/2024 Min. Entry; 9/25/2024 Min. Entry; 4/2/2025 Min. Entry.) Neither party can be heard to complain that they have not had their day in court. Based on the well-developed record, and even despite the Gelardis' persistent efforts to impair the Court's search for truth, the Court would almost certainly find that Plaintiff is entitled to judgment as a matter of law.

Therefore, under this Court's inherent powers, as well as Rules 41 and 55 of the Federal Rules of Civil Procedure, the Court orders case-ending sanctions against the Gelardis. Along with the other remaining Defendants in this case—Companions, CES, and IME M&C—the Gelardis are adjudged to be in default. Safa's counterclaims, (Dkt. 547), are dismissed, and her request for the Court to take judicial notice "of a pattern of bad faith litigation, coercive settlement practices, and extrajudicial intimidation," (Dkt. 569), is denied.

**B. Lost Profits**

In addition to case-ending sanctions, Plaintiff seeks compensation for its lost profits related to the conduct described in the Court's March 2025 Memorandum and Order. (Compensatory Damages Mem., Dkt. 582, at 1–4.) As discussed below, the Court denies this request.

1. <u>Legal Standard</u>

"A civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citations omitted). "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id.* at 1353 (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)). Lost profits may be "an

appropriate measure of actual damages" for civil contempt sanctions "so long as [the lost profits] can be traced back to the contemnor's contemptuous actions." *Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 2462333, at *3 (S.D.N.Y. June 13, 2019) (citing *Grand v. Schwarz*, No. 15-CV-8779 (KMW), 2018 WL 4026735, at *3 (S.D.N.Y. Aug. 18, 2018); *Upjohn Co. v. Medtron Lab'ys, Inc.*, 894 F. Supp. 126, 135 (S.D.N.Y. 1995)). To prove such damages, the "moving party must demonstrate a causal connection between the contemnor's contemptuous behavior and the alleged damages." *Broker Genius*, 2019 WL 2462333, at *3 (citations omitted).

2. Plaintiff's Lost-Profits Claim

Plaintiff requests $1,077,898.46 in sanctions as compensation for its lost profits from March 10, 2023 to March 31, 2025 related to Defendants' conduct described in the Court's March 2025 M&O. (Compensatory Damages Mem., Dkt. 582, at 1–4.) Of that figure, Plaintiff attributes $973,574.40 of the alleged lost profits to Companions, and $104,324.06 to IMELR. (*Id.* at 3–4.)

For Companions, Plaintiff estimates its lost profits using the following assumptions and calculations:

- First, Plaintiff alleges that "[b]etween 2018 and 2022 . . . Defendants stole at least sixty-seven (67) customers from Plaintiff." (*Id.* at 1.)

- Second, Plaintiff states that "[d]uring the period of contempt spanning from March 10, 2023 through March 31, 2025, . . . Defendants continued to serve some of these sixty-seven (67) customers." (*Id.* at 2 (citing Mar. 2025 M&O, Dkt. 448).)

- Third, Plaintiff extrapolates Companions' sales for the period between March 10, 2023, and March 31, 2025, assuming that Companions' yearly revenue is $883,046 based on Companions' revenue from 2022. (*Id.* at 3.)

- Fourth, Plaintiff relies on the Court's previous finding that, as of the March 27, 2023 hearing, "98.3% of the total revenue Defendants ha[d] generated since Companions' inception was obtained through sales from Plaintiff's former customers." (*Id.* at 3 (citing *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2023 WL 6958855, at *4 (E.D.N.Y. Oct. 20, 2023)).) Plaintiff thus assumes that 98.3% of

Companions' revenue between March 10, 2023 and March 31, 2025 also came from Plaintiff's former customers. (*Id.* at 3–4.)

- Fifth, Plaintiff asserts that it charges 5.59% more than Companions for each IME, and so it asserts that "Plaintiff's revenue . . . would have been 5.59% higher than Companions' revenue." (*Id.* at 3–4.)

- Sixth, Plaintiff calculates its estimated lost profit by applying its typical profit margin to the estimated revenue. (*Id.* at 3–4.)[18]

For IMELR, Plaintiff estimates its lost profits using similar assumptions and calculations:

- First, Plaintiff estimates IMELR's revenue for "services it performed for Plaintiff's former customers," (Compensatory Damages Mem., Dkt. 582, at 4), based on a "summary of all of IMELR's income which IMELR produced to Plaintiff in response to a subpoena," (Levi Decl., Dkt. 584, ¶ 19). That summary shows "[a]ll payments made to date" to IMELR from 14 customers. (Ex. D to Levi Decl., Dkt. 584-4.) The summary is not dated. (*See generally id.*)

- Second, Plaintiff estimates that its revenue would have been 5.59% higher than IMELR's if it had served those same customers because Plaintiff charges 5.59% more per IME. (Compensatory Damages Mem., Dkt. 582, at 4.)

- Third, Plaintiff calculates its estimated lost profits by applying its typical profit margin to the estimated revenue. (*Id.*)

The Gelardis argue that Plaintiff's lost profits estimate is speculative and based on "[i]nflated and [u]nreliable [i]nputs." (Defs.' Resp. to Compensatory Damages Mem., Dkt. 595, at ECF 1–3.) They state that Plaintiff should be awarded $0 because Plaintiff failed to prove "actual, net loss cause by contempt, proven with reasonable certainty." (*Id.* at ECF 1.) The Gelardis also argue that they should not be made to pay damages based on IMELR's revenues because Plaintiff already settled with IMELR and Liddie. (*Id.* at ECF 2–3.)

Here, the Court agrees with the Gelardis that Plaintiff's proposed sanctions for lost profits would not be compensatory because they are not appropriately "calibrat[ed] . . . to the injuries

[18] Plaintiff's profit margin is redacted in the publicly-filed document. (*See id.* at 3; *see also* Dkt. 581 (sealed and unredacted version).)

inflicted on the victims of the *contumacious* conduct." *See Terry*, 159 F.3d at 94 (emphasis added). For example, it is untenable to assume that Companions continued making revenue at its 2022 level after the Court enjoined Companions in 2023 from serving nearly all of the customers that formed the basis for that revenue. (3/27/2023 Dkt. Order.) And, contrary to Plaintiff's assumptions, the Court did *not* find that, between March 2023 and March 2025, Companions continued to serve all of the customers that Defendants had misappropriated from Plaintiff. At most, the Court found that Companions continued performing IMEs for *one* such customer. (*See* Mar. 2025 M&O, Dkt. 448, at 14, 37–38.) And the Court only found that Companions continued serving that customer through March 30, 2023, which was 20 days after the Court's TRO and three days after the Court's injunction. (*See id.*) These findings do not justify awarding Plaintiff the 24 months of alleged lost profits it claims, (Compensatory Damages Mem., Dkt. 582, at 4). Therefore, based on these untenable assumptions and others, the Court cannot award Plaintiff the lost-profits sanctions it seeks on compensatory grounds.

Most importantly, because the Court has decided to issue case-ending sanctions against the Gelardis, Plaintiff can now seek to recover its lost profits as damages for its underlying claims. (*See* 11/4/2024 Dkt. Order (clarifying that where there is an overlap between the damages "caused by the contumacious conduct at issue and the damages caused by Defendants' conduct that forms the basis of Plaintiff['s] underlying claims," Plaintiff would not be precluded from seeking the latter).) Awarding lost profits as sanctions here would risk allowing Plaintiff double recovery. *See Broker Genius Inc.*, 2019 WL 2462333, at *3 (declining to award lost profits damages as sanction for contempt when jury award included lost profits for the same time period).

For the same reasons, the Court will also not award Plaintiff lost-profits sanctions related to IMELR. The Court therefore does not address Plaintiff's argument that it can recover its lost

profits related to IMELR from the Gelardis and Companions instead of Liddie and IMELR. (*See* Levi Decl., Dkt. 584, at 1 n.1.)

**C. Attorneys' Fees**

Plaintiff's motion for contempt regarding the Woods End property sale asks the Court to order "reasonable attorneys' fees and costs incurred in connection with the instant motion." (Contempt Mot., Dkt. 478, at 2.) However, it provides no information about the amount of attorneys' fees and costs it has incurred. Plaintiff did not attach an affidavit setting forth its damages pursuant to Local Rule 83.6. (*See generally* Roa Decl., Dkt. 479 (supporting contempt motion with no description of damages sustained such as attorneys' fees or costs).) The Court has made Plaintiff aware of this requirement multiple times, *see, e.g.*, 732 F. Supp. 3d at 248, and so the Court takes Plaintiff's failure to include the requisite affidavit as a concession that Plaintiff is not seeking damages, including attorneys' fees and costs, in association with its filings regarding the Woods End property sale.

The Court will, however, grant Plaintiff's request for attorneys' fees associated with the contempt found in the March 2025 M&O.[19] Again, given the complex procedural history of this case, it is helpful to first summarize the relevant events and filings. On March 6, 2024, Plaintiff filed a contempt motion alleging that Defendants were continuing to serve a customer or customers on the Enjoined Customers List, (Dkt. 288). (*See* Mar. 2025 M&O, Dkt. 448, at 7.) On

[19] The March 2025 M&O addressed both Plaintiff's motion for contempt, (Dkt. 288), as well as its motion for a TRO and PI, (Dkt. 353). As this Court has previously held, a party who prevails on a motion for a preliminary injunction under the Defend Trade Secrets Act is *not* entitled to attorneys' fees for that motion until they obtain a final judgment or establish that they will not obtain a final judgment. (Nov. 2022 M&O, Dkt. 117, *reported at IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 16636766 (E.D.N.Y. Nov. 2, 2022).) Therefore, the Court only considers Plaintiff's attorneys' fees associated with its motion for contempt, but not its motion for a TRO and PI.

April 15, 2024, the Court directed Plaintiff to file a supporting affidavit. (4/15/2024 Dkt. Order.) On April 21 and May 3, 2024, Plaintiff filed supplemental declarations from Levi. (Dkts. 317, 321.) The Court held three hearings related to the contempt allegations, in May 2024, July 2024, and September 2024. (*See* Mar. 2025 M&O, Dkt. 448, at 6–11, 54.) In the March 2025 M&O, the Court found Defendants in contempt, but also found Plaintiff's briefing on compensatory damages (including attorneys' fees) insufficient and ordered Plaintiff to file supplemental briefing setting forth the actual damages it incurred related to the contempt proceedings. (*Id.* at 43 (citing Pl.'s Post-Hr'g Letter, Dkt. 411, at 8).) Plaintiff filed revised supplemental briefing on August 25, 2025. (Dkts. 580–83.) Plaintiff states that it "incurred $151,259.69 in attorneys' fees since March 28, 2023, in connection with Defendants' contempt." (Compensatory Damages Mem., Dkt. 582, at 4 (citing Levi Decl., Dkt. 584, ¶ 23).) The Gelardis responded on September 15, 2025. (Defs.' Resp. to Compensatory Damages Mem., Dkt. 595.)

1. <u>Legal Standard</u>

As stated above, a civil contempt sanction can "serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *Terry*, 886 F.2d at 1352. An award of attorneys' fees and costs to the contempt victim can "serve either goal—the coercive or the compensatory." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020); (*see also, e.g.*, Sep. 2024 M&O, Dkt. 394 (issuing contempt sanction of attorneys' fees and costs)).

Once a court has determined that an attorneys' fees award is appropriate, it must calculate the presumptively reasonable fee using the "lodestar" method. *See Treyger v. First Class Furniture & Rugs Inc.*, No. 21-CV-2902 (EK) (RLM), 2022 WL 18356256, at *5 (E.D.N.Y. July 14, 2022) (applying the lodestar method to calculate presumptively reasonable attorneys' fees on contempt motion), *report and recommendation adopted*, 2023 WL 199698 (E.D.N.Y.

Jan. 17, 2023); *see also id.* (collecting cases). The lodestar is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Stanczyk v. City of New York*, 752 F.3d 273, 284 (2d Cir. 2014) (quoting *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)).

"District courts have broad discretion, using 'their experience with the case, as well as their experience with the practice of law, to assess the reasonableness' of each component of a fee award." *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 94 (E.D.N.Y. 2012) (quoting *Fox Indus., Inc. v. Gurovich*, No. 03-CV-5166 (TCP) (WDW), 2005 WL 2305002, at *2 (E.D.N.Y. Sep. 21, 2005)). Among other considerations, the district court must determine a reasonable hourly rate for the attorneys' work. Reasonable hourly rates are informed in part by the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). In assessing fees, then, district courts "bear in mind all of the case-specific variables that . . . courts have identified as relevant to the reasonableness of [attorneys'] fees in setting a reasonable hourly rate." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008) (emphasis omitted). Ultimately, a "presumptively reasonable [attorneys'] fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (citation and internal quotation marks omitted).

Moreover, a fee applicant bears the burden of demonstrating the hours expended and the nature of the work performed through contemporaneous records. *Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 148 (2d Cir. 2014) (citing *N.Y. State Ass'n for Retarded Child., Inc. v.*

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 41 of 300

*Carey*, 711 F.2d 1136, 1147–48 (2d Cir. 1983)). If a court finds that claimed hours are "excessive, redundant, or otherwise unnecessary," it should exclude those hours in calculating a fee award. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). "A district court is not, however, required to set forth item-by-item findings concerning what may be countless objections to individual billing items, and may either subtract uncompensable hours or use percentage reductions to eliminate excessive or duplicative hours." *Marshall v. Reisman*, No. 11-CV-5764 (AAR) (VV), 2013 WL 1563335, at *4 (E.D.N.Y. Mar. 25, 2013) (citations and internal quotation marks omitted), *report and recommendation adopted*, 2013 WL 1561478 (E.D.N.Y. Apr. 12, 2013).

2. Plaintiff's Attorneys' Fees Claim

Adhering to the lodestar method, the Court calculates a presumptively reasonable attorneys' fees award by first considering the reasonable hourly rate and then considering the reasonable number of hours required. Here, Plaintiff seeks hourly rates of $300 for Emanuel Kataev and $450 for Jamie Felsen of Milman Labuda Law Group PLLC ("MLLG"), (Levi Decl., Dkt. 584, ¶ 24), and $300 for work performed by Sage Legal LLC ("Sage"), (*id.* ¶ 25). The Gelardis do not argue that these rates are unreasonable. (*See generally* Defs.' Resp. to Compensatory Damages Mem., Dkt. 595.)

As the Court has already held, "MLLG's hourly rates [of $300 and $450] are in-line with the prevailing hourly rates for attorneys within this District." (Sep. 2024 M&O, Dkt. 394, at 11–12.) The Court incorporates its reasoning and analysis from that prior decision and again holds that, "based on the Court's knowledge of the case and the attorneys' performance," MLLG's hourly rates are reasonable. (*Id.* at 12.) For the same reason, Sage's hourly rate of $300 is also reasonable.

Regarding the number of hours, Plaintiff seeks attorneys' fees for 250.6 hours of work from MLLG and 128.3 hours of work from Sage. (Levi Decl., Dkt. 584, ¶¶ 24–25.) Plaintiff

attaches MLLG's "billing descriptions provided in the invoices Plaintiff received," and Sage's "invoices to Plaintiff." (*Id.*; MLLG Billing Records, Dkt. 584-5; Sage Invoices, Dkt. 584-6.) The Gelardis argue that Plaintiff's request is "overbroad," that any attorneys' fee award should be "limit[ed] to compliance-related tasks," and that Plaintiff's requested fee should be reduced accordingly. (Defs.' Resp. to Compensatory Damages Mem., Dkt. 595, at ECF 4; *see also id.* at ECF 6 (arguing that "if fees are considered at all, they must be task-specific, non-duplicative, and reduced").)

The Court agrees with the Gelardis. As noted above, the Court "is not required to 'set forth item-by-item findings concerning what may be countless objections to individual billing items.'" *Gagasoules v. MBF Leasing LLC*, 296 F.R.D. 107, 111 (E.D.N.Y. 2013) (quoting *Siracuse v. Program for the Dev. of Hum. Potential*, No. 07-CV-2205 (CLP), 2012 WL 1624291, at *26 (E.D.N.Y. Apr. 30, 2012)). Nonetheless, a review of MLLG's billing descriptions shows that Plaintiff seeks to recover for numerous entries unrelated to Defendants' alleged non-compliance as set forth in the Court's March 2025 M&O. (*See generally* MLLG Billing Records, Dkt. 584-5.) MLLG's time entries include, for example, drafting a letter requesting to extend discovery; emailing the client and opposing counsel about settlement; and a call with opposing counsel about discovery deficiencies, among other things. (*See id.*) The Court is *yet again* "troubled by MLLG's 'efforts to inappropriately inflate their attorneys' fees,' . . . by including so many extraneous time entries." (Sep. 2024 M&O, Dkt. 394, at 14–15 (quoting *Wang v. XBB, Inc.*, No. 18-CV-7341 (PKC) (ST), 2023 WL 2614143, at *5 (E.D.N.Y. Mar. 23, 2023), *reconsideration denied*, 2024 WL 184263 (E.D.N.Y. Jan. 17, 2024)).) Similarly, a review of Sage's invoices shows numerous unrelated entries, as well as pervasive block-billing. (*See generally* Sage Invoices, Dkt. 584-6.) Sage's time entries include, for example, correspondences about settlement, judgment enforcement

strategy, and discovery; conducting legal research regarding cybersquatting; and reviewing various third-party subpoena responses, among other things; and many of the entries include more than ten different tasks billed in a single block. (*Id.*)

"[I]n dealing with such surplusage, the [C]ourt has the discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" *Gagasoules*, 296 F.R.D. at 111 (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998)). As a result, the Court reduces the number of hours for which Plaintiff seeks attorneys' fees by 30%. *See Broker Genius*, 2019 WL 3773856, at *3 (reducing attorneys' fees award for contempt sanction by 30% to account for inclusion of work unrelated to contempt motion, vague entries, and block-billing).

The Court therefore holds that Plaintiff may recover $105,881.78 as reasonable attorneys' fees related to the contempt proceedings described in the March 2025 M&O, which represents a 30% reduction from the $151,259.69 Plaintiff seeks.

**D. Immediate Entry of Judgment**

Finally, Plaintiff asks the Court to enter an immediate judgment for any monetary sanctions the Court issues. (Compensatory Damages Mem., Dkt. 582, at 4–6.) Plaintiff correctly observes that the Court previously granted Plaintiff's motion for entry of judgment regarding an earlier contempt sanction of attorneys' fees and costs that Defendants had failed to pay. (*Id.* (citing Aug. 2025 M&O, Dkt. 578).) The reasoning behind the Court's earlier decision applies with equal force here. Therefore, for the reasons stated in that Memorandum and Order, (Dkt. 578), the Court grants Plaintiff's request for immediate entry of judgment pursuant to Rule 58(d) and 58(a).

## CONCLUSION

For the reasons set forth above, Plaintiff's motion for contempt, (Dkt. 477), is granted in part and denied in part:

1. The Court denies Plaintiff's request for the Court to hold the Gelardis in criminal contempt.

2. The Court finds the Gelardis in civil contempt and orders case-ending sanctions. Default will be entered against the Gelardis under Rule 55(a) of the Federal Rules of Civil Procedure. The Court orders Plaintiff to file a motion for default judgment pursuant to Rule 55(b)(2) within thirty (30) days of this Memorandum and Order. The Gelardis shall submit any objections to Plaintiff's proposed judgment within thirty (30) days thereafter.

3. Safa's counterclaims, (Dkt. 547), are dismissed pursuant to Rule 41(c), and Safa's request for the Court to take judicial notice, (Dkt. 569), is denied.

4. The Court sanctions Defendants $105,881.78 for the contempt found in the Court's March 2025 Memorandum and Order, (Dkt. 448), which represents Plaintiff's reasonable associated attorneys' fees. The Court grants Plaintiff's request for immediate entry of judgment as to that amount, (Dkt. 582), pursuant to Rule 58(d) and 58(a).

The Clerk of Court is respectfully directed to enter default against all Defendants pursuant to Rule 55(a). The Clerk of Court is also respectfully directed to enter judgment in favor of Plaintiff against Defendants for $105,881.78 pursuant to Rule 58(d) and 58(a).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: February 9, 2026
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

v.

SAFA ABDULRAHIM GELARDI, et al.,

Defendants.
-------------------------------------------------------------X

SECOND JUDGMENT

22-CV-1032 (PKC) (JRC)

A Memorandum and Order of the Honorable Pamela K. Chen, United States District Judge, having been filed on February 9, 2026, granting in part and denying in part Plaintiff's motion for contempt, (Dkt. 477); it is

ORDERED and ADJUDGED that Plaintiff's motion for contempt, (Dkt. 477), is granted in part and denied in part as follows:

1. The Court denies Plaintiff's request for the Court to hold the Gelardis in criminal contempt.

2. The Court finds the Gelardis in civil contempt and orders case-ending sanctions. Default will be entered against the Gelardis under Rule 55(a) of the Federal Rules of Civil Procedure. The Court orders Plaintiff to file a motion for default judgment pursuant to Rule 55(b)(2) within thirty (30) days of this Memorandum and Order. The Gelardis shall submit any objections to Plaintiff's proposed judgment within thirty (30) days thereafter.

3. Safa's counterclaims, (Dkt. 547), are dismissed pursuant to Rule 41(c), and Safa's request for the Court to take judicial notice, (Dkt. 569), is denied.

4. The Court sanctions Defendants $105,881.78 for the contempt found in the Court's March 2025 Memorandum and Order, (Dkt. 448), which represents Plaintiff's reasonable associated attorneys' fees. The Court grants Plaintiff's request for immediate entry of judgment as

to that amount, (Dkt. 582), pursuant to Rule 58(d) and 58(a); it is also

ORDERED and ADJUDGED that judgment is entered in favor of Plaintiff against Defendants for $105,881.78 pursuant to Rule 58(d) and 58(a).

Dated: Brooklyn, New York
February 10, 2026

Brenna B. Mahoney
Clerk of Court

By: */s/Jalitza Poveda*
Deputy Clerk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

- against –

SAFA ABDULRAHIM GELARDI, et al.,

Defendants.
---------------------------------------------------------X

22-CV-1032 (PKC) (JRC)

**CERTIFICATE OF DEFAULT**

I, Brenna B. Mahoney, Clerk of the Court of the United States District Court for the Eastern District of New York, do hereby certify that Defendants Safa Abdulrahim Gelardi, Vito Gelardi, IME Companions LLC, Client Exam Services LLC, and IME Management & Consulting LLC, have not filed any answer or otherwise moved with respect to the Complaint herein. The default of Defendants is hereby noted pursuant to Rule 55(a) of the Federal Rules of Civil Procedure.

Dated: Brooklyn, New York
February 11, 2026

BRENNA B. MAHONEY, Clerk of the Court

By: *Jalitza Poveda*
Deputy Clerk

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
IME WATCHDOG, INC.,

Plaintiff,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS LLC, CLIENT EXAM SERVICES LLC, and IME MANAGEMENT & CONSULTING LLC,

Defendants.
-----------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Plaintiff IME Watchdog, Inc. ("Plaintiff" or "Watchdog") brings this action against Defendants Safa Abdulrahim Gelardi ("Safa"), Vito Gelardi ("Vito"), Gregory Elefterakis ("Elefterakis"), Roman Pollak ("Pollak"), Anthony Bridda ("Bridda"), IME Companions LLC ("Companions"), Client Exam Services LLC ("CES"), and IME Management & Consulting LLC ("IME M&C"). Before the Court are Plaintiff's motions filed in March and June 2024: (1) to hold Defendants Safa and Vito Gelardi and Companions (collectively, "Defendants"), non-party Eugene Liddie ("Liddie"), and non-party IME Legal Representatives ("IMELR") in contempt, and (2) for a preliminary injunction. The Court now makes Findings of Fact and Conclusions of Law, pursuant to Federal Rules of Civil Procedure 52(a) and 65(d), with respect to Plaintiff's motions, and finds Defendants, Liddie, and IMELR in civil contempt of this Court's previous Orders, and issues a separate Order setting forth the requirements of the preliminary injunction going forward.

## BACKGROUND

### I. Relevant Procedural History[1]

#### A. April 2022 Injunction and Amended Injunction

Plaintiff initiated this action on February 25, 2022, against Defendants, alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief. (Compl., Dkt. 1.) The same day, Plaintiff also filed a motion for a temporary restraining order ("TRO"), which the Court denied, (2/28/2022 Docket Order), as well as a motion for a preliminary injunction, which the Court granted in part and denied in part on April 5, 2022, ("April 2022 Injunction"), (*see* Dkts. 6–10; 4/5/2022 Docket Order). The Court also reserved ruling on the remainder of Plaintiff's request for a preliminary injunction and, after supplemental briefing, the Court issued the Memorandum & Order ("M&O") related to the April 2022 Injunction on May 13, 2022. (Apr. 2022 Inj. Mem. & Order ("M&O"), Dkt. 66.[2]) The April 2022 Injunction, *inter alia*, barred Defendants from using Plaintiff's trade secrets "in any manner whatsoever," franchising Companions, and contacting Plaintiff's clients, employees, and agents. (Apr. 2022 Inj., Dkt. 66-1, at 2.) It also directed Defendants, *inter alia*, "to return to Plaintiff all originals and copies of documents, records, and information . . . that contain Plaintiff's trade secrets and confidential and proprietary information," including "customer information." (*Id.* at 2–3.)

On June 8, 2022, Plaintiff filed a letter motion for contempt, alleging, *inter alia*, that Safa's GoFundMe page contained defamatory statements about Watchdog and its founder, Daniella Levi ("Levi"). (Dkt. 79; Dkt. 8, ¶¶ 1, 14.) That same day, the Court issued the Amended Injunction,

[1] Because of the extensive procedural background in this case, the Court recounts only those facts necessary to resolve the present motions.

[2] The M&O relating to the April 2022 Injunction is reported at *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486 (E.D.N.Y. May 13, 2022).

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 50 of 300

which added an injunction against both parties from making misleading or defamatory statements about one another and further enjoined "Defendants, their agents, officers and employees, and all other persons and entities in active concert or participation with them," from "contacting Plaintiff's current clients, employees, and agents." (Am. Inj., Dkt. 80, at 2; *see also* 6/8/2022 Docket Order). On June 10, 2022, the Court otherwise denied Plaintiff's contempt motion. (*See* 6/10/2022 Docket Order (denying, *inter alia*, "Plaintiff's request for coercive [monetary] sanctions and injunctive relief to compel Defendants to take down the GoFundMe page").)

**B. Client Exam Services ("CES")**

On March 10, 2023, Plaintiff filed (1) a second motion for a TRO, (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April 2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions. (Dkts. 151–55.) Plaintiff alleged, *inter alia*, that Defendants had (a) improperly contacted Plaintiff's customers by sending them "libelous or slanderous materials concerning [] Levi and Carlos Roa," ("Roa"), a Watchdog employee "who was associated with Companions prior to this litigation and blew the whistle on Defendants' illegal conduct," and (b) hired a private investigator to track Roa. (Dkt. 152, at 7–8.) The Court ordered the TRO the same day ("March 2023 TRO")—enjoining Defendants from operating their business and from contacting any of Plaintiff's customers—and further ordered the parties to appear for a hearing on March 27, 2023, regarding Plaintiff's motion for preliminary injunction and contempt. (3/10/2023 Docket Order; Dkt. 156.)

On March 22, 2023, Plaintiff filed a Declaration from Mayra Gomez, an independent contractor for Watchdog, attesting that she saw non-party Jeff Beibin ("Beibin"), who had worked for Companions, at an independent medical examination ("IME") on March 16, 2023. (Dkt. 173, ¶¶ 1, 9.) On March 24, 2023, Defendants filed an affidavit from Beibin, in which he acknowledged

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 51 of 300

being at an IME that day, but denied attending the IME on behalf of Defendants; rather, he was there as "an agent of [CES], which [was] owned and operated by Fari Gutierrez" ("Gutierrez"). (Dkt. 176, ¶ 3.) At the March 27, 2023 hearing, the Court found that: (1) Safa had arranged for Gutierrez, a "friend of the [Gelardi] family," to create CES with the help of Safa's nephew, Hesham Salameh ("Sammy"), in order to continue IMELR's business in violation of the Amended Injunction; and (2) Sammy had hired Beibin, who described himself as Vito's "brother in-law," to conduct the March 16, 2023 IME at issue in the contempt proceeding. (3/27/2023 Hr'g Tr., Dkt. 199, at 97–100, 106, 114–15, 118 (Court stating: "The testimony [from Beibin] I just heard and the documents I've seen indicate to me that this creation of a new corporation via the defendant's family friend and nephew, and based on the same exact clients and business model as IME Companions is an effort to end run the condition of the TRO I set, and that to me, is contemptuous conduct or contumacious conduct.")

On the record during the March 27, 2023 hearing, the Court "expand[ed] its previously ordered preliminary injunction to preclude Defendants from providing services to any customers who were former customers of Plaintiff IME Watchdog and listed on Plaintiff's 2016 customer list," and ordered Plaintiff to "file a submission identifying these customers" ("March 2023 Expanded Injunction"). (3/27/2023 Min. Entry.) The Court also ordered that CES provide "no more services . . . using the information from IME Companions." (3/27/2023 Hr'g Tr., Dkt. 199, at 139:24–25.) That same day, Plaintiff filed under seal a spreadsheet of all Watchdog customers (the "Enjoined Customers List"). (Enjoined Customers List, Dkt. 180-7.) The Court approved that list on April 7, 2023. (4/7/2023 Docket Order.) Thus, as of March 27, 2023, Defendants were prohibited from providing services to any customers on the Enjoined Customers List.

In October 2023, the Court found all Defendants in contempt of the Amended Injunction—by hiring a private investigator to contact and track Roa—and the March 2023 TRO—by helping to start CES, which the Court found the Gelardis controlled and operated after Safa directed Gutierrez to create it. (*See* Sec. Am. Inj. M&O, Dkt. 254,[3] at 26–32; Attach. & TRO M&O, Dkt. 284, at 3 n.3.) The Court also granted Plaintiff's request for a second preliminary injunction ("Second Amended Injunction"), denied its request for a TRO and permanent injunction, and reserved ruling on Plaintiff's motion for contempt, sanctions, and damages pending resolution of Plaintiff's motion for attorneys' fees. (Sec. Am. Inj. M&O, Dkt. 254; Sec. Am. Inj., Dkt. 254-1.) The Court later amended its October 2023 Order to clarify that it had found "Safa in civil contempt of the Amended Injunction and the March 2023 TRO," but reserved "making a final ruling on damages and imposing sanctions" until the parties briefed the issue of compensatory damages, including attorneys' fees, relating to the March 27, 2023 contempt proceedings. (Am. Sec. Am. Inj. M&O, Dkt. 299,[4] at 33.)

In December 2023, Plaintiff and Roa moved for attorneys' fees incurred as a result of Defendants' contempt of the Amended Injunction. (Dkts. 261–65, 267.) On September 25, 2024, the Court awarded Plaintiff $47,321.63 in attorneys' fees and $11,036.60 in costs, and Roa $6,890 in attorneys' fees and $1,209.11 in costs. (Dkt. 394, at 22.) On October 9, 2024, Plaintiff filed a motion for reconsideration, (Dkt. 399), which the Court denied in part, clarifying "that Plaintiff will not be precluded from seeking" damages caused by Defendants' conduct that forms the basis of Plaintiff's underlying claims "even if those damages overlap with consequential damages

[3] The Second Amended Injunction M&O is reported at *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2023 WL 6958855 (E.D.N.Y. Oct. 20, 2023).

[4] The Amended Second Amended Injunction M&O is reported at *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224 (E.D.N.Y. 2024).

flowing from Defendants' contumacious conduct," (11/4/2024 Docket Order). In that same Order, the Court denied Defendants' request for attorneys' fees and costs for responding to Plaintiff's reconsideration motion. (*Id.*; *see also* Dkt. 409.)

### C. IME Legal Representatives ("IMELR")

On April 18, 2023, Plaintiff filed a renewed motion for contempt and prejudgment attachment, based on alleged violations of the March 2023 Expanded Injunction. (*See* Dkts. 196–98.) Plaintiff argued that "Defendants did not stop serving customers on the Enjoined Customers List and instead—in a clear attempt to circumvent this Court's [O]rder—Defendants migrated their IME Companion website to a new domain name, https://imelegalreps.com." (Dkt. 197, at 2.) Pursuant to that motion, the Court held a hearing on May 4, 2023, ("May 2023 Hearing"), during which non-parties Liddie, Beibin, and Shakkiya Hall ("Hall") testified. (*See* 5/4/2023 Min. Entry; 5/4/2023 Hr'g Tr., Dkt. 219-1, at 154.) At the conclusion of the hearing, the Court stated that it found Liddie's claim that he had started IMELR on his own credible, and that the Court was not convinced that the Gelardis had used Liddie to "end-run" the March 2023 Expanded Injunction. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 147–48.) The Court also directed the parties to submit supplemental briefing. (*See* 5/4/2023 Min. Entry; Dkts. 218–20, 224–25.)

In Plaintiff's supplemental memorandum, it again asserted that "Defendants transferred their website to" Liddie, "whose role is that of a straw man on behest of Companions." (Dkt. 218, at 2.) Plaintiff requested, among other things, that the Court "expand[] the preliminary injunction" to non-parties Liddie, Beibin, and IMELR. (*Id.* at 1.) In a written decision issued on July 13, 2023, the Court denied Plaintiff's renewed motion for contempt, reiterating its findings from the May 2023 Hearing "that Eugene Liddie was a credible witness, that he started [IMELR] as 'a venture of his own,' and that Liddie's business, [IMELR], was not in violation of the Court's

injunctions." (July 2023 Contempt M&O, Dkt. 231,[5] at 3.) The decision also explained that "[t]he Court also found Jeff Beibin's testimony at the hearing was credible, and did not find that he or any of Defendants' other agents were still serving customers on the Enjoined Customers List in violation of the Court's injunctions." (*Id.*) The Court also denied Plaintiff's request to attach the Gelardis' New York property.[6] (*Id.* at 4.)

On March 6, 2024, Plaintiff filed another contempt motion against Defendants ("March 2024 Contempt Motion"), alleging that they were continuing to serve customers on the Enjoined Customers List—specifically, the Gucciardo Law Firm PLLC ("Gucciardo"). (March 2024 Contempt Mot., Dkt. 288.) The Court deferred ruling and converted a previously scheduled evidentiary hearing into an omnibus hearing that would include discussion of Plaintiff's contempt motion. (3/8/2024 Docket Order.) This contempt motion is one of the subjects of this M&O.

On March 22, 2024, Defendants filed a response in opposition to Plaintiff's March 2024 Contempt Motion, arguing that the motion was procedurally deficient because it "was brought by letter motion rather than by notice of motion or by order to show cause and lacks any supporting affidavit." (Dkt. 307, at 1.) The Court directed Plaintiff to file a supporting affidavit for its contempt motion and Defendants to file an opposition. (4/15/2024 Docket Order.) The Court also permitted Defendants' counsel to "contact [Gucciardo] for the purpose of defending Plaintiff's []

---

[5] The July 2023 Contempt M&O is reported at *IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2023 WL 4532459 (E.D.N.Y. July 13, 2023).

[6] Later, in February 2024, the Court partially granted another request by Plaintiff to attach several of the Gelardis' properties, and ordered attachment of the net proceeds from the sale of the Gelardis' Staten Island property. (Attach. & TRO M&O, Dkt. 284, at 14.) As of May 29, 2024, that Staten Island property had not yet been sold. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 175:7–176:7.)

contempt motion," and modified the Second Amended Injunction accordingly, "to the extent that [it] could be read as encompassing such communications," to permit this contact. (*Id.*)

On April 19, 2024, Plaintiff filed a procedurally deficient emergency motion for a TRO and to amend its complaint, (Dkt. 315), which the Court denied with leave to refile,[7] (4/19/2024 Docket Order). On April 21, 2024, Plaintiff filed a Supplemental Declaration of Daniella Levi in Further Support of the March 2024 Contempt Motion ("First Supplemental Levi Declaration"). (First Suppl. Levi Decl., Dkt. 317.) Defendants responded in opposition the following day, arguing that this, too, was procedurally deficient. (Defs.' Opp'n First Levi Decl., Dkt. 318.) On April 25, 2024, the Court accepted the First Supplemental Levi Declaration and permitted Plaintiff to file a second Levi affidavit in support of its March 2024 Contempt Motion. (4/25/2024 Docket Order.) On May 3, 2024, Plaintiff filed the Second Supplemental Declaration of Daniella Levi in Further Support of the March 2024 Contempt Motion ("Second Supplemental Levi Declaration"). (Second Suppl. Levi Decl., Dkt. 321.) Both Supplemental Levi Declarations contain additional allegations of Defendants violating this Court's Orders by servicing various law firms, not just Gucciardo, and that IMELR, like CES, is an alter ego and/or proxy of Companions.[8] (First Suppl. Levi Decl., Dkt. 317, ¶¶ 4, 7–21; Second Suppl. Levi Decl., Dkt. 321, ¶¶ 9, 13–18, 20–40.) The Second Supplemental Levi Declaration further alleges that Defendants "set[] up" Liddie "as the face of [IMELR] . . . while Safa continued to work with Plaintiff's customers which are on the Enjoined Customers List." (Second Suppl. Levi Decl., Dkt. 321, ¶ 14.) After various additional filings, (*see* Dkts. 323–27), the Court permitted Defendants' counsel, but not Defendants themselves, to communicate with certain law firms on the Enjoined Customers List in

---

[7] Plaintiff did not refile or raise again the request to amend.

[8] *See* discussion *infra* Factual Findings §§ IV.B–D.

advance of the May 29, 2024 hearing, "solely for the purpose of defending Plaintiff's contempt motion," (5/7/2024 Docket Order). On May 10, 2024, Defendants filed another response in opposition to Plaintiff's March 2024 Contempt Motion. (Defs.' Second Opp'n Contempt, Dkt. 328.)

On May 29, 2024, the Court held an evidentiary hearing ("May 2024 Hearing") on Plaintiff's March 2024 Contempt Motion, during which the Court heard testimony from Safa, Vito, and Liddie and scheduled an additional hearing for June 17, 2024. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 255–56.) On June 11, 2024, Plaintiff filed a motion to compel Defendants' and Liddie's appearances at the June 17, 2024 hearing. (Dkt. 345.) Alongside this motion, Plaintiff submitted to the Court links to and a transcript of an April 10, 2023 Zoom meeting (the "April 2023 Zoom" or the "Zoom") between Defendants and representatives of a marketing and web development company called Giant Partners, with which Safa had previously worked when she was running Companions. (Apr. 2023 Zoom Tr., Dkt. 345-1; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 73:22–74:2.)

Also on June 11, 2024, the Court granted Plaintiff's motion to compel and directed both Safa and Liddie to appear at the next hearing, which was eventually rescheduled for July 29, 2024. (6/11/2024, 6/13/2024, 6/17/2024, and 7/2/2024 Docket Orders.) On June 13, 2024, Plaintiff filed a procedurally deficient TRO motion, to which Liddie responded. (Dkt. 348; Liddie First Resp. to TRO Mot., Dkt. 350.) The Court denied Plaintiff's TRO motion the next day as procedurally deficient and directed that Plaintiff comply with the Federal Rules of Civil Procedure, if it wished to proceed with the motion, by "specifically address[ing] the legal standards for seeking a TRO or any other injunctive relief and/or leave to amend." (6/14/2024 Docket Order.)

On June 19, 2024, Plaintiff filed another TRO motion and another preliminary injunction motion ("June 2024 TRO and PI Motion")—the second motion that is the subject of this M&O—this time requesting that the Court enjoin Liddie, IMELR, "and any persons or entities acting in concert with or on behalf of Defendants, Liddie, and IMELR from" taking certain actions. (June 2024 TRO and PI Mot., Dkt. 353.) Alongside the June 2024 TRO and PI Motion, Plaintiff filed two recordings of the April 2023 Zoom. (Mem. Supp. June 2024 TRO and PI Mot. ("Pl.'s Mem."), Dkt. 354, at 2; *see also* Dkts. 355-5, 355-6.)

On July 1, 2024, the Court granted in part and denied in part the June 2024 TRO and PI Motion ("July 2024 TRO"). (7/1/2024 Docket Order; Dkt. 365.) In so doing, the Court found "that Plaintiff has demonstrated a likelihood of success on the merits and irreparable harm and that a TRO [was] justified." (7/1/2024 Docket Order.) The Court temporarily enjoined Liddie and IMELR "from serving customers on the enjoined customer[s] list," and scheduled a show cause hearing for July 29, 2024. (*Id.*) On July 18, 2024, Defendants filed their opposition to the June 2024 TRO and PI Motion. (Defs.' Opp'n to June 2024 TRO and PI Mot. ("Defs.' Mem."), Dkt. 369.) On July 29, 2024, the Court held an evidentiary and show cause hearing ("July 2024 Hearing"), during which it heard testimony from Safa and Liddie and after which it further reserved ruling on the March 2024 Contempt Motion and June 2024 TRO and PI Motion. (7/29/2024 Min. Entry; 7/29/2024 Hr'g Tr., Dkt. 437-1, at 289.) On July 30, 2024, the Court ordered Plaintiff to arrange for Jeremy Koenig ("Koenig") of Giant Partners to testify. (7/30/2024 Docket Order.)

On September 25, 2024, the Court held another show cause hearing ("September 2024 Hearing"),[9] and heard testimony from Koenig and Corey Weissman ("Weissman"), also of Giant

[9] For purposes of this M&O, the May 2024 Hearing, July 2024 Hearing, and September 2024 Hearing will be referred to collectively as "the 2024 Hearings," and the 2024 Hearings and the May 2023 Hearing will be referred to collectively as "the Hearings."

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 58 of 300

Partners. (9/25/2024 Min. Entry; 9/25/2024 Hr'g Tr., Dkt. 410, at 63.) The Court once again reserved ruling on the March 2024 Contempt Motion and June 2024 TRO and PI Motion, and directed the parties (and Liddie, if he so chose) to submit letters summarizing the relevant evidence and their legal arguments. (9/25/2024 Min. Entry.) The parties and Liddie (along with IMELR) filed numerous post-hearing briefs in October and November 2024. (*See* 10/16/2024 Docket Order; Pl.'s Post-Hr'gs Letter ("Pl.'s PHL"), Dkt. 411; Defs.' Post-Hr'gs Letter ("Defs.' PHL"), Dkt. 413; Liddie's[10] Post-Hr'gs Letter ("Liddie's PHL"), Dkt. 415; Liddie's Post-Hr'gs Resp. ("Liddie's PHR"), Dkt. 421; Defs.' Post-Hr'gs Resp. ("Defs.' PHR"), Dkt. 422; Pl.'s Post-Hr'gs Resp. ("Pl.'s PHR"), Dkt. 423.) On December 12, 2024, Plaintiff filed certified copies of transcripts of two phone calls introduced into evidence in the September 2024 Hearing. (4/10/2023 Phone Call Tr., Dkt. 429-1; 4/11/2023 Phone Call Tr., Dkt. 429-2.)

## FACTUAL FINDINGS

Given the complicated history in this case, the Court begins by reiterating which motions are being resolved in this M&O: (1) the March 2024 Contempt Motion, wherein Plaintiff alleges that Defendants continue to serve customers on the Enjoined Customers List, (March 2024 Contempt Mot., Dkt. 288); and (2) the June 2024 TRO and PI Motion, wherein Plaintiff requests that the Court enjoin Liddie, IMELR, "and any persons or entities acting in concert with or on behalf of Defendants, Liddie, and IMELR from" taking certain actions, (June 2024 TRO and PI Mot., Dkt. 353).

### I. Previous Relevant Findings of Fact

The Court presumes the parties' familiarity with the Court's previous findings of fact in this case, some of which have been recapitulated above, some of which have been set forth orally

[10] Liddie submitted his post-hearings briefing along with IMELR.

on the record at past hearings, and some of which have been recited in the Court's M&Os and reported decisions. The Court includes here only previous factual findings necessary to provide information about certain relevant persons and entities.

Watchdog and Companions are competitors in the personal injury litigation business. *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232. When a plaintiff brings a personal injury lawsuit, the defendant can obtain an independent medical examination, or IME, of the plaintiff to evaluate their alleged injuries. *Id.* Both Watchdog and Companions provide third-party services to personal injury attorneys that involve Watchdog and/or Companions associates (or "observers") accompanying plaintiffs to IMEs, observing the medical examination, taking notes, and helping plaintiffs fill out forms. *Id.* The observers produce reports of the IMEs for the plaintiffs' counsel to use in personal injury lawsuits. *Id.* Watchdog was established in May 2011 by Levi. *Id.* Companions was established in November 2017 by Safa and Vito, who are married to one another. *Id.* Safa started Companions by using materials and information misappropriated from Watchdog. *IME Watchdog, Inc.*, 2022 WL 1525486, at *3. More specifically, Defendants obtained Watchdog's materials and information by paying Plaintiff's President, Adam Rosenblatt ("Rosenblatt"), to share them with Safa in or about April 2017. *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232–33, 239. Then, in March 2023, after Defendants were enjoined from contacting Watchdog's customers, Gutierrez (as previously explained, a friend of the Gelardis and former part-time Companions IME observer), at Safa's direction, created CES "specifically to continue operating Defendants' business in contravention of the Court's TRO." (*Id.* at 237.) Finally, in or about Spring 2023, Liddie founded IMELR, his own IME business that Defendants were not involved in, even though Liddie was using the former Companions website for his new business. *IME Watchdog, Inc.*, 2023 WL 4532459, at *1; (Dkt. 197, at 2 (Plaintiff alleging that "Defendants

migrated their IME Companion website to a new domain name, https://imelegalreps.com."); 5/4/2023 Hr'g Tr., Dkt. 219-1, at 100:19–101:6 (Liddie explaining that, as of the May 2023 Hearing, IMELR was operating but not yet legally formed).)

## II. Safa's Credibility

Throughout this lengthy, hearing-filled lawsuit, the Court has found "that Safa Gelardi has repeatedly perjured herself . . . and is thus wholly uncredible as a witness." *IME Watchdog, Inc.*, 732 F. Supp. 3d at 232 n.4. Safa's testimony throughout the 2024 Hearings has done nothing to change the Court's unfavorable assessment of Safa's credibility. (*See, e.g.*, 5/29/2024 Hr'g Tr., Dkt. 355-1, at 165:7–9 (Safa testifying that "[in speaking to Rosenblatt,] I [was] making a bunch of stuff up because he's a liar and that's how you talk to liars. You lie to liars."); 7/29/2024 Hr'g Tr., Dkt. 437-1, at 13:23–14:1 ("I didn't lie about anything. I was just talking. Talking doesn't mean you lie—you can talk about anything. I can say the sky is green, it doesn't mean it's a lie."); *id.* at 51:16–20 (The Court: "[J]ust so I understand, everything that was spoken about [by you] in this Zoom conversation on April 10, 2023, was false?" Safa: "For the most part . . . , yeah.")); *compare* 5/29/2024 Hr'g Tr., Dkt. 355-1, at 65:19–66:2, 68:9–24 (Safa denying any involvement in, or meaningful knowledge about, a purported IME company ("AES")) *with* 7/29/2024 Hr'g Tr., Dkt. 437-1, at 45:14–48:12 (Safa admitting that her brother had purchased the AES domain name three days after the March 2023 TRO, that she had "proposed to [her] brother to start a business with [her]," that "[h]e shot [her] down," and that Safa did not acknowledge this during the May 2024 Hearing because she "did not want to give [Levi her] brother's information because [Levi]'s a criminal" who "goes after people.").) Accordingly, the Court continues to find that Safa Gelardi is not a credible witness.

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 61 of 300

## III. Safa's Attempts to Circumvent the Court's Orders Unrelated to IMELR

### A. Companions

In March 2023, Safa sent Subin Associates, LLP ("Subin")[11], a law firm on the Enjoined Customers List, an invoice for services provided by Companions that month. (Enjoined Customers List, Dkt. 180-7; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 54:18–20.) This invoice included services up to and including March 30, 2023. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 54:4–10 (publishing Subin invoice exhibit); *id.* at 58:16–18 (The Court: "And is it correct that you sent an invoice billing [Subin] for services provided on March 30th, 2023?" Safa: "Yes, Your Honor."); Subin Invoice, Dkt. 220-3, at 2–5 (showing dozens of IMEs performed by IME Companions for Subin in March 2023).) Thus, Companions serviced a customer on the Enjoined Customers List after the Court issued the March 2023 TRO (March 10, 2023) and after the Court ordered the March 2023 Expanded Injunction, which incorporated the Enjoined Customers List (March 27, 2023).

### B. Accompanied Exams Services ("AES")

During the May 2024 Hearing, Safa was asked about another company, AES, and testified that she had "heard of" them but was "not familiar with who they are." (5/29/2024 Hr'g Tr., Dkt. 355-1, at 64:3–5.) She was shown Plaintiff's Exhibit 37, a March 30, 2023 email—sent three days after the March 2023 Expanded Injunction—from Safa's Companions email account to Arnie Baum, the Subin Chief Operating Officer. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 64:24–65:4; Pl.'s Ex. 37.) In it, she wrote that Companions was "not allowed to service [Baum's] law firm anymore [i.e., Subin]," and "recommend[ed]" Subin use "Accompanied Exams." (Pl.'s Ex. 37.) Safa testified that she did not know who told her about AES, that she did not know who owns it, and that she did not operate it. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 65:19–66:2.) She did not explain

[11] Subin is "Plaintiff's former largest customer." (Pl.'s PHL, Dkt. 411, at 2.)

why she had recommended AES to Subin—which Safa described as a "very particular" company—and testified that she "[did not] even know" AES. (*Id.* at 66:17–67:24.) Safa was then shown Plaintiff's Exhibit 38, a GoDaddy search showing that the domain "accompaniedexams.com" was created on March 13, 2023, three days after the March 2023 TRO went into effect. (*Id.* at 68:9–21; Pl.'s Ex. 38.) Safa again denied owning or operating AES. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 68:22–24.)

During the July 2024 Hearing, however, Safa admitted that her brother, Jusuf Abdulrahim, had purchased the AES domain name three days after this Court issued the March 2023 TRO, that she had "proposed to [her] brother to start a business with [her]," that "[h]e shot [her] down," and that the company AES never went into operation. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 45:14–48:3.) Safa testified that she did not explain the connection between her brother and AES during the May 2024 Hearing because she "did not want to give [Levi her] brother's information because [Levi]'s a criminal" who "goes after people." (*Id.* at 48:4–12.) Thus, Safa's testimony at the May 2024 Hearing about not being familiar with AES was deliberately false. Based on Safa's admitted perjury at the May 2024 Hearing and the GoDaddy record introduced at the hearing (Plaintiff's Exhibit 38), the Court finds that AES, regardless of whether it ultimately went into operation, was yet another attempt by Safa to circumvent this Court's Orders and to continue to provide IME services to customers on the Enjoined Customers List.

**C. The IME Company**

Safa's current company is IME Legal Advocates, which is doing business as The IME Company. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 36:2–8.) Though Safa testified at the July 2024 Hearing that she was not doing any work in New York City, The IME Company's website states that "there are additional fees for travel to locations outside of New York City." (*Id.* at 36:23–

38:3.) Notably, The IME Company's website "is the exact website that [Safa] had for IME Companions," and contains language verbatim to IMELR's website. (*Id.* at 38:4–39:20.)

In February 2023, Safa sent Watchdog's client list—different than the Enjoined Customers List—to Giant Partners, which demonstrates that she did not delete the list from her computer as she was required to do under the Court's Orders. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 87:1–89:16.) Testimony during the Hearings did not illuminate why, or related to which company, Safa sent Watchdog's client list to Giant Partners. Thus, the Court finds that Safa failed to comply with the Court's Orders by not deleting Watchdog's client list from her computer as of February 2023.

## IV. IMELR and Liddie

### A. Origins of Liddie's Involvement with the Gelardis

Liddie first met the Gelardis in 2021, when he began discussing with them the possibility of helping to create a franchise of their business. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 67:18–20, 70:17–25.) This franchising did not take place because of the April 2022 Injunction, and Liddie instead planned to work with the Gelardis to help them with marketing by "reach[ing] out to different law firms." (*Id.* at 71:18–72:6.) Even though Liddie had no experience with marketing, he wanted to learn so that he could open his own business. (*Id.* at 72:1–14, 73:20–74:14.) Liddie later bought the Gelardis' Companions website for the price of one of their mortgage payments. (*Id.* at 88:4–25, 89:11–13; *see also* 5/29/2024 Hr'g Tr., Dkt. 355-1, at 203:13–15 (Liddie testifying that on April 10, 2023, he signed a contract with the Gelardis to buy the Companions website).) Vito was a party to the agreement to sell the website to Liddie. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 170:6–16.)

### B. Creation of IMELR

As discussed earlier, following the May 2023 Hearing, the Court found that Liddie "started [IMELR] as 'a venture of his own,' and that Liddie's business, [IMELR], was not in violation of

the Court's injunctions[,]" i.e., the business was not being used by Defendants to violate the Court's Orders. (July 2023 Contempt M&O, Dkt. 231, at 3.) Thereafter, however, Plaintiff produced the Giant Partners/April 2023 Zoom evidence, discussed further below, which suggests that at least as of April 2023, Defendants were, in fact, operating IMELR with Liddie, contrary to the Court's prior findings.

During the April 2023 Zoom, Safa solicited Giant Partners' help to create a website for a new business, then-titled Plaintiff Advocates, but renamed shortly after the Zoom meeting to IMELR.[12] (April 2023 Zoom Tr., Dkt. 345-1, at 6, 9.) Jeremy Koenig and Corey Weissman were on the Zoom for Giant Partners. (April 2023 Zoom Tr., Dkt. 345-1.) Liddie was not present for the Zoom. (*Id.*) Though Vito was present for the Zoom and contributed at times, Safa led the conversation. (*Id.*) Safa told Giant Partners that she was "going to make [her] life simpler by shutting IME Companions down, and [she was] going to just move [her] clients over, move [her] business over to plaintiffadvocates.com," and so she needed to "change the website around a little bit to make it look like, 'Hey, this is not the IME Companions website.'" (*Id.* at 1.) When she and Giant Partners discussed the design of the website further, Safa said she "was thinking [they] just use the same IME [C]ompanion's website, the same exact one, just change the pictures, the same template. Just change the pictures and the words." (*Id.* at 8.) Koenig described her request as "a simple rebrand," and told Safa that "if we want to kill the paper trail," "[l]et's do it." (*Id.* at 2–3.) Safa said that she was "going to play the criminal's game, and [she was] going to just rebrand,"

[12] Safa decided to use the name IMELR (instead of Plaintiff Advocates) for the new entity shortly after the Zoom. (4/10/2023 Phone Call Tr., Dkt. 429-1, at 1 (Safa: "So, I'm kind of [veering] away from [P]laintiff [A]dvocates, I'm in the process of buying imelegalreps.com"); Koenig Decl., Dkt. 355-8, ¶ 4 ("After the [April 2023 Zoom], Safa decided to use the name [IMELR] instead of Plaintiff Advocates.").)

but that she "[did not] want to call it a rebrand." (*Id.* at 3.) She requested that Giant Partners help this website "go live ASAP" because she "really need[ed] it to go live before [Levi[13]] tries to destroy [her] and put [her] in contempt for still operating with clients that [Levi] claims she owns." (*Id.* at 5.)

While the Zoom was ongoing, Safa created a GoDaddy account in Liddie's name, and set up the email address "plaintiffadvocates@gmail.com" because she did not "want to use [her] email." (*Id.* at 4.) She said that she and Giant Partners would "communicate through that [email] until the business is up completely," and then once she "purchase[d] the office, [they could] either switch emails to communicate [to] info@plaintiffadvocates, or [they] could continue at plaintiffadvocates@gmail." (*Id.* at 10.)

At the May 2024 Hearing, Safa was shown Plaintiff's Exhibit 39, which includes an April 11, 2023 email from "imelegalreps@gmail.com" (the "IMELR Gmail") to Weissman containing GoDaddy account login credentials with the username "imelegalreps@gmail.com" and a password comprised of Levi's name combined with a vulgar word. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 100:24–101:15; Pl.'s Ex. 39.) Safa denied sending the email with the GoDaddy credentials, and instead "assume[d]" that Liddie had sent it. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 71:4–72:7.) She confirmed, though, that the password was her creation, explaining that "[Levi] put [Safa] through hell." (*Id.* 72:13–14; *see also id.* 124:19–125:17 (Safa testifying that "that's been [her] password to almost everything after the case started").) Safa further testified that the credentials shown were *her* credentials for the Companions GoDaddy account, (*id.* at 125:24–

[13] Though Safa referred to Levi as "she" or "her" on the Zoom, the Court infers based on the context of the conversation and other evidence in this case that Safa was referring to Daniella Levi. (*See, e.g.*, April 2023 Zoom Tr., Dkt. 345-1, at 9 (referring "to courts and deadlines and things like that"); 7/29/2024 Hr'g Tr., Dkt. 437-1, at 29:10–20 (testifying about the Zoom and referring to Levi).)

127:1), and that "[her] credentials to IME Companions [were] given to [Liddie] so that he [could] give [them] to Giant Partners to migrate the domains," (*id.* at 73:14–18). As indicated in Plaintiff's Exhibit 39, Weissman then forwarded those credentials to Conor McDaniel, Director of Operations at Giant Partners, and wrote, "[h]ere are the credentials for the GoDaddy account for Safa at [IMELR]." (Pl.'s Ex. 39.)

During the September 2024 Hearing, Koenig and Weissman from Giant Partners both testified that they had received all of their instructions from Safa and had not spoken to Liddie.[14] (9/25/2024 Hr'g Tr., Dkt. 410, at 22:8–14, 42:16–20, 43:2–7; *see also id.* at 37:9–19 (Weissman testifying that though Safa said "that [Liddie] was going to be the face and the main point of contact, . . . she kept communicating with [Weissman], communicating with [Giant Partners]").) Koenig also added that Giant Partners performed LinkedIn marketing outreach for IMELR, not just the website redesign. (*Id.* at 53:2–15.)

In contrast, during the May 2023 Hearing—before the Court was made aware of the April 2023 Zoom—Liddie testified that he "went to GoDaddy and created a domain name, [his] own domain name which is IME Legal Reps," then "got the [Companions] website," and got "it redesigned and redone by the web developers," Giant Partners.[15] (5/4/2023 Hr'g Tr., Dkt. 219-1, at 89:5–8.) Once he "got the website," Liddie testified, Giant Partners "redesigned the whole

[14] Defendants argue that another Giant Partners employee, Estefania Sedano ("Sedano"), who did not testify, worked primarily with Liddie, and so Koenig and Weissman are "incompetent witness[es]." (Defs.' PHL, Dkt. 413, at 8.) The portions of the September 2024 Hearing to which Defendants cite, though, reflect Koenig testifying only that Sedano "just [sent] some emails back and forth, just trying to chase down the customer," but that "there was almost no back and forth whatsoever." (9/25/2024 Hr'g Tr., Dkt. 410, at 59:8–23.) The Court accordingly disregards Defendants' argument, for which they offer no competent evidence and which is contradicted by Koenig's testimony.

[15] During the May 2024 Hearing, Liddie clarified that these "web developers" were Giant Partners. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 191:9–11.)

website to [his] vision, to what [he] liked." (*Id.* at 95:6–9; see also *id.* at 117:7–16 (Liddie testifying that he worked with "the marketing company," i.e., Giant Partners, via phone to make changes to the website).) During the May 2024 Hearing, Liddie testified that Giant Partners did not do any marketing for IMELR, and only worked on its website. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 192:1–11.)

In light of the April 2023 Zoom and two recorded phone calls[16] between Safa and Giant Partners—which demonstrate that Safa, not Liddie, created the IMELR GoDaddy account and that Safa, not Liddie, gave Giant Partners all of the instructions on creating the IMELR website—the Court finds that Liddie's testimony at the May 2024 Hearing is false. The testimony from Koenig and Weissman further confirms this. Furthermore, the Court finds that Giant Partners not only performed IMELR's website redesign, but also engaged in some marketing outreach on LinkedIn on IMELR's behalf.

### C. Defendants' Agreement with Liddie

During the April 2023 Zoom, Safa explained Defendants' partnership with Liddie to Giant Partners, stating that "the gentleman who's going to . . . partner up with me is a detective with the" New York Police Department ("NYPD"), and he is "going to be the face of the company" for "maybe a year or so until *we* get this criminal [Levi] off my back." (April 2023 Zoom Tr., Dkt. 345-1, at 1 (emphasis added).) Safa claimed that she and Liddie had "an operating agreement

[16] As explained previously, Plaintiff submitted to the Court transcripts of two phone calls between Safa and representatives from Giant Partners from April 10 and 11, 2023, after the Zoom. In one of those phone calls, Safa said she "[was] kind of [veering] away from [P]laintiff [A]dvocates," and was "in the process of buying imelegalreps.com." (4/10/2023 Phone Call Tr., Dkt. 429-1, at 1; *see also id.* (Safa: "I'm gonna do IME Legal Reps as soon as I finish coordinating the phone number, the emails and everything").) During the May 2024 Hearing, before Plaintiff submitted these transcripts, Safa denied buying the domain IMELegalReps.com, and instead "assume[d] that . . . Liddie bought it." (5/29/2024 Hr'g Tr., Dkt. 355-1, at 72:15–19.)

behind the scenes where he doesn't own" the business but is "a small partner in it," later claiming that she had a 90% interest in the business and that she was a "silent partner" to Liddie. (*Id.* at 2, 4.) Koenig said that they would "write up a new agreement with [P]laintiff [A]dvocates under [Liddie's] name," which would "be exactly the same price" as their contract with Companions with "exactly the same scope of services," and would "just have a clause that says [they were] converting over the one site to the other site." (*Id.* at 10.) Safa confirmed this but said "that will only [be] between us. Confidential." (*Id.*) Email correspondence between Giant Partners and the IMELR Gmail reflects this language. (*See* Pl.'s Ex. 39 (reflecting 4/10/2023 email from Weissman to IMELR Gmail: "Hi Safa, Here is the link to the new agreement, same details just new company, and us helping you build the new website").)

During the July 2024 Hearing, Safa testified that "[f]or the most part," everything discussed on the April 2023 Zoom about she and Liddie "working together" was false. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 51:16–20.) She stated that there was no agreement with Liddie to work for Plaintiff Advocates, (*id.* at 14:11–17), even though it had been her plan to have a 90% interest in the business with Liddie functioning just as the face of it, (*id.* at 52:24–53:9, 54:5–18 (testifying that the 90% arrangement was "the agreement that [she] was going to propose to [Liddie]," but "[i]t wasn't something drawn out or thought out" and Liddie "had absolutely[] no clue" about it)). She then sought to clarify that she had "tried to make [Liddie] an offer" and "attempted" to do so, but that Liddie was not interested, and so she could not finish making the offer. (*Id.* at 55:2–10.) Safa acknowledged that, had the plan discussed in the Zoom gone "through, it would have been a blatant violation" of the Court's orders,[17] and that she was accordingly "grateful that it didn't" go through,

---

[17] Safa's counsel also confirmed that this would be violative of the Court's Orders in their Post-Hearing Letter. (*See* Defs.' PHL, Dkt. 413, at 4 ("While the video of Safa's virtual meeting with Giant Partners discussing her intention to use Liddie as a front to continue to work in New

(*id.* at 55:14–18), though she "would have loved for it to go through at the time," (*id.* at 51:24–25). Safa spontaneously offered the analogy that "[y]ou can attempt to kill someone and not kill them and[,] say[,] go to jail for murder." (*Id.* at 55:19–20.) Safa never told Giant Partners that she was not going forward with the plan for Plaintiff Advocates or IMELR. (*Id.* at 70:23–25.)

Also on the Zoom, Safa provided a Texas address for the new business: 205 Charleston Lane in Fate, Texas, which is the home address of Liddie's brother. (April 2023 Zoom Tr., Dkt. 345-1, at 6; Liddie Decl., Dkt. 282, ¶ 6.) Liddie does not live in Texas and estimated that he had not been to the state since visiting his brother for Christmas in 2022. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 205:10–13, 206:17–21.) The parties' briefing does not address why, during the April 2023 Zoom, Safa used Liddie's brother's address to set up IMELR, or how she would have had Liddie's brother's address if she were not partnering with Liddie.

Liddie disputes that he and Safa ever had any sort of business arrangement beyond the sale of the IME Companions website. But this testimony is not credible because of the inconsistencies within Liddie's submissions to the Court and testimony during the Hearings. For example, during the May 2023 Hearing—over a year before Plaintiff filed the April 2023 Zoom transcript—Liddie testified that he, not Safa, both created the IMELR domain name on GoDaddy and worked with Giant Partners to develop the IMELR website. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 89:5–8, 95:6–9, 117:7–16.) In Liddie's first response to the TRO Motion (filed shortly after Plaintiff filed the April 2023 Zoom transcript), he "denie[d] any involvement or associations with any company related to the defendants and/or what was discussed within the new videos presented." (Liddie First Resp. to TRO Mot., Dkt. 350, at 1.) In Liddie's second response (filed 12 days later), though, he

---

York would be damning if corroborated by evidence suggesting that her plan came to fruition, the fact remains that [P]laintiff failed to submit a scintilla of proof suggesting that Safa's plan was ever actually acted upon in any fashion, let alone agreed to by Liddie.").)

elaborated that he was "not acting in concert with the Defendants, nor has he acted with the Defendants regarding [IMELR] *in any way other than the development of the [IMELR] website*." (Liddie Second Resp. to TRO Mot., Dkt. 361, at 3 (emphasis added).) In sum, Liddie first claimed, falsely, to have created the IMELR domain name and website, then claimed that he had no "involvement or associations with any company related to the defendants," (Liddie First Resp. to TRO Mot., Dkt. 350, at 1), and eventually admitted that he had at least worked with Defendants to develop the IMELR website, (Liddie Second Resp. to TRO Mot., Dkt. 361, at 3).

During the July 2024 Hearing, Liddie testified that he never had a written or oral operating agreement with Safa related to IMELR or any other company. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 133:3–9.) He said that Safa "mentioned a partnership and [he] said, [he was not] interested," and that he "just want[ed] to move forward with buying the website like [they] initially agreed on." (*Id.* at 127:11–13.) Liddie acknowledged that he did not mention or testify to any discussions with Safa about a partnership at either the May 2023 or May 2024 Hearings. (*Id.* at 126:2–12.)

The Court does not find credible either Safa's or Liddie's denials of an attempted partnership between the two. Whether or not the two ever came close to finalizing the details of a partnership, Safa clearly acted as though a partnership between them existed, and then repetitively and unambiguously represented the existence of that partnership to Giant Partners. Further, though the parties and Liddie have offered no explanation for why Safa registered IMELR with Liddie's brother's address in Texas, this fact strongly supports the inference that Liddie intended, however briefly, to enter into a partnership with Safa and provided his brother's address to Safa for that purpose.

### D. IMELR Clients

As of the July 2024 Hearing, 98% of IMELR's income came from customers on the Enjoined Customers List. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 128:23–129:1.) As of the May 2024

Hearing, IMELR had used six or seven independent contractors, all of whom used to work for Companions. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 196:1–13, 197:14–16.) One of these independent contractors is Beibin, who referred the rest of the independent contractors to Liddie. (*Id.* at 196:21–22, 197:19–25.) During the May 2023 Hearing, the Court warned Liddie not to rely on client referrals from Beibin because he is an agent of Companions and the Gelardis. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 127:23–129:1; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 241:16–242:4.) Between the May 2023 and May 2024 Hearings, however, only Beibin[18] observed IMEs for IMELR. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 198:9–16.) At the July 2024 Hearing, Liddie testified that he had obtained new customers by "[taking] that upon [himself] to go and initiate getting new clients," (7/29/2024 Hr'g Tr., Dkt. 437-1, at 151:23–24), with methods that included "purchasing . . . Edible Arrangements" for law firms, (*id.* at 105:20–106:2). Liddie claimed that he obtained "[a]ll the customers that [he has]," including those on the Enjoined Customers List, via his various marketing efforts. (*Id.* at 105:9–16.)

While the Court previously found Liddie's and Beibin's testimony at the May 2023 Hearing credible, and that neither Beibin nor "any of Defendants' other agents were still serving customers on the Enjoined Customer[s] List in violation of the Court's injunctions," *IME Watchdog, Inc.*, 2023 WL 4532459, at *1, the evidence introduced at the July 2024 Hearing, especially the April 2023 Zoom, and the Court's related finding that Safa helped create IMELR requires the Court to now conclude otherwise. Clearly, since 98% of IMELR's income in July 2024 was from customers on the Enjoined Customers List, and since Beibin is the only observer from IMELR who performed IMEs after the May 2023 Hearing, Beibin continued to serve

[18] Beibin is the Gelardis' brother-in-law because he is married to Vito's sister, Angela. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 128:10–21.) At times, when Beibin had issues with his Zelle account, IMELR would make payments to Angela. (*Id.*)

customers on the Enjoined Customers List in violation of the Court's injunctions. The Court finds that the most reasonable inference is that IMELR's business with customers on the Enjoined Customers List was not due to Liddie's sales tactics, but was instead due to Liddie's reliance on Beibin.

Further, additional evidence demonstrates that Safa improperly referred firms on the Enjoined Customers List to IMELR. IMELR was not formed as a corporate entity until May 9, 2023—five days after the May 2023 Hearing—and did not have its own bank account until May 2023, yet IMELR performed an IME for Bergman, Bergman, Fields & Lamonsoff ("Bergman")[19] weeks earlier, on April 14, 2023, which was four days after Liddie bought the Companions website from the Gelardis. (Pl.'s PHL, Dkt. 411, at 5; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 204:1–205:10.)

During the April 2023 Zoom, which took place four days before the Bergman IME, Safa stated that she was "going to call [her clients] up" as soon as the Zoom was finished and "tell them, please start booking with plaintiffadvocates.com," which shortly thereafter became IMELR. (April 2023 Zoom Tr., Dkt. 345-1, at 2.) She also stated that she "really need[ed the website] to go live before [Levi] tries to destroy [her] and put [her] in contempt for still operating with clients that [Levi] claims she owns." (*Id.* at 5.)

Liddie's testimony about the Bergman IME is inconsistent and not credible. During the May 2023 Hearing, Liddie testified that he contacted Bergman first, and that he knew that the firm operated in Long Island through his wife, Hall, who has worked for Companions. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 84:3–25.) In the May 2024 Hearing, though, Liddie testified that he instead

---

[19] Bergman is a firm on the Enjoined Customers List, (Enjoined Customers List, Dkt. 180-7, at 1), and was a Companions client, (S. Gelardi Aff., Dkt. 51, ¶ 4(24)).

obtained Bergman's business via referral, i.e., that someone from Bergman called Liddie to ask if he had an IME company, and Liddie did not ask the caller how they knew about him. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 208:8–209:7.) While Liddie did wonder how Bergman knew to contact him, he "guess[ed he] was more excited about the opportunity," and so it did not occur to him to ask Bergman how the firm knew about him. (*Id.* at 209:3–16.) But when questioned at the July 2024 Hearing about this testimony, Liddie claimed that he "misspoke" and "misunderstood" during the May 2024 Hearing, and that he "[did] recall actually calling [Bergman], and then [he] did speak directly to Mr. Bergman." (7/29/2024 Hr'g Tr., Dkt. 437-1, at 100:5–15.) He also claimed that no one from Bergman called him directly. (*Id.* at 100:16–17.) Instead, Liddie testified that his wife suggested he call Bergman. (*Id.* at 100:18–21.)

Evaluating Liddie's inconsistent testimony on this issue in the context of his demonstrably false testimony about Safa's statements regarding their partnership on the April 2023 Zoom, the Court finds Liddie's claim that he reached out to Bergman first is false, and that he was instead referred to Bergman by Safa, as suggested by Safa's statements to Giant Partners that she was going to start referring clients to Plaintiff Advocates, which became IMELR.

**E. Spelling of Liddie's Name**

Evidence presented during multiple hearings included various instances of Liddie's name being misspelled as "Liddy" in his purported communications with Giant Partners. (*See* 5/29/2024 Hr'g Tr., Dkt. 355-1, at 215:17–19 (Liddie agreeing he had been shown "four or five instances where [his] name [was] spelled wrong").) For example, the April 2023 email exchange between Giant Partners, Safa's Gmail account, and the IMELR Gmail account, included an email sent from the IMELR Gmail that was signed "Eugene Liddy [sic]" and stated "Hello Everyone, This is Eugene Liddy [sic]. I am the owner of IME Legal Reps. Please . . . get the new mock ups ready as soon as possible. [W]e need this website up as [IMELR's] vision immediately. Please

communicate only with me as Safa is no longer involved." (5/29/2024 Hr'g Tr., Dkt. 355-1, at 95:5–6 (admitting into evidence Plaintiff's Exhibit 54); Pl.'s Ex. 54.) Notably, during the April 2023 Zoom, Safa spelled Liddie's name out loud and incorrectly as "L-i-d-d-y." (April 2023 Zoom Tr., Dkt. 345-1, at 3.)

At the May 2024 Hearing, Safa and Liddie both testified that Liddie had sent the emails misspelling his own name. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 95:5–23, 211:12–20.) Liddie testified that he did this because he "did the spell check once the email was completed," and his spell check "normally does that." (5/29/2024 Hr'g Tr., Dkt. 355-1, at 211:15–212:3.) He testified that he was "certain" that he sent the email in Plaintiff's Exhibit 54 and that Safa did not, and that he does spell check every time he sends an email. (*Id.* at 212:4–24.)

During the July 2024 Hearing, Liddie's counsel used Liddie's cell phone to demonstrate how its spell check function worked by typing "L-I-D-D-I-E" into the email application. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 161:13–17, 162:16–17.) But this demonstration yielded the following spell check options: "Liddie," "kiddie," and "kiddies." (*Id.* at 162:20–23.) Critically, "Liddy" was not among them. (*Id.* at 163:1–2.)

The evidence, common sense, and the Court's assessment of Safa's and Liddie's credibility dictate that Liddie's testimony that he misspelled his own name on multiple occasions in the communications with Giant Partners is false, as is Safa's testimony that Liddie, and not she, sent the emails misspelling his name. First, the April 2023 Zoom shows Safa misspelling Liddie's name as "Liddy," the same way it is improperly spelled in the emails in evidence. Second, there

is no evidence to corroborate Liddie's claim about his cell phone auto-correcting "Liddie" to "Liddy"—indeed, "Liddy" did not come up as a spell check option on Liddie's own cell phone.[20]

**CONCLUSIONS OF LAW**

Plaintiff moves for contempt based on Defendants' alleged violations of the Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction, and Liddie's alleged violations of the March 2023 TRO and March 2023 Expanded Injunction.[21] Central to the Court's inquiry is whether IMELR, like CES, is an attempt by Safa to "operate a 'business that unfairly competes with Plaintiff in violation of the law.'" *IME Watchdog, Inc.*, 732 F. Supp. 3d at 246–48 (citation omitted). Plaintiff argues that IMELR is "yet another thinly-veiled sham to create a successor entity . . . . after Defendants were already enjoined from operating [CES], which was similarly set up with a front-man[,] Fari Gutierrez, who is related to the Defendants." (Pl.'s Mem., Dkt. 354, at 1.) Plaintiff argues that Defendants intended to replicate this scheme with IMELR, and that "Liddie, a full-time NYPD police officer," would be "the face of the company" while "Safa would remain the majority owner as well as the operator of the business behind the scenes

---

[20] During the July 2024 Hearing, the Court warned Liddie that the potential consequences of a finding that he had been untruthful under oath "could have severe ramifications for [him] because [he is] an active police officer of the NYPD." (7/29/2024 Hr'g Tr., Dkt. 437-1, at 82:9–17.) The Court also warned that if it "[made] such a finding," it wanted Liddie "to be on notice that [it] will direct [P]laintiff's counsel to provide that finding, the transcript[,] and any supporting evidence, or relevant evidence to that finding, to the NYPD, because [the Court] think[s] they have an obligation to advise an opposing party, should [Liddie] testify at any kind of a trial or a hearing." (*Id.* at 82:18–24.) Accordingly, the Court will direct Plaintiff's counsel to provide a copy of this decision, in which the Court has found parts of Liddie's testimony to be knowingly false, along with the transcripts of the hearings at which Liddie testified and the other relevant and supporting evidence, to the appropriate unit within the NYPD, which will be determined later.

[21] As explained *infra* n.30, Plaintiff also requests the Court find Defendants in contempt of the April 2022 Injunction. But because the Amended Injunction, issued in June 2022, (*see* Am. Inj., Dkt. 80), superseded the April 2022 Injunction, the Court analyzes and refers to the Amended Injunction and not the April 2022 Injunction.

to evade this Court's Orders." (Pl.'s PHL, Dkt. 411, at 3.) In support of this argument, Plaintiff relies on the April 2023 Zoom recording, during which Defendants allegedly "outlined their new scheme to evade this Court's Orders" via a new company, Plaintiff Advocates.[22] (*Id.*; *see also* April 2023 Zoom Tr., Dkt. 345-1.) Plaintiff further argues that "IMELR is merely a continuation of and successor to the Defendants' original business and," with it, Defendants are "continuing to use Plaintiff's trade secrets and serve customers on the Enjoined Customers List." (Pl.'s Mem., Dkt. 354, at 1.) Thus, Plaintiff requests that the Court find Defendants, Liddie, and IMELR to be in contempt of Court, that the Second Amended Injunction be extended to apply to Liddie, IMELR, The IME Company,[23] and Accompanied Exams,[24] and that the Second Amended Injunction contain additional restrictions. (Pl.'s PHL, Dkt. 411, at 8.)

## I. Civil Contempt

### A. Legal Standard

"A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Regarding the first factor, "[a]n injunction is sufficiently clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" *Id.* (quoting *Drywall Tapers & Pointers v.*

---

[22] As explained *supra* n.12, the name "Plaintiff Advocates" was short lived, and the new company was renamed IMELR shortly after the April 2023 Zoom.

[23] Though not introduced until the 2024 Hearings and Plaintiff's post-hearings briefing, Safa's current company is IME Legal Advocates, which is doing business as The IME Company. (*See supra* p. 15.)

[24] AES was also not introduced until the 2024 Hearings and Plaintiff's post-hearings briefing. (*See supra* pp. 14–15.)

*Local 530*, 889 F.2d 389, 395 (2d Cir. 1989)). As to the second factor, noncompliance has to be "supported by clear and convincing evidence." *Id.* at 99. For the third factor, a confused party attempting to diligently comply in a reasonable manner, "to ensure that it remain[s] in compliance with the Injunction . . . 'c[an] petition[] the District Court for a modification, clarification[,] or construction of the order.'" *Id.* (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)). Importantly, a party's intent or state of mind does not matter for finding civil contempt. *See McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act.") (citations omitted). Moreover, broader injunctions, with more general language, "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *Id.* at 192. Indeed, "[i]t does not lie in [the defendants'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined." *Id.*

Federal Rule of Civil Procedure 65(d)(2) provides that an injunction binds only those "who receive actual notice" of the injunction, including non-parties "who are in active concert or participation with" the parties or their officers, agents, servants, employees, and attorneys. Fed. R. Civ. P. 65(d)(2). "[A] person who is not a named party to an injunction and who is not legally identified with such a party is bound by the injunction only from acting for the benefit of, or to assist, a named party in violating the injunction." *Havens v. James*, 76 F.4th 103, 108 (2d Cir. 2023). "The nonparty must either be 'legally identified' with the enjoined party or 'abet' the enjoined party's violation of the injunction." *Id.* at 111 (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930)).

Upon a finding of contempt, "[a] civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for

losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation omitted). "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id.* at 1353 (citation omitted). On the other hand, coercive sanctions are "left to the informed discretion of the district court" and should be based on "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *Id.* (citations omitted). Notably, "[t]he court may . . . serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020) (citations omitted).

### B. Plaintiff's Contempt Allegations

Plaintiff requests that the Court find Defendants, Liddie, and IMELR[25] in contempt of the Court's Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction, and that the Court "issue case ending sanctions pursuant to Rule 16(f) due to the multiple and repeated violations of this Court's . . . Orders including entry of judgment in favor of Plaintiff against Defendants, Liddie[,] and IMELR for compensatory damages, attorneys' fees and costs, and punitive damages." (Pl.'s PHL, Dkt. 411, at 8.)

[25] Plaintiff's March 2024 Contempt Motion did not request that the Court find that Liddie and IMELR are in contempt of court, but Plaintiff's Post-Hearings Letter and Response did. Further, Plaintiff's March 2024 Contempt Motion requested Defendants be ordered to show cause why they should not be incarcerated, (Dkt. 288, at 2), but Plaintiff's Post-Hearings Letter and Response do not request the Court to find either Defendants or Liddie in criminal contempt, (Dkts. 411, 423). Accordingly, the Court only evaluates civil contempt here.

Plaintiff's contempt allegations fall into three categories. First, Plaintiff alleges that Defendants provided services to clients on the Enjoined Customers List in violation of the March 2023 TRO and March 2023 Expanded Injunction. (*See* 3/27/2023 Min. Entry; March 2024 Contempt Mot., Dkt. 288, at 2 (alleging that Defendants attended IMEs with plaintiffs represented by the Gucciardo Law Firm[26]); Pl.'s Ex. A, Dkt. 288-1, at ECF[27] 2–4 (expert witness report from witness retained by Gucciardo, including a note from orthopedic surgeon that on April 20, 2023, a patient "was accompanied in the examining room by Ms. Tiffany Uribe from 'IME Companions'"); (Second Suppl. Levi Decl., Dkt. 321, ¶¶ 22–40 (alleging that Defendants, including via representatives for Companions and CES, attended IMEs with plaintiffs represented by Subin, Ginarte Gallardo Gonzalez Winograd LLP, and Bergman[28]).)

Second, Plaintiff revives its allegations from the April 2023 Contempt Motion that, in violation of the March 2023 TRO and March 2023 Expanded Injunction, Liddie's IMELR is an alter ego of Companions, relying on new evidence[29] obtained from Giant Partners (Second Suppl. Levi Decl., Dkt. 321, ¶¶ 13–18; 5/1/2024 Pl. Letter, Dkt. 319, at 1), and further alleges that Defendants also created AES to circumvent this Court's Orders, (Pl.'s PHL, Dkt. 411, at 2).

---

[26] As noted previously, Gucciardo is on the Enjoined Customers List. (Enjoined Customers List, Dkt. 180-7, at 3.) Despite Plaintiff's initial focus on Defendant's allegedly improper servicing of Gucciardo, (*see* March 2024 Contempt Mot., Dkt. 288, at 2), this firm was not a focus of the 2024 Hearings, and so the Court does not address it further.

[27] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[28] Subin, Ginarte Gallardo Gonzalez Winograd LLP, and Bergman are on the Enjoined Customers List. (Enjoined Customers List, Dkt. 180-7, at 1, 3, 8.)

[29] *See supra* Factual Findings §§ IV.B–D.

Third, Plaintiff alleges that Defendants violated the Amended Injunction's order to return all documents containing Plaintiff's trade secrets and confidential information as evidenced by the February 2023 email with Giant Partners in which Defendants shared a customer list that primarily contained Plaintiff's clients.[30] (Second Suppl. Levi Decl., Dkt. 321, ¶ 19; Pl.'s PHL, Dkt. 411, at 2.)

### C. Defendants' and Liddie's Arguments

Defendants principally argue that Plaintiff's motion is a "repetitive/successive motion which raises allegations of contempt which have previously been adjudicated,"[31] (Defs.' Second Opp'n Contempt, Dkt. 328, at 1), that Plaintiff has failed to support its motion with admissible evidence, and that Plaintiff has fallen short of demonstrating a clear and convincing violation of any Court Order.[32] (*See generally id.*; *see also* Defs.' PHL, Dkt. 413.)

[30] Though Plaintiff refers specifically to the April 2022 Injunction, the Court notes that by the time Safa sent the February 2023 email to Giant Partners, the Amended Injunction—which also ordered Safa to return all documents containing Plaintiff's trade secrets and confidential information—was already in effect, and so it is more appropriate to analyze whether Safa violated the Amended Injunction.

[31] Although Defendants are correct that Plaintiff has previously submitted some of the evidence and allegations concerning Subin during briefing for a previous contempt motion, the Court has not actually made any rulings based on this evidence yet. Plaintiffs submitted evidence related to Subin after the May 2023 Hearing. (*See* Dkt. 220-3 (filed 5/26/2023), Dkt. 225-1 (filed 6/9/2023).) The Court scheduled a hearing on the new evidence for August 22, 2023. *See IME Watchdog, Inc.*, 2023 WL 4532459, at *3. At the parties' request, the Court adjourned that hearing while the parties engaged in settlement discussions. (*See* Dkt. 232; 7/25/2023 Docket Order.) Thus, before the 2024 Hearings, the Court had not previously had an opportunity to hear testimony on these allegations.

[32] Defendants also protest that Plaintiff's contempt application is procedurally defective, despite acknowledging that Plaintiff has corrected these defects with leave from the Court. (Defs.' Second Opp'n Contempt, Dkt. 328, at 1–2; Defs.' PHL, Dkt. 413, at 1–2.) The Court therefore does not address this issue further.

Liddie argues that he is not acting and has not acted in concert with Defendants, (Liddie Second Resp. to TRO Mot., Dkt. 361, at 3); that no one "from Giant Partners testified or stated that they ever spoke with . . . Liddie about [Safa's] scheme," (*id.* at 7); that he did not have "any idea of the Plaintiff's 'business plan'" and that "any lay person could visit the IME Watchdog website and learn all it needs to know about how to operate the very same . . . business," (*id.* at 12); that he did not have "access [to] any trade secrets that belonged to . . . Plaintiff" and that "he did not rely on any referrals from . . . [D]efendants or their agents," (Liddie PHL, Dkt. 415, at 4); that Plaintiff has not met its burden to "demonstrate . . . that there was some sort of agreement or arrangement where the Gelard[is] were going to have some own ownership or operational interest in [IMELR]," (*id.* at 5); that the evidence shows that he, and not the Gelardis, "is running" IMELR, (*id.*); that "his only explanation for" the emails misspelling his name as "Liddy" is that "autocorrect may have changed the spelling of his name," (*id.*); and that while he generally testified truthfully, (*id.* at 6), discrepancies in his testimony during the various hearings were the result of "mistake[s]," (Liddie PHR, Dkt. 421, at 2).

**D. Admissibility of Evidence**

In Defendants' Post-Hearings Letter, they argue that "[P]laintiff failed to submit any admissible evidence" during the various hearings. (Defs.' PHL, Dkt. 413, at 2.) Defendants elaborate on this claim by pointing to various forms of presented evidence and arguing that they are all inadmissible hearsay, but neglect to cite any specific caselaw or Federal Rules of Evidence, other than noting that "[c]ontempt proceedings are governed by the Federal Rules of Evidence." (*Id.* (first citing Fed. R. Evid. 1101(b); and then citing *Really Good Stuff, LLC v. BAP Investors, L.C.*, 19-CV-2218 (LLS) (GWG), 2021 WL 2469707 (S.D.N.Y. June 17, 2021) (holding that screenshots from Amazon and YouTube, which are not forms of evidence relevant here, were not admissible).) Defendants also challenge Plaintiff's contempt allegations as weak, in part, because

they rest on "[P]laintiff's allegation that Safa, whom they have repeatedly referred to as a serial liar and perjurer, was telling Giant Partners the truth during" the April 2023 Zoom. (*Id.* at 3.)

The Court finds that in addition to the testimony elicited during the Hearings, Plaintiff has presented admissible and relevant evidence that includes the April 2023 Zoom, (7/29/2024 Hr'g Tr., Dkt. 437-1, at 5:3–10; April 2023 Zoom Tr., Dkt. 345-1), two recorded phone calls, (9/25/2024 Hr'g Tr., Dkt. 410, at 10:16–12:5, 19:16–20:12; 4/10/2023 Phone Call Tr., Dkt. 429-1; 4/11/2023 Phone Call Tr., Dkt. 429-2), and several emails, (*see, e.g.*, *supra* pp. 14–15, 18–19, 26–27). The Court relies on this evidence and does not otherwise consider Defendants' arguments regarding the admissibility of Plaintiff's evidence.

### E. The Court Finds Defendants in Contempt of the Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction

The Court finds Defendants in contempt of the Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction. As discussed more below, the Court directs Plaintiff to submit additional briefing and the required affidavit setting forth its damages claim with particularity.

#### 1. The Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction Are Clear and Unambiguous

The Amended Injunction, among other things, directed Defendants "to return to Plaintiff all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets and confidential and proprietary information." (Am. Inj., Dkt. 80, at 2–3.) It also enjoined "Defendants, their agents, officers and employees, and all other persons and entities in active concert or participation with them" from "using in any manner whatsoever Plaintiff's trade secrets and confidential and proprietary information," including "customer information." (*Id.* at 2.) New

York law is clear that the dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See, e.g.*, *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018) ("Under New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm."); *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm.").

The March 2023 TRO barred "Defendants and any persons/entities acting in concert with them" from "operating their business or any other business that unfairly and unlawfully competes with Plaintiff in violation of the law." (March 2023 TRO, Dkt. 156, at 3; 3/10/2023 Docket Order.) The March 2023 Expanded Injunction "expand[ed] [the Court's] previously ordered preliminary injunction to preclude Defendants from providing services to any customers who were former customers of Plaintiff IME Watchdog and listed on Plaintiff's 2016 customer list." (3/27/2023 Min. Entry.) On the record at the March 27, 2023 hearing, the Court ruled that "[D]efendants do not get to use any of the customers who were on [IME Watchdog's] customer list as reflected in the forensic examination or whose identity or names or information were provided by Mr. Rosenblatt as reflected in the forensic evidence to IME [C]ompanions at any point after the company started." (3/27/2023 Hr'g Tr., Dkt. 199, at 120:1–9.) Plaintiff filed the Enjoined Customers List under seal the same day that the Court issued the March 2023 Expanded Injunction. (Enjoined Customers List, Dkt. 180-7.) As of March 27, 2023, Defendants were clearly and unambiguously precluded from providing services to any customers on the Enjoined Customers List.

2. Evidence of Defendants' Noncompliance is Clear and Convincing

The evidence presented during the Hearings and in the related briefing clearly and convincingly establish that Defendants have attempted to circumvent the Court's previous Orders in numerous ways.

First, Companions continued to perform IMEs for Subin, a firm on the Enjoined Customers List, at least through March 30, 2023. Defendants argue they were not actually restrained from servicing Subin at that time because the March 2023 Expanded Injunction prohibited Defendants from providing services to any customers who were *both* "former customers of Plaintiff IME Watchdog **and** listed on Plaintiff's 2016 customer list," and "Subin was not listed on Plaintiff's 2016 customer list." (Defs.' PHL, Dkt. 413, at 2–3 (quoting, but not citing, 3/27/2023 Min. Entry) (emphasis in original).)

This argument is disingenuous at best. On the record at the March 27, 2023 hearing, the Court ruled that "[D]efendants do not get to use any of the customers who were on [IME Watchdog's] customer list as reflected in the forensic examination or whose identity or names or information were provided by Mr. Rosenblatt as reflected in the forensic evidence to IME [C]ompanions at any point after the company started." (3/27/2023 Hr'g Tr., Dkt. 199, at 120:1–9.) Subin, as Defendants well know, is encompassed by this. For example, in the April 2022 Injunction M&O, the Court found that "[a]s a result of Defendants' actions, Plaintiff lost many clients and business opportunities, including its largest account—the law firm of Subin & Associates, which was one of the accounts for which Rosenblatt shared proprietary information with Safa Gelardi in 2017." *IME Watchdog, Inc.*, 2022 WL 1525486, at *4. Indeed, the reason that the Court expanded the Amended Injunction to create the March 2023 Expanded Injunction, was based on a finding that Defendants had created CES in violation of the Amended Injunction and March 2023 TRO. (*See supra* p.4.) Defendants' disingenuous interpretation of the

March 2023 Expanded Injunction would clearly defeat its purpose, which was to expand, not decrease, the group of Watchdog clients that Defendants were prohibited from serving. If Defendants' reading were correct and a client had to be on both lists, the obvious effect would be that *fewer* Watchdog clients would be covered by the injunction, which Defendants cannot *in good faith* claim to believe was the Court's intent.

Thus, the Court finds that Companions knowingly violated the March 2023 TRO and the March 2023 Expanded Injunction by performing IMEs for Subin through March 30, 2023.

Furthermore, three days after the Court issued the March 2023 Expanded Injunction and mere weeks after the Court issued the March 2023 TRO, Safa emailed Subin to recommend that it use AES since Companions could no longer service the firm. (Pl.'s Ex. 37.) During the May 2024 Hearing, Safa blatantly lied by testifying that she was "not familiar with who they [AES] are" and that she did not know who owns or operates it, (5/29/2024 Hr'g Tr., Dkt. 355-1, at 64:3–5, 65:19–66:2), while, as she admitted during the July 2024 Hearing, her brother purchased the AES domain after she had suggested that they go into business together, (7/29/2024 Hr'g Tr., Dkt. 437-1, at 45:14–48:3). The very act of soliciting Subin's business via a new company she sought to start, AES, is a violation of this Court's Orders, whether or not Subin subsequently used AES.

In addition, Safa violated the March 2023 TRO and March 2023 Expanded Injunction by attempting to partner with Liddie and helping to create IMELR. During the April 2023 Zoom, Safa stated that she was "going to just rebrand" Companions into IMELR, and put pressure on Giant Partners for the new website to "go live ASAP" so that she could "call [her clients] up" and "tell them, please start booking with" the new website. (April 2023 Zoom Tr., Dkt. 345-1, at 2–3, 5.) During the Zoom, she told Giant Partners that she was a partner with Liddie and that she had a 90% interest in the new business. (*Id.* at 2, 4.) At the September 2024 Hearing, Koenig and

Weissman from Giant Partners both testified that Safa was their only point of contact for IMELR. (9/25/2024 Hr'g Tr., Dkt. 410, at 22:8–14, 42:16–20, 43:2–7.) Koenig further testified that, "to [his] knowledge," Companions and IMELR are "basically" the same company. (*Id.* at 21:15–22:4.) Thus, it is clear that IMELR was Safa's creation, and that Liddie's role was to serve just as "the face" of the business. (April 2023 Zoom Tr., Dkt. 345-1, at 1.)

As previously discussed, Safa acknowledged that, had the plan discussed in the Zoom gone "through, it would have been a blatant violation" of the Court's orders, and that she was purportedly "grateful that it didn't" go through, (7/29/2024 Hr'g Tr., Dkt. 437-1, at 55:14–18), though she "would have loved for it to go through at the time," (*id.* at 51:24–25). Her counsel also acknowledges that the video "would be damning if corroborated by evidence suggesting that her plan came to fruition." (Defs.' PHL, Dkt. 413, at 4.) The Court is not convinced by Safa's or her counsel's arguments, and instead finds that Defendants'[33] plan to start IMELR to continue to run Companions' IME business *did* come to fruition—for example, four days after Safa said on the April 2023 Zoom that she planned to call her clients and tell them to book on the new IMELR website, IMELR performed an IME for Bergman, a firm on the Enjoined Customers List. (Pl.'s PHL, Dkt. 411, at 5; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 204:1–205:10.)

Lastly, Safa violated the Amended Injunction first by still possessing Plaintiff's customer list in February 2023, and then by emailing it to Giant Partners. Defendants argue that "Safa credibly explained how [the list] was attached inadvertently among many other things, and Koenig testified that it was not used in Giant Partners' marketing efforts." (Defs.' PHL, Dkt. 413, at 8.)

[33] As previously noted, although Safa took the lead in the meetings with Giant Partners regarding IMELR, Vito was present for and briefly spoke during the April 2023 Zoom. (April 2023 Zoom Tr., Dkt. 345-1, at 8.) The Court therefore finds that all three Defendants—Safa and Vito Gelardi and their company Companions—were involved in the plan to create and run IMELR as an IME business and solicit work from the Enjoined Customers List.

It does not matter whether Safa inadvertently attached the list or whether Giant Partners used it. Pursuant to both the April 2022 Injunction and Amended Injunction, Safa was not supposed to have that list in her possession *at all*, and so it should not have been physically possible for her to inadvertently send it to anyone. (*See* April 2022 Inj., Dkt. 66-1, at 2–3 ("Defendants are directed to return to Plaintiff all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets and confidential and proprietary information"); *see also* Am. Inj., Dkt. 80, at 2–3 (same).) Pursuant to the Amended Injunction, Safa was prohibited from "using in any manner whatsoever Plaintiff's trade secrets and confidential and proprietary information." (Am. Inj., Dkt. 80, at 2.) Plaintiff's client list is indisputably part of Plaintiff's trade secrets and confidential information, and Safa was prohibited from emailing it, whether she did so intentionally or otherwise. *McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act.") (citations omitted)

Thus, the Court finds that there is clear and convincing evidence that Defendants violated the Amended Injunction, March 2023 TRO, and March 2023 Expanded Injunction.

3. <u>Safa Did Not Exercise Reasonable Diligence</u>

To the extent that Safa wished to comply with the Court's Orders but was confused about them, she could have asked the Court for "a modification, clarification[,] or construction of" them. *CBS Broad. Inc.*, 814 F.3d at 99 (quoting *McComb*, 336 U.S. at 192). She did not do so. Instead, it appears that she understood the Court's Orders very well and took efforts to conceal her efforts to violate them, including by making multiple successor entities and attempting to hide the related paper trails. Indeed, Safa's only frustration appears to be that she was not more successful in violating this Court's Orders. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 55:14–18, 51:24–25) (Safa

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 88 of 300

acknowledging that had the plan to create IMELR gone "through, it would have been a blatant violation," but stating that she "would have loved for it to go through at the time").)

Thus, the Court finds Safa and Companions, again, in civil contempt for violating the Amended Injunction, the March 2023 TRO, and the March 2023 Expanded Injunction. But the Court cannot enter an order finding them in civil contempt at this time because Plaintiff has not submitted the required affidavit "set[ting] out with particularity . . . the claim, if any, for damages occasioned [by Defendants' contemptuous actions] and such evidence as to the amount of damages as may be available to the moving party." *See* Loc. R. 83.6(a); *see also* Loc. R. 83.6(c) (requiring the Court "to set[] forth the amount of damages, if any, to which the complainant is entitled" and "fixing the fine, if any, imposed by the court" in an order of civil contempt).

For this reason, the parties will further brief the issue of damages and attorneys' fees based on the schedule set forth at the end of this M&O, and in compliance with the instructions provided *infra* Conclusions of Law § I.G.

**F. The Court Finds Liddie and IMELR in Contempt**

As noted, while Plaintiff's March 2024 Contempt Motion, (Dkt. 288), did not request that the Court find Liddie and IMELR in civil contempt, Plaintiff's Post-Hearing Letter, (Dkt. 411), did. The Court finds that Liddie and IMELR are in contempt of the March 2023 TRO and March 2023 Expanded Injunction, and will issue an order of contempt, subject to the parties' briefing on damages and attorneys' fees.

As previously explained, the Court's previous Orders are clear and unambiguous. Further, during the May 2023 Hearing, the Court warned Liddie not to rely on client referrals from Beibin because he was an agent of Companions and the Gelardis. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 127:23–129:1; 5/29/2024 Hr'g Tr., Dkt. 355-1, at 241:16–242:4.) The Court also stated that it would "give a copy of this amended preliminary injunction to [Liddie's] lawyer so she [could]

properly advise [him] about [its] overall contours." (5/4/2023 Hr'g Tr., Dkt. 219-1, at 127:16–18.) This sufficed to give Liddie and IMELR "actual notice" of this Court's Orders. Fed. R. Civ. P. 65(d)(2). Liddie confirmed during the July 2024 Hearing that he became aware of the Enjoined Customers List during the May 2023 Hearing, though he claimed that he did not know who was on the list because he never received it. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 106:4–107:5.)

Evidence of Liddie and IMELR's noncompliance is clear and convincing. 98% of IMELR's income is from customers on the Enjoined Customers List. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 128:23–129:1). As explained previously, IMELR was not formed as a corporate entity until May 9, 2023—five days after the May 2023 Hearing—and did not have its own bank account until sometime in May 2023. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 204:20–205:10.) Thus, as of the July 2024 Hearing, nearly all of IMELR's income had come from Watchdog customers on the Enjoined Customers List even though Liddie had notice of the list and the Court's Orders before IMELR was formed as a corporate entity. Whether Liddie and IMELR *willfully* violated the Court's Orders is irrelevant to the Court's finding of contempt. *McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act.") (citations omitted).

Lastly, Liddie and IMELR clearly did not exercise reasonable diligence because Liddie testified that he "did not make a[ny] effort" to get a copy of the Enjoined Customers list, despite being on notice that he and IMELR were not to serve any customers on it, and despite his attorney having received a copy of it at the May 2024 Hearing. (7/29/2024 Hr'g Tr., Dkt. 437-1, at 121:20–24); *CBS Broad Inc.*, 814 F.3d at 99 (explaining that if someone "subject to an injunction . . . wanted to insure that [they] remained in compliance," that person "'could have

petitioned the District Court for a modification, clarification, or construction of the order'") (quoting *McComb*, 336 U.S. at 192)).

As previously stated, the parties are directed to further brief the issue of damages and attorneys' fees based on the schedule set forth at the end of this M&O, and in compliance with the instructions provided *infra* Conclusions of Law § I.G.

**G. The Court Requires Further Briefing Regarding Compensatory Damages**

Plaintiff must file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages. *See* Loc. R. 83.6(a) ("The affidavit upon which such notice of motion [for contempt] or order to show cause is based shall *set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be available to the moving party*. A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage." (emphasis added)); *see also N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353 (explaining that "[c]ompensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury" (citation omitted)). Though Plaintiff seeks $2,490,000.00 in compensatory damages, (Pl.'s PHL, Dkt. 411, at 8), Plaintiff's briefing is not sufficient to support that amount. The Court also notes that this amount is purportedly based in part on Defendants' 2022 revenue, (*id.*), even though the actions relevant to this M&O took place in 2023.

Thus, Plaintiff is directed to submit a motion that sets forth the actual damages it has incurred due to Safa, Companions, Liddie, IMELR, AES, and The IME Company's 2023 conduct as detailed above. Plaintiff's briefing should be no more than five pages, should contain only information that is necessary to demonstrate its actual damages, and should not contain any

procedural history or colorful descriptors of the relevant conduct. Plaintiff may file an affidavit supporting these costs that also contains only information that is necessary to demonstrate its actual damages. Defendants and Liddie, if they so choose, may respond. If they do, their responses similarly must be limited to no more than five pages (plus a supporting affidavit), should contain only information that is necessary to rebut Plaintiff's claimed damages, and should not contain any procedural history or colorful descriptors of the relevant conduct.

## II. Preliminary Injunction

### A. Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right. A plaintiff seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666–67 (2d Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). "As a general matter . . . monetary injuries, such as those alleged by Plaintiff, do not constitute irreparable harm because such injuries can be estimated and compensated." *Baptichon v. Fed. Rsvr. Bank of Minneapolis*, No. 24-CV-6748 (PKC) (LB), 2024 WL 4350825, at *2 (E.D.N.Y. Sept. 30, 2024) (citing *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)).

"In at least two circumstances, a plaintiff seeking a preliminary injunction must satisfy a heightened standard by showing a clear or substantial likelihood of success on the merits, and by making a strong showing of irreparable harm." *JTH Tax, LLC*, 62 F.4th at 667 (cleaned up). "First, a plaintiff must meet that standard if [they] seek[] an injunction that provides [them] substantially all the relief [they] seek[] in the litigation, and that cannot be meaningfully undone in the event

that the enjoined party prevails at trial on the merits . . . . Second, a plaintiff must meet that standard if [they] seek[] a so called 'mandatory injunction'—that is, an injunction that 'alter[s] the status quo,' which usually is done by 'commanding some positive act.'" *Id.* (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34–35 (2d Cir. 1995)). "Under the heightened standard, [the party seeking a preliminary injunction] must 'show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm.'" *Id.* at 669 (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). Here, the Court applies the heightened standard required for mandatory injunctions because the Court is ordering Defendants to undertake a number of affirmative acts, including ceasing to provide services to the customers they stole or attempted to steal from Plaintiff.

**B. Likelihood of Success on the Merits**

Plaintiff argues, correctly, that it has "previously proven a likelihood of success on the merits." (Pl.'s Mem., Dkt. 354, at 10.) The Court has found so under both the general standard for preliminary injunctions and the heightened standard for mandatory injunctions. *See IME Watchdog, Inc.*, 2022 WL 1525486, at *6 (applying the general standard for preliminary injunctions and "reiterat[ing the Court's] finding, made at the close of the show-cause hearing, that Plaintiff has established a likelihood of success"); *IME Watchdog, Inc.*, 732 F. Supp. 3d at 240 (applying the heightened standard for mandatory injunctions and finding "that Plaintiff's customer lists constitute trade secrets and that Plaintiff is likely to succeed on the merits of their trade secret claims against Defendants").

Defendants argue that "Plaintiff has fallen far short of establishing its right [to] this drastic relief" because "Plaintiff has failed to identify any documents or electronic accounts in Defendants' possession that contain Plaintiff's alleged trade secrets, let alone show that they are being used by Defendants." (Defs.' Mem., Dkt. 369, at 7.) Further, Defendants argue that they

"cannot defend a trade secret violation case without access to the documents which purport to reflect the alleged trade secrets and would be handcuffed by the Court if forced to do so." (*Id.* at 8.) But Defendants' first argument is not true, and the second is nonsensical.

As the Court has already found, "there are volumes of undisputed evidence that Defendants did not gain Plaintiff's customers through publicly accessible databases, but rather, by paying Plaintiff's employee, Rosenblatt, to steal them for Defendants." *IME Watchdog, Inc.*, 732 F. Supp. 3d at 240. Further, as the Court found, *see supra* Factual Findings §§ III–IV, since the Amended Injunction, March 2032 TRO, and March 2023 Expanded Injunction were issued, Defendants: (1) continued to perform IMEs for Subin, Plaintiff's client; (2) created IMELR and AES as attempts to circumvent the Court's previous Orders; (3) referred a firm on the Enjoined Customers List, Bergman, to IMELR; (4) referred Subin to AES; and (5) distributed Watchdog's client list to Giant Partners long after Defendants were prohibited from possessing that list.

Liddie argues that "[t]he likelihood of success on the merits of the instant case between the actual parties has no bearing on whether Safa has any ownership in [IMELR]," and that it has "not been shown" that "Safa is operating [IMELR]." (Liddie Second Resp., Dkt. 361, at 10.) He also argues that "it has not been made clear as to whether the law firms that [IMELR] is servicing are [] even part of the [Enjoined Customers List]." (*Id.*) As the Court found, though, Safa helped create IMELR and referred to it one of its earliest clients, Bergman. *See supra* Factual Findings § IV.B–C. Further, nearly all of IMELR's income is from firms on the Enjoined Customers List. Thus, Liddie's arguments are unavailing, and the Court once again finds that Plaintiff is likely to succeed on the merits of its claims against Defendants.

**C. Irreparable Harm**

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction" and "[p]laintiffs must demonstrate that absent a preliminary injunction

they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC*, 62 F.4th at 672 (citations and quotation marks omitted). A defendant's dissemination of trade secrets can be sufficient to show a likelihood of irreparable harm absent a preliminary injunction. *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 331 (E.D.N.Y. 2020); *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages. . . . A trade secret once lost is, of course, lost forever."); *Coastal Distrib., LLC v. Town of Babylon*, No. 05-CV-2032 (JS) (ETB), 2006 WL 270252, at *3 (E.D.N.Y. Jan. 31, 2006), *aff'd as modified*, 216 F. App'x 97 (2d Cir. 2007) ("Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm. . . . Furthermore, loss of business opportunities and relationships with clients who could produce an indeterminate amount of business over years to come are also hard to measure in dollars and are properly considered irreparable harm." (internal citation and quotation marks omitted)).

Plaintiff argues that "the imminent use of a trade-secret constitutes irreparable harm," and that "Defendants, Liddie[,] and IMELR have been and continue to utilize [and] solicit [Watchdog]'s customers and have repeatedly violated Court Orders related to [the] same." (Pl.'s Mem., Dkt. 354, at 9.) This, Plaintiff argues, "is evident from" Safa's February 2023 email distributing the Watchdog client list to Giant Partners. (*Id.*) In its post-hearings briefing, Plaintiff argues that Defendants created IMELR and AES to continue "to attempt to serve Plaintiff's customers in violation of this Court's Orders." (Pl.'s PHL, Dkt. 411, at 2.) In response, Defendants argue that Plaintiff has not "identified any imminent harm it will sustain in the absence of injunctive relief." (Defs.' Mem., Dkt. 369, at 6.) Defendants further argue that "none of the

subject law firms want to work with [P]laintiff." (Defs.' PHL, Dkt. 413, at 3 n.1.) For his part, Liddie argues that Plaintiff will not suffer irreparable harm because "Plaintiff[ has] not established that [IMELR] has utilized any trade secret of the Plaintiff." (Liddie Second Resp., Dkt. 361, at 10.)

The Court has previously found evidence of irreparable harm to Plaintiff based on the proven theft of Watchdog's trade secrets. *See IME Watchdog, Inc.*, 2022 WL 1525486, at *7 ("[T]here is no doubt that Companions' existence and growth is based in part on Watchdog's misappropriated trade secrets, customers, and business opportunities."); *see IME Watchdog, Inc.*, 732 F. Supp. 3d at 242 ("Indeed, even with a preliminary injunction in place, Defendants disseminated Plaintiff's trade secrets, inflicting further harm against Plaintiff. Thus, Plaintiff will undoubtedly suffer additional irreparable harm absent a stricter preliminary injunction."). Defendants wrongfully misappropriated Plaintiff's trade secrets and customer information by, *inter alia*, continuing to perform IMEs for firms on the Enjoined Customers List (such as Subin and Bergman), recommending Subin consider using AES, and by sending Watchdog's client list to Giant Partners.[34] Further, Defendants' argument that "none of the subject law firms want to work with [P]laintiff," (Defs.' PHL, Dkt. 411, at 3 n.1), works against Defendants' position. Though the Court need not consider this conclusory statement that has not been raised or addressed

[34] Defendants argue that they should not be directed to return Plaintiff's documents containing Plaintiff's trade secrets and confidential and proprietary information because "Plaintiff has failed to identify any documents or electronic accounts in Defendants' possession that contain Plaintiff's alleged trade secrets." (Defs.' Mem., Dkt. 369, at 7.) Given that Safa still had the Watchdog client list in her possession when she sent it to Giant Partners, this is patently false. (5/29/2024 Hr'g Tr., Dkt. 355-1, at 87:1–89:16.) Furthermore, there is simply no legitimate reason for Defendants to retain Plaintiff's trade secrets or proprietary information and they should therefore be under a continuing obligation to turn them over upon learning that they have them. Their claimed or feigned ignorance about not possessing them is not a basis for the Court not to order their return.

elsewhere in the parties' briefing or the Hearings, if it is true that certain subject firms do not want to work with Plaintiff, this very well could be the result of "[l]oss of goodwill and injury to reputation," which are the injuries Plaintiff is claiming and "are difficult to measure in dollars." *Coastal Distrib., LLC*, 2006 WL 270252, at *3.

Once again, even with multiple injunctions and Court Orders in place, Defendants have continued to inflict, or attempt to inflict, harm on Plaintiff. Thus, the Court is convinced that absent a stricter preliminary injunction that encompasses Liddie, IMELR, AES, and The IME Company, this pattern of contumacious conduct will continue.

### D. Narrowly Drawn Injunction

In cases involving the alleged theft of trade secrets, the Second Circuit instructs that: "where irreparable injury has been demonstrated, a 'narrowly drawn' preliminary injunction that protects the trade secret from further disclosure or use may be appropriate. In all cases, the relief should be 'narrowly tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)). Here, the Court issues a narrowly tailored injunction, enjoining Defendants, Liddie, IMELR, AES, and The IME Company from: (1) providing services to or contacting those customers who Plaintiff has shown were misappropriated from Plaintiff; (2) using Plaintiff's trade secret and confidential and proprietary information in any manner; (3) returning to Plaintiff documents, records, and information that contain Plaintiff's trade secrets and confidential and proprietary information; (4) providing a list of all customers served by Defendants, Liddie, IMELR, AES, and The IME Company for purposes of issuing a Court-Authorized Notice; and (5) placing a public notice on the homepages of IME-related websites operated by Defendants, Liddie, IMELR, AES, and The

IME Company.[35] The Court notes again that this strengthened injunction is necessitated by Defendants', Liddie's, and IMELR's violation of the previous Orders.

**E. Balance of Equities**

The Court once again finds that the balance of equities tips decidedly in Plaintiff's favor. *IME Watchdog Inc.*, 732 F. Supp. 3d at 242. Plaintiff argues that its "legitimate interest in protecting against Defendants' exploitation of its trade secrets and its long-standing relationships and goodwill with its customers certainly outweighs Defendants' minimal interest in stealing that information through bribery so that it can do business with those customers in direct competition with [Watchdog], or do business at all given that Defendants have stolen everything they use to run their competing business, and do so by continuously violating this Court's Orders with impunity." (Pl.'s Mem., Dkt. 354, at 13.) Defendants do not address this factor in their briefing. (*See generally* Defs.' Mem., Dkt. 369; Defs.' PHL, Dkt. 413; Defs.' PHR, Dkt. 422.) Liddie argues that "the balance of equities tip in [his] favor . . . because an injunction against his business or court notice or restriction on his business and/or website would cripple his ability to grow his business of which he has an indelible right to do." (Liddie Second Resp., Dkt. 361, at 13.)

---

[35] The Court notes that Plaintiff seeks a more expansive preliminary injunction. (*See* June 2024 TRO and PI Mot., Dkt. 353, at 2–3 (proposing Defendants, Liddie, and IMELR be directed "to make all electronic accounts . . . in their control" and containing Watchdog-related information available to Plaintiff, that they pay for another forensic analysis of their digital devices, that they be enjoined from operating Companions and/or IMELR, and that the U.S. Marshals be directed to arrest Safa, Vito, and/or Liddie); Pl.'s PHL, Dkt. 411, at 8 (requesting attachment of all properties owned by Safa, Vito, and Liddie, as well as any corporate entities in which they have ownership interest, that the Court issue case-ending sanctions pursuant to Rule 16(f), and that Liddie and Defendants pay for a forensic analysis). The Court declines to include these orders in this preliminary injunction. The Court has already attached Defendants' Staten Island property. Further, a forensic analysis has already been performed, and the burden of an additional one currently outweighs the benefit. The Court might revisit Plaintiff's request for case-ending sanctions after the Show Cause hearing scheduled for April 2, 2025.

Here, Plaintiff has consistently demonstrated sufficient hardship and threat of irreparable harm, and Defendants have consistently demonstrated an undeterrable resolve to circumvent this Court's Orders and improperly use Plaintiff's trade secrets. Furthermore, "the Second Circuit is clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the defendant's own illegal activity." *IME Watchdog Inc.*, 732 F. Supp. 3d at 242 (collecting cases). Second, the Court is not persuaded that Liddie would be unduly burdened by an injunction impacting IMELR. This is an activity that Liddie "probably should not have engaged in to begin with," given that 98% of his customers are ones he should have known he was prohibited from servicing, and so he would suffer no real hardship from an injunction. *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 394 (S.D.N.Y. 2003) (finding that "[t]he fact that [a party] expended a large sum of money on its [improper activity] is, of course, no basis for concluding that the balance of hardship tips in its favor").

Further, IMELR is far from Liddie's only or primary source of income. Liddie is employed full time as an NYPD officer, has a tax preparation business, and, apparently, is significantly involved with Amway, a multi-level marketing business. (5/4/2023 Hr'g Tr., Dkt. 219-1, at 99:11–18 (Liddie is a full-time police officer), 68:25–69:5 (Amway is a multi-level marketing business); 7/29/2024 Hr'g Tr., Dkt. 437-1, at 186:11–12 (Liddie runs a tax preparation company); Liddie Decl., Dkt. 362, ¶ 9 (attesting that Liddie is a "Sapphire level member" with Amway, meaning that he "generates over $900,000.00 in one year for the company," and is "not desperate for passive income from the Gelardis").)[36] Defendants, Liddie, and IMELR "assumed the risks of losing

[36] The Court notes that, as of the July 2024 Hearing, Liddie had not informed the NYPD of his IMELR work, (7/29/2024 Hr'g Tr., Dkt. 437-1, at 197:16–21), despite being informed during the May 2023 Hearing that the NYPD Administrative Guide requires approval for off-duty employment, including for work that relates to having an ownership interest in another business, (5/4/2023 Hr'g Tr., Dkt. 219-1, at 121:3–122:9).

[their] customers when [they] intentionally engaged in illegal activity to obtain them, and cannot legitimately claim any harm when they are forced to relinquish their ill-gotten business." *IME Watchdog, Inc.*, 732 F. Supp. 3d at 243.

### F. Public Interest

Defendants' briefing is also silent on the matter of public interest. (*See generally* Defs.' Mem., Dkt. 369; Defs.' PHL, Dkt. 413; Defs.' PHR, Dkt. 422.) Liddie argues that an injunction would be of disservice to the public interest "because it would deprive New York law firms of the option of free choice in business," and would "send the message to the public that your mere association with an accused party can make you subject to the destruction of your business no matter the level of proof." (Liddie Second Resp., Dkt. 361, at 13.)

As the Court has previously explained in this case, "[i]t goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest." *IME Watchdog, Inc.*, 732 F. Supp. 3d at 243 (quoting *IME Watchdog, Inc.*, 2022 WL 1525486, at *8). Contrary to Liddie's argument, the Court declining to order a stronger injunction would send the wrong "message to the public" that one can repeatedly misappropriate or attempt to misappropriate another's trade secrets—despite clear and unambiguous Court Orders prohibiting just that—without consequence. The Court thus finds that the public interest will be best served by an injunction prohibiting Defendants, Liddie, IMELR, AES, and The IME Company from further using what the Court finds, based on clear and convincing evidence, are wrongfully obtained trade secrets to poach clients from Plaintiff.

### G. Bond

As before, the Court waives the bond requirement imposed by Federal Rule of Civil Procedure 65(c). Pursuant to Rule 65(c), a court may "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[W]here a bond is posted, it serves as security for the 'costs and damages' incurred by the wrongfully restrained party." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 558 (2d Cir. 2011). District courts are "vested with wide discretion" to determine the appropriate amount of the bond, *see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted), and, "despite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is no proof of likelihood of harm to the non-movant," *see Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (internal quotation marks omitted). If the district court decides that a bond is not necessary, it must "make this determination before it enter[s] the preliminary injunction." *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (per curiam).

Here, Defendants, Liddie, and IMELR have not requested a security bond and Plaintiff similarly has not raised the issue. Nevertheless, the Court makes an independent determination that a security bond is not necessary in this case. The Court has concluded that Plaintiff is highly likely to prevail on the merits in this litigation and that the hardship to Defendants, Liddie, IMELR, AES, and The IME Company from a preliminary injunction, if any, would therefore be minimal. *Golden Krust Patties, Inc.*, 957 F. Supp. 2d at 203 ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant." (collecting cases)); *see also Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that [the defendant] will be found to have wrongfully suffered harm."). Accordingly, the Court finds that no bond is required.

**CONCLUSION**

For the reasons stated above, the Court grants in part and denies in part Plaintiff's motion for contempt and request for a third preliminary injunction. The Court attaches the Third Amended Injunction Order, which sets forth the specific terms of the injunction, to this Memorandum & Order. Moreover, although the Court finds Safa, Vito, Companions, Liddie, and IMELR in civil contempt of the Court's previous Orders, the Court reserves making a final ruling on damages and imposing sanctions until Plaintiff submits supplemental briefing regarding its compensatory damages, including attorneys' fees, for the 2024 Hearings. Plaintiff's supplemental brief setting forth the specific amounts of attorneys' fees and compensatory damages it seeks as a result of Defendants' and Liddie's conduct and the creation of IMELR should be filed within sixty (60) days of this Order, i.e., by May 30, 2025, and should comply with the guidance provided above. Defendants and Liddie will be permitted to respond within thirty (30) days of Plaintiff's supplemental brief being filed, i.e., by June 30, 2025, if they so choose, and their supplemental brief should comply with the guidance provided above.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2025
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
IME WATCHDOG, INC.,

Plaintiff,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS, LLC, CLIENT EXAM SERVICES, LLC, and IME MANAGEMENT & CONSULTING, LLC,

Defendants.
-----------------------------------------------------x

**THIRD AMENDED PRELIMINARY INJUNCTION**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Upon consideration of Plaintiff's third application for a preliminary injunction, Plaintiff's memorandum of law and supplemental briefs filed in support thereof and the accompanying declarations, Defendants Safa Gelardi, Vito Gelardi, and IME Compannions, LLC's ("Defendants") memorandum of law and supplemental brief filed in opposition thereto and the accompanying declarations, non-party Eugene Liddie's ("Liddie") memorandum of law and supplemental brief filed in support thereof and the accompanying declarations, and the evidence presented at the show-cause hearings held on May 4, 2023, May 29, 2024, July 29, 2024, and September 25, 2024; and

Upon consideration of the Court's Findings of Fact and Conclusions of Law, set forth in the Court's Memorandum & Order dated March 31, 2025, that Plaintiff likely will succeed on the merits of this litigation, that Plaintiff will and has suffered irreparable harm if the requested relief is not granted in part, that the balance of hardships tips in Plaintiff's favor, and that it is in the public's interest for the Court to issue a preliminary injunction,

**IT IS ORDERED THAT:**

I. Plaintiff's application for a preliminary injunction is hereby GRANTED in part, and that (i) Defendants, their agents, officers, and employees, and all other persons and entities in active concert or participation with them; (ii) Liddie, his agents, officers, and employees, and all other persons and entities in active concert or participation with him; (iii) IME Legal Representatives, its agents, officers, and employees, and all other persons and entities in active concert or participation with it; (iv) Client Exam Services, its agents, officers, and employees, and all other persons and entities in active concert or participation with it; (v) Accompanied Exams Services, its agents, officers, and employees, and all other persons and entities in active concert or participation with it; and (vi) The IME Company, its agents, officers, and employees, and all other persons and entities in active concert or participation with it, are preliminarily enjoined from:

A. using in any manner whatsoever Plaintiff's trade secrets and confidential and proprietary information, including, but not limited to Plaintiff's:

1. customer lists;

2. customer information (such as customer names, contact information, whether customers paid the issued invoices, amounts paid, number of associate visits performed, nature of services performed and hours spent servicing the customer, and customer's preferences in connection with the independent medical examinations);

3. invoices;

4. website;

5. training handbooks;

6. independent medical examination reports; monthly, quarterly, and/or annual reports; internal memoranda;

7. financial information (such as information regarding payroll, banking, and profit and loss); and

8. employees and agents (such as which customers they service, which doctors' independent medical examinations they observed and how long such examinations lasted, and how much they earn);

B. providing any services to customers misappropriated from Plaintiff, including the customers identified on the Enjoined Customers List (attached as Exhibit A);

C. contacting (or eliciting contact from) and/or surveilling Plaintiff's current clients, employees, and agents;

D. franchising IME Companions LLC; and

E. other than as required to comply with Paragraph II below, destroying any documents, whether in hard copy and/or computerized and/or other electronic media format, that are presently in Defendants' personal or corporate possession relating to IME Watchdog, Inc., IME Companions LLC, IME Legal Representatives, Client Exam Services, Accompanied Exams Services, and The IME Company or any other matter relevant to this case.

II. Defendants, Liddie, IME Legal Representatives, Client Exam Services, Accompanied Exams Services, and The IME Company, will return to Plaintiff all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets and confidential and proprietary information, which are non-exhaustively described in Paragraph I.A. above.

III. Within fourteen (14) days of this Order, Defendants, Liddie, IME Legal Representatives, Client Exam Services, Accompanied Exams Services, and The IME Company will provide to the Court a list of all customers served since March 10, 2023, which shall include the date of each service, the name of each customer, the name of the observer or representative

who attended each, and the amount billed and collected for each, for purposes of issuing a Court-Authorized Notice.

IV. Within seven (7) days of Plaintiff's receipt of the submission required by Paragraph III above, Plaintiff will provide to the Court a list of all customers on the Enjoined Customers List served by Defendants, Liddie, IME Legal Representatives, Client Exam Services, Accompanied Exams Services, and/or The IME Company since March 10, 2023 ("List of Customers Serviced").

V. Within fourteen (14) days of this Order, Plaintiff will provide to the Court a proposed Court-Authorized Notice to be sent to each customer that Defendants, Liddie, IME Legal Representatives, Client Exam Services, Accompanied Exams Services, and/or The IME Company have served since March 10, 2023.

VI. Within seven (7) days of the Court's approval of the Court-Authorized Notice and List of Customers Serviced, the Plaintiff will provide the Court-Authorized Notice to the List of Customers Serviced.

VII. Within fourteen (14) days of this Order, Defendants, Liddie, IME Legal Representatives, Client Exam Services, Accompanied Exams Services, and The IME Company will provide to the Court the website domain for every website they own and/or operate in connection with the independent medical examination business.

VIII. Within fourteen (14) days of this Order, Plaintiff will provide to the Court a proposed Public Website Notice to be posted on the home page of the websites owned and/or operated by Defendants, Liddie, IME Legal Representatives, Client Exam Services, Accompanied Exams Services, and The IME Company in connection with the independent medical examination business.

IX. Within seven (7) days of the Court's approval of the Public Website Notice, Defendants, Liddie, IME Legal Representatives, Client Exam Services, Accompanied Exams Services, and The IME Company will post the Public Website Notice on the homepage of every website they own and/or operate in connection with the independent medical examination business.

This preliminary injunction shall continue until a final judgment or order is issued in this matter, unless otherwise modified in writing by the Court. Failure to comply with the preliminary injunction will result in findings of contempt and sanctions.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2025
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
IME WATCHDOG, INC.,

Plaintiff,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS, LLC, CLIENT EXAM SERVICES, LLC, and IME MANAGEMENT & CONSULTING, LLC,

Defendants.
---------------------------------------------------------x
SAFA GELARDI and IME COMPANIONS, LLC,

Third-Party Plaintiffs,

- against -

CARLOS ROA,

Third-Party Defendant.
---------------------------------------------------------x
CARLOS ROA,

Third-Party Counter-Claimant,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC,

Third-Party Counter-Defendants.
---------------------------------------------------------x

**AMENDED MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Plaintiff IME Watchdog, Inc. ("Watchdog" or "Plaintiff") initiated this action on February 25, 2022, against Safa Abdulrahim Gelardi ("Safa") and Vito Gelardi (collectively "Individual Defendants"), and IME Companions, LLC ("Companions"), alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.[1] (Compl., Dkt. 1.) On the same day, Plaintiff also filed a motion for a preliminary injunction, which the Court ultimately granted in part and denied in part on April 5, 2022 ("April 2022 Injunction"). (*See* Dkts. 6–14, 66; 3/29/2022 Docket Order; 4/5/2022 Docket Order.) As part of the April 2022 Injunction, the Court ordered a forensic examination in which Defendants would "provide complete and unrestricted access to their records and electronic accounts to the forensic analyst" (Dkt. 66-1, at 3), so that the Court could determine whether "Companions is built entirely on misappropriated information and poached clients" (Dkt. 66, at 17). On June 8, 2022, the Court issued an amended preliminary injunction, enjoining both parties from making misleading or defamatory statements about one another ("Amended Injunction"). (Dkt. 80; *see also* 6/8/2022 Docket Order.)

Discovery has proceeded over the past year and has included the forensic analysis of Defendants' records and depositions of Defendant Safa. (*See* Dkts. 86, 105, 115; 2/2/2023 Minute Entry; 2/3/2023 Minute Entry.) On March 10, 2023, Plaintiff filed (1) a second motion for a temporary restraining order ("TRO"), (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April

[1] Plaintiff filed an Amended Complaint on October 13, 2022, adding Gregory Elefterakis, Roman Pollak, Anthony Bridda, and Nicholas Liakis as additional Defendants. (Dkt. 114.) However, Plaintiff does not seek a preliminary injunction as to these Defendants. (*See* Dkt. 151, at 2 ("Let the defendants, Safa Abdulrahim Gelardi, Vito Gelardi, and IME Companions LLC (collectively the 'Defendants'), show cause . . . why an order should not be issued[.]").)

2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions. (Dkts. 151–55.) The Court ordered the TRO on the same day ("March 2023 TRO") and further ordered the parties to appear for a hearing regarding the motion for preliminary injunction and contempt on March 27, 2023. (Dkt. 156; *see also* Dkt. 167.) Defendants filed their opposition to Plaintiff's motions on March 17, 2023. (Dkts. 160–66.) Plaintiff filed their reply on March 22, 2023. (Dkts. 171–73.) At the March 27, 2023 preliminary injunction hearing, the parties presented and examined witnesses and presented documentary evidence.

Based on the parties' papers, affidavits, and witness testimony, the Court now makes the below Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Civil Procedure Rules 52(a) and 65(d), with respect to Plaintiff's renewed motion for a preliminary injunction and request to hold Defendants in contempt for violating the Court's previous orders. *See Eyewonder, Inc. v. Abraham*, 293 F. App'x 818, 820 (2d Cir. 2008) (vacating preliminary injunction because district court did not "state the reasons why it issued"). For the reasons stated below, the Court expands the scope of the Amended Injunction against Defendants and moreover, finds Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO.[2]

[2] After the March 27th preliminary injunction hearing, on April 18, 2023, Plaintiff filed a renewed motion for contempt and prejudgment attachment. (*See* Dkts. 196–98.) The Court held a hearing on May 4, 2023, pursuant to that motion, and directed the parties to submit supplemental briefing. (*See* 5/4/2023 Minute Entry; Dkts. 218–20, 224–25.) The Court denied Plaintiff's renewed motion for contempt on July 13, 2023 and does not address that motion here. (Dkt. 231.)

## FINDINGS OF FACT

### I. Previous Findings of Fact[3]

Plaintiff Watchdog and Defendant Companions are competitors in the personal injury litigation business. When a plaintiff brings a personal injury lawsuit, the defendant can obtain an independent medical examination ("IME") of the plaintiff to evaluate his or her alleged injuries. (*See* Levi Decl., Dkt. 8, ¶¶ 4–8.) Both Watchdog and Companions provide third-party services to personal injury attorneys, which involves Watchdog and/or Companions associates accompanying plaintiffs to IMEs, where the associate observes, takes notes, and helps the plaintiffs fill out forms. (*Id.* ¶¶ 3, 6–18.) The associates produce reports of the IMEs for the plaintiffs' counsel to use in the personal injury lawsuits. (*Id.* ¶¶ 15–16, 27–28.)

Watchdog is a New York corporation (*see* Am. Compl., Dkt. 114, ¶ 4) established in May 2011 by Daniella Levi (*see* Levi Decl., Dkt. 8, ¶¶ 1, 14). Levi is a personal injury attorney who saw a "need for a service" that could accompany personal injury clients to IMEs. (Am. Compl., Dkt. 114, ¶¶ 18–22.) She "developed forms and reports for the 'watch dogs' to complete relating to the different types of IMEs . . . , established price lists," and "built a customer database through her long-lasting relationships and friendships with other personal injury attorneys[.]" (*Id.* ¶¶ 25–26.) Watchdog developed information regarding its customers' preferences, "such as how soon each customer wants its reports, and whether the [associates] should have a conference with the customer in advance of the IME[.]" (Levi Decl., Dkt. 8, ¶ 30.)

[3] The Court issued a Memorandum & Order in support of the April 2022 Injunction in which the Court made numerous Findings of Fact. *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, (E.D.N.Y. May 13, 2022). The relevant Findings of Fact to this latest Memorandum & Order are repeated here.

Adam Rosenblatt was Watchdog's President at all relevant times. (Am. Compl., Dkt. 114, ¶ 40.) Only he and Levi had access to "Watch[d]og's entire database, including the identity of all its customers and clients, their contact information, their preferences, pricing information, and all of the financial details of IME Watch[d]og." (*Id.* ¶¶ 41–43.) The confidential documents in the database were password protected, such that only Levi and Rosenblatt had access to them. (Levi Decl., Dkt. 8, ¶¶ 34–35.)

Companions is a New York company (Am. Compl., Dkt. 114, ¶ 5) established in November 2017 by Defendants Safa and Vito Gelardi, a married couple. (*See* Safa Gelardi Decl., Dkt. 26, ¶¶ 2, 33.) Safa did not have any previous experience in the personal injury or IME field when starting Companions—rather, she had worked at a bank in various positions. (*See* April 4, 2022 Hearing Tr. ("April 2022 Tr."), Dkt. 98, 24:21–25:10, 29:16–30:7.) However, through meetings with Rosenblatt and his father in early 2017, Safa learned about Watchdog's business, reviewed Plaintiff's confidential documents that Rosenblatt shared with her, and decided to open Companions. (*See* Safa Gelardi Decl., ¶¶ 16–18, 20–22, 28, 33; April 2022 Tr. 35:19–21, 84:10–85:1, 155:12–14.)[4]

---

[4] The Court also finds that Safa Gelardi has repeatedly perjured herself throughout this case and is thus wholly uncredible as a witness. For example, at the April 2022 hearing, Safa was asked "[y]ou instructed Adam [Rosenblatt] to sabotage the customer accounts of IME WatchDog?" and she responded: "[a]bsolutely untrue." (Apr. 2022 Tr., 42:15–17.) But the forensic evidence shows that Safa sent text messages to Rosenblatt from 2019 through 2022 directing him to sabotage Plaintiff's customer accounts in exchange for monetary payments—including in the very months preceding the April 2022 hearing. *See infra* Findings of Fact Section II.B. (*See also* Dkt. 154-2, at 250–251 (showing text messages between Safa and Rosenblatt on February 22, 2022, in which she asks Rosenblatt to "turn [Douglas and Londin] down the next time" they ask Plaintiff to observe an IME in New York); *id.* at 252 (showing text from Safa to Rosenblatt on February 22, 2022 stating "Listen[,] turn all Wingate [] down so you can take them back when y[o]u work for your[self]"); March 27, 2023 Hearing Tr. ("March 2023 Tr."), Dkt. 199, 29:14–24.) At the March 27, 2023 hearing, the Court warned Defendants' counsel of Safa's history of perjury, and counsel ultimately chose not to have Safa testify. (March 2023 Tr. 121:17–24, 125:20–23.)

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 112 of 300

## II. Plaintiff's Trade Secrets

### A. Defendant Safa Gelardi's Receipt and Use of Plaintiff's Confidential Customer Lists and Financial Documents

The forensic examination of Defendant Safa's emails reveals that she received troves of confidential information about Plaintiff's business in the Spring of 2017 that helped her start Companions. In late April of 2017, Plaintiff's employee, Adam Rosenblatt, began emailing copies of Plaintiff's confidential financial records and customer lists to Safa. (Pl.'s Br., Dkt. 152 (hereinafter, "Dkt. 152"), at 3; *see also* Dkt. 154-3, at ECF[5] 112 (Rosenblatt emailing Plaintiff's "Sales by Client 2016.pdf" to Safa Gelardi with the message "On day one I could bring in money"); *id.* at ECF 1–27 (Rosenblatt sending copies of Plaintiff's Profit and Loss statements from 2014 through 2016 and Watchdog's 2016 Quarterly Review to Safa Gelardi); *id.* at ECF 22 (slide summarizing Watchdog's top 10 clients in 2015 and 2016).) Safa immediately forwarded these emails containing Plaintiff's confidential information to others. (Dkt. 154-3, at ECF 8 (forwarding copy of Plaintiff's 2016 Quarterly Review to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 34 (forwarding copy of "IME Watchdog Clients Master List 2017.xlsx" to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 40 (forwarding Rosenblatt's email with "a breakdown of March 2017, [i]ncluding the monthly P&L, list of clients for that month, a list of all the IME covered, the Watchdog invoices, a breakdown of their pay vs[.] what we billed, etc." to "jay@fivepillarsgroup.com" on April 29, 2017).)

In the first week of May 2017, Rosenblatt emailed Safa explaining what materials she needed to buy to get a competing business started and sent her Plaintiff's invoices to use as models. (Dkt. 152, at 4; Dkt. 154-3, at ECF 118 (Rosenblatt email to Safa dated May 1, 2017, with subject

---

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

line "Needed" and listing items to buy including "Computer with 3 monitors" and "Quickbooks").) On May 4, 2017, Safa's accountants formed IME GuardDog Inc.—the name that Safa wanted to call her competing business at the time, although she ultimately settled on IME Companions LLC. (Dkt. 152, at 4.) On the previous day, Rosenblatt had started an email thread with a website designer, Lumina, and Safa, explaining that "[a]s discussed, we need a website for IME Guard Dog with a significant amount of content to be taken from IME Watchdog." (Dkt. 154-3, at ECF 122.)

Safa used the financial information and customer lists from Rosenblatt to create her own "top revenue" customers, organized by customers who paid the most revenue to Plaintiff so that she could target them. (Dkt. 152, at 5; *see also* Dkt. 154-3, at 136 (forwarding "Attorney List Over 10,000 in Revenue.xlsx" to Defendant Roman Pollak on August 8, 2017).) On September 29, 2017, Safa sent Watchdog's confidential financial records to Defendant Roman Pollak in the hopes that he would pitch the idea of IME observers as a business opportunity to Defendant Greg Elefterakis. (*See* Dkt. 152, at 4 (citing Dkt. 154-3, at ECF 141–47); March 2023 Tr. 72:8–73:3.)[6] Neither Defendant Pollak nor Defendant Elefterakis knew anything about the IME observer business before Safa contacted them. (March 2023 Tr. 81:6–9 (establishing that fact as to Pollak); *id.* 42:18–19 (establishing that fact as to Elefterakis).) Pollak analyzed Watchdog's financial records to determine the business's profitability and asked Safa follow-up questions on October 3, 2017. (March 2023 Tr. 72:8–73:3; Dkt. 154-3, at ECF 148.) Pollak specifically mentioned in his October 3rd email to Safa, regarding "travel expenses.. [sic] I assume that is mostly the

[6] Plaintiff called Pollak and Elefterakis as witnesses at the March 27, 2023 hearing. Their testimony established that, in 2017, Elefterakis owned a business called Case Cash Funding, which worked with personal injury law firms to provide non-recourse loans to prospective plaintiffs. (March 2023 Tr. 46:15–23.) Pollak was the CFO of Case Cash Funding and reported to Elefterakis. (*Id.* 46:24–25, 61:3–12.)

doc/[A]dam." (Dkt. 154-3, at ECF 148.) At the hearing, Pollak testified that it was likely he was referring to Adam Rosenblatt at the time of the email, but did not know whether Adam Rosenblatt was affiliated with Watchdog when he wrote the email.[7] (March 2023 Tr. 74:8–75:10.) On October 5, 2017, Pollak emailed Lumina and Safa, requesting to "have a functional version [of the website] by months [sic] end" and indicating that "90% of the [website's] content will come from the IME watchdog site and the brochure provided by Safa." (Dkt. 154-3, at 149–50.)

Importantly, Defendants openly conceded during the March 2023 hearing that Safa took Plaintiff's confidential information from Rosenblatt. (March 2023 Tr. 29:8–13 (The Court: "[Safa] clearly took information via Mr. Rosenblatt and started her business. Are you denying that?" Defendants' counsel: "No, Judge. Mr. Rosenblatt sent her a customer list and[,] . . . I believe, gross revenue figures for 2016 on that list."); *see also id.* 31:1–3 (Defendants' counsel: "Mr. Rosenblatt sent the customer list with the general revenue provisions on it to Ms. Gelardi. There's no dispute as to that.").)[8] However, Defendants contend that it was of no consequence that Safa took Plaintiff's confidential information, because Plaintiff's customers—personal injury firms—are public knowledge and obtainable through daytime television advertisements (March 2023 Tr. 32:4–8), and moreover, that Defendant Gregory Elefterakis "was very well aware of the top personal injury firms, because he's in the cash provision business, and he knew all these firms

---

[7] The Court found Defendant Pollak to be evasive and untrustworthy throughout his examination. Pollak admitted that he reviewed Watchdog's website during his analysis of Watchdog's profitability but did not recall seeing Adam Rosenblatt listed as an employee on the website. (March 2023 Tr. 75:12–17.) At this time, the Court does not make a finding as to whether Pollak was lying during the hearing about his knowledge of Rosenblatt's employment with Watchdog because it is not necessary for resolving this motion.

[8] The Court notes that in light of these admissions, Safa perjured herself at the April 2022 hearing when she was asked "[Rosenblatt] gave you a Sales by Customer Summary for 2016 in or about April of [20]17, correct?" and she responded "No." (April 2022 Tr. 35:24–36:1.)

intimately" (*id.* 32:13–16). Defendants therefore claim that Safa built her business "through introductions by Mr. Elefterakis, not through [] the Rosenblatt [documents]." (*Id.* 32:16–20.) However, Defendant Elefterakis's testimony during the hearing flatly contradicted that argument.

At the hearing, Elefterakis testified that he joined Companions "to help [it] obtain customers[.]" (March 2023 Tr. 54:6–9.) But he also conceded that he introduced at most, 15 customers to Companions throughout his time at the company. (*See id.* at 44:3–14 ("[The Court]: And how many clients did you recall approaching[?] . . . [Elefterakis]: Originally, it was within, probably, ten clients to get a good sampling of what the response would be[.] . . . [The Court]: And did you, at any point, approach any other clients besides these ten? [Elefterakis]: No. [The Court]: And so this was at the beginning before Companions started; is that right? [Elefterakis]: Yes, correct."); *id.* 53:12–14 (Elefterakis testifying that he introduced "[b]etween ten and 15 clients that I obtained through my own, you know, personal contacts" to Companions).)

The documentary evidence shows that today, 90% of Defendants' customers are comprised of Plaintiff's former customers (Dkt. 152, at 5), with well over 400 of those customers being traceable to the customer lists and confidential information that Defendant wrongfully obtained from Rosenblatt (*see* Dkts. 180, 187; 4/3/2023 Docket Order). Moreover, 98.3% of the total revenue Defendants have generated since Companions' inception was obtained through sales from Plaintiff's former customers. (Levi Decl., Dkt. 172, at 2–3; March 2023 Tr. 10:24–11:10.) Thus, Defendants' claim that Safa built her business primarily through client introductions by Mr. Elefterakis is thoroughly contradicted by the evidence in the record, and plainly false.[9]

[9] During the hearing, Plaintiff submitted that in 2018, Defendants had only 12 customers, with 10 of those customers being former clients of Plaintiff. (March 2023 Tr. 58:2–3.) No competent evidence was adduced at the hearing as to whether these ten former Watchdog customers were also Elefterakis's clients. (*See id.* 58:18–23.) Furthermore, Defendant Pollak testified that he recalled providing customer names to Safa in the summer of 2017 beyond the ones

### B. Defendant Safa Gelardi's Text Messages and Venmo Payments to Plaintiff's Employee Adam Rosenblatt

Plaintiff has produced over 200 pages of text messages between Safa and Rosenblatt spanning from September 2019 through March 2022. (Dkt. 154-2.) These text messages establish that over the course of at least three years, Safa told Rosenblatt which of Plaintiff's customers she wanted and that she would pay Rosenblatt to sabotage Plaintiff's relationship with those customers so that they would use Companions instead. (*See, e.g.*, Dkt. 154-2, at ECF 85–86 (Safa: "Ignore them[,] fuck up a few times[,] and when they switch [to me] I will pay you big." Rosenblatt: "Sounds good . . . Will have some more immediate clients for you tomorrow." Safa: "Yes baby. Make that money."); *id.* at ECF 81 (Safa: "When am I gona [sic] get Parker Waichman. Name your price I got you[.]" Rosenblatt: "They pay 95[.]" Safa: "I will give you half in advance and half after they start booking[.]"); Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.) Moreover, Defendants conceded as much during the March 2023 hearing:

> THE COURT: Okay[—t]here's forensic evidence[—a]m I wrong that there actually are communications where [Safa]'s saying to Mr. Rosenblatt, send me this, or sabotage this? I read something in the papers where it says, go and get them, baby, or something to that effect, where he's basically trying to delay things, or the services aren't as good from Watchdog or to do other things to sabotage those clients of Watchdog. Is that not in evidence?

---

listed in Plaintiff's confidential customer lists. (March 2023 Tr. 92:19–93:11; *see also id.* 94:1–3.) Pollak could not recall the dates he provided such information and could not recall how he provided the information to Safa. (*Id.* 92:19–93:11.) To date, Defendants have not submitted any evidence of Pollak or Elefterakis providing Safa with any customer names. The Court therefore cannot make a factual finding at this time regarding how many of Defendants' initial 12 customers were procured through the confidential information Defendants misappropriated from Plaintiff versus through Elefterakis's or Pollak's pre-existing client relationships. However, the Court does not find this fact to be necessary or material to resolving the instant motion because of the plethora of other evidence showing that Safa Gelardi relied on Plaintiff's trade secrets to start her business and to continue building the business, which warrants an expanded preliminary injunction.

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 117 of 300

> MR. WARNER [(Defendants' counsel)]: There are text exchanges, Judge, that indicate what you are saying. But this was well after this business was set up and started. Well after.

(March 2023 Tr. 29:14–24.) Safa has pleaded the Fifth Amendment and invoked her right against self-incrimination with respect to her payments to Rosenblatt. (*See* Apr. 2022 Tr. 53:8–11; *id.* 61:14–62:16.)

## III. Defendant Safa Gelardi's Contacts with Carlos Roa

On November 4, 2022, Defendant Safa Gelardi hired a private investigator, Steve Stanulis, to track and contact Third-Party Defendant and Plaintiff's employee, Carlos Roa ("Roa"). (Dkt. 153, at 4–5; *see also* Dkt. 153-5, at ECF 1.) Stanulis works for a company called Silver Shield. (Dkt. 153-5, at ECF 1.) Safa hired Stanulis to "investigate" Roa because she believed that he, as a former employee, was "soliciting clients and slandering her name." (*Id.*) Specifically, Safa directed Stanulis to "befriend" Roa (March 2023 Tr. 137:18–20) and "try to relate to him" with the goal of getting Roa "to defame [Defendants] very badly" (Dkt. 181-1, at ECF 1). Safa provided Stanulis with scripted things to say to Roa, including complimenting him because "he loves it" and asking him "how long have you been in the sports business?" (*Id.* at ECF 1.)[10]

[10] During the hearing, Defendants' counsel claimed that hiring a private investigator to befriend Roa did not violate the Court's Amended Injunction barring contact between the parties, because it "wouldn't be contact initiated by [Safa] or her [private investigator]. It was supposed to go the other way around, Judge." (March 2023 Tr. 137:22–24.) Specifically, Defendants' counsel argued that Safa hiring a private investigator to "accept contact" was distinguishable from Safa *initiating* contact. (*Id.* 138:3–6.) The Court finds this argument to be meritless and bordering on frivolous. Defendants' counsel is, again, cautioned not to make disingenuous representations and frivolous arguments to the Court in future proceedings. (*See also id.* 138:8–16 (The Court: "I don't care if Mr. Roa initiates [contact] if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. I don't care who initiated it. . . . Again, this is the kind of parsing that you and your client are doing that strikes me as troublesome and will only result in further restrictions.").)

Moreover, Safa paid Stanulis to place a GPS tracker on Roa's car. (Dkt. 153-5.) On November 11, 2022, Roa discovered the tracker because his security camera captured Stanulis placing the GPS tracker. (Dkt. 153, at 3.) Roa reported the incident to the police on November 12, 2022. (*Id*. at 4.) Defendant Safa claimed that the GPS tracker was placed without her knowledge. (March 2023 Tr. 139:6–11.) However, the documentary evidence once again shows that Safa was being untruthful; in fact, she knowingly paid for the use of a tracker by her private investigator, Stanulis, and actively monitored the tracker before it was found. (Dkt. 153-5, at ECF 1, *id.* at ECF 11–16 (Safa texting Stanulis regarding whether GPS tracker is working).)

## IV. Defendants' Circumvention of the Court's March 2023 Temporary Restraining Order

The Court enjoined Defendants on March 10, 2023, from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.) Six days later, Mayra Gomez, one of Plaintiff's independent contractors, saw Jeff Beibin ("Beibin"), a Companions employee, at an IME on March 16, 2023 in Commack, New York. (Dkt. 173, ¶¶ 1, 9.) Beibin filed a declaration conceding that he was at an IME on that date, but that he was there as "an agent of Client Exam Services, which is owned and operated by Fari Gutierrez." (Dkt. 176, ¶ 3.) Based on evidence presented at the March 27, 2023 hearing, the Court finds that Fari Gutierrez ("Gutierrez")—a friend of the Gelardi family (March 2023 Tr. 98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)—created Client Exam Services at Safa's direction specifically to continue operating Defendants' business in contravention of the Court's TRO.

Documentary evidence and witness testimony from the hearing establishes that after the TRO was issued, Safa Gelardi told Fari Gutierrez that "I have been shut down. I cannot operate [Companions]. It's yours, if you want it." (March 2023 Tr. 25:1–3.) On March 11, 2023, Safa

told Beibin that Companions was shutting down until further notice and that Gutierrez had started a company and would contact Beibin. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel explaining that Safa told Mr. Beibin that "Fari may be taking over the business").) On March 12, 2023, Beibin received a call from "Sammy" on behalf of Client Exam Services, an IME observer business. Sammy explained "that everything would pretty much be operating the same way as they did" at Companions, and gave Beibin an IME assignment. (*Id.* 97:11–14, 100:21–24.) Sammy is Safa's nephew and his full name is Hesham Salameh. (*Id.* 107:2–110:15.) Client Exam Services was incorporated on March 16, 2023 (*id.* 6:23, 105:2–15), the same day that Beibin ran into Plaintiff's independent contractor, Gomez. Beibin's sole communication with Client Exam Services was with Sammy via phone and email. (*Id.* 104:16–20.) Beibin has never been to an office for Client Exam Services and is not aware of whether there is a physical office. (*Id.* 104:11–15.)

Since March 10, 2023, Beibin has attended approximately 12 IMEs on behalf of Client Exam Services, for the same clients he had been servicing when he worked at Companions. (*Id.* 100:25–101:2, 103:14–16, 115:2–5.) There are no differences in operations between Client Exam Services and Companions. (*Id.* 113:25–114:11.) In fact, Beibin did not think to ask Sammy or Client Exam Services about his pay rate or frequency because "[w]hen IME Companions was closed[,]" Safa informed him "that all of the business was now going to be taken over by Fari Gutierrez . . . [a]nd everything would remain the same, except for the name of the company[.]" (*Id.* 114.)[11]

[11] The Court found Defendants' arguments and defense counsel's credibility troubling throughout the Court's probing of the Client Exam Services issue. Defense counsel opened the March 27, 2023 hearing by unequivocally asserting that "there's no connection" between Defendants and Client Exam Services, and boldly stated that "[Defendants] have nothing to do with Client Exam Services." (March 2023 Tr. 24:13–16.) However, Beibin's testimony during

## CONCLUSIONS OF LAW

### I. Preliminary Injunction

#### A. Preliminary Injunction Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right. A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 64 F.4th 658, 666–67 (2d Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). "In at least two circumstances, a plaintiff seeking a preliminary injunction must satisfy a heightened standard by showing a clear or substantial likelihood of success on the merits, and by making a strong showing of irreparable harm." *Id*. at 667 (cleaned up). "First, a plaintiff must meet that standard if he seeks an injunction that provides him substantially all the relief he seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits . . . . Second, a plaintiff must meet that standard if he seeks a so-called 'mandatory injunction' – that is, an injunction that 'alter[s] the status quo,' which usually is done by commanding some positive act." *Id*. (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc*., 60 F.3d 27, 34–35 (2d Cir. 1995)). "Under the heightened standard, [the party seeking a preliminary injunction] 'must show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm.'" *Id.* at 669 (quoting *New York ex rel. Schneiderman*

---

the hearing plainly revealed Safa's integral role in creating Client Exam Services, and her close—even familial—relationship with Client Exam Services' managers, Gutierrez and "Sammy." Thus, after Beibin's testimony, defense counsel conceded "[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [it] leads back to [Safa]." (*Id.* 126:3–5.) Defense counsel is again warned that future false, disingenuous, and/or irresponsible claims and arguments could result in sanctions and/or findings of contempt.

*v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). Here, the Court applies the heightened standard required for mandatory injunctions because the Court is ordering Defendants to undertake a number of affirmative acts, including ceasing to provide services to the customers they stole from Plaintiff.

**B. Likelihood of Success on the Merits**

1. Legal Standard for Trade Secrets Claim

Plaintiff asserts, *inter alia*, causes of action under the Defend Trade Secrets Act ("DTSA") and misappropriation of trade secrets under New York common law. (*See* Am. Compl., Dkt. 114, at 2.) Section 1836 of the DTSA is a private cause of action for "[1] [a]n owner of a trade secret" which was "[2] misappropriated" and "[3] related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "The elements for a misappropriation claim under New York law are fundamentally the same [as under Section 1836] . . . [and] [d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (cleaned up). When a claimant proves "actual or threatened misappropriation," then "injunctive relief is authorized," but when "that there has been 'unjust enrichment' or 'actual loss caused by the misappropriation of the trade secret,' [then] damages are authorized." *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 403–04 (S.D.N.Y. 2021) (citing 18 U.S.C. § 1836.)

"Under New York law, a plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020) (citing *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019)). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and

which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 148 (E.D.N.Y. 2007). In general, the following factors must be considered to determine whether information is a trade secret:

> (1) The extent to which the information is known outside of the business;
>
> (2) the extent to which it is known by employees and others involved in the business;
>
> (3) the extent of measures taken by the business to guard the secrecy of the information;
>
> (4) the value of the information to the business and its competitors;
>
> (5) the amount of effort or money expended by the business in developing the information; and
>
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)).

Most relevant to this case, "[c]ustomer lists may constitute trade secrets under certain limited circumstances. Specifically, the identity of customers is protected if the list was developed through substantial effort and kept in confidence." *Id.* at 148 (citing *N. Atl. Instruments, Inc.*, 188 F.3d at 44). "[L]ists of customers will not be deemed protected trade secret information where customers are readily ascertainable as prospective users or consumers, of the product at issue." *Id.* at 149 (internal quotations and citation omitted). "The issue of whether and to what extent a customer list constitutes trade secret information is a question of fact for th[e] court. When determining the confidentiality of customer lists[,] . . . the court considers the trade secret criteria referred to above." *Id.* In particular, although lists of customers may be publicly available or back-trackable, "the *identities of individual contact people*" at customers' companies can be "protectable trade secrets." *N. Atl. Instruments, Inc.*, 188 F.3d at 45.

2. Plaintiff's Customer Lists Constitute Trade Secrets

Here, the record shows that Plaintiff developed its customer list through Daniella Levi's experience in the personal injury field, and that Plaintiff took measures to keep Watchdog's customer lists secret, such as password-protecting the lists and limiting access to them to only company executives. (Levi Decl., Dkt. 8, ¶¶ 34–35, 41–43.) The customer information was clearly valuable to individuals outside the business, as evidenced by Defendant Safa Gelardi's own text messages, and her willingness to pay Rosenblatt for the information. (Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.) Moreover, although Defendants argue that the names of personal injury law firms are public information (March 2023 Tr. 32:4–8), Plaintiff's customer lists contained not only firm names, but the identities of individual contacts for the firms, and the revenue paid and services contracted for by Watchdog's customers (*see* Dkts. 180-1, 180-2). In fact, Safa was able to use the details in Plaintiff's customer lists to create a spreadsheet of "top revenue" customers, organized by the firms who paid the most revenue to Plaintiff, so that Defendants could target them for poaching. (Dkt. 152, at 5.) Plaintiff's customer lists and information fall squarely within the definition of trade secrets, as found by the Second Circuit in *Heyman*:

> While the names of potential customers may have been obtainable from a simple examination of a classified directory, information as to the retailers who were actually purchasing plaintiff's product could not have been so secured. Moreover, the data concerning the amount of the product each customer purchased, compiled on a monthly basis, was certainly not obtainable in this way. Finally, as we have had occasion to note before, resolution of the issue in a case like this depends not upon how a defendant could have acquired the information, but rather upon how he did in fact *actually* acquire it. "It matters not that defendants *could* have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. *The fact is that they did not*. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment."

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 124 of 300

*Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590–91 (2d Cir. 1963) (emphasis added) (quoting *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953)). Here, there are volumes of undisputed evidence that Defendants did not gain Plaintiff's customers through publicly accessible databases, but rather, by paying Plaintiff's employee, Rosenblatt, to steal them for Defendants. *See supra* Findings of Fact Section II. Thus, the Court finds that Plaintiff's customer lists constitute trade secrets and that Plaintiff is likely to succeed on the merits of their trade secret claims against Defendants.

**C. Irreparable Harm**

1. Legal Standard for Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. . . . and plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC,* 62 F.4th at 672 (citations and quotation marks omitted). "[L]oss of reputation, good will, and business opportunities" may constitute irreparable harm. *Rex Med. L.P. v. Angiotech Pharm. (US) Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)). Good will is defined as the "expectancy of continued patronage[.]" *Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, No. 10-CV-8976 (RJH), 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x. 43 (2d Cir. 2012) (summary order); *see also Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07-CV-1562 (ERK) (RML), 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (noting that good will "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business"), *aff'd*, 282 F. App'x 885 (2d Cir. 2008) (summary order). "[G]ood will

constitutes the intangible qualities of a business that attracts customers . . . ." *Nat'l Elevator Cab & Door Corp.*, No. 07-CV-1562, at *5.

2. Plaintiff Has Shown Irreparable Harm

First and foremost, the Court notes that it already found evidence of irreparable harm to Plaintiff when the Court issued its April 2022 Injunction. *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, at *6 n.12 (E.D.N.Y. May 13, 2022) ("[I]n light of the overwhelming evidence of irreparable harm and clear likelihood of success, Plaintiff has met the heightened, mandatory injunction standard as well."). Thus, even prior to filing its renewed preliminary injunction motion and its contempt motion, Plaintiff had already met this standard. Now, the forensic examination and other discovery has laid bare the full extent of Defendants' theft of Plaintiff's trade secrets.

The forensic examination shows that beyond paying Rosenblatt to steal Watchdog's trade secrets to start Companions in 2017, Safa also paid Rosenblatt to intentionally sabotage Plaintiff's customer relationships and poach Plaintiff's clients over the course of almost three years. (*See, e.g.*, Dkt. 154-2, at ECF 83 (Safa asking Rosenblatt "[w]hat do I tell [Plaintiff's client] to get them to switch [to Companions?]"); *id.* at ECF 84–85 (Rosenblatt telling Safa to "be faster" when following up on clients he sends to Companions and advising her to "[m]ake them ready to switch [to Companions]" so that he "can just ignore them"); *id.* at ECF 92–93 (Safa offering "[$]400 paid semi[-]monthly on the 15th and the 1st" to Rosenblatt for "leads on [Plaintiff's] poachable clients" and marketing for Companions); *id.* at ECF 105 (Safa texting Rosenblatt to "[s]end me the attys [sic] that do last minute. Come on [Rosenblatt]. If you helped me out it won't put a dent in [W]atchdog. And you know I am willing to pay for them[.]").) Thus, notwithstanding Safa's self-serving and devious appeal to Rosenblatt about not "put[ting] a dent in [W]atchdog" (*id.*), Plaintiff has unquestionably lost good will, reputation, and business opportunities because of Defendants'

unlawful conduct and will continue to suffer irreparable harm absent an injunction. *See QBE Am., Inc. v. Allen*, Nos. 22-CV-756, 22-CV-757 (JSR), 2022 WL 889838, at *15 (S.D.N.Y. Mar. 15, 2022) ("Even if QBE could reliably measure and obtain damages for poached customers at the end of this litigation, it would be very difficult to precisely quantify the harm caused by having its trade secrets misappropriated and used to jump-start a new competitor."); *see also Coastal Distrib., LLC v. Town of Babylon*, No. 05-CV-2032 (JS) (ETB), 2006 WL 270252, at *3 (E.D.N.Y. Jan. 31, 2006), *aff'd as modified*, 216 F. App'x. 97 (2d Cir. 2007) ("Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm. . . . Furthermore, loss of business opportunities and relationships with clients who could produce an indeterminate amount of business over years to come are also hard to measure in dollars and are properly considered irreparable harm." (internal citation and quotation marks omitted)). Notably, the evidence presented throughout the multiple proceedings in this matter suggests that the IME market is relatively small and finite, such that finding new customers to replace the ones poached by Defendants has not and will not be easy for Plaintiff.

Moreover, a defendant's dissemination of trade secrets can be sufficient to show a likelihood of irreparable harm absent a preliminary injunction. *Intertek Testing Servs.*, 443 F. Supp. 3d at 331; *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages. . . . A trade secret once lost is, of course, lost forever."). Here, Defendants have conceded that they gave all of their customer information, including the information stolen from Plaintiff, to Fari Gutierrez to start Client Exam Services. (March 2023 Tr. 126–127.) Thus, Defendants not only wrongfully used Plaintiff's trade secrets to build Companions, Defendants further disseminated

Plaintiff's confidential information to outside parties in order to evade the Court's March 2023 TRO, resulting in further damage to Plaintiff's business, reputation, and good will.

Defendants argued during the March 2023 hearing that Safa "giving up" the misappropriated customer information to Gutierrez did not qualify as Safa "using" the information because "she's not profiting from it and she's not operating [Client Exam Services.]" (March 2023 Tr. 127:2–5.) However, Defendants misunderstand the plain text of both the Amended Injunction and trade secret law. The Amended Injunction states in relevant part: "Defendants . . . are preliminarily enjoined from . . . using *in any manner whatsoever* Plaintiff's trade secrets and confidential information" (Dkt. 80 (emphasis added)), and New York law is clear that the dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See, e.g.*, *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018) ("Under New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm."); *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm."). Therefore, the Court finds that Plaintiff has shown they will be irreparably injured absent a preliminary injunction. Indeed, even with a preliminary injunction in place, Defendants disseminated Plaintiff's trade secrets, inflicting further harm against Plaintiff. Thus, Plaintiff will undoubtedly suffer additional irreparable harm absent a stricter preliminary injunction.

### D. Narrowly Drawn Injunction

In the context of loss of trade secrets, the Second Circuit instructs that: "where irreparable injury has been demonstrated, a 'narrowly drawn' preliminary injunction that protects the trade secret from further disclosure or use may be appropriate. In all cases, the relief should be 'narrowly

tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)). Here, the Court issues a narrowly tailored injunction, only enjoining Defendants from providing services to those customers who Plaintiff has shown were misappropriated from Plaintiff. (*See* Dkt. 180; 4/3/2023 Docket Order; 4/7/2023 Docket Order; 4/10/2023 Docket Order.) The Court notes again that this strengthened injunction is necessitated by Defendants' violation of the previous injunction.

**E. Balance of Equities**

The Court finds that the balance of equities tips decidedly in Plaintiff's favor. The Court has already found that Plaintiff has suffered and will continue to suffer irreparable harm if Defendants are not enjoined from using and disseminating Plaintiff's trade secrets. As for Defendants' claims of hardship, the Second Circuit is clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the defendant's own illegal activity. *See, e.g.*, *Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd.*, No. 18-CV-8333 (ALC), 2019 WL 10960397, at *4 (S.D.N.Y. June 20, 2019) ("Where a party knowingly copies and uses another party's trademark without its permission, that party assumes the associated risks, and any potential loss suffered by an injunction may be considered to be self-imposed."); *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 247–48 (E.D.N.Y. 2009) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) for the proposition that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself"); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 394 (S.D.N.Y. 2003) (finding that there was no real hardship to the defendant resulting from the issuance of an injunction other than loss of money from activity "it probably should not have engaged in to begin

with"); *Pearson Educ., Inc. v. Labos*, 19-CV-487 (CM), 2019 WL 1949820, at *6 (S.D.N.Y. Apr. 23, 2019) ("[I]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." (internal quotation marks and citation omitted)). Thus, here, Defendants' claim of hardship falls flat given the mountain of irrefutable evidence that Defendants engaged in a multi-year campaign, from the formation of Companions to the initiation of this lawsuit, to steal Plaintiff's confidential information and customers knowingly, methodically, and persistently. That is, Defendants assumed the risks of losing these customers when Defendants intentionally engaged in illegal activity to obtain them, and cannot legitimately claim any harm when they are forced to relinquish their ill-gotten business.

**F. Public Interest**

Lastly, the Court finds that the public interest will be served by an injunction prohibiting Defendants from further using what the Court finds, based on clear and convincing evidence, are wrongfully obtained trade secrets to poach clients from Plaintiff. As the Court stated in its previous Memorandum & Order issuing the April 2022 Injunction, "[i]t goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest." *IME Watchdog, Inc.*, 2022 WL 1525486, at *8.

**G. Bond**

As before, the Court waives the bond requirement imposed by Federal Rule of Civil Procedure 65(c). Pursuant to Rule 65(c), a court may "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[W]here a bond is posted, it serves as security for the 'costs and damages' incurred by the wrongfully restrained party." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 558 (2d Cir. 2011). District courts are "vested with wide discretion" to determine the appropriate amount of the bond,

*see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted), and, "despite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is no proof of likelihood of harm to the non-movant, *see Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (internal quotation marks omitted). If the district court decides that a bond is not necessary, it must "make this determination before it enter[s] the preliminary injunction." *Corning, Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (per curiam).

Here, Defendants have not requested a security bond and Plaintiff similarly has not raised the issue. Nevertheless, the Court makes an independent determination that a security bond is not necessary in this case. The Court has concluded that Plaintiff is highly likely to prevail on the merits in this litigation and that the hardship to Defendants from a preliminary injunction, if any, would therefore be minimal. *Golden Krust*, 957 F. Supp. 2d at 203 ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant." (collecting cases)); *see also Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that [the defendant] will be found to have wrongfully suffered harm."). Accordingly, the Court finds that no bond is required.

## II. Civil Contempt

### A. Civil Contempt Legal Standard

"A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Regarding the first factor, "[a]n injunction is sufficiently

clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" *Id*. (quoting *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir.1989)). As to the second factor, "[n]oncompliance [has] to be supported by clear and convincing evidence." *Id*. at 99. For the third factor, a party who diligently complies in a reasonable manner, "to ensure it remain[s] in compliance with the Injunction" "c[an] petition[] the District Court for a modification, clarification or construction of the order." *Id*. (quoting *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 192 (1949)). Importantly, a party's intent or state of mind does not matter for finding contempt. *See McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act."). Moreover, broader injunctions, with more general language, "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *Id.* at 192. Indeed, "[i]t does not lie in [the defendants'] mouths to say that they have immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined." *Id.*

Upon a finding of contempt, "[a] civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation omitted). "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id*. at 1353 (citation omitted). On the other hand, coercive sanctions are "left to the informed discretion of the district court" and should be based on "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent

seriousness of the sanction's burden." *Id*. (citations omitted). Notably, "[t]he court may . . . serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020) (citations omitted).

**B. The Court Finds Defendants in Contempt of the Amended Injunction and March 2023 TRO**

Applying this standard, the Court finds Safa Gelardi in contempt of the Amended Injunction with respect to the provisions in the Amended Injunction: (1) barring Defendants from making contact with Carlos Roa; and (2) operating Defendants' business or any other business that unfairly and unlawfully competes with Plaintiff.

1. Hiring a Private Investigator to "Befriend" Carlos Roa Constitutes "Contacting" Roa in Violation of the Amended Injunction

a. The Amended Injunction Clearly Prohibited Contact

The Court's Amended Injunction enjoins "Defendants, *their agents*, officers and employees, *and all other persons and entities in active concert or participation with them*" from "contacting Plaintiff's current clients, employees, and agents[.]" (Dkt. 80, at 2 (emphasis added).) Safa's hired investigator, Stanulis, undoubtedly qualifies as her agent and/or a person acting in concert with her." *See CBS Broad. Inc.*, 814 F.3d at 98 ("An injunction is sufficiently clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" (quoting *Drywall Tapers & Pointers*, 889 F.2d at 395)). Thus, the Court finds that the Amended Injunction clearly and unambiguously prohibited Safa from hiring Stanulis to contact Roa.

b. Evidence of Safa's Violation is Clear and Convincing

Despite the plain language of the Amended Injunction, Safa hired a private investigator to contact Plaintiff's current employee, Roa. (*See* Dkt. 153-4 (contract between Safa and private

investigative agency dated "11/04/2022").) Safa directed the private investigator to "befriend" Roa, even providing the hired agent with scripted questions and conversation topics. (*See, e.g.*, Dkt. 181-1, at ECF 1 (email from Safa to the private investigator stating "Dear, Steve, this is my ex-employee [Carlos Roa], try to relate to him, he is a big mouth and will talk."); *id.* (Safa providing conversation material to the investigator including, "[Q]uestions to ask[:] how long have you been in the sports business? ([H]e claims to be a manager to runners[] and athletes[.] . . . Try to get him to talk shit about his current boss (Daniella Levi)[.] Try to get him to defame her badly and disparage her, and have him talk about starting his own IME Business[.]").) Moreover, Defendants "don't dispute" that Safa "had instructed the [private investigator] to befriend Mr. Roa." (March 2023 Tr. 137:18–20.)

In response, Defendants argue that Safa's plan of hiring a private investigator to *elicit* contact was not *initiating* contact. (*Id.* 137:22–138:6 (Safa's counsel arguing that "instruct[ing] the [private investigator] to befriend Mr. Roa" "wouldn't be a contact initiated by her or the [private investigator]" because it was "supposed to go the other way around"—that is—the investigator was hired to "accept contact, not to make contact.").) However, for the reasons stated on the record, the Court finds this argument wholly unavailing, if not disingenuous and cynical. (*Id.* 138:7–16 ("THE COURT: [W]hether [Stanulis] initiates it or not it's contact . . . if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. . . . She placed someone there to have contact with him.").) Moreover, whether Safa *willfully* violated the no-contact provision is irrelevant to the Court's finding of contempt, *see McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve from civil contempt . . . it matters not with what intent the defendant did the prohibited act."), although, based on the evidence produced in connection with the hearing, as well her conduct throughout these

proceedings, the Court would find Safa's conduct willful, if that were a requirement. Thus, the Court finds that there is clear and convincing evidence that Safa attempted to contact Roa through a hired investigator in violation of the Amended Injunction.[12]

c. Safa Did Not Exercise Reasonable Diligence

Lastly, although the plain language of the Amended Injunction clearly prohibited any individual working "in concert" with Safa from contacting Plaintiff's employees, to the extent Safa had any concerns about what the provision entailed, she could have asked the Court for "a modification, clarification[,] or construction of the order[.]" *CBS Broad. Inc.*, 814 F.3d at 99. Instead, she "incorrectly took it upon [her]self to interpret" the no-contact provision as allowing her to hire an individual to "befriend" Roa and did not exercise reasonable diligence in complying with the Amended Injunction. *Id.*[13] Moreover, any argument that the Amended Injunction's no-contact provision was too general is unavailing. Where a party's "proclivity for unlawful conduct has been shown[,]" as has been overwhelmingly established as to Defendants here, "[d]ecrees of [] generality are often necessary to prevent further violations." *McComb*, 336 U.S. at 192; *see also id.* ("It does not lie in [the defendants'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined.").

[12] Plaintiff also submitted clear and convincing evidence that Safa paid Stanulis to place a GPS tracker on Roa's car. (Dkt. 153-5, at ECF 1 (Stanulis declaring that Safa "requested 10 hours of surveillance and agreed to a 'tracker' on [Roa's] car as well"); *id.* at ECF 11–16 (Safa texting Stanulis regarding whether the GPS tracker is working).) For the reasons stated on the record, the Court declines to find that Safa's attempt to track Roa violated the Amended Injunction. (*See* March 2023 Tr. 20:5–21:4.) However, the Court's Second Amended Preliminary Injunction will expressly prohibit Defendants from surveilling and tracking Plaintiff and Plaintiff's employees in addition to the no-contact provision.

[13] Furthermore, as noted, the Court does not find that Safa misunderstood the language of the no-contact provision. Rather, she deliberately sought to end run the injunction by directing the private investigator to elicit contact and "befriend" Roa.

Thus, the Court finds Safa in civil contempt for violating the Amended Injunction. However, the Court cannot determine the amount of damages to which Plaintiff is entitled because Plaintiff has not submitted the required affidavit "set[ting] out with particularity . . . the claim, if any, for damages occasioned [by Defendants' contemptuous actions] and such evidence as to the amount of damages as may be available to the moving party." *See* Local Rule 83.6(a); *see also* Local Rule 83.6(c) (requiring the Court to "set[] forth the amount of damages, if any, to which the complainant is entitled" and "fixing the fine, if any, imposed by the Court" in an order of civil contempt). For this reason, the parties are directed to further brief the issue of damages and attorneys' fees. *See infra* Conclusions of Law, Section II.C.

2. <u>Defendants Violated the March 2023 TRO By Helping to Start Client Exam Services</u>

a. <u>The March 2023 TRO Clearly Prohibited Defendants from Helping to Start Client Exam Services</u>

On March 10, 2023, the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.) This language is clear and unambiguous.

b. <u>Evidence of Defendants' Noncompliance is Clear and Convincing</u>

The evidence presented during the March 27, 2023 hearing clearly and convincingly established that Safa directed Fari Gutierrez—a friend of the Gelardi family (March 2023 Tr. 98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)—to create Client Exam Services and circumvent the Court's TRO. Defendants' own counsel explained that after the issuance of the TRO, Safa "called Fari and said, [']I have been shut down. I cannot operate the business [Companions]. It's yours, if you want it.[']" (*Id.* 25:1–3.) Safa's employee, Beibin, also

testified that on March 11, 2023, the day after the Court issued the TRO, Safa told him that Companions was shutting down until further notice and that Gutierrez had started a company and would contact him. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel explaining that Safa told Mr. Beibin that "Fari may be taking over the business").) On March 12, 2023, Beibin received a call from "Sammy," Safa's nephew, on behalf of Client Exam Services, who explained to Beibin "that everything would pretty much be operating the same way as they did" at Companions. (*Id.* 97:11–14, 100:21–24.) There were, in fact, no differences in operations between Client Exam Services and Companions:

> THE COURT: Are you paid the same?
>
> THE WITNESS: I haven't been paid yet.
>
> THE COURT: But were you promised the same pay[?]
>
> THE WITNESS: It would be the same, yeah.
>
> THE COURT: But did you discuss that specifically?
>
> THE WITNESS: No.
>
> THE COURT: So why did you assume that?
>
> THE WITNESS: Because I was told that everything would operate the way it had before.
>
> THE COURT: . . . . Who told you that?
>
> THE WITNESS: That's what Sammy told me.
>
> THE COURT: As before what? The company didn't exist [until March 16th].
>
> THE WITNESS: When IME Companions was closed, I was made to believe that all of the business was now going to be taken over by Fari Gutierrez and . . . Sammy would give me my assignments.
>
> THE COURT: And everything would remain the same, except for the name of the company as far as you were told?
>
> THE WITNESS: As far as I was told, yeah.

(*Id.* 113:25–114:23.) Beibin attended approximately 12 IMEs on behalf of Client Exam Services for the same clients he had been servicing when he worked at Companions after the March 2023 TRO was issued. (*Id.* 100:25–101:2, 103:14–16, 115:2–5.)

Thus, the Court finds that there is overwhelming, undisputed evidence that "Defendants and any persons/entities acting in concert with them" have continued to operate a "business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.)

c. Defendants Did Not Exercise Reasonable Diligence

Lastly, Defendants clearly did not exercise reasonable diligence in complying with the March 2023 TRO. Defendants argue that Safa provided Companions' clients and "outstanding assignments" to Gutierrez because she wanted to ensure they were "take[n] care of" after Companions was enjoined from servicing them. (March 2023 Tr. 26:16 – 27:4.) Therefore, it was not Safa who was operating the business or using the client information, but rather "she was letting someone else us[e] them." (*Id.* 27:5–15.) But Defendants ignore the fact that they were already enjoined by the Amended Injunction from "using *in any manner whatsoever* Plaintiff's trade secrets and confidential information." (Dkt. 80 (emphasis added).) Moreover, under New York law, dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See Capstone Logistics Holdings, Inc.*, 2018 WL 6786338, at *33 ("[T]he use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm.").[14]

[14] During the March 27, 2023 hearing, Defendants' counsel argued that giving Plaintiff's client lists to Gutierrez did not qualify as "use" of Plaintiff's trade secrets if Safa was "not profiting from it" and "not operating" the new business. (March 2023 Tr. 127:2–5.) However, New York trade secrets law clearly refutes this argument. Furthermore, this self-serving, post-hoc argument

Thus, if Defendants had exercised any amount of diligence, they would not have let a family friend "take over" Companions' business after the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating [Companions] or any other business that unfairly competes with Plaintiff" (Dkt. 156, at 3), because it was a clear violation of the Court's TRO. (*See* March 2023 Tr. 114:16–18 (Beibin testifying that "[w]hen IME Companions was closed, [he] was made to believe that all of the business was now going to be taken over by Fari Gutierrez[.]").) Even defense counsel conceded during the March 27, 2023 hearing that"[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [Client Exam Services] leads back to [Safa]." (*Id.* 126:3–5.)

Thus, the Court finds Safa in civil contempt for violating the Court's March 2023 TRO.

**C. The Court Requires Further Briefing Regarding the Compensatory Damages Sought**

As discussed, Plaintiff must file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages. *See* Local Rule 83.6(a) ("The affidavit upon which such notice of motion [for contempt] or order to show cause is based shall *set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be available to the moving party*. A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage." (emphasis added)); *see also N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353 (explaining that "compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury" (citation omitted)). Thus, Plaintiff is directed to submit

ignores the plain language of the Amended Injunction and the Court's written decisions and oral pronouncements in this matter.

further briefing setting forth the actual damages it has incurred due to (1) Safa's "contact" with Roa, and (2) the creation of Client Exam Services, within 60 days of this Order.

**III. Plaintiff's Other Requested Relief**

In addition to the issues addressed above, Plaintiff is also seeking the following relief: (1) imposing upon Defendants a daily fine of $10,000 payable to Plaintiff for each day the Court finds Defendants in violation of the previous Injunctions; (2) attaching Defendants' real property or directing that all proceeds from the sale of any real property be held in escrow pending final disposition of this case; and (3) directing Defendants to submit to another forensic examination at their sole cost. The Court denied these requests for the reasons stated on the record at the March 27, 2023 hearing and does not find there is need to further supplement its reasoning at this time. (*See generally* March 2023 Tr.)

**CONCLUSION**

For the reasons stated above, the Court grants in part and denies in part Plaintiff's request for a second preliminary injunction. The Court attaches the Second Amended Preliminary Injunction Order, which sets forth the specific terms of the injunction, to this Memorandum & Order. Moreover, although the Court finds Safa in civil contempt of the Amended Injunction and the March 2023 TRO, the Court reserves on making a final ruling on damages and imposing sanctions until Plaintiff submits supplemental briefing regarding its compensatory damages, including attorneys' fees for the March 27, 2023 contempt proceedings. Plaintiff's supplemental brief setting forth the specific amounts of attorneys' fees and compensatory damages they believe they are owed as a result of Defendants' contact with Roa and the creation of Client Exam Services is due 60 days from the date of this Order. Defendants will be permitted 30 days to respond, if they choose.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 13, 2024
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
IME WATCHDOG, INC.,

Plaintiff,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS, LLC, CLIENT EXAM SERVICES, LLC, and IME MANAGEMENT & CONSULTING, LLC,

Defendants.
--------------------------------------------------x
SAFA GELARDI and IME COMPANIONS, LLC,

Third-Party Plaintiffs,

- against -

CARLOS ROA,

Third-Party Defendant.
--------------------------------------------------x
CARLOS ROA,

Third-Party Counter-Claimant,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC,

Third-Party Counter-Defendants.
--------------------------------------------------x

**<u>SECOND AMENDED PRELIMINARY INJUNCTION</u>**

22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Upon consideration of Plaintiff's second application for a preliminary injunction, Plaintiff's memorandum of law and supplemental briefs filed in support thereof and the accompanying declarations, Defendants' memorandum of law and supplemental brief filed in opposition thereto and the accompanying declarations, and the evidence presented at the show-cause hearing held on March 27, 2023; and

Upon consideration of the Court's Findings of Fact and Conclusions of Law, set forth in the Court's Memorandum & Order dated October 20, 2023, that Plaintiff likely will succeed on the merits of this litigation, that Plaintiff will and has suffered irreparable harm if the requested relief is not granted in part, that the balance of hardships tips in Plaintiff's favor, and that it is in the public's interest for the Court to issue a preliminary injunction,

**IT IS THEREFORE ORDERED THAT:**

A. Plaintiff's application for a preliminary injunction is hereby GRANTED in part, and that Defendants, their agents, officers, and employees, and all other persons and entities in active concert or participation with them, are preliminarily enjoined from:

1. using in any manner, whatsoever—including but not limited to transferring, transmitting, selling, and/or giving to another individual or entity—Plaintiff's trade secrets, and confidential and proprietary information, in the nature of Plaintiff's: customer lists, customer information (including, but not limited to, customer names, contact information, whether customers paid the issued invoices—and if so—amounts paid, number of associate visits performed, nature of services performed and hours spent servicing the customer, and customer's preferences in connection with the independent medical examinations); invoices; website; training

handbooks; independent medical examination reports; monthly, quarterly, and/or annual reports; internal memoranda; financial information (including, but not limited to, information regarding payroll, banking, and profit and loss); and employees and agents (including which customers they service, which doctors' independent medical examinations they observed and how long such examinations lasted, and how much they earn);

2. providing any services to customers misappropriated from Plaintiff, including the customers identified on the Enjoined Customers List (attached as Exhibit A);
3. contacting (or eliciting contact from) and/or surveilling Plaintiff's current clients, employees, and agents;
4. franchising IME Companions LLC; and
5. destroying any documents, whether in hard copy and/or computerized and/or other electronic media format, that are presently in Defendants' personal or corporate possession relating to IME Companions LLC, IME Watchdog, Inc., or any other matter relevant to this case.

B. Defendants are directed to return to Plaintiff all originals and copies of documents, records, and information, whether in hard copy and/or computerized and/or other electronic media form, that contain Plaintiff's trade secrets, and confidential and proprietary information, in the nature of Plaintiff's: invoices; website; training handbooks; independent medical examination reports; customer information (including, but not limited to, customer names, contact information, whether customers paid the issued invoices and if so, amounts paid, number of associate visits performed, nature of services performed and hours spent servicing the customer, and customer's preferences in connection with the independent

medical examinations); monthly, quarterly, and/or annual reports; internal memoranda; financial information (including information regarding payroll, banking, and profit and loss); and employees and agents (including, but not limited to, which customers they service, which doctors' independent medical examinations they observed and how long such examinations lasted, and how much they earn).

This preliminary injunction shall continue until a final judgment or order is issued in this matter, unless otherwise modified in writing by the Court. Failure to comply with the preliminary injunction will result in findings of contempt and in sanctions.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: October 20, 2023
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IME WATCHDOG, INC.,

Plaintiff,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS LLC, CLIENT EXAM SERVICES LLC, and IME MANAGEMENT & CONSULTING LLC,

Defendants.
-------------------------------------------------------x

**ORDER TO SHOW CAUSE**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

The Court is in receipt of (1) Safa and Vito Gelardi's ("Individual Defendants") response to the Court's 5/5/2025 Order to Show Cause ("OTSC"), (Defs.' OTSC Response, Dkts. 485, 487–491); (2) Plaintiff's request that the Court reconsider its 5/28/2025 Order, (Dkt. 495), granting, in part, Defendant Safa Gelardi's ("S. Gelardi") 5/27/2025 request to extend the stay in this case, (Dkt. 496[1]); and (3) Individual Defendants' request that the Court vacate its previous contempt orders, (Dkt. 498).

First, the Court denies Plaintiff's request to reconsider its May 29, 2025 decision extending the stay in this case by 30 days to allow Individual Defendants to retain new counsel, **except** that, in light of Individual Defendants' failure to notify the Court and Plaintiff of the sale of Individual

[1] The Court notes that Plaintiff's memorandum was cc'd to "All Counsel of Record (via ECF)." (Pl.'s Letter, Dkt. 496, at 4.) Defendant Vito Gelardi ("V. Gelardi"), though, is proceeding *pro se* and has not consented to electronic service via ECF. Plaintiff is directed to serve its memorandum to V. Gelardi via first-class mail and to file proof of such service on the docket by 6 pm ET on Monday, June 2, 2025. Plaintiff is directed to do the same with all of its filings unless and until V. Gelardi either consents to electronic notification or obtains new counsel.

Defendants' property located at 9 Woods End, Lake Harmony, Pennsylvania, the Court now **ORDERS** Individual Defendants to deposit all proceeds of that sale ($123,670.47) into the Court Registration Investment System ("CRIS") no later than Friday, **June 6, 2025**. If Individual Defendants no longer have the entire proceeds of that sale ($123,670.47), Individual Defendants are directed to (1) deposit all remaining proceeds into CRIS, and (2) submit a detailed, itemized summary by **June 6, 2025**, explaining what they have done with the outstanding proceeds. Individual Defendants should make this deposit via check payable out to "Clerk, U.S. District Courts." In the event Individual Defendants have also sold their other Pennsylvania property, located at 5265 Milford Road, East Stroudsburg, the Court **ORDERS** Individual Defendants to do the same for all proceeds of that sale into CRIS by **June 6, 2025**. If they still own that property, Individual Defendants will advise by **June 6, 2025**, whether they intend to sell that property within the next 30 days of this Order.

Attachment of these proceeds is necessary to ensure that the proceeds are preserved in the event a judgment is issued against Individual Defendants in this case, and to ensure that Individual Defendants are able to satisfy their existing obligations. And although Individual Defendants' claim in their 5/28/2025 letter, (Dkt. 498), that their former counsel, Jonathan Warner, is at fault for their failure to comply with the Court's March 8, 2024 Order directing Individual Defendants to "notify the Court within three (3) days of entering into any contract to sell their ownership interest in any other property [besides their property at 148 Clay Pit Road, Staten Island, New York]," the Court is skeptical of that claim and, even if the claim is true, is still concerned—given the history of Individual Defendants' flagrant non-compliance with multiple court orders in this case—that Individual Defendants will dissipate all of their assets in order to avoid paying any

judgment owed in this case, if the proceeds from the sale of the 9 Woods End property are not turned over to the Court.

Second, although Plaintiffs are correct that Individual Defendants have not complied with many aspects of the Court's prior orders, (*see* 4/2/2025 Minute Entry, 5/5/2025 OTSC, Dkt. 482), e.g. by providing certain financial statements from the preceding month, but not all statements/records from the previous two years, the Court believes that it is more important to address the most significant areas of Individual Defendants' non-compliance, namely, those relating to the dissipation of Individual Defendants' assets. For this reason, the Court is not going to direct Individual Defendants to fully comply with the Court's previous orders while the stay in still in effect and therefore, other than the exceptions described above, denies Plaintiff's reconsideration request. (Pl.'s Letter, Dkt. 496.)

Third, the Court notifies Individual Defendants that because they have, in effect, waived their attorney-client privilege regarding whether they told their former counsel about the impending sale of the 9 Woods End property, once the stay in this case is lifted, the Court will direct Individual Defendants' former counsel, Mr. Warner, to respond to Individual Defendants' allegation that they told him about the impending sale, but that he failed to notify the Court, despite the Court's March 8, 2024 Order. (*See* Defs.' Letter, Dkt. 498, at 1–2.)

Finally, the Court denies Individual Defendants' request that it vacate its previous contempt orders, (Defs.' Letter, Dkt. 498, at 3), and clarifies to Individual Defendants that it has not, at this point, found them in contempt as to the sale of the 9 Woods End property. Thus, Individual Defendants' request that the Court "[r]everse the contempt order on 9 Woods End," (*id.*) is denied as moot.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 30, 2025
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
IME WATCHDOG, INC.,

Plaintiff,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS LLC, CLIENT EXAM SERVICES LLC, and IME MANAGEMENT & CONSULTING LLC,

Defendants.
-----------------------------------------------------x

**ORDER TO SHOW CAUSE**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

On April 30, 2025, the Honorable James R. Cho granted the motion of defense counsel to withdraw from this case, and stayed this action until May 30, 2025, to permit Defendants Safa and Vito Gelardi and IME Companions LLC (collectively, "Defendants") the opportunity to retain new counsel. (*See* 4/30/2025 Minute Entry.) At the same time, however, the Court has learned that Defendants Safa and Vito Gelardi (the "Individual Defendants" or the "Gelardis") appear to have sold one or two of their properties, without providing notice to the Court as required by the Court's March 8, 2024 Order, which directed the Individual Defendants to "notify the Court within three (3) days of entering into any contract to sell their ownership interest in any other property [besides their property at 148 Clay Pit Road, Staten Island, New York] including the identity(ies) of the buyers and an anticipated closing date." (*See* Pl.'s 4/28/2025 Letter, Dkt. 472 (describing 2/27/2025 sale of property located at 9 Woods End, Lake Harmony, PA 18624); Pl.'s 4/30/2025 Letter, Dkt. 474 (describing undated sale of property located at 5265 Milford Road, East Stroudsburg, PA 18302)).

In light of what appears to be the Individual Defendants' clear and direct defiance of the Court's March 8, 2024 Order, and the need to ensure that the proceeds of any property sales by the Individual Defendants are not dissipated, concealed, or rendered unattachable, the Court carves out the following exception to Judge Cho's stay: by **May 19, 2025**, the Individual Defendants will file a summary of their financial information from the last two years,[1] which must include details about the sale(s) of any real property since March 8, 2024. This information should include, at a minimum, the address of the sold property, the date of sale, the buyer(s), the listed sale price, the agreed-upon sale price, the closing costs, the proceeds received, where the proceeds are located, and/or what was done with the proceeds. The same information, plus the anticipated closing date, will be provided as to any property that is under contract for sale, but has not yet been sold. In addition, the Individual Defendants will produce the closing documents for any sales of real property and the contracts for any anticipated sales.

---

[1] The Gelardis were previously ordered to provide this information by May 6, 2025. (*See* 4/2/2025 Minute Entry; 4/9/2025 Docket Order; 4/16/2025 Docket Order; 4/25/2025 Docket Order.) As a reminder, with respect to this disclosure, the Gelardis are required to:

> file all relevant documentation from the last two years, of all of their sources of income (even if the money received is then used to make a mortgage payment, for example) and of all of their assets. The statement of Defendants' finances should include a summary of all of their businesses (including, but not limited to, any independent medical exams ('IME') businesses, their daycare business, and their possible Italian sandwich deli business), a summary of all of their personal and business financial accounts (including bank accounts Defendants have signatory rights to, even if the account is in the name of another person or entity), a summary of all property they own and any related rental or rent-to-buy agreements, and full disclosure of all assets of any kind which they own. In addition to this summary, Defendants shall file all financial statements and/or records from the last two years that are related to the businesses, accounts, and/or assets identified.

(4/2/2025 Minute Entry.)

As part of the same submission, again due by **May 19, 2025,** the Individual Defendants are ordered to SHOW CAUSE why they should not be required to deposit all proceeds from any sales of their properties since March 8, 2024, with the Court Registration Investment System ("CRIS") during the pendency of this case. In February 2024, the Court found sufficient grounds to issue an Order of Attachment as to the Individual Defendants' Staten Island property, in order to satisfy any judgment Plaintiff secures in this matter. (*See* 2/29/24 Memorandum & Order, Dkt. 284 (noting Plaintiffs' request for $186,038.67 in compensatory damages).) Since then, the Court has assessed as contempt sanctions against Defendants: $47,321.63 in attorneys' fees and $11,036.00 in costs to Plaintiff, and $6,890.00 in attorneys' fees and $1,209.11 in costs to Carlos Roa. (Dkt. 394). The Court subsequently found the Individual Defendants in contempt again, (Dkt. 448), for which the Court has yet to make a determination regarding what additional sanctions will be imposed on the Individual Defendants. Furthermore, Individual Defendants still have not paid approximately $30,216.47—plus any applicable interest—that they owe to Berkeley Research Group, LLC ("BRG"), the neutral forensic examiner appointed by the Court on June 22, 2022. (Dkt. 90.) In addition to explaining why attachment of any property sales proceeds is not proper, the Individual Defendants' response should address the requirements of New York Civil Practice Law and Rules ("NYCPLR") § 6201, described in the Court's February 29, 2024 Attachment Memorandum & Order, Dkt. 284.

Additionally, on May 2, 2025, the Court received the attached correspondence from Ignatius Grande of BRG, in which Mr. Grande informed the Court that while Safa paid BRG the $2,000 payment the Court ordered during the April 2, 2025 Show Cause Hearing, she did not pay

BRG the $500 payment due May 1, 2025.[2] In accordance with the Court's Order during that Show Cause Hearing, (*see* 4/2/2025 Minute Entry), **the Court sanctions Safa $500, to be paid by May 12, 2025, to the Clerk of Court, United States District Court, Eastern District of New York. Also, by May 12, 2025, the Individual Defendants must pay BRG the $500 payment that was due on May 1, 2025. The Individual Defendants are directed to file proof of both payments on the docket by May 16, 2025.**

Lastly, also on May 2, 2025, Plaintiff filed yet another motion for a temporary restraining order and for contempt. (*See* Dkts. 477–79.) Because the Court has decided on its own to order the Gelardis to provide financial disclosures, including the details of the Gelardis' post-March 8, 2024 property sales, and to show cause why any proceeds from those sales should not be attached by the Court, the Court denies Plaintiff's related requests as moot. The Court defers resolution of Plaintiff's remaining requests until after the stay of this case is lifted, after which Defendants will be given time to oppose Plaintiff's remaining requests.

**Failure to timely comply with any direction in this Order could result in a finding of contempt against the Individual Defendants and could result in additional sanctions, including case-ending sanctions—i.e., the issuance of a default judgment against Defendants—under Federal Rule of Civil Procedure ("Rule") 16(f), which permits the Court to *sua sponte* "issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii)" where a party or its attorney fails to obey a pretrial order. Fed. R. Civ. P. 16(f). Rule**

[2] The Court acknowledges that, in accordance with the Court granting Mr. Grande leave during the April 2, 2025 Show Cause Hearing "to submit to the Court a letter calculating a 1% late fee and propose a payment schedule of the same," (4/2/2025 Minute Entry), Mr. Grande has provided a chart showing calculations resulting in $10,520.73 in interest owed. The Court defers resolution of the amount of interest Individual Defendants owe to BRG until after the stay of this case is lifted.

**37(b)(2)(A)(vi) permits the Court to "render[] a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(vi). *See Houghton v. Culver*, 467 F. App'x 63, 65 (2d Cir. 2012) (explaining that "the standards developed under Rule 37(b)(2)" apply to a district court's sanction under Rule 16(f)) (summary order).**

**CONCLUSION**

**By 5 pm ET on Monday, May 5, 2025**, Plaintiff shall serve on the Individual Defendants via both email and overnight mail this Order to Show Cause and its attachments, as well as the Court's February 29, 2024 Attachment Memorandum & Order, Dkt. 284. **By the same date and time**, Plaintiff shall provide Mr. Grande with a copy of this Order to Show Cause. Plaintiff is further directed to file proof of such service on the docket **by 6 pm ET on Monday, May 5, 2025**.

**By May 12, 2025**, Defendant Safa Gelardi shall pay $500 in sanctions to the Clerk of Court, United States District Court, Eastern District of New York, and the Individual Defendants shall pay BRG the $500 payment that was due on May 1, 2025. The Individual Defendants are directed to file proof of both payments on the docket **by May 16, 2025**.

**By May 19, 2025**, the Individual Defendants shall file with the Court: (1) the above-described summary of their financials and any and all sales of their property(ies) since March 8, 2024, and (2) their response to the Court's Order to Show Cause why they should not be required to deposit all proceeds from any sales of their properties since March 8, 2024 with CRIS during the pendency of this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 5, 2025
Brooklyn, New York

**From:** Ignatius Grande <igrande@thinkbrg.com>
**Sent:** Friday, May 2, 2025 2:58 PM
**Subject:** re: IME WatchDog, Inc. v. Gelardi, et al. (1:22-cv-1032)

**CAUTION - EXTERNAL:**

Dear Judge Chen,

I am writing you to provide you an update as requested in the IME WatchDog, Inc. v. Gelardi, et al. matter (1:22-CV-01032). Shortly after the April 2nd court conference that I participated in, on 4/7, BRG did receive that initial payment of $2,000 from the Defendants in this matter. However, I am writing to inform you that BRG did **NOT** receive a subsequent payment yesterday (May 1, 2025). I just checked again with our Finance Department and they confirmed that no payment came through yesterday, 5/1. As per your order following the show cause hearing, *"[b]eginning on Thursday, May 1, 2025, Safa shall pay BRG $500 on the first of every month, regardless of the day of the week, until her outstanding balance to BRG is satisfied. In the event that any of these payments is late, Safa will be sanctioned $500 per late or missed payment."*

In addition, as I noted during the oral argument in April, as per our engagement letter, BRG is entitled to "a late payment charge of one percent (1%) per month." According to our Finance Department's calculations, as of April 3rd, the interest that the defendants have incurred as of that date was **$10,520.73.** I have attached a chart showing those calculations. Please let me know if you have any question or need any additional information.

Best regards,

Ignatius

**Ignatius Grande** | Director

**BRG**

810 Seventh Avenue, Suite 4100 | New York, NY 10019

D 646.809.8066 | M 718.249.7203

igrande@thinkbrg.com | thinkbrg.com

*IME Watchdog, Inc. v. Gelardi, et al.* 1:22-cv-01032

| **BRG Past Due Invoices: Interest Calculator** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Matter# | Invoice Date | Invoice# | Invoice Amount | Net Payment Days | Monthly Interest Rate | Input Date | Interest Owed | Total Amount Owed (/w Interest) |
| 043993 | 8/26/22 | 138643 | 9,803.75 | 30 | 1.00% | 4/3/2025 | $2,941.13 | $12,744.88 |
| 043993 | 11/21/22 | 140379 | 13,964.84 | 30 | 1.00% | 4/3/2025 | $3,770.51 | $17,735.35 |
| 043993 | 12/21/22 | 145019 | 1,219.84 | 30 | 1.00% | 4/3/2025 | $317.16 | $1,537.00 |
| 043993 | 1/26/23 | 145926 | 6,751.45 | 30 | 1.00% | 4/3/2025 | $1,687.86 | $8,439.31 |
| 043993 | 3/31/23 | 147715 | 2,987.18 | 30 | 1.00% | 4/3/2025 | $687.05 | $3,674.23 |
| 043993 | 3/31/23 | 149244 | 2,150.50 | 30 | 1.00% | 4/3/2025 | $494.62 | $2,645.12 |
| 043993 | 5/3/23 | 151458 | 2,624.33 | 30 | 1.00% | 4/3/2025 | $577.35 | $3,201.68 |
| 043993 | 6/1/23 | 153975 | 214.58 | 30 | 1.00% | 4/3/2025 | $45.06 | $259.64 |
| | | | **$39,716.47** | | | | **$10,520.73** | **$50,237.20** |

**From:** Jonathon Warner <jdwarner@wslaw.nyc>
**Sent:** Friday, August 29, 2025 10:18 AM
**To:** NYED_Chen Chambers <chen_chambers@nyed.uscourts.gov>
**Cc:** Karl Scheuerman <kescheuerman@wslaw.nyc>
**Subject:** RE: Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Memorandum & Opinion

**CAUTION - EXTERNAL:**

I attach my Declaration with Exhibit 1 attached, in accordance with your Honor's Order of August 25.

Jonathon D. Warner, Esq.

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, NY 10011

Office: 212.924.7111

Fax: 212.924.6111

Cell: 917.656.4197

www.wslaw.nyc

Martindale-Hubbell
AV PREEMINENT
Peer Rated for Highest Level of Professional Excellence 2025

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS LLC, CLIENT EXAM SERVICES LLC, and IME MANAGEMENT & CONSULTING LLC,

Defendants.
---------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**DECLARATION OF**
**<u>JONATHON D. WARNER</u>**

JONATHON D. WARNER, hereby declares and verifies the truth of the following, under penalty of perjury under the laws of the United States of America, pursuant to Title 28, United States Code, Section 1746:

1. I am a member of the firm of Warner & Scheuerman ("W&S"), former attorneys for defendants Safa Abdulrahim Gelardi ("Safa"), Vito Gelardi ("Vito") (collectively, the "Individual Defendants"), and I am fully familiar with the facts set forth herein. I submit this affirmation in compliance with this Court's Order dated August 25, 2025.

2. I was advised on March 11, 2025, that the Individual Defendants had sold the Woods End property. I was advised of the sale via a telephone conversation with Safa. W&S's billing records reflect my March 11th conversation with Safa.

3. As for the "evidence S. Gelardi included in and attached to her July 18, 2025 letter," the Individual Defendants had not advised me prior to closing on the sale of the Woods End property that they had entered into a contract of sale. I had only been informed that they were attempting to sell the Woods End Property. I had not been informed that the Individual Defendants

had entered into any contract of sale, whether with a first purchaser, a second purchaser, or anyone else. Nor had I ever been provided with a copy of any contract of sale for the Woods End property.

4. I was well aware that the Individual Defendants were trying to sell the Woods End property, and I had communications with Safa about my firm's outstanding bills wherein she stated that she would make a payment after she closed on the Woods End property. But I was never advised that the Individual Defendants had actually entered into a contract of sale for the Woods End property or that any closing was scheduled.

5. I could not have notified the Court within three (3) days from when the Individual Defendants entered into a contract of sale for the Woods End property because I was not aware that a contract of sale had been entered into until after the closing of title had occurred. I have yet to see the contract of sale and still do not know when the Individual Defendants entered into it.

6. I do not dispute the genuineness of Safa's January 10th text message attached to her July 18th letter. I note that such text message makes no reference to any contract of sale or to any specific closing date for the Woods End property. I further note that while Safa used the word "closes" in her January 10th text message, I did not know at that time that a contract of sale had been entered into and thought that she was speaking in general terms about W&S getting paid whenever the Individual Defendants got money from a sale of property.

7. After I had learned of the closing, I did not notify the Court that the closing had already occurred because I was specifically instructed by Safa not to do so. I also believed that my ethical obligations to my clients precluded me at that time from informing the Court that the Individual Defendants had failed to notify the Court that they had entered into a contract of sale for the Woods End property within three (3) days of doing so.

8. Frankly, I was unsure what to do when I learned on March 11, 2025, that the closing had occurred, other than to move to be relieved as counsel at a time when such application would least prejudice my clients. My partner and I had numerous discussions and debates concerning our ethical duties, and we concluded that our duty to maintain client confidences precluded us from disclosing the sale to the Court since the closing had already had occurred and the damage had already been done, and we decided to move to be relieved to extricate ourselves from the difficult situation our clients had placed us in. I stand by my legal opinion concerning my ethical obligations to my former clients since the closing had already occurred when they notified me of it.

9. That I was unaware that the Individual Defendants had entered into a contract of sale until after the closing is confirmed by the email I sent to the Individual Defendants on March 14, 2025, at 2:48 P.M.. My March 14th email to the Individual Defendants stated that they had failed to advise me of the contract of sale and had never sent me a copy of the contract of sale. The Individual Defendants did not respond to my March 14th email. A copy of my March 14th email is annexed as Exhibit "1."

10. W&S thereafter moved to be relieved as counsel as soon as it was reasonably practicable. My moving declaration alluded to the ethical dilemma that the Individual Defendants had placed me in. I did not provide any of the above details in my moving declaration due to my ethical obligation to maintain client confidences. I referenced my ethical obligation to maintain client confidences throughout my moving declaration.

11. I do not deny that W&S received a $10,000 check from its former clients on or about March 20, 2025. I disclosed W&S's receipt of the $10,000.00 payment in W&S's motion to be relieved.

12. I hope that this declaration addresses all matters which I am required to disclose pursuant to this Court's Order of August 25, 2025.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 27, 2025.

Jonathon D. Warner

# EXHIBIT "1"

**Karl Scheuerman**

| | |
|---|---|
| **From:** | Jonathon Warner |
| **Sent:** | Friday, March 14, 2025 2:48 PM |
| **To:** | Safa Gelardi; vito gelardi |
| **Cc:** | Karl Scheuerman |
| **Subject:** | FW: Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Order on Motion to Appear by Telephone/Video |

Judge Chen's March 8 Order below, which I sent to you on March 8, 2024, and which you replied to, required that you notify the Court within 3 days of entering into a contract for the sale of "any of" your properties. You have advised me that on Monday of this week you closed on the sale of one of the two PA properties, but you never sent me a copy of the contract, much less within "three days" of its being signed. How do you expect me to defend you when the next contempt motion is made (as it surely will)?

Jonathon D. Warner, Esq.
Warner & Scheuerman
6 West 18th Street, 10th Floor
New York, NY 10011
Office: 212.924.7111
Fax: 212.924.6111
Cell: 917.656.4197
www.wslaw.nyc

Martindale-Hubbell
PREEMINENT
AV
Peer Rated for Highest Level of Professional Excellence
2025

---

**From:** Safa Gelardi <safagelardi@gmail.com>
**Sent:** Friday, March 8, 2024 4:04 PM
**To:** Jonathon Warner <jdwarner@wslaw.nyc>
**Cc:** vito gelardi <vitogelardi@gmail.com>; Karl Scheuerman <kescheuerman@wslaw.nyc>
**Subject:** Re: Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Order on Motion to Appear by Telephone/Video

I'm sorry Jonathan. I cannot my children have obligations and so do I. We also do not have money to come

Sent from my iPhone

> On Mar 8, 2024, at 2:56 PM, Jonathon Warner <jdwarner@wslaw.nyc> wrote:
>
> Please see judge Chen's decision below. You both must appear at the evidentiary hearing. The Judge denied our request that you appear by video,

**From:** ecf_bounces@nyed.uscourts.gov <ecf_bounces@nyed.uscourts.gov>
**Sent:** Friday, March 8, 2024 3:52 PM
**To:** nobody@nyed.uscourts.gov
**Subject:** Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Order on Motion to Appear by Telephone/Video

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Eastern District of New York**

### Notice of Electronic Filing

The following transaction was entered on 3/8/2024 at 3:51 PM EST and filed on 3/8/2024

| | |
|---|---|
| **Case Name:** | IME WatchDog, Inc. v. Gelardi et al |
| **Case Number:** | 1:22-cv-01032-PKC-JRC |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**ORDER: The Court has reviewed the parties' recent submissions. (*See* Dkts. [286]-[298].) First, the Court denies Defendants' [289] request to communicate with The Gucciardo Law Firm PPLC ("Gucciardo"). As Plaintiff points out, the Court's 3/27/2023 Minute Entry makes clear that Defendants are enjoined "from providing services to any customer who were *former* clients of Plaintiff." (*See* 3/27/2023 Min. Entry (emphasis added).) Thus, the question of whether Gucciardo is currently Plaintiff's client (*see* Dkt. 289) has no bearing on Plaintiff's [288] contempt motion. Second, the Court defers ruling on Plaintiff's [288] contempt motion and Defendants' [298] motion to reconsider until it has an opportunity to hear from the parties regarding the allegations and arguments therein. Third, the Court denies Defendants' [294] motion to appear for the evidentiary hearing via telephone/video, to the extent that either or both of them are called as witnesses at the hearing.**

**That said, to allow Defendants more time to make the requisite preparations to appear in person, and because it is clear that the Court must address a number of issues beyond Plaintiff's initial motion for attachment, the Court reschedules the evidentiary hearing previously scheduled for 3/13/2024, to April 29, 2024, at 11:00 a.m. EST in Courtroom 4F North. (*See* 2/21/2024 Scheduling Order.) Any witness**

**who testifies will be required to appear in person on that date. This will be an omnibus hearing, and the parties should be prepared to discuss the following issues: (1) Plaintiff's [270], [278], and [283] motions for attachment and the allegations therein, including Defendants' property sales *and* Plaintiff's potentially incorrect reporting of Defendants' property sales (*see* Dkt. [286]); (2) Plaintiff's latest motion for contempt (*see* Dkt. 288), including the allegations therein and the question of whether some/all of those allegations have been previously submitted to this Court; (3) the allegations concerning Plaintiff's potential harassment of Eugene Liddie (*see* Dkt. [282]); (4) the outstanding bill owed to Berkeley, Research Group, LLC (*see* 1/29/2024 Docket Order); and (5) Defendants' motion for reconsideration. The parties shall file amended witness and exhibit lists by 4/15/2024.**

**Additionally, Defendants shall file another status report regarding the sale of the Staten Island Property by 3/15/2024. (*See* 3/1/2024 Docket Order.) The Individual Defendants shall also notify the Court within three (3) days of entering into any contract to sell their ownership interest in any other property, including the identity(ies) of the buyers and an anticipated closing date. Ordered by Judge Pamela K. Chen on 3/8/2024. (FG)**

**1:22-cv-01032-PKC-JRC Notice has been electronically mailed to:**

Steven Siegler steven@kilegal.com, karen@kilegal.com, samantha@kilegal.com, ssiegler123@gmail.com

Anthony Joseph Genovesi agenovesi@abramslaw.com, anthony@genovesi.us

Jonathon D. Warner jdwarner@warnerandscheuerman.com, diana@warnerandscheuerman.com, kescheuerman@warnerandscheuerman.com, melanie@warnerandscheuerman.com

Jamie Scott Felsen jamiefelsen@mmmlaborlaw.com

Melanie I. Wiener mwiener@abramslaw.com

Andreas Koutsoudakis andreas@kilawgroup.com, calendar@kilawgroup.com, karen@kilegal.com, samantha@kilegal.com, zoe@kilegal.com

Kenneth C. Brown kcb@alberlegal.com

James Francis Valentino james@valentinolegal.com, valentino@clayro.com, valentino.james@gmail.com

Emanuel Kataev emanuel@sagelegal.nyc, 4119461420@filings.docketbird.com, daniellalevi@levilawny.com, ekesq2014@recap.email

Maria Zieher mzieher@zieherlaw.com

**1:22-cv-01032-PKC-JRC Notice will not be electronically mailed to:**

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**IME Watchdog, Inc. v. Safa Gelardi, et al**
**Case No.: 1:22-cv-01032 (PKC)(JRC)**

---

## Letter Motion for Leave to File Clarifying Submission Regarding Discovery Limitation

**Dated: January 17, 2026**

---

**Hon. Pamela K. Chen**
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Chen,

I respectfully submit this letter motion seeking leave to file a short clarifying submission, for the limited purpose of preserving the record with respect to the scope of discovery as outlined in the Court's April 3, 2025, Order, which stated:

> "The Court extends the close of discovery deadline to Friday, May 30, 2025, for the limited purpose of taking the deposition of Daniella Levi, exchanging documents to support Plaintiff's damages claim, and resolving any objections to Defendants' document requests."

For the avoidance of doubt, this is a record-preservation request only. I am not seeking any relief, I am not seeking reconsideration, I am not asking the Court to reopen discovery, and I am not challenging the Court's prior rulings. I respectfully request leave only to clarify the procedural history and preserve the record regarding how the April 3, 2025 discovery limitation was framed and subsequently relied upon

I understand that the docket is administratively frozen. I am not seeking to reopen discovery, delay proceedings, or reargue the Court's prior rulings. My sole intent is to ensure the record reflects the circumstances under which the above limitation was imposed.

At the April 2025 hearing, I was present but represented and therefore unable to speak. When the Court inquired why discovery had not closed, my former counsel stated that no depositions had been taken and that damages discovery remained. When asked who he intended to depose, he named only Plaintiff Daniella Levi. He did not inform the Court that, on May 10, 2023, he had served formal deposition notices for Plaintiff Levi (June 15), Carlos Roa (June 8), and Adam Rosenblatt (June 1). True and correct copies of those deposition notices are attached hereto as Exhibits B, C, and D. He also did not disclose that I had consistently requested verified financial documentation, including tax returns, to substantiate Plaintiffs' damages claims.

Following that hearing, my former counsel did not pursue even the discovery he had acknowledged. After I proceeded pro se, I successfully compelled and conducted Plaintiff Levi's deposition in August 2025. I also moved to compel the production of tax returns, but that motion was denied by Magistrate Judge Cho. Plaintiffs later submitted a "Sales by Customer Summary" as their damages evidence, which was never supported by any verified financial record.

In addition, during an August 6, 2025, discovery conference, Plaintiffs' counsel falsely stated that I had only requested the depositions of Levi and Roa—not Rosenblatt. That was not true. I immediately submitted a letter to Judge Cho on the same day correcting the record and attaching the original deposition notices. A copy of that letter is attached as Exhibit A.

Exhibit A is submitted solely to document my contemporaneous correction of a factual misstatement regarding the Rosenblatt deposition request, and not to renew or seek discovery relief.

A copy of the original email from former counsel forwarding the deposition notices is attached as Exhibit E.

I raise none of this to relitigate discovery or delay the case. I am requesting permission to file a brief clarification so the record reflects that: - The limited discovery scope in the April 3, 2025 Order was based on incomplete information; - The deposition of Rosenblatt had been formally noticed but was not disclosed to the Court; - And I took all appropriate steps, both through counsel and pro se, to obtain discovery that was ultimately never allowed or pursued.

Thank you for your time and consideration.

Respectfully submitted,
**Safa Gelardi, Vito Gelardi**
Pro Se Defendants

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS, NICHOLAS LIAKIS, and IME COMPANIONS LLC,

Defendants.
---------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

Third-Party Plaintiffs,

-against-

CARLOS ROA,

Third-Party Defendant.
---------------------------------------------------------------X
CARLOS ROA,

Third-Party Counter-Claimant,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC,

Third-Party Counter-Defendants.
---------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**NOTICE OF DEPOSITION**

**PLEASE TAKE NOTICE,** that pursuant to Rule 30 of the Federal Rules of Civil Procedure, defendants Safa Abdulrahim Gelardi, Vito Gelardi and IME Companions LLC, by and through its attorneys, Warner & Scheuerman, will take the deposition of plaintiff IME Watchdog, Inc., by Daniella Levi, upon oral examination of any knowledge or information that is relevant to this

case before a Notary Public or other person authorized to administer oaths at 10:00 a.m. on June 15, 2023, by stenographic, audiovisual, and/or videographic means, at the office of Warner & Scheuerman, 6 West 18th Street, 10th Floor, New York, New York 10011.

The oral examination will continue for one day of seven (7) hours until completed. Plaintiff reserves the right to seek additional time consistent with Rules 26(b)(1) and (2).

Dated: New York, New York
May 10, 2023

**WARNER & SCHEUERMAN**
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC

By: *_/s/ Jonathon D. Warner_*
Jonathon D. Warner (5195)
6 West 18th Street, 10th Floor
New York, New York 10011
(212) 924-7111
jdwarner@wslaw.nyc

To: MILMAN LABUDA LAW GROUP PLLC
Attorneys for Plaintiffs
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
(516) 328-8899
emanuel@mllaborlaw.com
(VIA EMAIL)

LEO SHALIT, P.C.,
Attorneys for Third-Party Defendant/
Third-Party Counterclaimant
Carlos Roa
45 Glen Cove Road
Greenvale, New York 11548
(833) SHALIT-1
leo@shalit-law.com
(VIA EMAIL)

MELANIE I. WIENER, ESQ.
Attorney for Defendants
Anthony Bridda, Roman Pollak
and Gregory Elefterakis
1 Metro Tech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
mwiener@abramslaw.com
(VIA EMAIL)

LAW OFFICES OF MICHAEL J. ALBER, P.C.
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC
21 Walt Whitman Road, 2nd Floor
Huntington Station, New York 11746
(631) 333-1600
kcb@alberlegal.com
(VIA EMAIL)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS, NICHOLAS LIAKIS, and IME COMPANIONS LLC,

Defendants.
---------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

Third-Party Plaintiffs,

-against-

CARLOS ROA,

Third-Party Defendant.
---------------------------------------------------------------X
CARLOS ROA,

Third-Party Counter-Claimant,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC,

Third-Party Counter-Defendants.
---------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**NOTICE OF DEPOSITION**

**PLEASE TAKE NOTICE,** that pursuant to Rule 30 of the Federal Rules of Civil Procedure, defendants Safa Abdulrahim Gelardi, Vito Gelardi and IME Companions LLC, by and through its attorneys, Warner & Scheuerman, will take the deposition of third-party defendant/third-party claimant Carlos Roa upon oral examination of any knowledge or information that is relevant

to this case before a Notary Public or other person authorized to administer oaths at 10:00 a.m. on June 8, 2023, by stenographic, audiovisual, and/or videographic means, at the office of Warner & Scheuerman, 6 West 18th Street, 10th Floor, New York, New York 10011.

The oral examination will continue for one day of seven (7) hours until completed. Plaintiff reserves the right to seek additional time consistent with Rules 26(b)(1) and (2).

Dated: New York, New York
May 10, 2023

**WARNER & SCHEUERMAN**
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC

By: */s/ Jonathon D. Warner*
Jonathon D. Warner (5195)
6 West 18th Street, 10th Floor
New York, New York 10011
(212) 924-7111
jdwarner@wslaw.nyc

To: MILMAN LABUDA LAW GROUP PLLC
Attorneys for Plaintiffs
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
(516) 328-8899
emanuel@mllaborlaw.com
(VIA EMAIL)

LEO SHALIT, P.C.,
Attorneys for Third-Party Defendant/
Third-Party Counterclaimant
Carlos Roa
45 Glen Cove Road
Greenvale, New York 11548
(833) SHALIT-1
leo@shalit-law.com
(VIA EMAIL)

MELANIE I. WIENER, ESQ.
Attorney for Defendants
Anthony Bridda, Roman Pollak
and Gregory Elefterakis
1 Metro Tech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
mwiener@abramslaw.com
(VIA EMAIL)

LAW OFFICES OF MICHAEL J. ALBER, P.C.
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC
21 Walt Whitman Road, 2nd Floor
Huntington Station, New York 11746
(631) 333-1600
kcb@alberlegal.com
(VIA EMAIL)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS, NICHOLAS LIAKIS, and IME COMPANIONS LLC,

Defendants.
---------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

Third-Party Plaintiffs,

-against-

CARLOS ROA,

Third-Party Defendant.
---------------------------------------------------------------X
CARLOS ROA,

Third-Party Counter-Claimant,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC,

Third-Party Counter-Defendants.
---------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**NOTICE OF DEPOSITION**

**PLEASE TAKE NOTICE,** that pursuant to Rule 30 of the Federal Rules of Civil Procedure, defendants Safa Abdulrahim Gelardi, Vito Gelardi and IME Companions LLC, by and through its attorneys, Warner & Scheuerman, will take the deposition of plaintiff IME Watchdog, Inc., by Adam Rosenblatt, upon oral examination of any knowledge or information that is relevant

to this case before a Notary Public or other person authorized to administer oaths at 10:00 a.m. on June 1, 2023, by stenographic, audiovisual, and/or videographic means, at the office of Warner & Scheuerman, 6 West 18th Street, 10th Floor, New York, New York 10011.

The oral examination will continue for one day of seven (7) hours until completed. Plaintiff reserves the right to seek additional time consistent with Rules 26(b)(1) and (2).

Dated: New York, New York
May 10, 2023

**WARNER & SCHEUERMAN**
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC

By: */s/ Jonathon D. Warner*
Jonathon D. Warner (5195)
6 West 18th Street, 10th Floor
New York, New York 10011
(212) 924-7111
jdwarner@wslaw.nyc

To: MILMAN LABUDA LAW GROUP PLLC
Attorneys for Plaintiffs
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
(516) 328-8899
emanuel@mllaborlaw.com
(VIA EMAIL)

LEO SHALIT, P.C.,
Attorneys for Third-Party Defendant/
Third-Party Counterclaimant
Carlos Roa
45 Glen Cove Road
Greenvale, New York 11548
(833) SHALIT-1
leo@shalit-law.com
(VIA EMAIL)

MELANIE I. WIENER, ESQ.
Attorney for Defendants
Anthony Bridda, Roman Pollak
and Gregory Elefterakis
1 Metro Tech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
mwiener@abramslaw.com
(VIA EMAIL)

LAW OFFICES OF MICHAEL J. ALBER, P.C.
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC
21 Walt Whitman Road, 2nd Floor
Huntington Station, New York 11746
(631) 333-1600
kcb@alberlegal.com
(VIA EMAIL)

Gmail

**Safa Gelardi <safagelardi@gmail.com>**

## FW: Depositions in Gelardi ads. Watchdogs

**Jonathon Warner** <jdwarner@wslaw.nyc> Wed, May 10, 2023 at 5:22 PM
To: Safa Gelardi <safagelardi@gmail.com>, vito gelardi <vitogelardi@gmail.com>

I served these Deposition Notices today on the plaintiff. Please note your schedules accordingly.

Jonathon D. Warner, Esq.

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, NY 10011

Office: 212.924.7111

Fax: 212.924.6111

Cell: 917.656.4197

www.wslaw.nyc

AV PREEMINENT®
Peer Rated for Highest Level of Professional Excellence
2023

---

**From:** Jonathon Warner
**Sent:** Wednesday, May 10, 2023 2:22 PM
**To:** Emanuel Kataev <Emanuel@mllaborlaw.com>; LEO SHALIT <leo@shalit-law.com>
**Cc:** mweiner@abramslaw.com
**Subject:** FW: Depositions in Gelardi ads. Watchdogs

Please see attached Notices for your clients.

[Quoted text hidden]

**3 attachments**

**DeposiotionNoticeLevi.pdf**
170K

**DepositionNoticeRosenblatt.pdf**
170K

**DepositionNoticeCarlosRoa.pdf**
170K

Gmail

Safa Gelardi <safagelardi@gmail.com>

# Re: Plaintiffs' Counsel's False Statement Regarding Rosenblatt Deposition / Necessity of 4506-T / Deficiency of Client Summary

1 message

**Safa Gelardi** <safagelardi@gmail.com> Wed, Aug 6, 2025 at 6:19 PM
To: NYED_Cho Chambers <cho_chambers@nyed.uscourts.gov>

Dear Judge Cho:

At the August 6, 2025 conference, Mr. Kataev falsely stated that defendants only sought the depositions of Daniella Levi and Carlos Roa—not Adam Rosenblatt. That was a direct misrepresentation to the Court.

Enclosed are the formal deposition notices dated May 10, 2023, served through counsel, which include:

- Adam Rosenblatt (June 1, 2023)
- Carlos Roa (June 8, 2023)
- Daniella Levi (June 15, 2023)

Plaintiffs' attorneys were properly served with these notices. There is no ambiguity. The claim that we "never asked for Rosenblatt" is false—and it is not the first time plaintiffs' counsel has misstated facts to the Court. This conduct reflects a **consistent pattern of obstruction and misrepresentation** that undermines the integrity of these proceedings.

Equally concerning is the plaintiffs' continued refusal to produce real financial documentation supporting their claimed damages. For over three years, they have alleged millions in lost income and business value without producing a single tax return, P&L statement, or bank record.

That is why the **IRS Form 4506-T** is essential. It provides certified IRS income records that cannot be manipulated, unlike the selectively generated QuickBooks "Sales by Customer Summary" they now offer. If plaintiffs truly lost millions, it will appear in their tax filings. If not, the case is built on fiction.

**What I was trying to explain during the conference is simple: I earned close to a million dollars a year in this business. If plaintiffs are claiming I "stole" their business, then they need to show they were making at least that much—and lost it because of me.** Anything less does not support their damages claim.

Additionally, we note that a "Sales by Customer Summary" is not proof of damages or entitlement. IME Watchdog may have been the first IME observer business, but that does not mean every client they once worked with belongs to them. **By the time I obtained many of those clients, they were already using other IME observer companies—not IME Watchdog.** I did not take them from Watchdog—I gained them from the broader market after they had moved on. Clients are not property, and prior use of IME Watchdog does not establish exclusive ownership or monetary loss.

## Accordingly, I respectfully request that the Court:

1. **Acknowledge** that defendants properly and timely requested Mr. Rosenblatt's deposition;
2. **Take judicial notice** of Mr. Kataev's false statement made directly to the Court;
3. **Preclude** plaintiffs from relying on Mr. Rosenblatt's affidavits or testimony going forward; and
4. **Compel** plaintiffs to execute IRS Form 4506-T for tax years 2022, 2023, and 2024 to finally verify or disprove their claimed financial losses.

Thank you for your attention to these serious issues, which continue to prejudice defendants and delay resolution of this matter.

Respectfully,
**Safa Gelardi**
Pro Se Defendant

**Attachments:**

1. Notice of Deposition – Adam Rosenblatt (June 1, 2023)
2. Notice of Deposition – Carlos Roa (June 8, 2023)
3. Notice of Deposition – Daniella Levi (June 15, 2023)
4. Email from Jonathan Warner dated May 10, 2025

Respectfully,
**Safa Gelardi**
Pro Se Defendant

---

**4 attachments**

**DeposiotionNoticeLevi.pdf**
170K

**DepositionNoticeCarlosRoa.pdf**
170K

**DepositionNoticeRosenblatt.pdf**
170K

**Gmail - FW_ Depositions in Gelardi ads. Watchdogs.pdf**
184K

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS, NICHOLAS LIAKIS, and IME COMPANIONS LLC,

Defendants.
---------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

Third-Party Plaintiffs,

-against-

CARLOS ROA,

Third-Party Defendant.
---------------------------------------------------------------X
CARLOS ROA,

Third-Party Counter-Claimant,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC,

Third-Party Counter-Defendants.
---------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**NOTICE OF DEPOSITION**

**PLEASE TAKE NOTICE,** that pursuant to Rule 30 of the Federal Rules of Civil Procedure, defendants Safa Abdulrahim Gelardi, Vito Gelardi and IME Companions LLC, by and through its attorneys, Warner & Scheuerman, will take the deposition of plaintiff IME Watchdog, Inc., by Adam Rosenblatt, upon oral examination of any knowledge or information that is relevant

to this case before a Notary Public or other person authorized to administer oaths at 10:00 a.m. on June 1, 2023, by stenographic, audiovisual, and/or videographic means, at the office of Warner & Scheuerman, 6 West 18th Street, 10th Floor, New York, New York 10011.

The oral examination will continue for one day of seven (7) hours until completed. Plaintiff reserves the right to seek additional time consistent with Rules 26(b)(1) and (2).

Dated: New York, New York
May 10, 2023

**WARNER & SCHEUERMAN**
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC

By: */s/ Jonathon D. Warner*
Jonathon D. Warner (5195)
6 West 18th Street, 10th Floor
New York, New York 10011
(212) 924-7111
jdwarner@wslaw.nyc

To: MILMAN LABUDA LAW GROUP PLLC
Attorneys for Plaintiffs
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
(516) 328-8899
emanuel@mllaborlaw.com
(VIA EMAIL)

LEO SHALIT, P.C.,
Attorneys for Third-Party Defendant/
Third-Party Counterclaimant
Carlos Roa
45 Glen Cove Road
Greenvale, New York 11548
(833) SHALIT-1
leo@shalit-law.com
(VIA EMAIL)

MELANIE I. WIENER, ESQ.
Attorney for Defendants
Anthony Bridda, Roman Pollak
and Gregory Elefterakis
1 Metro Tech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
mwiener@abramslaw.com
(VIA EMAIL)

LAW OFFICES OF MICHAEL J. ALBER, P.C.
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC
21 Walt Whitman Road, 2nd Floor
Huntington Station, New York 11746
(631) 333-1600
kcb@alberlegal.com
(VIA EMAIL)

Gmail

**Safa Gelardi <safagelardi@gmail.com>**

## FW: Depositions in Gelardi ads. Watchdogs

**Jonathon Warner** <jdwarner@wslaw.nyc> Wed, May 10, 2023 at 5:22 PM
To: Safa Gelardi <safagelardi@gmail.com>, vito gelardi <vitogelardi@gmail.com>

I served these Deposition Notices today on the plaintiff. Please note your schedules accordingly.

Jonathon D. Warner, Esq.

Warner & Scheuerman

6 West 18th Street, 10th Floor

New York, NY 10011

Office: 212.924.7111

Fax: 212.924.6111

Cell: 917.656.4197

www.wslaw.nyc

PREEMINENT

AV

Peer Rated for Highest Level of Professional Excellence

2023

---

**From:** Jonathon Warner
**Sent:** Wednesday, May 10, 2023 2:22 PM
**To:** Emanuel Kataev <Emanuel@mllaborlaw.com>; LEO SHALIT <leo@shalit-law.com>
**Cc:** mweiner@abramslaw.com
**Subject:** FW: Depositions in Gelardi ads. Watchdogs

Please see attached Notices for your clients.

[Quoted text hidden]

**3 attachments**

**DeposiotionNoticeLevi.pdf**
170K

**DepositionNoticeRosenblatt.pdf**
170K

**DepositionNoticeCarlosRoa.pdf**
170K

**WARNER & SCHEUERMAN**
**Attorneys at Law**
**6 West 18th Street, 10th Floor**
**New York, New York 10011**
**Tel: (212) 924-7111**
**Fax: (212) 924-6111**

**Jonathon D. Warner, Esq.**
jdwarner@wslaw.nyc

**Karl E. Scheuerman, Esq.**
kescheuerman@wslaw.nyc

March 8, 2024

**VIA ECF**

Pamela K. Chen, U.S.D.J.
United States District Court, Eastern District of New York
225 Cadman Plaza East, Courtroom 4F North
Brooklyn, New York 11201-1804

Re: *IME Watchdog, Inc. v. Gelardi, et al.*
Case No.: 1:22-cv-1032 (PKC)(JRC)

Dear Judge Chen:

We represent defendants Safa Gelardi ("Safa"), Vito Gelardi ("Vito") and IME Companions LLC (collectively, "Defendants") in the above-referenced case. Defendant Vito respectfully submits this letter motion[1] in support of his request for an Order, pursuant to Federal Rule 60(b) and Local Rule 6.3, granting reconsideration and/or reargument of this Court's Order dated February 29, 2024 (the "Order of Attachment") to the extent it ordered the attachment of Vito's 50% share of the net sale proceeds of the Staten Island home jointly-owned by Vito and Safa as husband and wife. (Dkt. 284). A copy of this Court's Order of Attachment is annexed as Exhibit "A."

We respectfully submit that this Court misconstrued its prior preliminary finding of contempt and the evidence upon which it was based when it ordered that Vito's share of the net sale proceeds of the Staten Island home should be attached. Before addressing this Court's preliminary findings of contempt, it must be noted that plaintiff's application for an order of attachment was based solely upon its expectation of a contempt damage judgment. (Dkt. 270). Plaintiff's moving papers did not seek an order of attachment based upon any judgment that it might procure on its complaint. Plaintiff wrote: "Plaintiff respectfully submits this letter motion to request an Order requiring Defendants to place all proceeds from the sale of their Staten Island

[1] Defendants respectfully request leave of this Court to make the instant request as a letter motion rather than a formal motion in accordance with Rule 1 of the Federal Rules of Civil Procedure, which requires that the Federal Rules be construed, administered, and employed by the Court and the partes to secure the just, speedy, and inexpensive determination of every action and proceeding.

home in escrow until the Court determines the amount of fees it will award to Plaintiff in connection with Plaintiff's pending fee application." (Dkt. 270). Plaintiff wrote: "The Court has already granted Plaintiff's motion for attorneys' fees and costs in connection with work performed to establish Defendants' contempt. The only remaining question is what will be the amount of fees and costs awarded to Plaintiff." (Dkt. 270). Plaintiff requested "an order requiring that all proceeds from the sale of the Staten Island home be held in escrow pending entry of a judgment for attorneys' fees and costs." (Dkt. 270).

Defendants argued in opposition, among other things, that the net sale proceeds of the jointly-owned Staten Island home are not subject to attachment where no judgment for contempt damages will be entered against Vito since only Safa was preliminarily found in contempt.[2] (Dkt. 274). Defendants argued that only Safa's one-half share of the net sale proceeds could be attached. Defendants did not address the merits of plaintiff's underlying trade secret claims in their opposition since such claims were not a basis for plaintiff's motion for an order of attachment. Nor did Defendants address plaintiff's alleged trade secret damages.

This Court rejected Defendants' argument that only Safa's share could be attached and ordered the attachment of the net proceeds from the sale of the jointly-owned Staten Island home on the ground that there is no basis for separating Safa's proceeds from Vito's proceeds with respect to either plaintiff's contempt damages or underlying trade secret damages. (Dkt. 284). This Court went on to hold that its "contempt finding – though not yet finalized for the reasons previously discussed – is as to all Defendants, i.e., Safa and Vito and their company, Companions." (Dkt. 284). We respectfully submit that this Court erred in ordering the attachment of Vito's share of the net proceeds from the sale of the Staten Island home for two separate and distinct reasons.

*First*, and as evidenced by the plain language of plaintiff's letter motion (Dkt. 270), plaintiff's motion for an order of attachment was not based upon any damages it might obtain on its trade secret claims. It was based solely and exclusively upon its contempt damage claim (Dkt. 270), and it was thus opposed by Defendants as if it was based solely and exclusively upon plaintiff's contempt damage claim (Dkt. 274). Plaintiff's trade secret damage claim was introduced later and only in the most conclusory fashion possible (Dkt. 279), after this Court graciously permitted plaintiff to cure a fatal defect in its moving papers following Defendants' submission of their opposing letter brief. Defendants never had a full and fair opportunity to defend plaintiff's application to the extent it was entertained based upon its trade secret claims rather than its contempt damage claim, and Defendants were sandbagged by plaintiff yet again (as they were when Safa was found in contempt for violating a Temporary Restraining Order

---

[2] Defendants' opposition to plaintiff's fee application was submitted on behalf of all three Defendants and not only Safa as this Court indicated at pg. 12, footnote 9, of its Order. (Dkt. 284) Our opposition stated: "We represent defendants Safa Gelardi ("Safa"), Vito Gelardi ("Vito") and IME Companions LLC (collectively, "defendants") and write in opposition to plaintiff's application for contempt damages...." (Dkt. 267). We wrote: "In conclusion, defendants respectfully request that this Court deny plaintiff's request for contempt damages against <u>all</u> <u>defendants</u>...." (Emphasis added).

based upon allegations submitted by plaintiff in reply, without notice, and in violation of their due process rights as evinced by Local Rule 83.6).

We respectfully submit that this Court should have denied plaintiff's defective motion for an order of attachment with leave to renew upon proper papers. This Court instead permitted plaintiff to cure the defect in its papers by belatedly submitting the affidavit required by C.P.L.R. § 6212(a), which affidavit raised a new ground for attachment after Defendants' opposition had already been submitted, and then countenanced plaintiff's sandbagging of Defendants by granting the Order of Attachment based in part on the new argument improperly raised by plaintiff in its belated submission. Defendants had no expectation that an order of attachment could be granted based upon the claims in plaintiff's complaint where plaintiff's motion made no such request.

Moreover, plaintiff's belatedly-submitted C.P.L.R. § 6212(a) affidavit – just like its contempt application – focused solely on Safa. (Dkt. 279). Plaintiff's principal stated in her affidavit that: "Safa has no counterclaims against Plaintiff." (Dkt. 279, ¶22). Plaintiff did not state that Vito had no counterclaims against plaintiff as required by the C.P.L.R. Plaintiff's principal stated: "As a result, Safa should be enjoined from selling her Staten Island home." (Dkt. 279, ¶23). Nor did plaintiff's affidavit accuse Vito of committing any fraud. For example, plaintiff's principal stated: "I respectfully request that the Court infer that Safa has engaged in fraud..." (Dkt. 279, ¶19). The basis for this Court's Order of Attachment against Vito cannot be found in plaintiff's C.P.L.R. § 6212(a) affidavit.

To make matters worse, plaintiff's belated submission contained no proof whatsoever with the respect to the merits of any of its trade secret claims against Vito, let alone the damages resulting from any tortious act allegedly committed by Vito. With respect to plaintiff's underlying claims, plaintiff's principal stated: "Plaintiff states claims for a money judgment for which this Court has already concluded that Plaintiff will probably succeed." (Dkt. 279, ¶3). Plaintiff did not provide any details concerning its claims against any defendant, let alone Vito. We will not belabor this point as this Court is fully familiar with plaintiff's allegations and proof and thus knows full well that plaintiff's evidence in this action has consistently been directed against Safa, only. No proof of any tortious conduct or other wrongdoing by Vito has ever been submitted. Had Defendants known that this Court intended to entertain plaintiff's application for an order of attachment based upon the viability of its underlying claims, we would have pointed out the complete and utter lack of evidence against Vito.

It is beyond cavil that Vito is not vicariously liable for his wife's or company's alleged tortious acts. The Order of Attachment should be vacated as against Vito where plaintiff has never submitted any evidence showing that it has a viable cause of action against Vito.

*Second*, this Court's holding in its Order of Attachment that its finding of contempt was against both Safa and Vito is contradicted by the plain language of the underlying Order in question. A copy of this Court's Order dated October 20, 2023 (the "Contempt Order") is annexed as Exhibit "B." We have scoured the Contempt Order for language supporting this

Court's holding that Vito had been found in contempt and have been unable to find any. The simple truth, as demonstrated below, is that Vito was not found to have committed any act of contempt, and more importantly, no evidence was submitted in either plaintiff's contempt application or at the contempt hearing supporting any alleged finding of contempt against Vito. Again, all of plaintiff's evidence and allegations pertained to Safa, and did not in any way implicate Vito. No evidence was submitted indicating that Vito was involved in hiring the investigator who attempted to contact Carlos Roa (Roa was never actually "contacted" by anyone as that word plainly means). No evidence was submitted indicating that Vito instructed the investigator to contact Roa. No evidence was submitted indicating that Vito was in any way involved in Fari Guiterriez's operation of Client Exam Services.

That this Court found that only Safa had engaged in any allegedly contemptuous conduct is underscored by the plain language of both the Contempt Order and this Court's docket entry which accompanied it. The Contempt Order contains the heading: "III. Defendant Safa Gelardi's Contacts with Carlos Roa." (Dkt. 254, pg.11). Under such heading, this Court found:

- "On November 4, 2022, Defendant Safa Gelardi hired a private investigator, Steve Stanulis, to track and contact Third-Party Defendant and Plaintiff's employee, Carlos Roa ("Roa")." (Dkt. 254, pg.11).

- "Specifically, Safa directed Stanulis to 'befriend' Roa...." (Dkt. 254, pg.11).

- "Safa provided Stanulis with scripted things to say to Roa...." (Dkt. 254, pg.11).

- "Moreover, Safa paid Stanulis to place a GPS tracker on Roa's car." (Dkt. 254, pg.12).

- "[S]he knowingly paid for the use of a tracker by her private investigator..." (Dkt. 254, pg.12).

The Contempt Order contains the heading: "IV. Defendants' Circumvention of the Court's March 2023 Temporary Restraining Order." (Dkt. 254, pg.12). Under such heading, this Court found:

- "Based on evidence presented at the March 27, 2023 hearing, the Court finds that Fari Guiterriez ("Guiterriez") – a friend of the Gelardi family... and part-time IME observer for Companions... – created Client Exam Services at Safa's direction specifically to continue operating Defendants' business in contravention of the Court's TRO." (Dkt. 254, pg.12).

- "Documentary evidence and witness testimony from the hearing established that after the TRO was issued, Safa Gelardi told Fari Gutierrez that 'I have been shut down. I cannot operate [Companions]. It's yours, if you want it." (Dkt. 254, pg.12).

- "On March 11, 2023, Safa told Bieben that Companions was shutting down until further notice and that Gutierrez had started a company and would contact Beiben." (Dkt. 254, pgs.12-13).

- Bieben attended "approximately 12 IME's on behalf of Client Exam Services." (Dkt. 254, pg.13).

Under its conclusions of law pertaining to contempt, this Court clearly and unambiguously held that only Safa had committed any act contempt. This Court held:

- "Applying this standard, the Court is prepared to find Safa Gelardi in contempt of the Amended Injunction, upon a showing of compensatory damages incurred by Plaintiff, with respect to the provisions in the Amended Injunctions: (1) barring Defendants from making contact with Carlos Roa; and (2) operating Defendants' business or any other business that unfairly and unlawfully competes with Plaintiff." (Dkt. 254, pg.26).

- "Safa's hired investigator, Stanulis, undoubtedly qualifies as her agent and/or a person acting in concert with her." (Dkt. 254, pg.26).

- "Thus, the Court finds that the Amended Injunction clearly and unambiguously prohibited Safa from hiring Stanulis to contact Roa." (Dkt. 254, pg.26).

This Court's conclusions of law with respect to contempt contained the heading: "b. Evidence of Safa's Violation is Clear and Convincing." (Dkt. 254, pg.27). Under such heading, this Court held:

- "Despite the plain language of the Amended injunction, Safa hired a private investigator to contact Plaintiff's current employee, Roa." (Dkt. 254, pg.27).

- "Safa directed the private investigator to 'befriend' Roa, even providing the hired agent with scripted questions and conversation topics." (Dkt. 254, pg.27).

- "Moreover, whether Safa willfully violated the no-contact provision is irrelevant to the Court's finding of contempt." (Dkt. 254, pg.27).

- "Thus, the Court finds that there is clear and convincing evidence that Safa attempted to contact Roa through a hired investigator in violation of the Amended Injunction." (Dkt. 254, pg.28).

This Court's conclusions of law with respect to contempt contained the heading: "c. Safa Did Not Exercise Reasonable Diligence." (Dkt. 254, pg.28). Under such heading, this Court held:

- "Thus, the Court is prepared to hold Safa in civil contempt for violating the Amended Injunction. However, the Court cannot enter an order finding Safa in civil contempt at this time because Plaintiff has not submitted the required affidavit...." (Dkt. 254, pg.29).

- "For this reason, the parties are directed to further brief the issue of damages and attorneys' fees before the Court can hold Safa in contempt." (Dkt. 254, pg.29).

This Court's conclusions of law with respect to contempt also contained the heading: "2. Defendants Violated the March 2023 TRO By Helping To Start Client Exam Services." Under such heading, this Court held:

- "The evidence presented during the March 27, 2023 hearing clearly and convincingly established that Safa directed Fari Gutierrez – a friend of the Gelardi family... and part-time IME observer for Companions... – to create Client Exam Services and circumvent the Court's TRO." (Dkt. 254, pgs.29-30).

- "Safa's employee, Beiben, also testified that on March 11, 2023, the day after the Court issued the TRO, Safa told him that Companions was shutting down until further notice and that Gutierrez had stated a company and would contact him." (Dkt. 254, pg.30).

This Court held: "Thus, the Court is prepared to hold Safa in civil contempt for violating the Court's March 2023 TRO." (Dkt. 254, pg.32). This Court further held: "As discussed, in order to hold Safa in civil contempt, Plaintiff must file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages." (Dkt. 254, pg.32). This Court concluded: "Moreover, although the Court is prepared to find Safa in civil contempt of the Amended Injunction and the March 2023 TRO, the Court reserves on making a final ruling...." (Dkt. 254, pg.33).

Not only does this Court's Contempt Order contradict its finding in the Order of Attachment that this Court had found Vito in contempt as well as Safa, but this Court's Docket Entries and Minute Orders also make it crystal clear that only Safa had been preliminarily found in contempt.

This Court's October 20, 2023 Docket order states: "Moreover, although the Court is prepared to find Defendant Safa Gelardi in civil contempt of the 80 Amended Injunction and the 156 March 2023 Temporary Restraining Order, the Court reserves on making a final ruling...."

On February 21, 2024, this Court issued a Minute Order which directed only plaintiff and Safa to appear for the contempt damage hearing. This Court's Minute Order states:

> SCHEDULING ORDER: The Court directs Plaintiff IME Watchdog, Inc. and Defendant Safa Abdulrahim Gelardi to appear for an evidentiary hearing regarding the parties' 261, 267, 270, and 274 submissions. The hearing will be held on March 13, 2024, at 2:00 p.m. in Courtroom 4F North. If a party intends to call witnesses at the hearing, they shall file a witness list, which must both identify the witnesses and estimate the length of each witness's testimony by March 6, 2024. If applicable, the parties are also directed to file an exhibit list for the hearing by March 8, 2024.
>
> Additionally, Plaintiff is directed to file the affidavit required by C.P.L.R. § 6212 by February 29, 2024. Finally, by March 1, 2024, Defendant Safa Gelardi is directed to file a list identifying: (1) all real property in which she currently has an ownership interest; (2) all real property in which she previously had an ownership interest that was sold or otherwise disposed of from February 1, 2022 to Present. The list should include, at minimum, the address and estimated fair market value of each property.

After plaintiff filed an emergency application for a temporary restraining order with respect to its then pending motion for an order of attachment, this Court issued a Minute Order which directed only Safa to oppose the application. This Court wrote: "ORDER: The Court is in receipt of Plaintiff's 278 motion for a temporary restraining order. Defendant Safa Gelardi is directed to respond by 2/27/2024 at 5:30 p.m. EST."

Accordingly, pursuant to the plain language of this Court's Orders, only Safa was found in contempt, and only Safa was directed by this Court to appear for the hearing regarding plaintiff's contempt damages (261) and plaintiff's application to deposit funds from the sale of the Staten Island home (270), and only Safa was directed by this Court to file a list of properties in which she had an ownership interest. Vito was not directed to appear in Court for either the contempt damage application or the attachment application. Nor was Vito directed to list any properties he owns or has sold since the commencement of this litigation or to oppose plaintiff's emergency application for a temporary restraining order.

Notwithstanding the foregoing, this Court apparently reversed itself without notice to Vito, and issued the Order of Attachment against Vito based upon its mistaken belief that both Vito and Safa had been found to have committed acts of contempt. We respectfully submit that this Court misconstrued its own Contempt Order and the proof upon which it was based and mistakenly issued the Order of Attachment against Vito without any grounds therefor, and

without due notice to Vito. Vito was not found in contempt. No evidence was ever submitted suggesting that Vito had ever done anything contemptuous. Nor has any evidence ever been submitted showing that he committed any of the acts upon which plaintiff's trade secret claims are based. Vito has been improperly and wrongfully lumped together with Safa, and the Order of Attachment is based upon nothing more than guilt by association to the extent it attaches Vito's share of the net sale proceeds from the Staten Island home.

For the foregoing reasons, we respectfully request that this Court reconsider its Order of Attachment and direct that only Safa's one-half share of the net proceeds from the sale of the Staten Island home be held in escrow pending the entry of a contempt damage judgment, if any, against Safa.

Respectfully,

*/s/ Jonathon D. Warner*

JDW/ks
Encs.

cc: All Counsel (via ECF)

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
IME WATCHDOG, INC.,

Plaintiff,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS, LLC, CLIENT EXAM SERVICES, LLC, and IME MANAGEMENT & CONSULTING, LLC,

Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Presently before this Court are Plaintiff IME Watchdog, Inc.'s motion for attachment pursuant to New York Civil Practice Law and Rules ("CPLR") § 6201 and motion for an temporary restraining order ("TRO") requesting the same relief. (*See* Dkts. 270, 278, 279.) Plaintiff requests an order preventing Defendants Safa Abdulrahim Gelardi and Vito Gelardi (collectively, the "Individual Defendants") from selling their former Staten Island residence (the "Staten Island Property" or "Property") or, in the alternative, requiring the Individual Defendants to place the proceeds of the sale in escrow until the Court resolves Plaintiff's pending application for attorneys' fees and costs related to the Court's October 2023 contempt order against Defendants. (*See* Dkt. 270 at 1; *see also* Dkt. 278 at 1.) For the reasons stated below, the Court grants in part and denies in part Plaintiff's motion for attachment under CPLR § 6201, and denies Plaintiff's motion for a TRO as moot.

**BACKGROUND**[1]

Plaintiff IME Watchdog, Inc. ("Watchdog" or "Plaintiff") initiated this action on February 25, 2022, against Safa Abdulrahim Gelardi ("Safa") and Vito Gelardi ("Vito"), and IME Companions, LLC ("Companions") (collectively, "Defendants"), alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.[2] (Compl., Dkt. 1.) On the same day, Plaintiff also filed a motion for a preliminary injunction, which the Court ultimately granted in part and denied in part on April 5, 2022 ("April 2022 Injunction"). (*See* Dkts. 6–14, 66; 3/29/2022 Docket Order; 4/5/2022 Docket Order.) On June 8, 2022, the Court issued an amended preliminary injunction, enjoining both parties from making misleading or defamatory statements about one another ("Amended Injunction"). (Dkt. 80; *see also* 6/8/2022 Docket Order.)

On March 10, 2023, Plaintiff filed (1) a second motion for a TRO, (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April 2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions. (Dkts. 151–55.) The Court ordered the TRO on the same day ("March 2023 TRO") and further ordered the parties to appear for a hearing regarding the motions for a preliminary injunction and contempt on March 27, 2023. (Dkt. 156; *see also*

---

[1] The facts and procedural background of this case have been set forth in detail in prior opinions in this litigation, most recently in the Court's October 20, 2023 Memorandum and Order on Plaintiff's motions for a second preliminary injunction and to hold Defendants in contempt for violating the Court's previous orders. (*See generally* Dkt. 254.) The Court thus assumes the parties' familiarity with the factual and procedural background in this matter and only recounts those facts necessary to resolve the instant motions.

[2] Plaintiff filed an Amended Complaint on October 13, 2022, adding Gregory Elefterakis, Roman Pollak, Anthony Bridda, and Nicholas Liakis as additional Defendants. (Dkt. 114.)

Dkt. 167.) At the March 27, 2023 preliminary injunction hearing, the parties presented and examined witnesses and presented documentary evidence. (*See* 3/27/2023 Min. Entry.)

On October 20, 2023, "the Court expand[ed] the scope of the Amended Injunction against Defendants and . . . [found] Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO."[3] (Dkt. 254 at 3.) In connection with its contempt finding, the Court ordered Plaintiff to "file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages." (*Id.* at 32 (citing Local Rule 83.6(a)).) On December 19, 2023, Plaintiff submitted the requested briefing and documentation in support of its request for $186,038.67 in attorneys' fees and costs. (*See* Dkts. 261–65.) Safa responded on January 18, 2024, asking the Court to reconsider its contempt finding and disputing the amount requested by Plaintiff. (*See* Dkt. 267.)[4]

On January 25, 2024, Plaintiff filed a letter motion (the "Attachment Motion") informing the Court that the Individual Defendants are planning to sell their property located at 148 Clay Pit Road, Staten Island, NY 10309 (i.e., the Staten Island Property), where the Individual Defendants resided before moving to Texas. (Dkt. 270 at 3; *see also* Dkt. 257 (explaining that the Individual Defendants "have relocated to Texas, where their children are enrolled in school").) Plaintiff requests an attachment on the Staten Island Property and/or an order requiring the Individual

---

[3] To be clear, the Court's finding of contempt was as to all Defendants, i.e., the Individual Defendants and Companions. (*See, e.g.*, Dkt. 254 at 3 (finding "Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO"); *id.* at 12–13, 29–32 (discussing Defendants' circumvention of the March 2023 TRO).) For procedural reasons, the Court reserved on issuing the formal contempt order pending the resolution of the amount of the contempt fine. (*Id.* at 32–34.)

[4] The Court notes that Safa did not file an actual motion for reconsideration under Local Rule 6.3, which must be filed within 14 days of the decision that the movant is seeking to have reconsidered, but asked for reconsideration in her response to Plaintiff's request for attorneys' fees and costs.

Defendants to place the proceeds from the sale of the Property in escrow until the Court renders a final decision on contempt and damages. (*See* Dkt. 270.) Defendants filed a letter in opposition on February 7, 2024, which also informed the Court that the Attachment Motion was missing the statutorily required affidavit setting forth the evidence that supports the Attachment Motion. (*See* Dkt. 274 at 2 (citing N.Y. C.P.L.R. § 6212(a)).)

On February 21, 2024, the Court scheduled an evidentiary hearing on the Attachment Motion for March 13, 2024. (*See* 2/21/2024 Docket Order.) The Court directed Plaintiff to file the statutorily required affidavit prior to the hearing. (*Id.*) In light of Safa's request to reconsider the Court's contempt finding against Defendants and her objection to Plaintiff's request for fees and costs, the Court directed Safa to file a list identifying: "(1) all real property in which she currently has an ownership interest; (2) all real property in which she previously had an ownership interest that was sold or otherwise disposed of from February 1, 2022 to Present." (*Id.*)

Two days later, on February 23, 2024, Plaintiff filed a motion for a TRO in advance of the hearing (the "TRO Motion") in light of the fact that the Staten Island Property was listed as being under contract as of February 22, 2024. (*See* Dkt. 278 at 1.) Plaintiff also filed the statutorily required affidavit in support of its Attachment Motion. (*See* Dkt. 279.) The Court directed Safa to respond to the TRO Motion by February 27, 2024. (2/23/2024 Docket Order.) The Court further directed Safa to include the name of the prospective buyer of the Staten Island Property in her response, and informed the parties that it would consider moving up the hearing date. (*Id.*) Safa filed her opposition to the TRO Motion on February 27, 2024. (*See* Dkts. 280–82.) On February 28, 2024, Plaintiff filed a reply, indicating that the Individual Defendants were scheduled to close on the sale of the Staten Island Property on March 1, 2024. (Dkt. 283 at 1.)

## DISCUSSION

### I. Attachment Under CPLR § 6201

"Federal Rule of Civil Procedure 64 permits federal litigants to seek an order of attachment in the manner provided by the law of the state in which the district court sits." *DLJ Mortg. Cap., Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 318 (E.D.N.Y. 2009). New York law authorizes prejudgment attachment pursuant to CPLR §§ 6201(3) and 6212(a). *See Prabir v. Bukhara Indian Cuisine, Inc.*, No. 17-CV-3704 (AJN) (HBP), 2018 WL 2709231, at *2 (S.D.N.Y. May 17, 2018) (quoting N.Y. C.P.L.R. §§ 6212(a), 6201(3)) (collecting cases), *report & recommendation adopted*, 2018 WL 2694435 (S.D.N.Y. June 5, 2018). Attachment is "a drastic remedy," and is "strictly construed in favor of those against whom it may be employed." *Ne. United Corp. v. Lewis*, 26 N.Y.S.3d 810, 812 (N.Y. App. Div. 2016); *see also Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1073 (S.D.N.Y. 1994) ("Attachment is a harsh remedy, and should not be lightly granted by the court."). "A plaintiff seeking an order of attachment must show 'that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in [CPLR §] 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff.'" *Cap. Ventures Int'l v. Republic of Arg.*, 443 F.3d 214 (2d Cir. 2006) (quoting N.Y. C.P.L.R. § 6212(a)).

Plaintiff easily satisfies the first and fourth requirements. With regard to the first requirement, which requires Plaintiff to state a cause of action for money judgment, Plaintiff's underlying suit against Defendants seeks a combination of legal and equitable relief (*see generally* Dkt. 203), and its contempt motion against Defendants seeks compensatory damages (*see generally* Dkt. 261). With regard to the fourth requirement, Defendants have not asserted any counterclaims against Plaintiff, and as such, it is undisputed that the amount demanded from

Defendants exceeds all counterclaims asserted against Plaintiff. (*See* Dkt. 279 ¶ 22 (citing Dkt. 87).) The Court therefore turns to whether the other two requirements for attachment are met.

As to the second requirement, the Court finds that Plaintiff has demonstrated a probability of success on the merits of its contempt motion and its underlying trade secret claims. "Probability of success on the merits for purposes of an order of attachment requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case." *Musket Corp. v. PDVSA Petroleo, S.A.*, 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007) (citations omitted); *see also DLJ Mortg. Cap., Inc.*, 594 F. Supp. 2d at 319 (same). "In assessing whether a plaintiff can show a probability of success on the merits, the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts." *Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 293 (E.D.N.Y. 2010) (citation and internal quotation marks omitted); *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004) (same). Here, the Court has already found that Plaintiff is likely to succeed on the merits of its underlying trade secret claims. (*E.g.*, Dkt. 254 at 15–17.) Defendants provide no basis for reevaluating this finding, nor does the Court see any reason to do so. And although Safa is seeking reconsideration of the Court's finding of civil contempt against Defendants, the Court does not anticipate vacating or altering that finding,[5] and thus does not find that Safa's pending

[5] In their response to Plaintiff's supplemental briefing on compensatory damages, Safa asks the Court to reconsider its preliminary finding of contempt for two reasons. (*See* Dkt. 267.) First, Defendants argue that Safa did not violate the Preliminary Injunction because her attempt to contact Carlos Roa failed. (*Id.* at 2–3.) This argument is borderline frivolous, which is underscored by Safa's failure to provide any legal support for drawing such a distinction. (*See generally* Dkt. 267.) Second, Safa argues that the Court's preliminary finding that she disobeyed the TRO violated her due process rights because Plaintiff's order to show cause for contempt accused her of only violating the Amended Preliminary Injunction. (*Id.* at 3 (citing Dkt. 156).) Even assuming, *arguendo*, that this were true, this argument only applies to the Court's contempt

reconsideration request diminishes the likelihood of success with respect to Plaintiff's contempt motion. The Court therefore finds that Plaintiff has demonstrated a likelihood of success on the merits of its contempt motion for the same reasons that it preliminarily found Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO. (Dkt. 254 at 24–32.)

Finally, the Court finds that Plaintiff has demonstrated that grounds for attachment exist. Plaintiff argues that Defendants, "with intent to defraud [their] creditors or frustrate the enforcement of a judgment that might be rendered in [P]laintiff's favor, [have] assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." N.Y. C.P.L.R. § 6201(3). Under CPLR § 6201(3), "it is incumbent upon [the plaintiff] to demonstrate that the defendant is acting with intent to defraud." *Colon v. Cole Bros. Circus, Inc.*, No. 04-CV-3606, 2007 WL 3014706, at *2 (E.D.N.Y. Oct. 12, 2007) (quoting *Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 331–32 (2d Cir. 1983)). It is "well established in New York" that "the mere removal or other disposition of property by a debtor is not a sufficient ground for an attachment." *Dafeng Hengwei Textile Co., Ltd. v. Aceco Indus. & Commercial Corp.*, 54 F. Supp. 3d 287, 293–94 (E.D.N.Y. 2014) (quoting *Bank of Leumi Trust Co. of N.Y. v. Istim, Inc.*, 892 F. Supp. 478, 483 (S.D.N.Y. 1995)). Courts in the Second Circuit have identified the following non-exhaustive list of "badges of fraud" that may be considered:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a

---

finding as to the TRO and has no bearing on the success of Plaintiff's contempt motion as to the Preliminary Injunction, which, as discussed, the Court has already credited. (Dkt. 254 at 24–32.) Although the Court will address both arguments further when it resolves Safa's reconsideration request and finalizes the Court's contempt order, neither argument persuades the Court to reevaluate its finding that Plaintiff is likely to succeed on the merits of its contempt motion.

> pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Coley v. Vannguard Urb. Improvement Ass'n, Inc.*, No. 12-CV-5565 (PKC) (RER), 2016 WL 7217641, at *7 (E.D.N.Y. Dec. 13, 2016) (quoting *CF 135 Flat LLC v. Triadou SPV N.A.*, No. 15-CV-5345, 2016 WL 5945912, at *10 (S.D.N.Y. June 24, 2016)).

Here, the Court infers the Individual Defendants' fraudulent intent from "the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors" and "the general chronology of the events and transactions under inquiry." *Id.* Since the start of this action, the Individual Defendants have sold at least three other properties, including: (1) a home in East Stroudberg, PA for $569,400 on April 29, 2022; (2) a home in Philadelphia, PA for $229,000 on December 5, 2023; and (3) a home in Champions Gate, FL for $760,000 on December 15, 2023. (Dkt. 279 ¶¶ 10–16.) In addition to the Staten Island Property, the Individual Defendants also appear to be in the process of selling a house in Lake Harmony, PA. (*Id.* ¶ 17.) Notably, the Individual Defendants sold the Florida property for well below the initial listing price (*id.* ¶¶ 12–15), and appear poised to do the same with the Staten Island Property (Dkt. 283). Courts frequently find fraudulent intent where, as here, a defendant sells numerous pieces of property shortly after the commencement of litigation or while a plaintiff's motion for a preliminary injunction is pending. *E.g.*, *Prabir*, 2018 WL 2709231, at *2–6; *Coley*, 2016 WL 7217641, at *8–10; *JSC Foreign Econ. Ass'n Technostroyexport*, 306 F. Supp. 2d at 487–88.

The Individual Defendants' argument that Plaintiff has failed to "demonstrate some identifiable necessity for the attachment, such as the 'identifiable risk' that [D]efendants 'will not be able to satisfy the judgment' which [P]laintiff might obtain against Safa on its contempt

application" is without merit. (*See* Dkt. 274 at 4 (quoting *VisionChina Media Inc. v. Shareholder Representative Servs., LLC*, 967 N.Y.S.2d 338, 345–46 (N.Y. App. Div. 2013)).) To the contrary, the Individual Defendants' conduct throughout the course of this litigation has demonstrated that the risk of non-payment is real. Notably, Defendants have yet to pay *any* of their outstanding bill of $32,716.46 to Berkeley Research Group, LLC ("BRG"), the neutral forensic examiner appointed by the Court, despite being ordered by the Court to do so *multiple times*.[6] (*See* Dkt. 271; 1/29/2024 Docket Order). And, as we know from the contempt proceedings, this is just the latest example of the Individual Defendants' failure to comply with the Court's orders.

Likewise, despite the Individual Defendants' assertions, this Court's prior finding that Plaintiff failed to demonstrate intent to defraud in the context of a previous attachment request does not bar Plaintiff's latest request. (*See* Dkt. 274 at 1.) Specifically, the Individual Defendants argue that the law of the case applies, and that Plaintiff has failed to submit any new evidence supporting its fraud allegations. (*Id.* at 2.) However, Plaintiff *has* submitted new evidence supporting its fraud allegations, including but not limited to the evidence showing that the Individual Defendants: (1) sold two properties in December 2023, at least one of which was sold for well below the initial listing price; (2) are in contract to sell the Staten Island Property for well below the initial listing price; (3) are in the process of selling *another* piece of property (the Lake

[6] The Court first ordered the parties to resolve their share of the outstanding bill on September 11, 2023 (*see* 9/11/2023 Docket Order), which Defendants failed to do (*see* Dkt. 271). On January 29, 2024, the Court ordered Defendants to resolve their share of the outstanding bill by February 9, 2024, and confirm such resolution by that date or risk sanctions. (1/29/2024 Docket Order.) To date, Defendants have yet to file confirmation that they have paid BRG any of the past due amount.

Harmony house); and (4) have defied several of this Court's orders, including the Court's orders to pay their outstanding bill of $32,716.46 to BRG. *See supra* at 8–9.[7]

Based on Plaintiff's submissions and the evidence in the record, the Court finds that Plaintiff has demonstrated a probability of success on the merits of its claims. Moreover, the Court finds that attachment is warranted in light of the evidence demonstrating Individual Defendants' fraudulent intent in selling their property and the uncertainty of Plaintiff's ability to enforce a potential judgment in its favor.[8]

**II. Scope of Relief**

As noted, Plaintiff requests an order preventing the Individual Defendants from selling the Staten Island Property or, alternatively, requiring the Individual Defendants to place the proceeds of the sale in escrow until the Court resolves Plaintiff's pending fee application. (*See* Dkt. 270 at

---

[7] Furthermore, as the Court has noted on the record several times, the Court does not find the Individual Defendants' factual representations to be credible. (*See, e.g.*, Dkt. 254 at 5 n.4 ("The Court also finds that Safa Gelardi has repeatedly perjured herself throughout this case and is thus wholly uncredible as a witness.").) Indeed, at the outset of this case, the Individual Defendants claimed that they did not steal confidential information from Plaintiff, which was demonstrably false. (*See, e.g.*, *id.* at 8, 8 n.8.) Thereafter, they claimed that they did not initiate contact with Carlos Roa, which was again demonstrably false. (*See, e.g.*, *id.* at 11–12, 11 n.10.) Similarly, they claimed that they were not involved in the creation and management of the IME business that took over Companions' business, which the Court found to be false. (*See, e.g.*, *id.* at 12–13, 13 n.11.) In short, the credibility of the Individual Defendants' factual claims in this matter, as a result of their own conduct during this litigation, is virtually nil.

[8] Plaintiff also argues, and the Court agrees, that CPLR § 6201(1), which provides that grounds for attachment exist when "the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state," applies. (Dkt. 279 ¶ 7 (citing N.Y. C.P.L.R. § 6201(1)). For their part, the Individual Defendants argue that Plaintiff should not be able to rely on CPLR § 6201(1) because that provision is only mentioned in Plaintiff's subsequently filed affidavit, and not in Plaintiff's initial motion. (*See* Dkt. 280 at 5.) Because the Court finds that grounds for attachment exist under CPLR § 6201(3), it declines to address the parties' arguments concerning CPLR § 6201(1) any further at this time.

1; *see also* Dkt. 278 at 1.) The Court declines to issue an order that would even temporarily prevent the Individual Defendants from selling the Property. However, for the reasons discussed above, the Court finds that attachment of the proceeds from the Individual Defendants' sale of the Staten Island Property is warranted.

As a starting point, the Court notes that Plaintiff requests $186,038.67 in compensatory damages in connection with the contempt proceedings. The Individual Defendants represent that although they are selling the Staten Island Property for $975,000, they only expect to net approximately $184,000 from the sale. (Dkt. 280 at 4; *see also* Dkt. 280-2.) Defendants further contend that there are no grounds for an order of attachment against Vito, and as such, Plaintiff would only be entitled to Safa's expected share of the proceeds, which amounts to $92,000 and "is less than her $150,000 homestead exemption under [CPLR] § 5206." (Dkt. 280 at 4.) As an initial matter, the Court agrees with Plaintiff that the Individual Defendants' attempt to invoke CPLR § 5206 is unavailing because the evidence in the record indicates that Vito and Safa have relocated to Texas. (*See* Dkt. 283 at 1 (citing Dkt. 257).) By its terms, CPLR § 5206 only applies to property "owned and occupied as a principal residence." N.Y. C.P.L.R. § 5206(a); *accord. In re Issa*, 501 B.R. 223, 226 (Bankr. S.D.N.Y. 2013) ("When occupancy of the exempt property ceases the purpose of the homestead ceases too." (citation and internal quotation marks omitted)). Subject to certain exceptions, "a debtor must show 'actual physical occupancy on a *regular basis*' and an intent to reside permanently [on the property]." *In re Issa*, 501 B.R. at 226 (emphasis added) (quoting *In re Bellafiore*, 492 B.R. 109, 113 (Bankr. E.D.N.Y. 2013)). Here, the Individual Defendants have failed to demonstrate actual occupancy of the Staten Island Property or that any homestead or other exemption applies.

Nor is there a basis for separating Safa's proceeds from Vito's proceeds for purposes of the attachment to satisfy either the contempt order or Plaintiff's underlying trade secrets claims. First, the Court's contempt finding—though not yet finalized for the reasons previously discussed—is as to all Defendants, i.e., Safa and Vito and their company, Companions.[9] Although the Court's previous contempt findings focused on Safa, its findings concerning the March 2023 TRO was explicitly based on *Defendants'* use of Client Exam Services to circumvent the Court's order enjoining them from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 254 at 12 (citing Dkt. 156 at 3).) Vito is named as a Defendant in this action and, with Safa, established Companions, the business at issue in the March 2023 TRO that Defendants had continued to operate in violation of the Court's orders. (Dkt. 254 at 5, 29–32.) Second, the Court findings concerning Plaintiff's likelihood of success on the underlying trade secret claims apply with full force to Vito (*see* Dkt. 254 at 15–18), as do the Court's findings that Plaintiff has grounds for attachment under CPLR § 6201, *see supra* at 7–10.

Accordingly, pursuant to CPLR § 6201(3), the Court orders attachment of the net proceeds from the Individual Defendants' sale of the Staten Island Property, which the Individual Defendants estimate will amount to approximately $184,000. The Individual Defendants will be required to file proof of the deposit of those proceeds in their attorney's escrow account and an accounting of all funds disbursed.

**III. Undertaking**

CPLR § 6212(b) requires a plaintiff seeking an order of attachment "to provide an 'undertaking' as security for (1) costs and damages incurred by the defendant in the event that the

[9] Indeed, if anything, the fact that Safa alone has filed a request to reconsider the Court's contempt finding, as a technical matter, means that Vito and Companions are not seeking reconsideration of that ruling and are not contesting the amount of damages sought by Plaintiff.

court subsequently determines that the plaintiff was not entitled to an attachment or if defendant ultimately recovers judgment; and (2) certain fees incurred by the sheriff." *Herzi v. Ateliers De La Haute-Garonne*, No. 15-CV-7702 (RJS), 2015 WL 8479676, at *3 (S.D.N.Y. Oct. 13, 2015) (citing N.Y. C.P.L.R. §§ 6212(b), 8011). "The amount of the undertaking must be at least $500 but otherwise is within the discretion of the court." *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 672 n.2 (S.D.N.Y. 2017) (citing N.Y. C.P.L.R. § 6212(b)).

Courts frequently set the undertaking as a fraction of a percent of the value of the attachment. *See, e.g.*, *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F. Supp. 2d 340, 348 (S.D.N.Y. 2004) (setting undertaking at 0.04% of the value of the attachment); *Disney Enters., Inc. v. Finanz St. Honore, B.V.*, No. 13-CV-6338 (NG) (SMG), 2017 WL 1862211, at *4 (E.D.N.Y. May 8, 2017) (setting undertaking at 0.5% of the value of the attachment); *Herzi*, 2015 WL 8479676, at *3 (setting undertaking at 0.67% of the value of the attachment); *In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d 301, 313 (S.D.N.Y. 2010) (setting undertaking at 0.35% of the value of the attachment); *but see N.Y. Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*, No. 07-CV-8008 (RJS), 2008 WL 2115225, at *6 (S.D.N.Y. May 16, 2008) (setting undertaking at 4.5% of the value of the attachment). Here, the Court finds that an undertaking of $920, which amounts to approximately .5% of the value of the attachment, is appropriate, particularly considering the high likelihood that Plaintiff will succeed on the merits. *See Disney Enters., Inc.*, 2017 WL 1862211, at *4 (undertaking of .5% of the value of the attachment appropriate where plaintiff had already prevailed on the merits).

Finally, because the Court grants attachment of the net proceeds of the Staten Island Property sale, it denies Plaintiff's request for a TRO preventing the sale as moot.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Plaintiff's Attachment Motion. Pursuant to CPLR § 6201(3), the Court orders attachment of the net proceeds from the Individual Defendants' sale of the Staten Island Property. The Individual Defendants are further directed to provide an accounting of all funds disbursed as part of the sale, including all closing costs, and proof that the net proceeds from the sale were deposited in the escrow account of their attorneys in this matter, within **fourteen (14) days of the closing**, and in any event, no later than **March 15, 2024**. Plaintiff is directed to post an undertaking in accordance with CPLR § 6212(b) in the sum of $920 within **fourteen (14) days of this order**. Finally, the Court denies Plaintiff's TRO Motion as moot in light of this order.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: February 29, 2024
Brooklyn, New York

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
IME WATCHDOG, INC.,

Plaintiff,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS, LLC, CLIENT EXAM SERVICES, LLC, and IME MANAGEMENT & CONSULTING, LLC,

Defendants.
--------------------------------------------------x
SAFA GELARDI and IME COMPANIONS, LLC,

Third-Party Plaintiffs,

- against -

CARLOS ROA,

Third-Party Defendant.
--------------------------------------------------x
CARLOS ROA,

Third-Party Counter-Claimant,

- against -

SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC,

Third-Party Counter-Defendants.
--------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
22-CV-1032 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

Plaintiff IME Watchdog, Inc. ("Watchdog" or "Plaintiff") initiated this action on February 25, 2022, against Safa Abdulrahim Gelardi ("Safa") and Vito Gelardi (collectively "Individual Defendants"), and IME Companions, LLC ("Companions"), alleging misappropriation of Watchdog's confidential information and trade secrets, and seeking monetary and injunctive relief.[1] (Compl., Dkt. 1.) On the same day, Plaintiff also filed a motion for a preliminary injunction, which the Court ultimately granted in part and denied in part on April 5, 2022 ("April 2022 Injunction"). (*See* Dkts. 6–14, 66; 3/29/2022 Docket Order; 4/5/2022 Docket Order.) As part of the April 2022 Injunction, the Court ordered a forensic examination in which Defendants would "provide complete and unrestricted access to their records and electronic accounts to the forensic analyst" (Dkt. 66-1, at 3), so that the Court could determine whether "Companions is built entirely on misappropriated information and poached clients" (Dkt. 66, at 17). On June 8, 2022, the Court issued an amended preliminary injunction, enjoining both parties from making misleading or defamatory statements about one another ("Amended Injunction"). (Dkt. 80; *see also* 6/8/2022 Docket Order.)

Discovery has proceeded over the past year and has included the forensic analysis of Defendants' records and depositions of Defendant Safa. (*See* Dkts. 86, 105, 115; 2/2/2023 Minute Entry; 2/3/2023 Minute Entry.) On March 10, 2023, Plaintiff filed (1) a second motion for a temporary restraining order ("TRO"), (2) a second motion for a preliminary injunction, (3) a second motion for a permanent injunction, (4) an emergency motion for contempt of the April

[1] Plaintiff filed an Amended Complaint on October 13, 2022, adding Gregory Elefterakis, Roman Pollak, Anthony Bridda, and Nicholas Liakis as additional Defendants. (Dkt. 114.) However, Plaintiff does not seek a preliminary injunction as to these Defendants. (*See* Dkt. 151, at 2 ("Let the defendants, Safa Abdulrahim Gelardi, Vito Gelardi, and IME Companions LLC (collectively the 'Defendants'), show cause . . . why an order should not be issued[.]").)

2022 Injunction and Amended Injunction, and (5) an accompanying motion for a hearing to address the filed motions. (Dkts. 151–55.) The Court ordered the TRO on the same day ("March 2023 TRO") and further ordered the parties to appear for a hearing regarding the motion for preliminary injunction and contempt on March 27, 2023. (Dkt. 156; *see also* Dkt. 167.) Defendants filed their opposition to Plaintiff's motions on March 17, 2023. (Dkts. 160–66.) Plaintiff filed their reply on March 22, 2023. (Dkts. 171–73.) At the March 27, 2023 preliminary injunction hearing, the parties presented and examined witnesses and presented documentary evidence.

Based on the parties' papers, affidavits, and witness testimony, the Court now makes the below Findings of Fact and Conclusions of Law, pursuant to Federal Rule of Civil Procedure Rules 52(a) and 65(d), with respect to Plaintiff's renewed motion for a preliminary injunction and request to hold Defendants in contempt for violating the Court's previous orders. *See Eyewonder, Inc. v. Abraham*, 293 F. App'x 818, 820 (2d Cir. 2008) (vacating preliminary injunction because district court did not "state the reasons why it issued"). For the reasons stated below, the Court expands the scope of the Amended Injunction against Defendants and moreover, finds Defendants to be in civil contempt for violating both the Amended Injunction and the March 2023 TRO.[2]

[2] After the March 27th preliminary injunction hearing, on April 18, 2023, Plaintiff filed a renewed motion for contempt and prejudgment attachment. (*See* Dkts. 196–98.) The Court held a hearing on May 4, 2023, pursuant to that motion, and directed the parties to submit supplemental briefing. (*See* 5/4/2023 Minute Entry; Dkts. 218–20, 224–25.) The Court denied Plaintiff's renewed motion for contempt on July 13, 2023 and does not address that motion here. (Dkt. 231.)

## FINDINGS OF FACT

### I. Previous Findings of Fact[3]

Plaintiff Watchdog and Defendant Companions are competitors in the personal injury litigation business. When a plaintiff brings a personal injury lawsuit, the defendant can obtain an independent medical examination ("IME") of the plaintiff to evaluate his or her alleged injuries. (*See* Levi Decl., Dkt. 8, ¶¶ 4–8.) Both Watchdog and Companions provide third-party services to personal injury attorneys, which involves Watchdog and/or Companions associates accompanying plaintiffs to IMEs, where the associate observes, takes notes, and helps the plaintiffs fill out forms. (*Id.* ¶¶ 3, 6–18.) The associates produce reports of the IMEs for the plaintiffs' counsel to use in the personal injury lawsuits. (*Id.* ¶¶ 15–16, 27–28.)

Watchdog is a New York corporation (*see* Am. Compl., Dkt. 114, ¶ 4) established in May 2011 by Daniella Levi (*see* Levi Decl., Dkt. 8, ¶¶ 1, 14). Levi is a personal injury attorney who saw a "need for a service" that could accompany personal injury clients to IMEs. (Am. Compl., Dkt. 114, ¶¶ 18–22.) She "developed forms and reports for the 'watch dogs' to complete relating to the different types of IMEs . . . , established price lists," and "built a customer database through her long-lasting relationships and friendships with other personal injury attorneys[.]" (*Id.* ¶¶ 25–26.) Watchdog developed information regarding its customers' preferences, "such as how soon each customer wants its reports, and whether the [associates] should have a conference with the customer in advance of the IME[.]" (Levi Decl., Dkt. 8, ¶ 30.)

[3] The Court issued a Memorandum & Order in support of the April 2022 Injunction in which the Court made numerous Findings of Fact. *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, (E.D.N.Y. May 13, 2022). The relevant Findings of Fact to this latest Memorandum & Order are repeated here.

Adam Rosenblatt was Watchdog's President at all relevant times. (Am. Compl., Dkt. 114, ¶ 40.) Only he and Levi had access to "Watch[d]og's entire database, including the identity of all its customers and clients, their contact information, their preferences, pricing information, and all of the financial details of IME Watch[d]og." (*Id.* ¶¶ 41–43.) The confidential documents in the database were password protected, such that only Levi and Rosenblatt had access to them. (Levi Decl., Dkt. 8, ¶¶ 34–35.)

Companions is a New York company (Am. Compl., Dkt. 114, ¶ 5) established in November 2017 by Defendants Safa and Vito Gelardi, a married couple. (*See* Safa Gelardi Decl., Dkt. 26, ¶¶ 2, 33.) Safa did not have any previous experience in the personal injury or IME field when starting Companions—rather, she had worked at a bank in various positions. (*See* April 4, 2022 Hearing Tr. ("April 2022 Tr."), Dkt. 98, 24:21–25:10, 29:16–30:7.) However, through meetings with Rosenblatt and his father in early 2017, Safa learned about Watchdog's business, reviewed Plaintiff's confidential documents that Rosenblatt shared with her, and decided to open Companions. (*See* Safa Gelardi Decl., ¶¶ 16–18, 20–22, 28, 33; April 2022 Tr. 35:19–21, 84:10–85:1, 155:12–14.)[4]

[4] The Court also finds that Safa Gelardi has repeatedly perjured herself throughout this case and is thus wholly uncredible as a witness. For example, at the April 2022 hearing, Safa was asked "[y]ou instructed Adam [Rosenblatt] to sabotage the customer accounts of IME WatchDog?" and she responded: "[a]bsolutely untrue." (Apr. 2022 Tr., 42:15–17.) But the forensic evidence shows that Safa sent text messages to Rosenblatt from 2019 through 2022 directing him to sabotage Plaintiff's customer accounts in exchange for monetary payments—including in the very months preceding the April 2022 hearing. *See infra* Findings of Fact Section II.B. (*See also* Dkt. 154-2, at 250–251 (showing text messages between Safa and Rosenblatt on February 22, 2022, in which she asks Rosenblatt to "turn [Douglas and Londin] down the next time" they ask Plaintiff to observe an IME in New York); *id.* at 252 (showing text from Safa to Rosenblatt on February 22, 2022 stating "Listen[,] turn all Wingate [] down so you can take them back when y[o]u work for your[self]"); March 27, 2023 Hearing Tr. ("March 2023 Tr."), Dkt. 199, 29:14–24.) At the March 27, 2023 hearing, the Court warned Defendants' counsel of Safa's history of perjury, and counsel ultimately chose not to have Safa testify. (March 2023 Tr. 121:17–24, 125:20–23.)

## II. Plaintiff's Trade Secrets

### A. Defendant Safa Gelardi's Receipt and Use of Plaintiff's Confidential Customer Lists and Financial Documents

The forensic examination of Defendant Safa's emails reveals that she received troves of confidential information about Plaintiff's business in the Spring of 2017 that helped her start Companions. In late April of 2017, Plaintiff's employee, Adam Rosenblatt, began emailing copies of Plaintiff's confidential financial records and customer lists to Safa. (Pl.'s Br., Dkt. 152 (hereinafter, "Dkt. 152"), at 3; *see also* Dkt. 154-3, at ECF[5] 112 (Rosenblatt emailing Plaintiff's "Sales by Client 2016.pdf" to Safa Gelardi with the message "On day one I could bring in money"); *id.* at ECF 1–27 (Rosenblatt sending copies of Plaintiff's Profit and Loss statements from 2014 through 2016 and Watchdog's 2016 Quarterly Review to Safa Gelardi); *id.* at ECF 22 (slide summarizing Watchdog's top 10 clients in 2015 and 2016).) Safa immediately forwarded these emails containing Plaintiff's confidential information to others. (Dkt. 154-3, at ECF 8 (forwarding copy of Plaintiff's 2016 Quarterly Review to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 34 (forwarding copy of "IME Watchdog Clients Master List 2017.xlsx" to "jay@fivepillarsgroup.com" on April 29, 2017); *id.* at ECF 40 (forwarding Rosenblatt's email with "a breakdown of March 2017, [i]ncluding the monthly P&L, list of clients for that month, a list of all the IME covered, the Watchdog invoices, a breakdown of their pay vs[.] what we billed, etc." to "jay@fivepillarsgroup.com" on April 29, 2017).)

In the first week of May 2017, Rosenblatt emailed Safa explaining what materials she needed to buy to get a competing business started and sent her Plaintiff's invoices to use as models. (Dkt. 152, at 4; Dkt. 154-3, at ECF 118 (Rosenblatt email to Safa dated May 1, 2017, with subject

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

line "Needed" and listing items to buy including "Computer with 3 monitors" and "Quickbooks").) On May 4, 2017, Safa's accountants formed IME GuardDog Inc.—the name that Safa wanted to call her competing business at the time, although she ultimately settled on IME Companions LLC. (Dkt. 152, at 4.) On the previous day, Rosenblatt had started an email thread with a website designer, Lumina, and Safa, explaining that "[a]s discussed, we need a website for IME Guard Dog with a significant amount of content to be taken from IME Watchdog." (Dkt. 154-3, at ECF 122.)

Safa used the financial information and customer lists from Rosenblatt to create her own "top revenue" customers, organized by customers who paid the most revenue to Plaintiff so that she could target them. (Dkt. 152, at 5; *see also* Dkt. 154-3, at 136 (forwarding "Attorney List Over 10,000 in Revenue.xlsx" to Defendant Roman Pollak on August 8, 2017).) On September 29, 2017, Safa sent Watchdog's confidential financial records to Defendant Roman Pollak in the hopes that he would pitch the idea of IME observers as a business opportunity to Defendant Greg Elefterakis. (*See* Dkt. 152, at 4 (citing Dkt. 154-3, at ECF 141–47); March 2023 Tr. 72:8–73:3.)[6] Neither Defendant Pollak nor Defendant Elefterakis knew anything about the IME observer business before Safa contacted them. (March 2023 Tr. 81:6–9 (establishing that fact as to Pollak); *id.* 42:18–19 (establishing that fact as to Elefterakis).) Pollak analyzed Watchdog's financial records to determine the business's profitability and asked Safa follow-up questions on October 3, 2017. (March 2023 Tr. 72:8–73:3; Dkt. 154-3, at ECF 148.) Pollak specifically mentioned in his October 3rd email to Safa, regarding "travel expenses.. [sic] I assume that is mostly the

[6] Plaintiff called Pollak and Elefterakis as witnesses at the March 27, 2023 hearing. Their testimony established that, in 2017, Elefterakis owned a business called Case Cash Funding, which worked with personal injury law firms to provide non-recourse loans to prospective plaintiffs. (March 2023 Tr. 46:15–23.) Pollak was the CFO of Case Cash Funding and reported to Elefterakis. (*Id.* 46:24–25, 61:3–12.)

doc/[A]dam." (Dkt. 154-3, at ECF 148.) At the hearing, Pollak testified that it was likely he was referring to Adam Rosenblatt at the time of the email, but did not know whether Adam Rosenblatt was affiliated with Watchdog when he wrote the email.[7] (March 2023 Tr. 74:8–75:10.) On October 5, 2017, Pollak emailed Lumina and Safa, requesting to "have a functional version [of the website] by months [sic] end" and indicating that "90% of the [website's] content will come from the IME watchdog site and the brochure provided by Safa." (Dkt. 154-3, at 149–50.)

Importantly, Defendants openly conceded during the March 2023 hearing that Safa took Plaintiff's confidential information from Rosenblatt. (March 2023 Tr. 29:8–13 (The Court: "[Safa] clearly took information via Mr. Rosenblatt and started her business. Are you denying that?" Defendants' counsel: "No, Judge. Mr. Rosenblatt sent her a customer list and[,] . . . I believe, gross revenue figures for 2016 on that list."); *see also id.* 31:1–3 (Defendants' counsel: "Mr. Rosenblatt sent the customer list with the general revenue provisions on it to Ms. Gelardi. There's no dispute as to that.").)[8] However, Defendants contend that it was of no consequence that Safa took Plaintiff's confidential information, because Plaintiff's customers—personal injury firms—are public knowledge and obtainable through daytime television advertisements (March 2023 Tr. 32:4–8), and moreover, that Defendant Gregory Elefterakis "was very well aware of the top personal injury firms, because he's in the cash provision business, and he knew all these firms

[7] The Court found Defendant Pollak to be evasive and untrustworthy throughout his examination. Pollak admitted that he reviewed Watchdog's website during his analysis of Watchdog's profitability but did not recall seeing Adam Rosenblatt listed as an employee on the website. (March 2023 Tr. 75:12–17.) At this time, the Court does not make a finding as to whether Pollak was lying during the hearing about his knowledge of Rosenblatt's employment with Watchdog because it is not necessary for resolving this motion.

[8] The Court notes that in light of these admissions, Safa perjured herself at the April 2022 hearing when she was asked "[Rosenblatt] gave you a Sales by Customer Summary for 2016 in or about April of [20]17, correct?" and she responded "No." (April 2022 Tr. 35:24–36:1.)

intimately" (*id.* 32:13–16). Defendants therefore claim that Safa built her business "through introductions by Mr. Elefterakis, not through [] the Rosenblatt [documents]." (*Id.* 32:16–20.) However, Defendant Elefterakis's testimony during the hearing flatly contradicted that argument.

At the hearing, Elefterakis testified that he joined Companions "to help [it] obtain customers[.]" (March 2023 Tr. 54:6–9.) But he also conceded that he introduced at most, 15 customers to Companions throughout his time at the company. (*See id.* at 44:3–14 ("[The Court]: And how many clients did you recall approaching[?] . . . [Elefterakis]: Originally, it was within, probably, ten clients to get a good sampling of what the response would be[.] . . . [The Court]: And did you, at any point, approach any other clients besides these ten? [Elefterakis]: No. [The Court]: And so this was at the beginning before Companions started; is that right? [Elefterakis]: Yes, correct."); *id.* 53:12–14 (Elefterakis testifying that he introduced "[b]etween ten and 15 clients that I obtained through my own, you know, personal contacts" to Companions).)

The documentary evidence shows that today, 90% of Defendants' customers are comprised of Plaintiff's former customers (Dkt. 152, at 5), with well over 400 of those customers being traceable to the customer lists and confidential information that Defendant wrongfully obtained from Rosenblatt (*see* Dkts. 180, 187; 4/3/2023 Docket Order). Moreover, 98.3% of the total revenue Defendants have generated since Companions' inception was obtained through sales from Plaintiff's former customers. (Levi Decl., Dkt. 172, at 2–3; March 2023 Tr. 10:24–11:10.) Thus, Defendants' claim that Safa built her business primarily through client introductions by Mr. Elefterakis is thoroughly contradicted by the evidence in the record, and plainly false.[9]

---

[9] During the hearing, Plaintiff submitted that in 2018, Defendants had only 12 customers, with 10 of those customers being former clients of Plaintiff. (March 2023 Tr. 58:2–3.) No competent evidence was adduced at the hearing as to whether these ten former Watchdog customers were also Elefterakis's clients. (*See id.* 58:18–23.) Furthermore, Defendant Pollak testified that he recalled providing customer names to Safa in the summer of 2017 beyond the ones

**B. Defendant Safa Gelardi's Text Messages and Venmo Payments to Plaintiff's Employee Adam Rosenblatt**

Plaintiff has produced over 200 pages of text messages between Safa and Rosenblatt spanning from September 2019 through March 2022. (Dkt. 154-2.) These text messages establish that over the course of at least three years, Safa told Rosenblatt which of Plaintiff's customers she wanted and that she would pay Rosenblatt to sabotage Plaintiff's relationship with those customers so that they would use Companions instead. (*See, e.g.*, Dkt. 154-2, at ECF 85–86 (Safa: "Ignore them[,] fuck up a few times[,] and when they switch [to me] I will pay you big." Rosenblatt: "Sounds good . . . Will have some more immediate clients for you tomorrow." Safa: "Yes baby. Make that money."); *id.* at ECF 81 (Safa: "When am I gona [sic] get Parker Waichman. Name your price I got you[.]" Rosenblatt: "They pay 95[.]" Safa: "I will give you half in advance and half after they start booking[.]"); Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.) Moreover, Defendants conceded as much during the March 2023 hearing:

> THE COURT: Okay[—t]here's forensic evidence[—a]m I wrong that there actually are communications where [Safa]'s saying to Mr. Rosenblatt, send me this, or sabotage this? I read something in the papers where it says, go and get them, baby, or something to that effect, where he's basically trying to delay things, or the services aren't as good from Watchdog or to do other things to sabotage those clients of Watchdog. Is that not in evidence?

---

listed in Plaintiff's confidential customer lists. (March 2023 Tr. 92:19–93:11; *see also id.* 94:1–3.) Pollak could not recall the dates he provided such information and could not recall how he provided the information to Safa. (*Id.* 92:19–93:11.) To date, Defendants have not submitted any evidence of Pollak or Elefterakis providing Safa with any customer names. The Court therefore cannot make a factual finding at this time regarding how many of Defendants' initial 12 customers were procured through the confidential information Defendants misappropriated from Plaintiff versus through Elefterakis's or Pollak's pre-existing client relationships. However, the Court does not find this fact to be necessary or material to resolving the instant motion because of the plethora of other evidence showing that Safa Gelardi relied on Plaintiff's trade secrets to start her business and to continue building the business, which warrants an expanded preliminary injunction.

> MR. WARNER [(Defendants' counsel)]: There are text exchanges, Judge, that indicate what you are saying. But this was well after this business was set up and started. Well after.

(March 2023 Tr. 29:14–24.) Safa has pleaded the Fifth Amendment and invoked her right against self-incrimination with respect to her payments to Rosenblatt. (*See* Apr. 2022 Tr. 53:8–11; *id.* 61:14–62:16.)

## III. Defendant Safa Gelardi's Contacts with Carlos Roa

On November 4, 2022, Defendant Safa Gelardi hired a private investigator, Steve Stanulis, to track and contact Third-Party Defendant and Plaintiff's employee, Carlos Roa ("Roa"). (Dkt. 153, at 4–5; *see also* Dkt. 153-5, at ECF 1.) Stanulis works for a company called Silver Shield. (Dkt. 153-5, at ECF 1.) Safa hired Stanulis to "investigate" Roa because she believed that he, as a former employee, was "soliciting clients and slandering her name." (*Id.*) Specifically, Safa directed Stanulis to "befriend" Roa (March 2023 Tr. 137:18–20) and "try to relate to him" with the goal of getting Roa "to defame [Defendants] very badly" (Dkt. 181-1, at ECF 1). Safa provided Stanulis with scripted things to say to Roa, including complimenting him because "he loves it" and asking him "how long have you been in the sports business?" (*Id.* at ECF 1.)[10]

---

[10] During the hearing, Defendants' counsel claimed that hiring a private investigator to befriend Roa did not violate the Court's Amended Injunction barring contact between the parties, because it "wouldn't be contact initiated by [Safa] or her [private investigator]. It was supposed to go the other way around, Judge." (March 2023 Tr. 137:22–24.) Specifically, Defendants' counsel argued that Safa hiring a private investigator to "accept contact" was distinguishable from Safa *initiating* contact. (*Id.* 138:3–6.) The Court finds this argument to be meritless and bordering on frivolous. Defendants' counsel is, again, cautioned not to make disingenuous representations and frivolous arguments to the Court in future proceedings. (*See also id.* 138:8–16 (The Court: "I don't care if Mr. Roa initiates [contact] if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. I don't care who initiated it. . . . Again, this is the kind of parsing that you and your client are doing that strikes me as troublesome and will only result in further restrictions.").)

Moreover, Safa paid Stanulis to place a GPS tracker on Roa's car. (Dkt. 153-5.) On November 11, 2022, Roa discovered the tracker because his security camera captured Stanulis placing the GPS tracker. (Dkt. 153, at 3.) Roa reported the incident to the police on November 12, 2022. (*Id.* at 4.) Defendant Safa claimed that the GPS tracker was placed without her knowledge. (March 2023 Tr. 139:6–11.) However, the documentary evidence once again shows that Safa was being untruthful; in fact, she knowingly paid for the use of a tracker by her private investigator, Stanulis, and actively monitored the tracker before it was found. (Dkt. 153-5, at ECF 1, *id.* at ECF 11–16 (Safa texting Stanulis regarding whether GPS tracker is working).)

## IV. Defendants' Circumvention of the Court's March 2023 Temporary Restraining Order

The Court enjoined Defendants on March 10, 2023, from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.) Six days later, Mayra Gomez, one of Plaintiff's independent contractors, saw Jeff Beibin ("Beibin"), a Companions employee, at an IME on March 16, 2023 in Commack, New York. (Dkt. 173, ¶¶ 1, 9.) Beibin filed a declaration conceding that he was at an IME on that date, but that he was there as "an agent of Client Exam Services, which is owned and operated by Fari Gutierrez." (Dkt. 176, ¶ 3.) Based on evidence presented at the March 27, 2023 hearing, the Court finds that Fari Gutierrez ("Gutierrez")—a friend of the Gelardi family (March 2023 Tr. 98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)—created Client Exam Services at Safa's direction specifically to continue operating Defendants' business in contravention of the Court's TRO.

Documentary evidence and witness testimony from the hearing establishes that after the TRO was issued, Safa Gelardi told Fari Gutierrez that "I have been shut down. I cannot operate [Companions]. It's yours, if you want it." (March 2023 Tr. 25:1–3.) On March 11, 2023, Safa

told Beibin that Companions was shutting down until further notice and that Gutierrez had started a company and would contact Beibin. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel explaining that Safa told Mr. Beibin that "Fari may be taking over the business").) On March 12, 2023, Beibin received a call from "Sammy" on behalf of Client Exam Services, an IME observer business. Sammy explained "that everything would pretty much be operating the same way as they did" at Companions, and gave Beibin an IME assignment. (*Id.* 97:11–14, 100:21–24.) Sammy is Safa's nephew and his full name is Hesham Salameh. (*Id.* 107:2–110:15.) Client Exam Services was incorporated on March 16, 2023 (*id.* 6:23, 105:2–15), the same day that Beibin ran into Plaintiff's independent contractor, Gomez. Beibin's sole communication with Client Exam Services was with Sammy via phone and email. (*Id.* 104:16–20.) Beibin has never been to an office for Client Exam Services and is not aware of whether there is a physical office. (*Id.* 104:11–15.)

Since March 10, 2023, Beibin has attended approximately 12 IMEs on behalf of Client Exam Services, for the same clients he had been servicing when he worked at Companions. (*Id.* 100:25–101:2, 103:14–16, 115:2–5.) There are no differences in operations between Client Exam Services and Companions. (*Id.* 113:25–114:11.) In fact, Beibin did not think to ask Sammy or Client Exam Services about his pay rate or frequency because "[w]hen IME Companions was closed[,]" Safa informed him "that all of the business was now going to be taken over by Fari Gutierrez . . . [a]nd everything would remain the same, except for the name of the company[.]" (*Id.* 114.)[11]

---

[11] The Court found Defendants' arguments and defense counsel's credibility troubling throughout the Court's probing of the Client Exam Services issue. Defense counsel opened the March 27, 2023 hearing by unequivocally asserting that "there's no connection" between Defendants and Client Exam Services, and boldly stated that "[Defendants] have nothing to do with Client Exam Services." (March 2023 Tr. 24:13–16.) However, Beibin's testimony during

## CONCLUSIONS OF LAW

### I. Preliminary Injunction

#### A. Preliminary Injunction Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right. A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 64 F.4th 658, 666–67 (2d Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)). "In at least two circumstances, a plaintiff seeking a preliminary injunction must satisfy a heightened standard by showing a clear or substantial likelihood of success on the merits, and by making a strong showing of irreparable harm." *Id*. at 667 (cleaned up). "First, a plaintiff must meet that standard if he seeks an injunction that provides him substantially all the relief he seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the merits . . . . Second, a plaintiff must meet that standard if he seeks a so-called 'mandatory injunction' – that is, an injunction that 'alter[s] the status quo,' which usually is done by commanding some positive act." *Id*. (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34–35 (2d Cir. 1995)). "Under the heightened standard, [the party seeking a preliminary injunction] 'must show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm.'" *Id.* at 669 (quoting *New York ex rel. Schneiderman*

---

the hearing plainly revealed Safa's integral role in creating Client Exam Services, and her close—even familial—relationship with Client Exam Services' managers, Gutierrez and "Sammy." Thus, after Beibin's testimony, defense counsel conceded "[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [it] leads back to [Safa]." (*Id.* 126:3–5.) Defense counsel is again warned that future false, disingenuous, and/or irresponsible claims and arguments could result in sanctions and/or findings of contempt.

*v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). Here, the Court applies the heightened standard required for mandatory injunctions because the Court is ordering Defendants to undertake a number of affirmative acts, including ceasing to provide services to the customers they stole from Plaintiff.

**B. Likelihood of Success on the Merits**

1. Legal Standard for Trade Secrets Claim

Plaintiff asserts, *inter alia*, causes of action under the Defend Trade Secrets Act ("DTSA") and misappropriation of trade secrets under New York common law. (*See* Am. Compl., Dkt. 114, at 2.) Section 1836 of the DTSA is a private cause of action for "[1] [a]n owner of a trade secret" which was "[2] misappropriated" and "[3] related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "The elements for a misappropriation claim under New York law are fundamentally the same [as under Section 1836] . . . [and] [d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (cleaned up). When a claimant proves "actual or threatened misappropriation," then "injunctive relief is authorized," but when "that there has been 'unjust enrichment' or 'actual loss caused by the misappropriation of the trade secret,' [then] damages are authorized." *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 403–04 (S.D.N.Y. 2021) (citing 18 U.S.C. § 1836.)

"Under New York law, a plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020) (citing *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019)). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and

which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 148 (E.D.N.Y. 2007). In general, the following factors must be considered to determine whether information is a trade secret:

> (1) The extent to which the information is known outside of the business;
>
> (2) the extent to which it is known by employees and others involved in the business;
>
> (3) the extent of measures taken by the business to guard the secrecy of the information;
>
> (4) the value of the information to the business and its competitors;
>
> (5) the amount of effort or money expended by the business in developing the information; and
>
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)).

Most relevant to this case, "[c]ustomer lists may constitute trade secrets under certain limited circumstances. Specifically, the identity of customers is protected if the list was developed through substantial effort and kept in confidence." *Id.* at 148 (citing *N. Atl. Instruments, Inc.*, 188 F.3d at 44). "[L]ists of customers will not be deemed protected trade secret information where customers are readily ascertainable as prospective users or consumers, of the product at issue." *Id.* at 149 (internal quotations and citation omitted). "The issue of whether and to what extent a customer list constitutes trade secret information is a question of fact for th[e] court. When determining the confidentiality of customer lists[,] . . . the court considers the trade secret criteria referred to above." *Id.* In particular, although lists of customers may be publicly available or back-trackable, "the *identities of individual contact people*" at customers' companies can be "protectable trade secrets." *N. Atl. Instruments, Inc.*, 188 F.3d at 45.

2. Plaintiff's Customer Lists Constitute Trade Secrets

Here, the record shows that Plaintiff developed its customer list through Daniella Levi's experience in the personal injury field, and that Plaintiff took measures to keep Watchdog's customer lists secret, such as password-protecting the lists and limiting access to them to only company executives. (Levi Decl., Dkt. 8, ¶¶ 34–35, 41–43.) The customer information was clearly valuable to individuals outside the business, as evidenced by Defendant Safa Gelardi's own text messages, and her willingness to pay Rosenblatt for the information. (Dkt. 152, at 6; *see also* Apr. 2022 Tr. 61:14–62:16.) Moreover, although Defendants argue that the names of personal injury law firms are public information (March 2023 Tr. 32:4–8), Plaintiff's customer lists contained not only firm names, but the identities of individual contacts for the firms, and the revenue paid and services contracted for by Watchdog's customers (*see* Dkts. 180-1, 180-2). In fact, Safa was able to use the details in Plaintiff's customer lists to create a spreadsheet of "top revenue" customers, organized by the firms who paid the most revenue to Plaintiff, so that Defendants could target them for poaching. (Dkt. 152, at 5.) Plaintiff's customer lists and information fall squarely within the definition of trade secrets, as found by the Second Circuit in *Heyman*:

> While the names of potential customers may have been obtainable from a simple examination of a classified directory, information as to the retailers who were actually purchasing plaintiff's product could not have been so secured. Moreover, the data concerning the amount of the product each customer purchased, compiled on a monthly basis, was certainly not obtainable in this way. Finally, as we have had occasion to note before, resolution of the issue in a case like this depends not upon how a defendant could have acquired the information, but rather upon how he did in fact *actually* acquire it. "It matters not that defendants *could* have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. *The fact is that they did not.* Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment."

*Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590–91 (2d Cir. 1963) (emphasis added) (quoting *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953)). Here, there are volumes of undisputed evidence that Defendants did not gain Plaintiff's customers through publicly accessible databases, but rather, by paying Plaintiff's employee, Rosenblatt, to steal them for Defendants. *See supra* Findings of Fact Section II. Thus, the Court finds that Plaintiff's customer lists constitute trade secrets and that Plaintiff is likely to succeed on the merits of their trade secret claims against Defendants.

**C. Irreparable Harm**

1. <u>Legal Standard for Irreparable Harm</u>

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. . . . and plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax, LLC,* 62 F.4th at 672 (citations and quotation marks omitted). "[L]oss of reputation, good will, and business opportunities" may constitute irreparable harm. *Rex Med. L.P. v. Angiotech Pharm. (US) Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)). Good will is defined as the "expectancy of continued patronage[.]" *Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, No. 10-CV-8976 (RJH), 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x. 43 (2d Cir. 2012) (summary order); *see also Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07-CV-1562 (ERK) (RML), 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (noting that good will "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business"), *aff'd*, 282 F. App'x 885 (2d Cir. 2008) (summary order). "[G]ood will

constitutes the intangible qualities of a business that attracts customers . . . ." *Nat'l Elevator Cab & Door Corp.*, No. 07-CV-1562, at *5.

2. Plaintiff Has Shown Irreparable Harm

First and foremost, the Court notes that it already found evidence of irreparable harm to Plaintiff when the Court issued its April 2022 Injunction. *See IME Watchdog, Inc. v. Gelardi*, No. 22-CV-1032 (PKC) (JRC), 2022 WL 1525486, at *6 n.12 (E.D.N.Y. May 13, 2022) ("[I]n light of the overwhelming evidence of irreparable harm and clear likelihood of success, Plaintiff has met the heightened, mandatory injunction standard as well."). Thus, even prior to filing its renewed preliminary injunction motion and its contempt motion, Plaintiff had already met this standard. Now, the forensic examination and other discovery has laid bare the full extent of Defendants' theft of Plaintiff's trade secrets.

The forensic examination shows that beyond paying Rosenblatt to steal Watchdog's trade secrets to start Companions in 2017, Safa also paid Rosenblatt to intentionally sabotage Plaintiff's customer relationships and poach Plaintiff's clients over the course of almost three years. (*See, e.g.*, Dkt. 154-2, at ECF 83 (Safa asking Rosenblatt "[w]hat do I tell [Plaintiff's client] to get them to switch [to Companions?]"); *id.* at ECF 84–85 (Rosenblatt telling Safa to "be faster" when following up on clients he sends to Companions and advising her to "[m]ake them ready to switch [to Companions]" so that he "can just ignore them"); *id.* at ECF 92–93 (Safa offering "[$]400 paid semi[-]monthly on the 15th and the 1st" to Rosenblatt for "leads on [Plaintiff's] poachable clients" and marketing for Companions); *id.* at ECF 105 (Safa texting Rosenblatt to "[s]end me the attys [sic] that do last minute. Come on [Rosenblatt]. If you helped me out it won't put a dent in [W]atchdog. And you know I am willing to pay for them[.]").) Thus, notwithstanding Safa's self-serving and devious appeal to Rosenblatt about not "put[ting] a dent in [W]atchdog" (*id.*), Plaintiff has unquestionably lost good will, reputation, and business opportunities because of Defendants'

unlawful conduct and will continue to suffer irreparable harm absent an injunction. *See QBE Am., Inc. v. Allen*, Nos. 22-CV-756, 22-CV-757 (JSR), 2022 WL 889838, at *15 (S.D.N.Y. Mar. 15, 2022) ("Even if QBE could reliably measure and obtain damages for poached customers at the end of this litigation, it would be very difficult to precisely quantify the harm caused by having its trade secrets misappropriated and used to jump-start a new competitor."); *see also Coastal Distrib., LLC v. Town of Babylon*, No. 05-CV-2032 (JS) (ETB), 2006 WL 270252, at *3 (E.D.N.Y. Jan. 31, 2006), *aff'd as modified*, 216 F. App'x. 97 (2d Cir. 2007) ("Loss of goodwill and injury to reputation are injuries that are difficult to measure in dollars, and thus, these types of injuries are irreparable harm. . . . Furthermore, loss of business opportunities and relationships with clients who could produce an indeterminate amount of business over years to come are also hard to measure in dollars and are properly considered irreparable harm." (internal citation and quotation marks omitted)). Notably, the evidence presented throughout the multiple proceedings in this matter suggests that the IME market is relatively small and finite, such that finding new customers to replace the ones poached by Defendants has not and will not be easy for Plaintiff.

Moreover, a defendant's dissemination of trade secrets can be sufficient to show a likelihood of irreparable harm absent a preliminary injunction. *Intertek Testing Servs.*, 443 F. Supp. 3d at 331; *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets cannot be measured in money damages. . . . A trade secret once lost is, of course, lost forever."). Here, Defendants have conceded that they gave all of their customer information, including the information stolen from Plaintiff, to Fari Gutierrez to start Client Exam Services. (March 2023 Tr. 126–127.) Thus, Defendants not only wrongfully used Plaintiff's trade secrets to build Companions, Defendants further disseminated

Plaintiff's confidential information to outside parties in order to evade the Court's March 2023 TRO, resulting in further damage to Plaintiff's business, reputation, and good will.

Defendants argued during the March 2023 hearing that Safa "giving up" the misappropriated customer information to Gutierrez did not qualify as Safa "using" the information because "she's not profiting from it and she's not operating [Client Exam Services.]" (March 2023 Tr. 127:2–5.) However, Defendants misunderstand the plain text of both the Amended Injunction and trade secret law. The Amended Injunction states in relevant part: "Defendants . . . are preliminarily enjoined from . . . using *in any manner whatsoever* Plaintiff's trade secrets and confidential information" (Dkt. 80 (emphasis added)), and New York law is clear that the dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See, e.g.*, *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018) ("Under New York law, the use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm."); *IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm."). Therefore, the Court finds that Plaintiff has shown they will be irreparably injured absent a preliminary injunction. Indeed, even with a preliminary injunction in place, Defendants disseminated Plaintiff's trade secrets, inflicting further harm against Plaintiff. Thus, Plaintiff will undoubtedly suffer additional irreparable harm absent a stricter preliminary injunction.

**D. Narrowly Drawn Injunction**

In the context of loss of trade secrets, the Second Circuit instructs that: "where irreparable injury has been demonstrated, a 'narrowly drawn' preliminary injunction that protects the trade secret from further disclosure or use may be appropriate. In all cases, the relief should be 'narrowly

tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994)). Here, the Court issues a narrowly tailored injunction, only enjoining Defendants from providing services to those customers who Plaintiff has shown were misappropriated from Plaintiff. (*See* Dkt. 180; 4/3/2023 Docket Order; 4/7/2023 Docket Order; 4/10/2023 Docket Order.) The Court notes again that this strengthened injunction is necessitated by Defendants' violation of the previous injunction.

**E. Balance of Equities**

The Court finds that the balance of equities tips decidedly in Plaintiff's favor. The Court has already found that Plaintiff has suffered and will continue to suffer irreparable harm if Defendants are not enjoined from using and disseminating Plaintiff's trade secrets. As for Defendants' claims of hardship, the Second Circuit is clear that a defendant's hardship should be discounted when that hardship is self-inflicted by the defendant's own illegal activity. *See, e.g.*, *Kipling Apparel Corp. v. Boading Baigou Xincheng Younuo Trading Co., Ltd.*, No. 18-CV-8333 (ALC), 2019 WL 10960397, at *4 (S.D.N.Y. June 20, 2019) ("Where a party knowingly copies and uses another party's trademark without its permission, that party assumes the associated risks, and any potential loss suffered by an injunction may be considered to be self-imposed."); *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 247–48 (E.D.N.Y. 2009) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) for the proposition that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself"); *Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 394 (S.D.N.Y. 2003) (finding that there was no real hardship to the defendant resulting from the issuance of an injunction other than loss of money from activity "it probably should not have engaged in to begin

with"); *Pearson Educ., Inc. v. Labos*, 19-CV-487 (CM), 2019 WL 1949820, at *6 (S.D.N.Y. Apr. 23, 2019) ("[I]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." (internal quotation marks and citation omitted)). Thus, here, Defendants' claim of hardship falls flat given the mountain of irrefutable evidence that Defendants engaged in a multi-year campaign, from the formation of Companions to the initiation of this lawsuit, to steal Plaintiff's confidential information and customers knowingly, methodically, and persistently. That is, Defendants assumed the risks of losing these customers when Defendants intentionally engaged in illegal activity to obtain them, and cannot legitimately claim any harm when they are forced to relinquish their ill-gotten business.

**F. Public Interest**

Lastly, the Court finds that the public interest will be served by an injunction prohibiting Defendants from further using what the Court finds, based on clear and convincing evidence, are wrongfully obtained trade secrets to poach clients from Plaintiff. As the Court stated in its previous Memorandum & Order issuing the April 2022 Injunction, "[i]t goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest." *IME Watchdog, Inc.*, 2022 WL 1525486, at *8.

**G. Bond**

As before, the Court waives the bond requirement imposed by Federal Rule of Civil Procedure 65(c). Pursuant to Rule 65(c), a court may "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[W]here a bond is posted, it serves as security for the 'costs and damages' incurred by the wrongfully restrained party." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 558 (2d Cir. 2011). District courts are "vested with wide discretion" to determine the appropriate amount of the bond,

*see Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation and citations omitted), and, "despite the seemingly mandatory nature of Rule 65(c), a district court in its discretion may deny a bond altogether if there is no proof of likelihood of harm to the non-movant, *see Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013) (internal quotation marks omitted). If the district court decides that a bond is not necessary, it must "make this determination before it enter[s] the preliminary injunction." *Corning, Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (per curiam).

Here, Defendants have not requested a security bond and Plaintiff similarly has not raised the issue. Nevertheless, the Court makes an independent determination that a security bond is not necessary in this case. The Court has concluded that Plaintiff is highly likely to prevail on the merits in this litigation and that the hardship to Defendants from a preliminary injunction, if any, would therefore be minimal. *Golden Krust*, 957 F. Supp. 2d at 203 ("Some courts have considered the strength of a movant's case in analyzing the likelihood of harm to a potentially wrongfully enjoined nonmovant." (collecting cases)); *see also Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 590 (W.D.N.Y. 2011) ("The greater plaintiff's likelihood of success on the merits, the lower the probability that an injunction in plaintiff's favor will later be determined to have been issued in error, and consequently that [the defendant] will be found to have wrongfully suffered harm."). Accordingly, the Court finds that no bond is required.

## II. Civil Contempt

### A. Civil Contempt Legal Standard

"A court may hold a party in contempt if (1) the order the party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted to comply in a reasonable manner." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016). Regarding the first factor, "[a]n injunction is sufficiently

clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" *Id.* (quoting *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir.1989)). As to the second factor, "[n]oncompliance [has] to be supported by clear and convincing evidence." *Id.* at 99. For the third factor, a party who diligently complies in a reasonable manner, "to ensure it remain[s] in compliance with the Injunction" "c[an] petition[] the District Court for a modification, clarification or construction of the order." *Id.* (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)). Importantly, a party's intent or state of mind does not matter for finding contempt. *See McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve [a party] from civil contempt[;] . . . it matters not with what intent the defendant did the prohibited act."). Moreover, broader injunctions, with more general language, "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *Id.* at 192. Indeed, "[i]t does not lie in [the defendants'] mouths to say that they have immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined." *Id.*

Upon a finding of contempt, "[a] civil contempt sanction may . . . serve either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citation omitted). "Compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury." *Id.* at 1353 (citation omitted). On the other hand, coercive sanctions are "left to the informed discretion of the district court" and should be based on "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent

seriousness of the sanction's burden." *Id*. (citations omitted). Notably, "[t]he court may . . . serve either goal—the coercive or the compensatory—by awarding attorneys' fees and costs to a contempt victim." *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 208 (S.D.N.Y. 2020) (citations omitted).

**B. The Court Finds Defendants in Contempt of the Amended Injunction and March 2023 TRO**

Applying this standard, the Court is prepared to find Safa Gelardi in contempt of the Amended Injunction, upon a showing of compensatory damages incurred by Plaintiff, with respect to the provisions in the Amended Injunction: (1) barring Defendants from making contact with Carlos Roa; and (2) operating Defendants' business or any other business that unfairly and unlawfully competes with Plaintiff.

1. <u>Hiring a Private Investigator to "Befriend" Carlos Roa Constitutes "Contacting" Roa in Violation of the Amended Injunction</u>

a. <u>The Amended Injunction Clearly Prohibited Contact</u>

The Court's Amended Injunction enjoins "Defendants, *their agents*, officers and employees, *and all other persons and entities in active concert or participation with them*" from "contacting Plaintiff's current clients, employees, and agents[.]" (Dkt. 80, at 2 (emphasis added).) Safa's hired investigator, Stanulis, undoubtedly qualifies as her agent and/or a person acting in concert with her." *See CBS Broad. Inc.*, 814 F.3d at 98 ("An injunction is sufficiently clear and unambiguous if it leaves 'no doubt in the minds of those to whom it was addressed . . . precisely what acts are forbidden.'" (quoting *Drywall Tapers & Pointers*, 889 F.2d at 395)). Thus, the Court finds that the Amended Injunction clearly and unambiguously prohibited Safa from hiring Stanulis to contact Roa.

b. Evidence of Safa's Violation is Clear and Convincing

Despite the plain language of the Amended Injunction, Safa hired a private investigator to contact Plaintiff's current employee, Roa. (*See* Dkt. 153-4 (contract between Safa and private investigative agency dated "11/04/2022").) Safa directed the private investigator to "befriend" Roa, even providing the hired agent with scripted questions and conversation topics. (*See, e.g.*, Dkt. 181-1, at ECF 1 (email from Safa to the private investigator stating "Dear, Steve, this is my ex-employee [Carlos Roa], try to relate to him, he is a big mouth and will talk."); *id.* (Safa providing conversation material to the investigator including, "[Q]uestions to ask[:] how long have you been in the sports business? ([H]e claims to be a manager to runners[] and athletes[.] . . . Try to get him to talk shit about his current boss (Daniella Levi)[.] Try to get him to defame her badly and disparage her, and have him talk about starting his own IME Business[.]").) Moreover, Defendants "don't dispute" that Safa "had instructed the [private investigator] to befriend Mr. Roa." (March 2023 Tr. 137:18–20.)

In response, Defendants argue that Safa's plan of hiring a private investigator to *elicit* contact was not *initiating* contact. (*Id.* 137:22–138:6 (Safa's counsel arguing that "instruct[ing] the [private investigator] to befriend Mr. Roa" "wouldn't be a contact initiated by her or the [private investigator]" because it was "supposed to go the other way around"—that is—the investigator was hired to "accept contact, not to make contact.").) However, for the reasons stated on the record, the Court finds this argument wholly unavailing, if not disingenuous and cynical. (*Id.* 138:7–16 ("THE COURT: [W]hether [Stanulis] initiates it or not it's contact . . . if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. . . . She placed someone there to have contact with him.").) Moreover, whether Safa *willfully* violated the no-contact provision is irrelevant to the Court's finding of contempt, *see*

*McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve from civil contempt . . . it matters not with what intent the defendant did the prohibited act."), although, based on the evidence produced in connection with the hearing, as well her conduct throughout these proceedings, the Court would find Safa's conduct willful, if that were a requirement. Thus, the Court finds that there is clear and convincing evidence that Safa attempted to contact Roa through a hired investigator in violation of the Amended Injunction.[12]

c. Safa Did Not Exercise Reasonable Diligence

Lastly, although the plain language of the Amended Injunction clearly prohibited any individual working "in concert" with Safa from contacting Plaintiff's employees, to the extent Safa had any concerns about what the provision entailed, she could have asked the Court for "a modification, clarification[,] or construction of the order[.]" *CBS Broad. Inc.*, 814 F.3d at 99. Instead, she "incorrectly took it upon [her]self to interpret" the no-contact provision as allowing her to hire an individual to "befriend" Roa and did not exercise reasonable diligence in complying with the Amended Injunction. *Id.*[13] Moreover, any argument that the Amended Injunction's no-contact provision was too general is unavailing. Where a party's "proclivity for unlawful conduct has been shown[,]" as has been overwhelmingly established as to Defendants here, "[d]ecrees of

[12] Plaintiff also submitted clear and convincing evidence that Safa paid Stanulis to place a GPS tracker on Roa's car. (Dkt. 153-5, at ECF 1 (Stanulis declaring that Safa "requested 10 hours of surveillance and agreed to a 'tracker' on [Roa's] car as well"); *id.* at ECF 11–16 (Safa texting Stanulis regarding whether the GPS tracker is working).) For the reasons stated on the record, the Court declines to find that Safa's attempt to track Roa violated the Amended Injunction. (*See* March 2023 Tr. 20:5–21:4.) However, the Court's Second Amended Preliminary Injunction will expressly prohibit Defendants from surveilling and tracking Plaintiff and Plaintiff's employees in addition to the no-contact provision.

[13] Furthermore, as noted, the Court does not find that Safa misunderstood the language of the no-contact provision. Rather, she deliberately sought to end run the injunction by directing the private investigator to elicit contact and "befriend" Roa.

[] generality are often necessary to prevent further violations." *McComb*, 336 U.S. at 192; *see also id.* ("It does not lie in [the defendants'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined.").

Thus, the Court is prepared to hold Safa in civil contempt for violating the Amended Injunction. However, the Court cannot enter an order finding Safa in civil contempt at this time because Plaintiff has not submitted the required affidavit "set[ting] out with particularity . . . the claim, if any, for damages occasioned [by Defendants' contemptuous actions] and such evidence as to the amount of damages as may be available to the moving party." *See* Local Rule 83.6(a); *see also* Local Rule 83.6(c) (requiring the Court to "set[] forth the amount of damages, if any, to which the complainant is entitled" and "fixing the fine, if any, imposed by the Court" in an order of civil contempt). For this reason, the parties are directed to further brief the issue of damages and attorneys' fees before the Court can hold Safa in contempt. *See infra* Conclusions of Law, Section II.C.

2. Defendants Violated the March 2023 TRO By Helping to Start Client Exam Services

a. The March 2023 TRO Clearly Prohibited Defendants from Helping to Start Client Exam Services

On March 10, 2023, the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating their business or any other business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.) This language is clear and unambiguous.

b. Evidence of Defendants' Noncompliance is Clear and Convincing

The evidence presented during the March 27, 2023 hearing clearly and convincingly established that Safa directed Fari Gutierrez—a friend of the Gelardi family (March 2023 Tr.

98:10–12) and part-time IME observer for Companions (*id.* 105:22–106:1)—to create Client Exam Services and circumvent the Court's TRO. Defendants' own counsel explained that after the issuance of the TRO, Safa "called Fari and said, [']I have been shut down. I cannot operate the business [Companions]. It's yours, if you want it.[']" (*Id.* 25:1–3.) Safa's employee, Beibin, also testified that on March 11, 2023, the day after the Court issued the TRO, Safa told him that Companions was shutting down until further notice and that Gutierrez had started a company and would contact him. (*Id.* 97:7–10; *see also id.* 25:6–8 (Defendants' counsel explaining that Safa told Mr. Beibin that "Fari may be taking over the business").) On March 12, 2023, Beibin received a call from "Sammy," Safa's nephew, on behalf of Client Exam Services, who explained to Beibin "that everything would pretty much be operating the same way as they did" at Companions. (*Id.* 97:11–14, 100:21–24.) There were, in fact, no differences in operations between Client Exam Services and Companions:

> THE COURT: Are you paid the same?
>
> THE WITNESS: I haven't been paid yet.
>
> THE COURT: But were you promised the same pay[?]
>
> THE WITNESS: It would be the same, yeah.
>
> THE COURT: But did you discuss that specifically?
>
> THE WITNESS: No.
>
> THE COURT: So why did you assume that?
>
> THE WITNESS: Because I was told that everything would operate the way it had before.
>
> THE COURT: . . . . Who told you that?
>
> THE WITNESS: That's what Sammy told me.
>
> THE COURT: As before what? The company didn't exist [until March 16th].

THE WITNESS: When IME Companions was closed, I was made to believe that all of the business was now going to be taken over by Fari Gutierrez and . . . Sammy would give me my assignments.

THE COURT: And everything would remain the same, except for the name of the company as far as you were told?

THE WITNESS: As far as I was told, yeah.

(*Id.* 113:25–114:23.) Beibin attended approximately 12 IMEs on behalf of Client Exam Services for the same clients he had been servicing when he worked at Companions after the March 2023 TRO was issued. (*Id.* 100:25–101:2, 103:14–16, 115:2–5.)

Thus, the Court finds that there is overwhelming, undisputed evidence that "Defendants and any persons/entities acting in concert with them" have continued to operate a "business that unfairly competes with Plaintiff in violation of the law." (Dkt. 156, at 3; 3/10/2023 Docket Order.)

c. Defendants Did Not Exercise Reasonable Diligence

Lastly, Defendants clearly did not exercise reasonable diligence in complying with the March 2023 TRO. Defendants argue that Safa provided Companions' clients and "outstanding assignments" to Gutierrez because she wanted to ensure they were "take[n] care of" after Companions was enjoined from servicing them. (March 2023 Tr. 26:16 – 27:4.) Therefore, it was not Safa who was operating the business or using the client information, but rather "she was letting someone else us[e] them." (*Id.* 27:5–15.) But Defendants ignore the fact that they were already enjoined by the Amended Injunction from "using *in any manner whatsoever* Plaintiff's trade secrets and confidential information." (Dkt. 80 (emphasis added).) Moreover, under New York law, dissemination of trade secrets constitutes "use" of such secrets and is exactly the type of harm preliminary injunctions are meant to prevent. *See Capstone Logistics Holdings, Inc.*, 2018 WL

6786338, at *33 ("[T]he use and disclosure of an employer's confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm.").[14]

Thus, if Defendants had exercised any amount of diligence, they would not have let a family friend "take over" Companions' business after the Court enjoined "Defendants and any persons/entities acting in concert with them" from "operating [Companions] or any other business that unfairly competes with Plaintiff" (Dkt. 156, at 3), because it was a clear violation of the Court's TRO. (*See* March 2023 Tr. 114:16–18 (Beibin testifying that "[w]hen IME Companions was closed, [he] was made to believe that all of the business was now going to be taken over by Fari Gutierrez[.]").) Even defense counsel conceded during the March 27, 2023 hearing that"[t]here's no question, Judge, of what you've heard [from Beibin] and I'm not denying that . . . [Client Exam Services] leads back to [Safa]." (*Id.* 126:3–5.)

Thus, the Court is prepared to hold Safa in civil contempt for violating the Court's March 2023 TRO.

### C. The Court Requires Further Briefing Regarding the Compensatory Damages Sought

As discussed, in order to hold Safa in civil contempt, Plaintiff must file a brief detailing the amount of compensatory damages it seeks and submit evidence supporting such damages. *See* Local Rule 83.6(a) ("The affidavit upon which such notice of motion [for contempt] or order to show cause is based shall *set out with particularity the misconduct complained of, the claim, if any, for damages occasioned thereby and such evidence as to the amount of damages as may be*

[14] During the March 27, 2023 hearing, Defendants' counsel argued that giving Plaintiff's client lists to Gutierrez did not qualify as "use" of Plaintiff's trade secrets if Safa was "not profiting from it" and "not operating" the new business. (March 2023 Tr. 127:2–5.) However, New York trade secrets law clearly refutes this argument. Furthermore, this self-serving, post-hoc argument ignores the plain language of the Amended Injunction and the Court's written decisions and oral pronouncements in this matter.

*available to the moving party*. A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage." (emphasis added)); *see also N.Y. State Nat'l Org. for Women*, 886 F.2d at 1353 (explaining that "compensatory sanctions should reimburse the injured party for its actual damages" and be "based upon evidence of such loss or injury" (citation omitted)). Thus, Plaintiff is directed to submit further briefing setting forth the actual damages it has incurred due to (1) Safa's "contact" with Roa, and (2) the creation of Client Exam Services, within 60 days of this Order.

**III. Plaintiff's Other Requested Relief**

In addition to the issues addressed above, Plaintiff is also seeking the following relief: (1) imposing upon Defendants a daily fine of $10,000 payable to Plaintiff for each day the Court finds Defendants in violation of the previous Injunctions; (2) attaching Defendants' real property or directing that all proceeds from the sale of any real property be held in escrow pending final disposition of this case; and (3) directing Defendants to submit to another forensic examination at their sole cost. The Court denied these requests for the reasons stated on the record at the March 27, 2023 hearing and does not find there is need to further supplement its reasoning at this time. (*See generally* March 2023 Tr.)

**CONCLUSION**

For the reasons stated above, the Court grants in part and denies in part Plaintiff's request for a second preliminary injunction. The Court attaches the Second Amended Preliminary Injunction Order, which sets forth the specific terms of the injunction, to this Memorandum & Order. Moreover, although the Court is prepared to find Safa in civil contempt of the Amended Injunction and the March 2023 TRO, the Court reserves on making a final ruling and imposing sanctions until Plaintiff submits supplemental briefing regarding its compensatory damages, including attorneys' fees for the March 27, 2023 contempt proceedings. Plaintiff's supplemental

brief setting forth the specific amounts of attorneys' fees and compensatory damages they believe they are owed as a result of Defendants' contact with Roa and the creation of Client Exam Services is due 60 days from the date of this Order. Defendants will be permitted 30 days to respond, if they choose.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: October 20, 2023
Brooklyn, New York

*** Filed ***
12:36 PM, 11 Feb, 2026
U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

IME WATCHDOG, INC.,

Plaintiff,

v. Case No. 1:22-cv-01032 (PKC) (JRC)

SAFA GELARDI, VITO GELARDI,

IME COMPANIONS LLC, CLIENT EXAM SERVICES LLC,

IME MANAGEMENT & CONSULTING LLC, and others,

Defendants

---------------------------------------------------------X

**NOTICE OF APPEAL**

Notice is hereby given that Defendants Safa Gelardi and Vito Gelardi, appearing pro se, hereby appeal to the United States Court of Appeals for the Second Circuit from the Memorandum & Order entered February 9, 2026 (ECF No. 616), and the Judgment entered February 10, 2026 (ECF No. 617). Defendants further appeal from the Certificate of Default entered February 11, 2026 (ECF No. 618), and from all prior orders, rulings, and determinations that merge into the foregoing and/or form the basis for the relief awarded.

Dated: February 11, 2026

Respectfully submitted,

/s/ Safa Gelardi, pro se

/s/ Vito Gelardi, pro se

APPEAL,ACO,PROSENEF

# U.S. District Court
# Eastern District of New York (Brooklyn)
# CIVIL DOCKET FOR CASE #: 1:22-cv-01032-PKC-JRC

IME WatchDog, Inc. v. Gelardi et al
Assigned to: Judge Pamela K. Chen
Referred to: Magistrate Judge James R. Cho
Cause: 18:1836(a) - Injunction against Misappropriation of Trade Secrets

Date Filed: 02/25/2022
Jury Demand: Plaintiff
Nature of Suit: 880 Defend Trade Secrets Act (of 2016)
Jurisdiction: Federal Question

**Movant**

**Eugene Liddie** represented by **Karen Hillary Charrington**
THE CHARRINGTON FIRM PC
One Cross Island Plaza
Suite 212
Rosedale, NY 11422
718-528-4422
Fax: 718-528-4420
Email: kcharrington@charringtonlawfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**IME WatchDog, Inc.** represented by **Jamie Scott Felsen**
Milman Labuda Law Group PLLC
3000 Marcus Avenue
Suite 3w8
Lake Success, NY 11042
516-328-8899
Fax: 516-328-0082
Email: jamiefelsen@mmmlaborlaw.com
*ATTORNEY TO BE NOTICED*

**Emanuel Kataev**
Sage Legal LLC
18211 Jamaica Avenue
Jamaica, NY 114232327
718-412-2421
Fax: 718-489-4155
Email: emanuel@sagelegal.nyc
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Safa Abdulrahim Gelardi** represented by **Safa Abdulrahim Gelardi**
26118 Crosswood Trails Lane

| | | |
|---|---|---|
| | | As to (2), Plaintiff's request is not referred to Judge Cho, even though it involves a discovery-related dispute and Judge Cho's prior order, and the Court defers ruling on it pending its consideration of Plaintiff's anticipated order to show cause discussed above. Ordered by Judge Pamela K. Chen on 1/28/2026. (JEC) (Entered: 01/28/2026) |
| 01/28/2026 | | ORDER: The Court denies the 613 request by Defendants Safa and Vito Gelardi seeking leave to file a "clarifying submission" to demonstrate that "[t]he limited discovery scope in the April 3, 2025 Order was based on incomplete information" and that the Gelardis "took all appropriate steps, both through counsel and pro se, to obtain discovery that was ultimately never allowed or pursued." (Dkt. 613.) Defendants are "not seeking any relief... [or] reconsideration," (*id.*), and Defendants' request to clarify the record is not related to any matter pending before the Court. Ordered by Judge Pamela K. Chen on 1/28/2026. (JEC) (Entered: 01/28/2026) |
| 01/28/2026 | 615 | ORDER: The Court vacates the sanctions ordered on October 6, 2025 because Defendants Safa Gelardi and Vito Gelardi have complied with the Order by paying Berkeley Research Group, LLC ("BRG") $2,500 and timely making their November 1, 2025 payment. (*See* 10/6/2025 Dkt. Order for Dkt. 599.)<br><br>However, the Court received the attached correspondence from Ignatius Grande of BRG informing the Court that BRG did not receive the monthly payments due on December 1, 2025 or January 1, 2026. The Court therefore sanctions the Gelardis $500 for each missed payment. By **February 11, 2026**, the Gelardis are ordered to pay BRG $1,000 for December and January (in addition to the $500 payment due on February 1, 2026), and they are ordered to pay $1,000 in sanctions to the Clerk, U.S. Court, E.D.N.Y. Alternatively, if Defendants pay BRG $1,500 by February 11, 2026 **and** timely make their $500 February 1, 2026 payment to BRG, the Court will vacate the sanctions ordered. Ordered by Judge Pamela K. Chen on 1/28/2026. (JEC) (Entered: 01/28/2026) |
| 02/09/2026 | 616 | MEMORANDUM & ORDER: For the reasons explained in the attached Memorandum and Order, Plaintiff's motion for contempt, (Dkt. 477 ), is granted in part and denied in part:<br><br>1. The Court denies Plaintiff's request for the Court to hold Defendants Safa and Vito Gelardi (together, the "Gelardis") in criminal contempt.<br><br>2. The Court finds the Gelardis in civil contempt and orders case-ending sanctions. Default will be entered against the Gelardis, along with the defaulting corporate Defendants, under Rule 55(a) of the Federal Rules of Civil Procedure. The Court orders Plaintiff to file a motion for default judgment pursuant to Rule 55(b)(2) within **thirty (30) days** of this Memorandum and Order. The Gelardis shall submit any objections to Plaintiff's proposed judgment within **thirty (30) days** thereafter.<br><br>3. Safa's counterclaims, (Dkt. 547 ), are dismissed pursuant to Rule 41(c), and Safa's request for the Court to take judicial notice, (Dkt. 569 ), is denied.<br><br>4. The Court sanctions Defendants $105,881.78 for the contempt found in the Court's March 2025 Memorandum and Order, (Dkt. 448 ), which represents Plaintiff's reasonable associated attorneys' fees. The Court grants Plaintiff's request for immediate entry of judgment as to that amount, (Dkt. 582 ), pursuant to Rule 58(d) and 58(a).<br><br>The Clerk of Court is respectfully directed to enter default against all Defendants pursuant to Rule 55(a). The Clerk of Court is also respectfully directed to enter judgment in favor of Plaintiff against Defendants for $105,881.78 pursuant to Rule 58(d) and 58(a). Ordered by Judge Pamela K. Chen on 2/9/2026. (JEC) (Entered: 02/09/2026) |

| | | |
|---|---|---|
| 02/10/2026 | 617 | CLERK'S SECOND JUDGMENT: that Plaintiffs motion for contempt, (Dkt. 477), is granted in part and denied in part as follows:<br><br>1. The Court denies Plaintiffs request for the Court to hold the Gelardis in criminal contempt.<br><br>2. The Court finds the Gelardis in civil contempt and orders case-ending sanctions. Default will be entered against the Gelardis under Rule 55(a) of the Federal Rules of Civil Procedure. The Court orders Plaintiff to file a motion for default judgment pursuant to Rule 55(b)(2) within thirty (30) days of this Memorandum and Order. The Gelardis shall submit any objections to Plaintiffs proposed judgment within thirty (30) days thereafter.<br><br>3. Safa's counterclaims, (Dkt. 547), are dismissed pursuant to Rule 41(c), and Safa's request for the Court to take judicial notice, (Dkt. 569), is denied.<br><br>4. The Court sanctions Defendants $105,881.78 for the contempt found in the Court's March 2025 Memorandum and Order, (Dkt. 448), which represents Plaintiff's reasonable associated attorneys' fees. The Court grants Plaintiffs request for immediate entry of judgment as to that amount, (Dkt. 582), pursuant to Rule 58(d) and 58(a); and<br><br>Judgment is entered in favor of Plaintiff against Defendants for $105,881.78 pursuant to Rule 58(d) and 58(a).Signed by Deputy Clerk, Jalitza Poveda, on behalf of Clerk of Court, Brenna B. Mahoney, on 2/10/2026. (JP) (Entered: 02/10/2026) |
| 02/11/2026 | 618 | Clerk's ENTRY OF DEFAULT It appearing from the docket maintained in this action that defendant Client Exam Services LLC, Safa Abdulrahim Gelardi, Vito Gelardi, IME Companions LLC, IME Management & Consulting LLC has failed to appear or otherwise defend this action, the default of defendant Client Exam Services LLC, Safa Abdulrahim Gelardi, Vito Gelardi, IME Companions LLC, IME Management & Consulting LLC is hereby noted pursuant to Rule 55a of the Federal Rules of Civil Procedure. (JP) (Entered: 02/11/2026) |
| 02/11/2026 | 619 | NOTICE OF APPEAL as to 618 Clerk's Entry of Default, by Safa Abdulrahim Gelardi, Vito Gelardi. (VJ) (Entered: 02/11/2026) |
| 02/11/2026 | | APPEAL FILING FEE DUE re 619 Notice of Appeal Payment in the amount of $605.00, can be made in person to the clerks office, or mailed in or paid online with the event *Civil Case Appeal Filing Fee*. (VJ) (Entered: 02/11/2026) |
| 02/11/2026 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 619 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 02/11/2026) |
| 02/11/2026 | 620 | MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction by IME WatchDog, Inc.. (Felsen, Jamie) (Entered: 02/11/2026) |
| 02/11/2026 | 621 | MEMORANDUM in Support re 620 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by IME WatchDog, Inc.. (Felsen, Jamie) (Entered: 02/11/2026) |
| 02/11/2026 | 622 | AFFIDAVIT/DECLARATION in Support re 620 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction filed by IME WatchDog, Inc.. (Attachments: # 1 Exhibit A Part 1, # 2 Exhibit A Part 2, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D) (Felsen, Jamie) (Entered: 02/11/2026) |

**ACMS Docket Report**
**United States Court of Appeals for the Second Circuit**

**Court of Appeals Docket #:** 26-616 **Docketed:** 03/13/2026
**Nature of Suit:** 3880 Defend Trade Secrets Act (of 2016)
IME WatchDog, Inc. v. Gelardi
**Appeal From:** EDNY (BROOKLYN)
**Fee Status:** Paid

**Case Type Information:**
**1)** Civil
**2)** Private
**3)**

**Originating Court Information:**
**District:** EDNY (BROOKLYN) : 1:22-cv-1032
**Trial Judge:** Pamela K. Chen, District Judge
**Magistrate Judge:** James R. Cho, Magistrate Judge
**Date Filed:** 02/25/2022

| Date Order/Judgment: | Date Order/Judgment EOD: | Date NOA Filed: | Date Rec'd COA: |
|---|---|---|---|
| 02/10/2026 | 02/10/2026 | 03/09/2026 | 03/10/2026 |

**Prior Cases:**
None

**Current Cases:**
None

| | |
|---|---|
| IME WATCHDOG, INC.<br>Plaintiff - Appellee | Jamie Felsen, -<br>Direct: 516-328-8899<br>[Retained]<br>Milman Labuda Law Group, PLLC<br>3000 Marcus Avenue<br>Suite 3w8<br>Lake Success, NY 11042<br><br>Emanuel Kataev, -<br>Direct: 718-412-2421<br>[Retained]<br>Sage Legal LLC<br>18211 Jamaica Avenue<br>Jamaica, NY 11423 |
| SAFA ABDULRAHIM GELARDI<br>Defendant - Appellant | Safa Abdulrahim Gelardi<br>[Pro Se]<br>26118 Crosswood Trails Lane<br>Cypress, TX 77433 |

| | |
|---|---|
| VITO GELARDI<br>Defendant - Appellant | Vito Gelardi<br>[Pro Se]<br>26118 Crosswood Trails Lane<br>Cypress, TX 77433 |
| IME COMPANIONS LLC<br>Defendant | |
| GREGORY ELEFTERAKIS<br>Defendant | |
| ROMAN POLLAK<br>Defendant | |
| ANTHONY BRIDDA<br>Defendant | |
| NICHOLAS ELEFTERAKIS<br>Defendant | |
| NICHOLAS LIAKIS<br>Defendant | |
| CLIENT EXAM SERVICES LLC<br>Defendant | |
| IME MANAGEMENT & CONSULTING LLC<br>Defendant | |
| DIRECT IME SERVICES LLC<br>**Terminated:** 04/21/2026<br>Defendant | |
| CARLOS ROA<br>Defendant | |
| DANIELLA LEVI<br>Defendant | |

IME WatchDog, Inc.,

Plaintiff-Counter-Defendant-Appellee,

v.

Safa Abdulrahim Gelardi, Vito Gelardi,

Defendants -Third-Party-Plaintiffs-Counter-Claimants-Counter-Defendants-Appellants,

IME Companions LLC, Gregory Elefterakis, Roman Pollak, Anthony Bridda, Nicholas Elefterakis, Nicholas Liakis, Client Exam Services LLC, IME Management & Consulting LLC, Direct IME Services LLC,

Defendants-Third-Party-Plaintiffs-Counter-Claimants.

| | | |
|---|---|---|
| 3/10/2026 | 1<br>116 pg. 1,145 KB | NOTICE OF CIVIL APPEAL, with district court docket, on behalf of Appellant Safa Abdulrahim Gelardi, Vito Gelardi, FILED. [Entered: 03/13/2026 01:36 PM] |
| 3/10/2026 | 2<br>41 pg. 636 KB | DISTRICT COURT MEMORANDUM AND ORDER, dated 02/09/2026, RECEIVED. [Entered: 03/13/2026 01:39 PM] |
| 3/10/2026 | 3<br>2 pg. 204 KB | DISTRICT COURT SECOND JUDGMENT, dated 02/10/2026, RECEIVED. [Entered: 03/13/2026 01:41 PM] |
| 3/10/2026 | 5<br>1 pg. 401 KB | DISTRICT COURT ENTRY OF DEFAULT, dated 02/11/2026, RECEIVED. [Entered: 03/13/2026 01:43 PM] |
| 3/10/2026 | 6<br>118 pg. 965 KB | ELECTRONIC INDEX, in lieu of record, FILED. [Entered: 03/13/2026 01:47 PM] |
| 3/13/2026 | 4<br>1 pg. 188 KB | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellee IME WatchDog, Inc., FILED. Service date 03/13/2026 by ACMS. [Entered: 03/13/2026 01:43 PM] |
| 3/13/2026 | 7<br>118 pg. 1,331 KB | CIVIL APPEAL, on behalf of Appellant Safa Abdulrahim Gelardi, Vito Gelardi, OPENED. [Entered: 03/13/2026 01:53 PM] |
| 3/13/2026 | 8<br>1 pg. 176 KB | INSTRUCTIONAL FORMS, to Pro Se litigants Safa Abdulrahim Gelardi, Vito Gelardi, SENT. [Entered: 03/13/2026 01:56 PM] |
| 3/16/2026 | 9 | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellee IME WatchDog, Inc., FILED. Service date 03/16/2026 by ACMS. [Entered: 03/16/2026 04:40 PM] |
| 3/17/2026 | 10<br>118 pg. 965 KB | SUPPLEMENTAL ELECTRONIC INDEX, in lieu of record, FILED. [Entered: 03/18/2026 10:59 PM] |
| 3/19/2026 | 11<br>2 pg. 245 KB | DEFECTIVE DOCUMENT, Acknowledgment and Notice of Appearance Form, at docket entry 9, on behalf of Appellee IME WatchDog, Inc., FILED. [Entered: 03/19/2026 12:54 AM] |
| 3/19/2026 | 12<br>2 pg. 175 KB | NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL, on behalf of IME WatchDog, Inc., FILED. [Entered: 03/19/2026 08:20 AM] [Edited: 03/27/2026 01:27 PM] |
| 3/23/2026 | 13 | CURED DEFECTIVE DOCUMENT, Notice of Appearance, at entry 12, on behalf of Appellee IME WatchDog, Inc., FILED. [Entered: 03/23/2026 06:19 AM] |
| 3/27/2026 | 14<br>1 pg. 118 KB | CERTIFICATE OF SERVICE, for notice of appearance as additional counsel, on behalf of Appellee IME WatchDog, Inc., FILED. Service date 03/27/2026 by United States Mail. [Entered: 03/27/2026 03:14 PM] [Edited: 03/27/2026 04:50 PM] |
| 4/3/2026 | 15<br>1 pg. 183 KB | ORDER, dated 04/03/2026, dismissing appeal by 04/24/2026, unless Appellant Vito Gelardi, submits Acknowledgment and Notice of Appearance form, copy to pro se appellant, FILED. [Entered: 04/03/2026 09:16 AM] [Edited: 04/03/2026 09:50 AM] |
| 4/3/2026 | 16<br>1 pg. 182 KB | ORDER, dated 04/03/2026, dismissing appeal by 04/24/2026, unless Appellant Safa Abdulrahim Gelardi, submits Acknowledgment and Notice of Appearance form, copy to pro se appellant, FILED. [Entered: 04/03/2026 09:18 AM] |
| 4/3/2026 | 17<br>1 pg. 184 KB | ORDER, dated 04/03/2026, dismissing appeal by 04/24/2026, unless Appellant Vito Gelardi, submits form D-P, copy to pro se appellant, FILED. [Entered: 04/03/2026 09:25 AM] |
| 4/3/2026 | 18<br>1 pg. 184 KB | ORDER, dated 04/03/2026, dismissing appeal by 04/24/2026, unless Appellant Safa Abdulrahim Gelardi, submits form D-P, copy to pro se appellant, FILED. [Entered: 04/03/2026 09:28 AM] |

| | | |
|---|---|---|
| 4/3/2026 | 19<br>1 pg. 213 KB | ORDER, dated 04/03/2026, dismissing appeal by 04/24/2026, unless Appellant Vito Gelardi, submits fee or moves for in forma pauperis, copy to pro se appellant, FILED. [Entered: 04/03/2026 09:35 AM] |
| 4/3/2026 | 20<br>1 pg. 212 KB | ORDER, dated 04/03/2026, dismissing appeal by 04/24/2026, unless Appellant Safa Abdulrahim Gelardi, submits fee or moves for in forma pauperis, copy to pro se appellant, FILED. [Entered: 04/03/2026 09:38 AM] |
| 4/9/2026 | 21 | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellant Safa Abdulrahim Gelardi, FILED. Service date 04/09/2026 by United States Mail. [Entered: 04/09/2026 07:39 PM] |
| 4/9/2026 | 22 | FORM D-P, on behalf of Appellant Safa Abdulrahim Gelardi, FILED. Service date 04/09/2026 by United States Mail. [Entered: 04/09/2026 07:40 PM] |
| 4/9/2026 | 23 | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellant Vito Gelardi, FILED. Service date 04/09/2026 by United States Mail. [Entered: 04/09/2026 07:41 PM] |
| 4/9/2026 | 24 | FORM D-P, on behalf of Appellant Vito Gelardi, FILED. Service date 04/09/2026 by United States Mail. [Entered: 04/09/2026 07:43 PM] |
| 4/9/2026 | 25<br>4 pg. 3,191 KB | LETTER, dated 04/09/2026, informing the Court the appeal fee has been mailed to the District Court, on behalf of Appellant Safa Abdulrahim Gelardi, Appellant Vito Gelardi, RECEIVED. No Service. [Entered: 04/09/2026 07:46 PM] |
| 4/9/2026 | 26 | LR 31.2 SCHEDULING NOTIFICATION, on behalf of Appellant Safa Abdulrahim Gelardi, informing Court of proposed due date 06/30/2026, RECEIVED. No Service. [Entered: 04/09/2026 07:50 PM] |
| 4/9/2026 | 27<br>2 pg. 225 KB | DEFECTIVE DOCUMENT, Acknowledgment and Notice of Appearance Form, at docket entry 21, on behalf of Appellant Safa Abdulrahim Gelardi, copy to pro se appellant, FILED. [Entered: 04/09/2026 08:02 PM] |
| 4/9/2026 | 28<br>2 pg. 226 KB | DEFECTIVE DOCUMENT, Form D-P, at docket entry 22, on behalf of Appellant Safa Abdulrahim Gelardi, copy to pro se appellant, FILED. [Entered: 04/09/2026 08:04 PM] |
| 4/9/2026 | 29<br>2 pg. 226 KB | DEFECTIVE DOCUMENT, Acknowledgment and Notice of Appearance Form, at docket entry 23, on behalf of Appellant Vito Gelardi, copy to pro se appellant, FILED. [Entered: 04/09/2026 08:05 PM] |
| 4/9/2026 | 30<br>2 pg. 226 KB | DEFECTIVE DOCUMENT, Form D-P, at docket entry 24, on behalf of Appellant Vito Gelardi, copy to pro se appellant, FILED. [Entered: 04/09/2026 08:07 PM] |
| 4/9/2026 | 31<br>2 pg. 328 KB | DEFECTIVE DOCUMENT, LR 31.2 Scheduling Notification, at docket entry 26, on behalf of Appellant Safa Abdulrahim Gelardi, copy to pro se appellant, FILED. [Entered: 04/09/2026 08:10 PM] |
| 4/15/2026 | 32<br>3 pg. 959 KB | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellant Safa Abdulrahim Gelardi, FILED. Service date 04/09/2026 and 04/15/2026 by United States Mail. [Entered: 04/17/2026 06:30 AM] [Edited: 04/17/2026 06:43 AM] |
| 4/15/2026 | 33<br>3 pg. 968 KB | FORM D-P, on behalf of Appellant Safa Abdulrahim Gelardi, FILED. Service date 04/09/2026 and 04/15/2026 by United States Mail. [Entered: 04/17/2026 06:32 AM] [Edited: 04/17/2026 07:05 AM] |
| 4/15/2026 | 34<br>3 pg. 812 KB | LR 31.2 SCHEDULING NOTIFICATION, on behalf of Appellant Safa Abdulrahim Gelardi, informing Court of proposed due date 06/30/2026, RECEIVED. Service date 04/09/2026 and 04/15/2026 by United States Mail. [Entered: 04/17/2026 06:34 AM] |
| 4/15/2026 | 35<br>3 pg. 942 KB | ACKNOWLEDGMENT AND NOTICE OF APPEARANCE, on behalf of Appellant Vito Gelardi, FILED. Service date 04/09/2026 and 04/15/2026 by United States Mail. [Entered: 04/17/2026 06:35 AM] |
| 4/15/2026 | 36<br>3 pg. 948 KB | FORM D-P, on behalf of Appellant Vito Gelardi, FILED. Service date 04/09/2026 and 04/15/2026 by United States Mail. [Entered: 04/17/2026 06:37 AM] [Edited: 04/17/2026 07:04 AM] |

| | | |
|---|---|---|
| 4/15/2026 | 37<br>120 pg. 977 KB | SUPPLEMENTAL ELECTRONIC INDEX, in lieu of record, FILED. [Entered: 04/17/2026 06:40 AM] |
| 4/15/2026 | 38<br>1 pg. 122 KB | PAYMENT OF DOCKETING FEE, on behalf of Appellant Safa Abdulrahim Gelardi, Vito Gelardi, district court receipt #100026137, FILED. [Entered: 04/17/2026 06:42 AM] [Edited: 04/28/2026 09:01 PM] |
| 4/17/2026 | 39 | CURED DEFECTIVE DOCUMENT, Acknowledgment and Notice of Appearance Form, at entry 32, on behalf of Appellant Safa Abdulrahim Gelardi, FILED. [Entered: 04/17/2026 06:49 AM] |
| 4/17/2026 | 40 | CURED DEFECTIVE DOCUMENT, Form D-P, at entry 33, on behalf of Appellant Safa Abdulrahim Gelardi, FILED. [Entered: 04/17/2026 06:50 AM] |
| 4/17/2026 | 41 | CURED DEFECTIVE DOCUMENT, LR 31.2 Scheduling Notification, at entry 34, on behalf of Appellant Safa Abdulrahim Gelardi, FILED. [Entered: 04/17/2026 06:53 AM] |
| 4/17/2026 | 42 | CURED DEFECTIVE DOCUMENT, Acknowledgment and Notice of Appearance Form, at entry 35, on behalf of Appellant Vito Gelardi, FILED. [Entered: 04/17/2026 06:54 AM] |
| 4/17/2026 | 43 | CURED DEFECTIVE DOCUMENT, Form D-P, at entry 36, on behalf of Appellant Vito Gelardi, FILED. [Entered: 04/17/2026 06:56 AM] |
| 4/21/2026 | 44 | NEW PARTY, Third Party Defendant Carlos Roa, Daniella Levi, ADDED. [Entered: 04/21/2026 08:49 AM] |
| 4/21/2026 | 45 | Defendant Direct IME Services LLC, TERMINATED. [Entered: 04/21/2026 08:51 AM] |
| 4/21/2026 | 46<br>1 pg. 175 KB | CAPTION, Third Party Defendants Carlos Roa and Daniella Levi added, AMENDED. [Entered: 04/21/2026 08:56 AM] |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS, NICHOLAS LIAKIS, and IME COMPANIONS LLC,

Defendants.
---------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

Third-Party Plaintiffs,

-against-

CARLOS ROA,

Third-Party Defendant.
---------------------------------------------------------------X
CARLOS ROA,

Third-Party Counter-Claimant,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC,

Third-Party Counter-Defendants.
---------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**NOTICE OF DEPOSITION**

**PLEASE TAKE NOTICE,** that pursuant to Rule 30 of the Federal Rules of Civil Procedure, defendants Safa Abdulrahim Gelardi, Vito Gelardi and IME Companions LLC, by and through its attorneys, Warner & Scheuerman, will take the deposition of third-party defendant/third-party claimant Carlos Roa upon oral examination of any knowledge or information that is relevant

to this case before a Notary Public or other person authorized to administer oaths at 10:00 a.m. on June 8, 2023, by stenographic, audiovisual, and/or videographic means, at the office of Warner & Scheuerman, 6 West 18th Street, 10th Floor, New York, New York 10011.

The oral examination will continue for one day of seven (7) hours until completed. Plaintiff reserves the right to seek additional time consistent with Rules 26(b)(1) and (2).

Dated: New York, New York
May 10, 2023

**WARNER & SCHEUERMAN**
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC

By: */s/ Jonathon D. Warner*
Jonathon D. Warner (5195)
6 West 18th Street, 10th Floor
New York, New York 10011
(212) 924-7111
jdwarner@wslaw.nyc

To: MILMAN LABUDA LAW GROUP PLLC
Attorneys for Plaintiffs
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
(516) 328-8899
emanuel@mllaborlaw.com
(VIA EMAIL)

LEO SHALIT, P.C.,
Attorneys for Third-Party Defendant/
Third-Party Counterclaimant
Carlos Roa
45 Glen Cove Road
Greenvale, New York 11548
(833) SHALIT-1
leo@shalit-law.com
(VIA EMAIL)

MELANIE I. WIENER, ESQ.
Attorney for Defendants
Anthony Bridda, Roman Pollak
and Gregory Elefterakis
1 Metro Tech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
mwiener@abramslaw.com
(VIA EMAIL)

LAW OFFICES OF MICHAEL J. ALBER, P.C.
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC
21 Walt Whitman Road, 2nd Floor
Huntington Station, New York 11746
(631) 333-1600
kcb@alberlegal.com
(VIA EMAIL)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, NICHOLAS ELEFTERAKIS, NICHOLAS LIAKIS, and IME COMPANIONS LLC,

Defendants.
---------------------------------------------------------------X
SAFA GELARDI and IME COMPANIONS, LLC,

Third-Party Plaintiffs,

-against-

CARLOS ROA,

Third-Party Defendant.
---------------------------------------------------------------X
CARLOS ROA,

Third-Party Counter-Claimant,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, and IME COMPANIONS, LLC,

Third-Party Counter-Defendants.
---------------------------------------------------------------X

Case No.: 1:22-cv-1032 (PKC)(JRC)

**NOTICE OF DEPOSITION**

**PLEASE TAKE NOTICE,** that pursuant to Rule 30 of the Federal Rules of Civil Procedure, defendants Safa Abdulrahim Gelardi, Vito Gelardi and IME Companions LLC, by and through its attorneys, Warner & Scheuerman, will take the deposition of plaintiff IME Watchdog, Inc., by Daniella Levi, upon oral examination of any knowledge or information that is relevant to this

case before a Notary Public or other person authorized to administer oaths at 10:00 a.m. on June 15, 2023, by stenographic, audiovisual, and/or videographic means, at the office of Warner & Scheuerman, 6 West 18th Street, 10th Floor, New York, New York 10011.

The oral examination will continue for one day of seven (7) hours until completed. Plaintiff reserves the right to seek additional time consistent with Rules 26(b)(1) and (2).

Dated: New York, New York
May 10, 2023

**WARNER & SCHEUERMAN**
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC

By: */s/ Jonathon D. Warner*
Jonathon D. Warner (5195)
6 West 18th Street, 10th Floor
New York, New York 10011
(212) 924-7111
jdwarner@wslaw.nyc

To: MILMAN LABUDA LAW GROUP PLLC
Attorneys for Plaintiffs
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
(516) 328-8899
emanuel@mllaborlaw.com
(VIA EMAIL)

LEO SHALIT, P.C.,
Attorneys for Third-Party Defendant/
Third-Party Counterclaimant
Carlos Roa
45 Glen Cove Road
Greenvale, New York 11548
(833) SHALIT-1
leo@shalit-law.com
(VIA EMAIL)

MELANIE I. WIENER, ESQ.
Attorney for Defendants
Anthony Bridda, Roman Pollak
and Gregory Elefterakis
1 Metro Tech Center, Suite 1701
Brooklyn, New York 11201
(718) 215-5300
mwiener@abramslaw.com
(VIA EMAIL)

LAW OFFICES OF MICHAEL J. ALBER, P.C.
Attorneys for Defendants
Safa Abdulrahim Gelardi, Vito Gelardi and
IME Companions, LLC
21 Walt Whitman Road, 2nd Floor
Huntington Station, New York 11746
(631) 333-1600
kcb@alberlegal.com
(VIA EMAIL)

Gmail

Safa Gelardi <safagelardi@gmail.com>

# Re: Plaintiffs' Counsel's False Statement Regarding Rosenblatt Deposition / Necessity of 4506-T / Deficiency of Client Summary

1 message

**Safa Gelardi** <safagelardi@gmail.com> Wed, Aug 6, 2025 at 6:19 PM
To: NYED_Cho Chambers <cho_chambers@nyed.uscourts.gov>

Dear Judge Cho:

At the August 6, 2025 conference, Mr. Kataev falsely stated that defendants only sought the depositions of Daniella Levi and Carlos Roa—not Adam Rosenblatt. That was a direct misrepresentation to the Court.

Enclosed are the formal deposition notices dated May 10, 2023, served through counsel, which include:

- Adam Rosenblatt (June 1, 2023)
- Carlos Roa (June 8, 2023)
- Daniella Levi (June 15, 2023)

Plaintiffs' attorneys were properly served with these notices. There is no ambiguity. The claim that we "never asked for Rosenblatt" is false—and it is not the first time plaintiffs' counsel has misstated facts to the Court. This conduct reflects a **consistent pattern of obstruction and misrepresentation** that undermines the integrity of these proceedings.

Equally concerning is the plaintiffs' continued refusal to produce real financial documentation supporting their claimed damages. For over three years, they have alleged millions in lost income and business value without producing a single tax return, P&L statement, or bank record.

That is why the **IRS Form 4506-T** is essential. It provides certified IRS income records that cannot be manipulated, unlike the selectively generated QuickBooks "Sales by Customer Summary" they now offer. If plaintiffs truly lost millions, it will appear in their tax filings. If not, the case is built on fiction.

**What I was trying to explain during the conference is simple: I earned close to a million dollars a year in this business. If plaintiffs are claiming I "stole" their business, then they need to show they were making at least that much—and lost it because of me.** Anything less does not support their damages claim.

Additionally, we note that a "Sales by Customer Summary" is not proof of damages or entitlement. IME Watchdog may have been the first IME observer business, but that does not mean every client they once worked with belongs to them. **By the time I obtained many of those clients, they were already using other IME observer companies—not IME Watchdog.** I did not take them from Watchdog—I gained them from the broader market after they had moved on. Clients are not property, and prior use of IME Watchdog does not establish exclusive ownership or monetary loss.

## Accordingly, I respectfully request that the Court:

1. **Acknowledge** that defendants properly and timely requested Mr. Rosenblatt's deposition;
2. **Take judicial notice** of Mr. Kataev's false statement made directly to the Court;
3. **Preclude** plaintiffs from relying on Mr. Rosenblatt's affidavits or testimony going forward; and
4. **Compel** plaintiffs to execute IRS Form 4506-T for tax years 2022, 2023, and 2024 to finally verify or disprove their claimed financial losses.

Thank you for your attention to these serious issues, which continue to prejudice defendants and delay resolution of this matter.

Respectfully,
**Safa Gelardi**
Pro Se Defendant

**Attachments:**

1. Notice of Deposition – Adam Rosenblatt (June 1, 2023)
2. Notice of Deposition – Carlos Roa (June 8, 2023)
3. Notice of Deposition – Daniella Levi (June 15, 2023)
4. Email from Jonathan Warner dated May 10, 2025

Respectfully,
**Safa Gelardi**
Pro Se Defendant

---

**4 attachments**

**DeposiotionNoticeLevi.pdf**
170K

**DepositionNoticeCarlosRoa.pdf**
170K

**DepositionNoticeRosenblatt.pdf**
170K

**Gmail - FW_ Depositions in Gelardi ads. Watchdogs.pdf**
184K

A P P E A R A N C E S:

SAFA GELARDI AND VITO GELARDI, PRO SE
EMAIL: SAFAGELARDI@GMAIL.COM

MILMAN LABUDA LAW GROUP PLLC
Attorneys for IME WATCHDOG, INC.
3000 Marcus Avenue, Suite 3W8
Lake Success, New York 11042
BY: JAMIE S. FELSEN, ESQ.
Email: JAMIE@MLLABORLAW.COM

SAGE LEGAL LLC
Attorneys for DANIELLA LEVI
182-11 Jamaica Avenue
Jamaica, New York 11423
BY: EMANUEL KATAEV, ESQ.
Email: EMANUEL@SAGELEGAL.NYC

ALSO PRESENT:
ELIYAHU LEVI
CARLOS ROA
OLIVIA COONEY, Paralegal

* * *

this question frankly. Are you okay with excusing Mr. Roa from the deposition today?

MR. KATAEV: No, your Honor.

JUDGE CHO: All right. Why does he need to be there?

MR. KATAEV: Well, first of all, your Honor, this is the last deposition in this case so he will not be testifying and he has not been deposed. Second, he's part of our legal team and he's an officer of IME WatchDog. He's participated in every deposition to date. There's no basis to exclude him.

MS. GELARDI: Your Honor.

MR. KATAEV: He's here as a corporate officer.

JUDGE CHO: Ms. Gelardi, Mr. Gelardi let me explain something to you. So under our Local Rule 30.3 entitled persons attending depositions. Here's what the rules says: A person who is a party in the action may attend a deposition of a party or a witness. A

witness or a potential witness in the action may attend the deposition of a party or witness unless or ordered otherwise by the court.

So Mr. Kataev, Mr. Felsen, let me ask you this question: Do you expect Mr. Roa to be a witness in this case?

MR. KATAEV: If the case goes to trial, which we don't expect it to.

JUDGE CHO: I'm sorry. I didn't hear that. Yes or no?

MR. KATAEV: If the case goes to trial, he will be called as a witness at trial. We are not expecting him to be deposed and we don't expect a trial to occur in this case because we're going to be moving to summary judgments. And Judge Chen repeatedly issued orders.

JUDGE CHO: All right, I heard enough. I heard enough. So Ms. Gelardi, Mr. Gelardi, I am allowing him to be there pursuant to our Local Rule, okay, because he may be a witness in this case. He's allowed to be there.

Carlos claims he has received his JD from. The response was:

"Good morning. In response to your inquiry. We inform you there is no record in our database of any individual named Carlos David Roa born on March 18, 1992 as a student or graduate of Universidad Carlos III de Madrid in the year 2019 or in any other period. We hope this information is helpful. Kind regards, Alumni UC3M."

MR. FELSEN: Again, objection. All the other objections I raised and hearsay.

MS. GELARDI: This will be Exhibit B.

(Whereupon, UC3M E-Mail was marked as Defendants' Exhibit B for identification as of this date by the Reporter.)

MS. GELARDI: Let me show you another document, Ms. Levi, in regards to the school. I'm sure you won't have an objection to this. It's straight

Brook University in 2014, a Master's in public health from the same university in 2016 and a Doctorate of Law specializing in sports law from Universidad Carlos III de Madrid in 2019. His academic achievements underscore his dedication to diverse fields. Carlos is a seasoned entrepreneur, renowned for founding a boutique international sports management firm. His firm boasts an impressive clientele comprising athletes in soccer, track and field and tennis. Notably, he serves as the international counsel to the Panamanian Olympic Committee and the Panamanian National Soccer Team leveraging his expertise in negotiations involving athletes, sponsorships and clothing brands. Before assuming his current role at IME WatchDog, Carlos honed his skills at one of New York City's largest personal injury firms overseeing the IME department." He calls himself Of Counsel basically. He's claiming in his biography to be an attorney. Do you agree with that, Ms. Levi?

MR. KATAEV: Objection.

A. No, I do not.

D. LEVI

litigation, you do not know whether Carlos Roa was served with deposition notices?

A. I'm not aware of that. I don't have an independent recollection of that.

Q. So you wouldn't know then why did Mr. Roa not appear for his deposition despite being noticed and holding the title of president of operations of your company?

MR. FELSEN: Objection. Which question do you want her to answer?

Q. Why he didn't appear for his deposition?

A. I'm not aware that there was a deposition notice or that there was a deposition date that he failed to appear to.

Q. You also stated that you weren't aware of a deposition notice date for yourself, correct?

MR. FELSEN: Objection.

A. Not off the top of my head, no.

Q. You were sent multiple deposition and damage production requests both verbally, during conferences and formally; is it fair to say?

D. LEVI

The Witness: So if you want to ask me a question at a deposition and you want me to provide you with an answer, you need me to let me complete answering the question and then you can ask another question. You keep interjecting, interrupting and it's impossible to conduct a deposition in this way.

MS. GELARDI: I apologize. I'll repeat the question, okay. Actually I'll move on to the next one.

MR. FELSEN: Let her finish her answer.

THE WITNESS: Can you read me back my answer, what I started to say, please.

(Whereupon, the referred to answer was read back by the Reporter.)

THE WITNESS: The damages are 98.3 of your sales.

MS. GELARDI: I'm sorry, Ms. Levi, I didn't ask you about the damages. That wasn't the question.

D. LEVI

very derived from misappropriated clients. And therefore 98.3 percent of every dollar that was earned by IME Companions belong to IME WatchDog. Those are my damages.

In addition, my damages are the loss of my reputation that you tarnished, as well as the loss of the reputation of IME WatchDog, which you also tarnished thanks to the way you instructed Adam to sabotage relationships and screw up relationships or as you say "fuck it up."

Q. Let me ask the question that I asked, Ms. Levi. You were sent multiple deposition and damage production requests, your attorneys were sent multiple deposition damages requests, both verbally during conferences and formally in writing by my prior attorney Jonathon Warner, correct?

A. I don't know. I don't have the record in front of me. I have to look at documents in order to give you a comprehensive answer.

D. LEVI

Q. Ms. Levi, why didn't Adam Rosenblatt appear for a deposition in this case given that he is the main accuser and your entire case relies heavily on his affidavit?

MR. FELSEN: Objection.

A. Again, I'm not aware of a deposition notice that was served with respect to Adam. And Judge Cho already ordered that discovery in this case is closed after my deposition.

Q. Understood. Why would the main accuser whose testimony you're relying on to support your claim even need a formal deposition request from the opposing party?

MR. FELSEN: Objection.

MR. KATAEV: Objection.

MR. FELSEN: You can answer if you understand.

A. No, I don't. Can you ask the question again.

Q. My question is, why would the main accuser whose testimony you are relying on to support your claims even need a formal deposition request from the opposing party?

A. I'm not here to do the work of your

D. LEVI

finances.

MR. FELSEN: She doesn't memorize her finances. All these documents you're referring to, show it to us.

MS. GELARDI: All I'm asking is, you know, you know your finances. If you ask me how much I make, people know how much they make.

Q. My question is in your damages model, you claim you lost a million and change, correct, but not in any year have you made anything near that, correct, in profit?

A. You misunderstand.

Q. I'm just asking.

A. You do not understand the way that damages are calculated and I'm going to repeat it.

Q. Ms. Levi, with all respect --

A. Let me finish answering. 98.3 percent of Companions's sales should've been IME WatchDog and those are my damages. Period. End of story. How much money I made, how the money, how the finances of the company were handled is immaterial and irrelevant.

D. LEVI

A. My affidavit explains very clearly how the damages calculation were arrived at.

Q. Ms. Levi, you used gross revenue numbers in your damages model, correct?

A. Again, I have to look at the affidavit I presented. You want to show me the affidavit, I am happy to explain it to you.

MR. FELSEN: I'll make a statement that your questions mischaracterizes what her affidavit says.

MR. KATAEV: Objection.

Q. A lost customer is one that stops paying you entirely, correct, Ms. Levi?

A. No.

Q. If a customer is still paying you, then they are not lost, correct?

MR. KATAEV: Objection. Argumentative.

A. Well, if a customer is paying me a certain amount, but paying IME Companions a certain amount, so whatever money was paid to IME Companion is part of my damages calculation. I don't know how many more times I have to explain it to you.

D. LEVI

irrelevant because it cannot point to clients?
A. Correct.
Q. But now you're telling me the case is not about clients because I'm showing that over 40 percent of my clients were never your clients from 2011 to 2022 they're nowhere in your records.
A. We can agree to disagree.
Q. Okay, let's agree to disagree. We at least agree that these are, all the highlighted in green are not lost accounts?
A. I have no idea. I have to review it based on our clients. I cannot do it just taking a look at it in a deposition.
Q. Okay. Ms. Levi, your financial records reflect repeated launch payments, hundreds of thousands of dollars to an entity called Zariz, correct?
MR. KATAEV: Objection. This is in violation of Rule 26 which is designed to harass. We instruct the witness not to answer the question.
MS. GELARDI: For the record, I'm only asking in regards to damages and

D. LEVI

expenses. I'm getting to a gross and net point here. So you don't have to answer. I'm just going to state the questions.

Q. Those payments appear year after year, correct?

A. I have to look at the financial records.

Q. You agree those payments are not to any IME observers?

MR. KATAEV: Objection. Vague.

Q. The payments, the hundreds of thousands of dollars made to an equity named Zariz?

MR. FELSEN: What records are you referring to?

MS. GELARDI: I'm just asking.

MR. FELSEN: I want to know what records you're referring.

MS. GELARDI: I'm asking a question.

MR. FELSEN: What records are you referring to that this question is based on? It sounds like you're in possession of Plaintiff's confidential information

D. LEVI

claim of expenses, grosses versus net. I'm just going to ask the questions, Mr. Felsen.

MR. FELSEN: You have the information that was on the dockets and trade secrets and we're not going to answer questions about information that you have that you're not supposed to have.

MS. GELARDI: I don't have the information. I am asking questions about the information. I'm just going to continue asking questions, you don't have to answer them.

Q. These payments they're not made to any IME physician, they're not made to any IME observer, they're not made to any law firm, correct, Ms. Levi?

MR. FELSEN: Objection.

Q. So these payments are not for IME WatchDog's core services, correct?

MR. FELSEN: Objection.

A. (No verbal response.)

Q. What services does Zariz provide to

D. LEVI

Q. You never produced a document showing you made a million dollars in profit, yes or no?

MR. KATAEV: Objection. You can answer.

A. (No verbal response.)

Q. Your top clients stayed with you, correct, Ms. Levi?

MR. FELSEN: Objection.

A. That's actually incorrect because Subin was our top client and they left and never came back.

Q. Your revenue increased for some of them, correct?

MR. KATAEV: Objection. Vague. You can answer the question.

Q. Of your top clients?

A. I have to look at financial records in order to ascertain and give you answers. However, the damages calculation is not based on IME WatchDog's records. It's based on Companions's records.

Q. Given all that information, your damages claim is not supported by a complete and

reliable financial picture, correct?

MR. FELSEN: Objection.

A. Absolutely incorrect.

MS. GELARDI: I just want to ask a couple of questions about Wingate and then we're going to move away from the financial part.

THE WITNESS: It's your deposition.

MS. GELARDI: I'm really trying not to make you uncomfortable. That's the only reason I'm saying that.

THE WITNESS: I'm very comfortable. I'm enjoying this.

Q. When you cease of a lost client on your damages claim that means. I asked you this already that customers stop doing business with you.

A. And I already responded.

Q. With respect to Wingate, they continued booking with you after the date you claimed they were lost; is that fair to say?

A. Again.

Q. It's in your records, Ms. Levi.

A. Again, as I said, to the extent that

D. LEVI

some of Wingate's business went to IME Companions, whatever money was generated through Wingate for IME Companions should've been IME WatchDog's income. So that is the basis for the damages calculation.

Q. The 98.3 percent claim that came from your damages claim, right, it was generated, it came from an Excel sheet that you provided to the court, correct?

A. Again, I have to refer back to, this was a filing that was done, I believe over two years ago. So I would have to look at that time to tell you exactly how things were calculated.

Q. You represented that spreadsheet as your actual customer list and said names were misappropriated from you by me; is that fair to say?

A. Whatever I submitted is what I submitted. The documents speak for themselves.

Q. Your own verified customer revenue record, your sales by summary list proved that many of the companies on the Excel spreadsheet including at Wingate never appeared at all; is that correct, these are your documents that you

MS. GELARDI: I'm going to get past this. I get the 98.3. I was just trying to prove to you that those figures were wrong.

Q. Let's move on to, Ms. Levi, you pled guilty in United States District Court to a federal offense, correct?

MR. FELSEN: Objection.

A. Yes.

Q. You received one year probation and $5,000 fine, correct?

MR. FELSEN: Objection.

A. Correct.

Q. You understand that the classification of the offense is a federal felony regardless of receiving probation; you understand that part?

MR. FELSEN: Objection.

A. (No verbal response.)

Q. At that time, you were enrolled in law school, correct?

A. Yes.

Q. Which one?

A. My first year was at Pace Law School

IME WatchDog Inc.

(https://imewatchdog.com)



## *President, Operations*

- (718) 463-2320(tel:+17184632320)
- carlos@imewatchdog.com(mailto:carlos@imewatchdog.com)
- Download VCard

As the President of Operations, Carlos Roa brings a formidable blend of academic prowess and entrepreneurial acumen to the table. Armed with a Bachelor's in Health Science from Stony Brook University (2014), a Master's in Public Health from the same institution in 2016, and a Doctorate of Law specializing in Sports Law from Universidad Carlos III de Madrid in 2019, his academic achievements underscore his dedication to diverse fields. Carlos is a seasoned entrepreneur, renowned for founding a boutique international sports management firm. His firm boasts an impressive clientele comprising athletes in Soccer, Track and Field, and Tennis. Notably, he serves as the International Counsel to the Panamanian Olympic Committee and the Panamanian National Soccer Team, leveraging his expertise in negotiations involving athletes, sponsorships, and clothing brands. Before assuming his current role at IME Watchdog, Carlos honed his skills at one of New York City's largest Personal Injury Law firms, overseeing the IME Department. His

*v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). Here, the Court applies the heightened standard required for mandatory injunctions because the Court is ordering Defendants to undertake a number of affirmative acts, including ceasing to provide services to the customers they stole from Plaintiff.

**B. Likelihood of Success on the Merits**

1. Legal Standard for Trade Secrets Claim

Plaintiff asserts, *inter alia*, causes of action under the Defend Trade Secrets Act ("DTSA") and misappropriation of trade secrets under New York common law. (*See* Am. Compl., Dkt. 114, at 2.) Section 1836 of the DTSA is a private cause of action for "[1] [a]n owner of a trade secret" which was "[2] misappropriated" and "[3] related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). "The elements for a misappropriation claim under New York law are fundamentally the same [as under Section 1836] . . . [and] [d]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (cleaned up). When a claimant proves "actual or threatened misappropriation," then "injunctive relief is authorized," but when "that there has been 'unjust enrichment' or 'actual loss caused by the misappropriation of the trade secret,' [then] damages are authorized." *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 403–04 (S.D.N.Y. 2021) (citing 18 U.S.C. § 1836.)

"Under New York law, a plaintiff claiming misappropriation of a trade secret must prove that (1) it possessed a trade secret, and (2) the trade secret was used by defendant in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 339 (E.D.N.Y. 2020) (citing *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019)). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and

which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." *Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 148 (E.D.N.Y. 2007). In general, the following factors must be considered to determine whether information is a trade secret:

> (1) The extent to which the information is known outside of the business;
>
> (2) the extent to which it is known by employees and others involved in the business;
>
> (3) the extent of measures taken by the business to guard the secrecy of the information;
>
> (4) the value of the information to the business and its competitors;
>
> (5) the amount of effort or money expended by the business in developing the information; and
>
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999)).

Most relevant to this case, "[c]ustomer lists may constitute trade secrets under certain limited circumstances. Specifically, the identity of customers is protected if the list was developed through substantial effort and kept in confidence." *Id.* at 148 (citing *N. Atl. Instruments, Inc.*, 188 F.3d at 44). "[L]ists of customers will not be deemed protected trade secret information where customers are readily ascertainable as prospective users or consumers, of the product at issue." *Id.* at 149 (internal quotations and citation omitted). "The issue of whether and to what extent a customer list constitutes trade secret information is a question of fact for th[e] court. When determining the confidentiality of customer lists[,] . . . the court considers the trade secret criteria referred to above." *Id.* In particular, although lists of customers may be publicly available or back-trackable, "the *identities of individual contact people*" at customers' companies can be "protectable trade secrets." *N. Atl. Instruments, Inc.*, 188 F.3d at 45.

Case: 26-616, 07/17/2026, DktEntry: 66.1, Page 281 of 300

b. Evidence of Safa's Violation is Clear and Convincing

Despite the plain language of the Amended Injunction, Safa hired a private investigator to contact Plaintiff's current employee, Roa. (*See* Dkt. 153-4 (contract between Safa and private investigative agency dated "11/04/2022").) Safa directed the private investigator to "befriend" Roa, even providing the hired agent with scripted questions and conversation topics. (*See, e.g.*, Dkt. 181-1, at ECF 1 (email from Safa to the private investigator stating "Dear, Steve, this is my ex-employee [Carlos Roa], try to relate to him, he is a big mouth and will talk."); *id.* (Safa providing conversation material to the investigator including, "[Q]uestions to ask[:] how long have you been in the sports business? ([H]e claims to be a manager to runners[] and athletes[.] . . . Try to get him to talk shit about his current boss (Daniella Levi)[.] Try to get him to defame her badly and disparage her, and have him talk about starting his own IME Business[.]").) Moreover, Defendants "don't dispute" that Safa "had instructed the [private investigator] to befriend Mr. Roa." (March 2023 Tr. 137:18–20.)

In response, Defendants argue that Safa's plan of hiring a private investigator to *elicit* contact was not *initiating* contact. (*Id.* 137:22–138:6 (Safa's counsel arguing that "instruct[ing] the [private investigator] to befriend Mr. Roa" "wouldn't be a contact initiated by her or the [private investigator]" because it was "supposed to go the other way around"—that is—the investigator was hired to "accept contact, not to make contact.").) However, for the reasons stated on the record, the Court finds this argument wholly unavailing, if not disingenuous and cynical. (*Id.* 138:7–16 ("THE COURT: [W]hether [Stanulis] initiates it or not it's contact . . . if [Safa] knowingly puts a [private investigator] in the position to have contact with Mr. Roa, I consider that contact. . . . She placed someone there to have contact with him.").) Moreover, whether Safa *willfully* violated the no-contact provision is irrelevant to the Court's finding of contempt, *see*

*McComb*, 336 U.S. at 191 ("The absence of wil[l]fulness does not relieve from civil contempt . . . it matters not with what intent the defendant did the prohibited act."), although, based on the evidence produced in connection with the hearing, as well her conduct throughout these proceedings, the Court would find Safa's conduct willful, if that were a requirement. Thus, the Court finds that there is clear and convincing evidence that Safa attempted to contact Roa through a hired investigator in violation of the Amended Injunction.[12]

c. Safa Did Not Exercise Reasonable Diligence

Lastly, although the plain language of the Amended Injunction clearly prohibited any individual working "in concert" with Safa from contacting Plaintiff's employees, to the extent Safa had any concerns about what the provision entailed, she could have asked the Court for "a modification, clarification[,] or construction of the order[.]" *CBS Broad. Inc.*, 814 F.3d at 99. Instead, she "incorrectly took it upon [her]self to interpret" the no-contact provision as allowing her to hire an individual to "befriend" Roa and did not exercise reasonable diligence in complying with the Amended Injunction. *Id.*[13] Moreover, any argument that the Amended Injunction's no-contact provision was too general is unavailing. Where a party's "proclivity for unlawful conduct has been shown[,]" as has been overwhelmingly established as to Defendants here, "[d]ecrees of

[12] Plaintiff also submitted clear and convincing evidence that Safa paid Stanulis to place a GPS tracker on Roa's car. (Dkt. 153-5, at ECF 1 (Stanulis declaring that Safa "requested 10 hours of surveillance and agreed to a 'tracker' on [Roa's] car as well"); *id.* at ECF 11–16 (Safa texting Stanulis regarding whether the GPS tracker is working).) For the reasons stated on the record, the Court declines to find that Safa's attempt to track Roa violated the Amended Injunction. (*See* March 2023 Tr. 20:5–21:4.) However, the Court's Second Amended Preliminary Injunction will expressly prohibit Defendants from surveilling and tracking Plaintiff and Plaintiff's employees in addition to the no-contact provision.

[13] Furthermore, as noted, the Court does not find that Safa misunderstood the language of the no-contact provision. Rather, she deliberately sought to end run the injunction by directing the private investigator to elicit contact and "befriend" Roa.

correct?

A No.

Q Let's look at Plaintiff's 37. This is an October 3rd, 2017 email from you to Safa Gelardi.

You sent this email, correct?

A Yes.

Q And in this email you are analyzing profit and loss statements, correct?

A Yes.

Q And the reason why you're analyzing these profit and loss statements is to determine whether you also, with Greg and Anthony, want to get into a similar business, correct?

A I analyzed it because Safa asked me to.

Q And the reason why you fulfilled her request is to determine whether you wished to use this information to start a competing business, correct?

A No.

Q Well, isn't it true that this email that you're analyzing the insurance expense to determine how much money is spent on insurance, for example?

A Yes.

Q And you're stating in here that you will not have similar expensing related to utilities, correct?

A Correct.

Q And you have questions about items such as the

commissioner of labor expense and lawyer expense, correct?
A Yes.
Q And you've analyzed that and used that information to determine whether you wanted to open a competing business, correct?
A No.
Q Let's go to Plaintiff's 38.
THE COURT: So can I ask you, what was the purpose of your email back to her with these responses?
THE WITNESS: Well, yeah, Safa asked me to analyze the P&L and give her my thoughts, and these were the items that stuck out to me.
THE COURT: But for what purpose? In other words, what -- did she say why she wanted you to do that?
THE WITNESS: Well, she was trying to -- I guess see if the business was profitable.
THE COURT: Okay. But why come to you and say, can you analyze this?
THE WITNESS: Well, she was trying to get me to present it to Greg --
THE COURT: Okay.
THE COURT REPORTER: Present it to who?
THE WITNESS: To Greg as a business opportunity.
THE COURT: Okay. So is it accurate that you were doing this analysis, in part, because you were trying to

decide if you should pitch it to Greg as a business he should get involved in?

THE WITNESS: In part.

THE COURT: Okay. All right.

Go ahead.

BY MR. KATAEV:

Q Now, you knew from your discussions with Safa that she had Adam on the inside of the IME Watchdog, correct?

A No, not at this time.

Q But in this email, you ended with -- with respect to travel expenses, I, quote: I will assume that is mostly the dock or Adam.

Do you see that?

THE COURT: Hang on. So hang on.

For the court reporter, you got to go slower.

MR. KATAEV: All right.

THE COURT: It says, I assume that is mostly the dock, slash, Adam. None of that capitalized.

Okay. Go ahead.

THE WITNESS: Correct. Can you repeat that?

Q You stated in this email, with respect to travel expenses, that you assume that is mostly the dock or Adam, correct?

A Yes.

Q And when you refer to "Adam," you're referring to Adam

A Okay.
Q What were the gross profits over three years for the Watchdogs?
MR. KATAEV: Objection, Your Honor, relevance.
THE COURT: Well, I can look at the document. You don't need to have him answer that question, unless it leads to another question --
MR. WARNER: It does.
THE COURT: Okay. Of this witness?
MR. WARNER: Yes.
THE COURT: Okay. Go ahead.
So looking at that exhibit.
Q 2014, they lost $42,000, correct? Is that correct?
A It's a $42,000 loss in 2014.
Q And 2015, how did they do?
A Almost 70,000 of net income.
Q And in 2016?
A Almost 75,000 of income.
Q So what would be the approximate average income that they made annually?
A With the loss?
Q Yes.
A Maybe 30,000.
Q Were you interested in this business because it made about $30,000 a year, or for some other reason?

to go further than that to see how that relationship worked. He is someone who is highly functional, but not highly intelligent and as a result he was taken advantage of.

THE COURT: In terms of human intelligence.

MR. KATAEV: That's correct, Your Honor.

THE COURT: I have admitted all of the documents, some of which were marked and some of which were not, that were provided by the plaintiff and questioned -- or about which there were questions posed to the witnesses. So those are in the record. I think at this point then I'm just going to issue the order and go from there, but it should be very clear that no more information -- the information from IME Companions cannot be used by this new company because my intent was not to -- the whole purpose of my finding of irreparable harm, and this is part of the case law, is that it constitutes irreparable harm if that information that allegedly stolen, and I find it was, is then transmitted to other individuals to further undermine the reputation and business of the original owner of the trade secrets.

So this new company, Client Exam Services, cannot use that information and if you want to, they can come in here and they can make their case, but I'm not allowing them to use it since it came from a tainted source and I intended to not allow IME Companions to use it to give to other individuals to take advantage of it and that should have been clear. If it

Gmail

Safa Gelardi <safagelardi@gmail.com>

## IME Watchdog for March 2017

**Adam Rosenblatt** <adammrosenblatt@gmail.com> Fri, Apr 28, 2017 at 3:48 PM
To: safagelardi@gmail.com

Hi Safa,

Attached please find a breakdown of March 2017. Including the monthly P&L, list of clients for that month, a list of all the IME covered, the Watchdog invoices, a breakdown of their pay vs what we billed, etc.

Thank you

Adam M. Rosenblatt

**20170410111302146.pdf**
14275K

Gmail

Safa Gelardi <safagelardi@gmail.com>

# IME Watchdog P&L Last 3 years

6 messages

**Adam Rosenblatt** <adammrosenblatt@gmail.com> Fri, Apr 28, 2017 at 3:15 PM
To: safagelardi@gmail.com

Good evening Safa,

As per our discussion attached please find the P&L for IME Watchdog for the last three years.

I would like for you to really understand that this company could have achieved an even greater success had any reinvestment been made or if a serious marketing strategy been established.

Thank you,

Adam M. Rosenblatt

**3 attachments**

**P&L 2016.pdf**
14K

**P&L 2015.pdf**
13K

**P&L 2014.pdf**
13K

**Safa Gelardi** <safagelardi@gmail.com> Sat, Apr 29, 2017 at 3:57 PM
To: "jay@fivepillarsgroup.com" <jay@fivepillarsgroup.com>

Sent from my iPhone

Begin forwarded message:

[Quoted text hidden]

**3 attachments**

**P&L 2016.pdf**
14K

**P&L 2015.pdf**
13K

**P&L 2014.pdf**
13K

**Safa Gelardi** <safagelardi@gmail.com> Fri, Sep 29, 2017 at 12:58 PM

To: Roman Pollak <rpollak002@gmail.com>

see attached

coming to see u

---

**3 attachments**

**P&L 2016.pdf**
14K

**P&L 2015.pdf**
13K

**P&L 2014.pdf**
13K

---

**Roman Pollak** <rpollak002@gmail.com> Tue, Oct 3, 2017 at 1:38 PM
To: Safa Gelardi <safagelardi@gmail.com>

So my questions would be as follows (Looking at 2016)

Insurance Expense of $1,282 - what insurance do they have and why?
Utilities seem high at $12K. But then again, we wont have any similar expenses.
Their Credit Card processing fees are about 1.95% of their total revenue. Would prefer to get a rate similar to that if we can.
Commissioner of Labor expense of $1,596. What is that?
They also have a 'Lawyer' Expense of $45K to Trivella & Forte!? What is that

And travel expenses.. I assume that is mostly the doc/adam.
[Quoted text hidden]

---

**Safa Gelardi** <safagelardi@gmail.com> Fri, Mar 11, 2022 at 2:54 PM
To: Steven Siegler <steven@kilegal.com>

First email

Sent from my iPhone

Begin forwarded message:

> **From:** Adam Rosenblatt <adammrosenblatt@gmail.com>
> **Date:** April 28, 2017 at 4:16:00 PM EDT
> **To:** safagelardi@gmail.com
> **Subject: IME Watchdog P&L Last 3 years**
>
> [Quoted text hidden]

---

**3 attachments**

**P&L 2016.pdf**
14K

**P&L 2015.pdf**
13K

**P&L 2014.pdf**
13K

---

**Safa Gelardi** <safagelardi@gmail.com> Wed, Jun 22, 2022 at 6:08 PM
To: Jonathon Warner <jdwarner@wslaw.nyc>

---------- Forwarded message ---------
From: **Adam Rosenblatt** <adammrosenblatt@gmail.com>
Date: Fri, Apr 28, 2017 at 4:16 PM
Subject: IME Watchdog P&L Last 3 years
To: <safagelardi@gmail.com>
[Quoted text hidden]

---

**3 attachments**

**P&L 2016.pdf**
14K

**P&L 2015.pdf**
13K

**P&L 2014.pdf**
13K

משרד המשפטים
MINISTRY OF JUSTICE
وزارة العدل

רשות התאגידים
ISRAELI CORPORATIONS AUTHORITY
سلطة التنظيمات

רשם החברות והשותפויות
REGISTRAR OF COMPANIES AND PARTNERSHIPS
مسجل الشركات والشراكات

# תעודת התאגדות חברה
# CERTIFICATE OF INCORPORATION OF COMPANY

This is to certify that the company:

וזאת לתעודה כי החברה:

## זריז שיפוצים בע"מ
## ZARIZ SHIPUZIM LTD

Company Number: **511511701** :מספר חברה

was incorporated and registered in Israel
**on 25th October 1990**
as a limited liability company
according to Companies Laws of the State of Israel

נתאגדה ונרשמה בישראל
**ביום 25/10/1990, ו' חשון התשנ"א**
כחברה בערבון מוגבל
לפי דיני החברות של מדינת ישראל

משרד המשפטים
רשם החברות והשותפויות

Shuli Avni-Shoham, Adv.
Registrar of Companies
Head of the Israeli Corporations Authority

שולי אבני-שוהם, עו"ד
רשמת החברות
ראש רשות התאגידים

The company details appearing in this certificate reflect the information as recorded in the Companies Registry on the date of the company's registration. It is possible that changes have occurred in the company details since the certificate was issued. In order to obtain up-to-date information about the company details, the complete company file must be reviewed and/or a status confirmation must be issued.

פרטי החברה המופיעים בתעודה זו משקפים את המידע כפי שנרשם במרשם החברות במועד רישום החברה. ייתכן כי חלו שינויים בפרטי החברה מאז הנפקת התעודה. לצורך קבלת מידע עדכני אודות פרטי החברה. יש לעיין בתיק החברה המלא ו/או להוציא אישור סטטוס.

**Produced on 5th June 2026**
**At 21:05**

**הופקה ביום 05/06/2026 כ' סיון התשפ"ו**
**בשעה 21:05**

To obtain a company information summary,
scan the barcode or click here

להפקת נסח חברה - תמצית מידע על החברה,
יש לסרוק את הברקוד או ללחוץ כאן

רשות התאגידים
אישור שמסמך זה החתום אלקטרונית,
מהווה העתק של מסמך (מקור או העתק) המצוי
ביום החתימה בתיק התאגיד ברשות התאגידים

Please be advised that a company or partnership extract may be obtained for a nominal fee of 12 NIS through the "Israeli Corporations Authority – Registrar of Companies" website, by accessing the "Obtain an Extract" service at:

https://www.gov.il/he/service/company_extract

This service is provided for public convenience and reference.

# Company Registry Extract

## Company Details

**Company Number:** 511511701

Legal Status: **Dissolved by court order**

Registration Date: **25 Oct, 1990**

**Company Name:** ZARIZ SHIPUZIM LTD

Company Type: **Israeli company**

Company Classification: **Private company**

Shareholders' Liability: **Limited liability**

Corporate Address: **16 Hativat Givati, Ra'anana, Israel, c/o Ziegman Yaakov** *AI*

Principal Corporate Purposes: **To engage only in activities specified in the articles of association**

Annual reports have not been filed

## Capital Structure

Type of Share: **Ordinary**

Par Value: **1**

Number of Shares: **14,000**

Currency: **New Israeli Sheqel - ILS**

Authorised Share Capital: **14,000**

Issued Share Capital: **20**

## Shareholders

1. Name: **Razon Avraham** *AI*
   ID Number: **2111268**
   Identity Type: **Israeli citizen**
   Registration Date: **09 Sep, 1999**
   Address: **26 Ramat HaHayal-HaLah, Tel Aviv - Yafo, Israel** *AI*
   Holding: 10 Ordinary shares, par value New Israeli Sheqel - ILS 1 each, held directly

2. Name: **Ziegman Yaakov** *AI*
   ID Number: **2970515**
   Identity Type: **Israeli citizen**
   Registration Date: **09 Sep, 1999**
   Address: **16 Hativat Givati, Ra'anana, Israel** *AI*
   Holding: 10 Ordinary shares, par value New Israeli Sheqel - ILS 1 each, held directly

## Directors

אישור שמסמך זה הותם אלקטרונית, מהווה העתק (קובץ) נאמן למקור / העתק המצוי ביום החתימה במאגר רשות התאגידים
OFFICIAL CERTIFICATION
This document was electronically generated and electronically signed by the Israeli Corporations Authority.

רשות התאגידים
Israeli Corporations Authority

Name: **Ziegman Yaakov** *AI*
Identity Type: **Israeli citizen**
Address: **16 Hativat Givati, Ra'anana, Israel** *AI*

ID Number: **2970515**
Appointment Date: **28 Oct, 1990**

***The company has no active obligations***

***Registered charges on the company: None***

***No changes to the articles of association***

## Status Changes

1. Change Date: **15 Nov, 1992**
   Status Description: **In court-ordered liquidation**
   Court Order Number: **0021292** Order Date: **01 Nov, 1992** Court: **Tel Aviv**

2. Change Date: **15 Apr, 1997**
   Status Description: **in Liquidation by Court Order**
   Court Order Number: **0021292** Order Date: **01 Nov, 1992** Court: **Tel Aviv**

This extract was prepared based on the information contained in the Companies Registry database as of 08 Jun, 2026 at 17:13

This company extract constitutes a summary of information derived from the computerized database of the Israeli Corporations Authority and is provided as a public service, based on information received by the Authority. The information contained in this extract may be incomplete, inaccurate, or not up to date, as it does not constitute one of the statutory registers maintained by the Israeli Corporations Authority pursuant to law. For the purpose of verifying the information and filings submitted to the Registrar of Companies as required by law, reference should be made to the company's official file. Instructions and access to the official file can be found at:

https://www.gov.il/he/service/company_online_portfolio

It is emphasized that the information contained in the company file regarding shareholders and directors, as well as additional information, is of a declarative nature only and does not constitute a substitute for inspection of the shareholders register and directors register maintained by the company itself, which are open for public inspection at the company's registered office. In addition, this extract may include summarized information received from state authorities (including, inter alia, the Insolvency and Economic Rehabilitation Authority, the Enforcement and Collection Authority, the court system, and other authorities). Such information is recorded in accordance with the applicable law and is reflected in this extract as a public service. This information may be partial or not up to date, and reliance should not be placed upon it; verification should be made with the relevant competent public or state authority.

**Translation and AI-Generated Content** To enhance accessibility for international stakeholders, certain fields in this extract have been translated into English using advanced automated or AI-based translation tools (including literal translations or phonetic transliterations), as indicated alongside the relevant fields. These translations are provided for convenience and for general informational purposes only; they are provided on an "as-is" basis and do not constitute an official, certified, or binding translation of the original Hebrew records. The Israeli Corporations Authority encourages users to verify critical information against the Hebrew source.

**In the event of any discrepancy between this English extract and the official Hebrew records, the information recorded in Hebrew in the official registers of the Israeli Corporations Authority shall solely prevail.**

רשות התאגידים
Israeli Corporations Authority
אישור שמסמך זה החתום אלקטרונית,
מהווה העתק של מסמך (מקור או העתק) המצוי
ביום החתימה בתיק התאגיד ברשות התאגידים
OFFICIAL CERTIFICATION
This document was electronically generated and electronically signed by the Israeli Corporations Authority.

FILED

MAY 20 3 32 PM '93

U.S. DISTRICT COURT
BRIDGEPORT, CONN

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

Grand Jury B-91-2

UNITED STATES OF AMERICA : CRIMINAL NO. 3:93CR00106 TFGD

: VIOLATIONS:
18 U.S.C. Section 371
[1 count]
: 18 U.S.C. Section 1956(a)(1)
[109 counts]
: 18 U.S.C. Section 1956(a)(2)
[15 counts]
: 18 U.S.C. Section 982
[1 count]

v.

DAVID VANOUNOU,
aka JOSEPH BENNUN
RAYMOND CHOCHANA,
aka RAYMOND SHASHANA
ADI TAL
MEIR OHAION
ALEX ADJMI
ALAN DAYON
DANIELLA LEVI
JACK ZEBEDE
ISSHAI DAVID VANOUNOU,
aka ESHAY DAVID WANUNU
BENJAMIN HESSON,
aka BENNY HASSAN
DINO TOSCANI
JACOB COHEN

A-294

INDICTMENT

The grand jury charges:

COUNT ONE

The Offense

1. Beginning in early 1991, approximately, and continuing through the date of this indictment, in the District of Connecticut and elsewhere within and outside the United States, including the Southern and Eastern Districts of New York, the District of New Jersey, the Central District of California, the Northern District of Texas, the State of Israel, the Dominion of Canada, the Republic of Italy, and the Republic of Colombia, the defendants

DAVID VANOUNOU,
aka JOSEPH BENNUN
RAYMOND CHOCHANA,
aka RAYMOND SHASHANA
ADI TAL
MEIR OHAION
ALEX ADJMI
ALAN DAYON
DANIELLA LEVI
JACK ZEBEDE
ISSHAI DAVID VANOUNOU,
aka ESHAY DAVID WANUNU
BENJAMIN HESSON,
aka BENNY HASSAN
DINO TOSCANI
JACOB COHEN

together and with others known and unknown to the Grand Jury, including Szion Jacob Abenhaim, a co-conspirator named in a separate indictment, Criminal No. 5:92CR-67(TFGD), did unlawfully, willfully, and knowingly combine, conspire, confederate and agree to commit certain offenses against the United States as follows:

127



# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

## JUDGMENT IN A CRIMINAL CASE

MAY 27 3 32 PM '94

FILED

**UNITED STATES OF AMERICA**

**v.**

**CASE NO. 3:93CR00106 TFGD**

**DANIELLA LEVI**
86-26 62nd Avenue
Rego Park, N.Y. 11374
SSN: 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 DOB: 08/25/62

Richard B. Herman, Esq.
Defendant's Attorney

The defendant pleaded guilty to count one of an Indictment after a plea of not guilty. Accordingly, the defendant is adjudged guilty of count one, which involves the following offense:

Title & Section: 31:5324(1) and 371 Count: One
Nature of Offense: Conspiracy to knowingly evade reporting requirements of 31:5313(a)
Date Offense Concluded: 5/93

The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

The defendant shall be placed on probation for a term of one year.

It is further Ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid. It is hereby Ordered that the general conditions of probation set out on the reverse side be imposed.

It is ordered that the defendant shall pay a Special Assessment of $50.00, for count one which shall be due immediately.

May 27, 1994
Date of Imposition of Sentence

/s/
T. F. Gilroy Daly, U.S.D.J. Date:

*CERTIFIED AS A TRUE COPY*
*ON THIS DATE* ___________
*BY:* ___________________
*Deputy Clerk*

A-296

Levi admitted the defect under oath. She testified that '[t]he damages are 98.3 of your sales,' that '98.3 percent of every dollar that was earned by IME Companions belong[s] to IME WatchDog,' and that '[t]hose are my damages.' Ex. 9, Levi Dep. Tr. 102:21-22, 104:3-6. She later admitted the damages calculation 'is not based on IME WatchDog's records' but is 'based on Companions's records.' Ex. 9, Levi Dep. Tr. 152:21-23. Levi also testified that 'how the finances of the company were handled is immaterial and irrelevant.' Ex. 9, Levi Dep. Tr. 126:21-25. WatchDog's finances are not irrelevant. WatchDog's finances are the proof.

The WatchDog P&Ls defeat the assumed margin. The historical figures reviewed with former counsel and discussed in this litigation show $525,199.40 in sales income and a $42,539.82 net loss in 2014; $835,016.90 in sales income and $69,800.66 in net income in 2015; and $969,699.84 in sales income and $74,557.42 in net income in 2016. Ex. 15, Gelardi Decl. ¶ 3. Together, WatchDog generated $2,329,916.14 in sales income and $101,818.26 in net income, an approximate 4.37% aggregate margin. A 50% margin would have generated $1,164,958.07 in net income. WatchDog generated $101,818.26. The difference is $1,063,139.81.

Rosenblatt's separate April 28, 2017 email titled 'IME Watchdog for March 2017' confirms that WatchDog maintained the records needed to test damages: the monthly P&L, client list, list of all IMEs covered, WatchDog invoices, and pay-versus-billed breakdown. Ex. 13-A. Based on Defendants' review with former counsel, the March 2017 materials reflected 516 IMEs, $25,000 to Zariz that month, $75,000 to Zariz year-to-date, the March P&L with prior-year comparison and YTD, bank-account records, WatchDog payroll with IME breakdowns, client information,
projected cash-flow materials, and pay-versus-billed records. Ex. 15, Gelardi Decl. ¶ 4. Plaintiff controls those records. Plaintiff did not submit them.

The DLA, Daniella Levi, and Zariz entries make a paper damages award impossible on this record. WatchDog's records reflected approximately $183,314.13 in distributions to DLA in 2014; approximately $165,000 in distributions to DLA, a separate $25,000 entry booked to Daniella Levi, and approximately $90,000 to Zariz in 2015; and approximately $220,000 to Zariz in 2016. Ex. 15, Gelardi Decl. ¶ 5. The March 2017 materials reflected another $25,000 to Zariz in March 2017 and $75,000 to Zariz year-to-date. Ex. 15, Gelardi Decl. ¶¶ 4-5. If those entries were business expenses, they reduce net profit. If they were distributions, related-party transfers, personal transfers, or non-operating payments, the books require scrutiny before any damages award.

The Zariz public record illustrates the proof failure. The Israeli Corporations Authority Certificate of Incorporation identifies ZARIZ SHIPUZIM LTD., Company Number 511511701, as an Israeli limited-liability company incorporated on October 25, 1990. Ex. 39. The Company Registry Extract identifies the same company, lists legal status as 'Dissolved by court order,' and records status changes showing court-ordered liquidation on November 15, 1992 and liquidation by court order on April 15, 1997, under Court Order Number 0021292 in Tel Aviv. Ex. 40. Plaintiff did not identify Zariz Shipuzim Ltd., any different Zariz recipient, any individual recipient, services, invoices, contracts, bank records, tax treatment, or how the one-word 'Zariz' entries affect WatchDog's claimed margin.

Plaintiff's customer proof fails for the same reason. Customer overlap is not customer-specific causation. WatchDog was the incumbent provider in this niche market and marketed itself as 'the first and largest IME company in New York,' 'covering over 1,000 exams per month.' Ex. 17, PDF p. 1. Plaintiff's materials included firms Defendants never serviced, firms whose WatchDog revenue continued or increased, firms that used multiple providers, firms that moved to other providers, and firms Plaintiff listed as 'Clients that Never Returned' with $0.00. Exs. 8, 24, 25, 26. That record does not prove customer-specific loss. It proves why customer-specific proof was required.

Levi's federal financial-crime conviction reinforces why damages must be established through objective financial records rather than unsupported assumptions. Levi is Plaintiff's owner, the person seeking the money judgment, and the declarant supporting the claimed 50% margin. The Judgment states that Levi pleaded guilty to Count One and was adjudged guilty of conspiracy to knowingly evade federal reporting requirements. Ex. 18, Judgment, PDF p. 8. The indictment caption identified 126 counts, including conspiracy, money laundering, and forfeiture counts. Ex. 18, Indictment, Doc. 8 at 30. The indictment charged that Levi, then a Bank Leumi vice president, was asked to find someone who could launder money, introduced a co-conspirator to Alex Adjmi for that purpose, and received a fee for initiating money-laundering transactions. Ex. 18, Indictment, Doc. 8 at 9, PDF p. 10. The broader scheme involved cash proceeds from drug trafficking, including cocaine trafficking, evasion of federal reporting requirements, concealment from law-enforcement scrutiny, commissions, counter-surveillance, beepers, code names, and approximately $22.5 million in cash delivered to Prism Financial Services and transferred to accounts in the United States and abroad. Ex. 18, Indictment, Doc. 8 at 4, 7, 28; PDF pp. 11-12, 2. Defendants do not offer that history as a standalone character attack. Plaintiff asks the Court to accept Levi's financial margin while withholding the books, leaving DLA/Daniella Levi/Zariz entries unexplained, and blocking the questions that would test net profit. In this record, financial proof must come from records, not trust.

This is not a case where damages were difficult but proven. Plaintiff seeks more than $5 million without WatchDog's books, without a reliable margin, without customer-specific causation, without a net unjust-enrichment calculation, without a reasonable-royalty analysis, and without a narrowly tailored basis for a permanent occupational ban. Plaintiff proved only that it wants to convert Defendants' gross customer-sales records into WatchDog's money judgment. Rule 55 does not permit that result. The Court should enter zero compensatory damages.