# 26-616

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**IME WatchDog, Inc.,**
Plaintiff-Counter-Defendant-Appellee,

**v.**

**Safa Abdulrahim Gelardi, Vito Gelardi,**
Defendants-Third-Party-Plaintiffs-Counter-Claimants-
Counter-Defendants-Appellants,

**IME Companions LLC, Gregory Elefterakis, Roman Pollak, Anthony Bridda,
Nicholas Elefterakis, Nicholas Liakis, Carlos Roa, Daniella Levi,
Client Exam Services LLC, IME Management & Consulting LLC,
Direct IME Services LLC,**
Defendants-Third-Party-Plaintiffs-Counter-Claimants.

On Appeal from the United States District Court
for the Eastern District of New York
No. 1:22-cv-01032-PKC-JRC - Hon. Pamela K. Chen

## APPENDIX VOLUME II OF II FOR DEFENDANTS-APPELLANTS

Safa Abdulrahim Gelardi, pro se
Vito Gelardi, pro se
26118 Crosswood Trails Lane
Cypress, Texas 77433
safagelardi@gmail.com | vitogelardi@gmail.com

# Table of Contents

Contents of Volume 2:

AB - Damages-Response Excerpts (continued) ................. App'x A-300 to A-302
Final Response excerpts re 9 Woods / damages objections .... App'x A-306 to A-315
Supplemental Affirmation / Counterclaim excerpts ........... App'x A-368 to A-380
Supplemental Affirmation excerpts .......................... App'x A-467 to A-470
July 17, 2025 Letter excerpts .............................. App'x A-573 to A-576
Dkt. 199 Hearing excerpts ................................. App'x A-581 to A-584
Appendix Addendum cover / contents ......................... App'x B-1
March 3, 2026 Minute Entry ................................. App'x B-2
March 9, 2026 Order ........................................ App'x B-3 to B-4
March 23, 2026 Roa Declaration excerpts .................... App'x B-5 to B-6
March 29, 2026 Morgan & Morgan motion excerpts ............. App'x B-7 to B-8
April 10, 2026 Order ....................................... App'x B-9 to B-10
Damages-response excerpt re Wingate / never-serviced firms . App'x B-11

## LEGAL STANDARD

• Greyhound separates liability from damages. A default may establish well-pleaded liability allegations, but it 'is not considered an admission of damages.' Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). Default did not prove WatchDog's lost net profits, a 50% margin, customer-specific causation, Companions' net unjust enrichment, a reasonable royalty, punitive damages, prejudgment interest, fees, costs, or an occupational ban.

• Credit Lyonnais requires damages to be determined with 'reasonable certainty.' Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999). Reasonable certainty requires competent proof, not selected gross-sales summaries, a prior attribution percentage, an unsupported margin, and an insider declaration.

• Transatlantic Marine permits paper damages only when 'detailed affidavits and documentary evidence' establish a reliable basis for the award. Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997). Lost profits require net profit, not gross receipts; unjust enrichment requires net gain, not gross sales.

• Syntel confines DTSA damages to actual loss, non-duplicative unjust enrichment, or a reasonable royalty. Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc., 68 F.4th 792, 808-14 (2d Cir. 2023); 18 U.S.C. § 1836(b)(3)(B). A model converting Defendants' gross receipts into WatchDog's lost profits without WatchDog's net loss, Companions' net gain, or a reasonable royalty is not a statutory damages measure.

• Rule 55 and the DTSA require zero compensatory damages on this record. Plaintiff supplied no WatchDog P&Ls, tax returns, ledgers, expense records, payroll records, observer-payment records, bank records, distribution records, Zariz/DLA records, net-profit calculation, Companions net-gain

Companions, or any net profit WatchDog lost. The Elefterakis and Liakas entries make the exhibit even less probative. Plaintiff sued Gregory Elefterakis, Nicholas Elefterakis, and Nicholas Liakis in this litigation, then treated Elefterakis, Elefterakis & Panek and Liakas Law P.C. as “never returned” damages entries. A firm’s failure to return after litigation, conflict, customer dissatisfaction, use of other providers, or ordinary customer choice does not prove that Defendants caused WatchDog lost net profits.

Subin, Zemsky, Oresky, Khavinson, Zaremba, and Liakas show ordinary market movement. Subin's COO stated Subin was unhappy with WatchDog before using Companions. Ex. 32, Dkt. 27 at 1, PageID 380. Zemsky stated WatchDog was the first IME service his firm used, that he was unhappy with WatchDog because it could not cover last-minute requests, that he began using IME Guards in or about February 2019, and that he was unhappy with IME Guards because it lacked coverage; Zemsky later confirmed the firm was no longer working with IME Companions as of March 10, 2023. Ex. 33, Dkt. 28 at 1, PageID 381; Ex. 23, PDF p. 1. Oresky emailed both Companions and WatchDog seeking IME coverage, and Safa replied to all, including WatchDog. Ex. 24, PDF p. 1. NYSCEF-filed IME reports show firms in Plaintiff's alleged customer universe using other legal representatives and IME-observation providers after the TRO. Ex. 25, PDF pp. 4-13.

Plaintiff's own win-back email confirms competition. Levi wrote that she was 'hoping to win your business back' and offered reduced pricing of $165 for the first hour and $45 for each additional half hour 'in an effort to win back your business.' Ex. 17, PDF p. 1. Defendants also marketed independently: IME Companions performed attorney-event outreach at NYSTLA/SITLA events, sent follow-up emails, used marketing materials and sample reports, marketed its portal, services, languages, reports, professionalism, ownership, pricing, and reliability, and paid for professional marketing infrastructure, including a July 2020 Marketing 360 agreement with a $1,195 monthly recurring total,

Madwire/Marketing 360 invoices in January, February, and March 2022 showing $1,034.07 invoice totals and $0 balances, and an August 2022 Giant Partners campaign for $7,250 with recurring monthly terms. Ex. 15, Gelardi Decl. ¶ 8; Exs. 27-A, 27-B, 27-C, 28.

The Elefterakis record shows why individualized proof was required. The Court's October 20, 2023 Order states that Elefterakis joined Companions 'to help [it] obtain customers' and conceded he introduced, at most, approximately ten to fifteen clients. Ex. 29, Dkt. 254 at 9, PageID 4925. The Court also noted that no competent evidence had been adduced as to whether certain former WatchDog customers were also Elefterakis's clients. Ex. 29, Dkt. 254 at 9 n.9, PageID 4925. IME Companions' 2018 Membership Interest Purchase Agreement shows Greg Elefterakis, Roman Pollak, and Anthony Bridda collectively owned 50% of IME Companions before Safa purchased their interests for $115,000. Ex. 30, PDF pp. 2-3. Plaintiff still seeks more than $5 million through an aggregated customer-overlap model that cannot distinguish a lost customer from a shared customer, a retained customer, a never-serviced firm, a customer using another provider, or a customer generated by independent marketing.

**VII. PLAINTIFF'S ANTICIPATED REPLY DOES NOT CURE THE MISSING PROOF.**

Plaintiff's reply cannot cure the opening-record failure. Plaintiff may call this liability relitigation; it is not. Defendants challenge damages, margin, causation, attribution, and scope of relief. Default does not prove damages, WatchDog's lost net profits, a 50% margin, customer-specific causation, Companions' net unjust enrichment, or a reasonable royalty. Plaintiff may call 98.3% law of the case, but that figure was a gross-revenue attribution assertion, not a net-profit calculation, and the October 20, 2023 Order required further proof of actual damages. Ex. 29, Dkt. 254 at 32-34, PageID 4948-4950. Plaintiff may call Levi's 50% margin reasonable, but WatchDog's own P&Ls show a 2014 loss, single-digit margins in 2015 and 2016, and an approximate 4.37% aggregate margin. Ex. 15, Gelardi Decl. ¶ 3. If Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**-----------------------------------------------------------------X**
IME WATCHDOG, INC.,
*Plaintiff,*

**CaseNo.:1:22-cv-1032 (PKC)(JRC)**

**-against-**
SAFA ABDULRAHIM GELARDI, VITO GELARDI
DECLARATION OF GREGORY ELEFTERAKIS,
ROMAN POLLAK, JONATHON D. WARNER, ESQ.
ANTHONY BRIDDA, IME COMPANIONS LLC,
CLIENT EXAM SERVICES LLC, and IME
MANAGEMENT & CONSULTING LLC,
***Defendants.***

**-----------------------------------------------------------------X**

**DEFENDANTS' FINAL RESPONSE TO ORDER ON CONTEMPT AND SANCTIONS**

# PRELIMINARY STATEMENT

**ENOUGH.** I am done being treated as guilty before I have ever been given a fair chance to prove my innocence. The Court's Order asks why I should not be branded a criminal and punished with case-ending sanctions. The answer is in the record: I **disclosed**, I **relied on counsel**, and the **documents** prove it.

For nearly four years my family has lived under a false narrative—built by Plaintiffs' bad faith and sustained by my former attorney, who failed me and then lied to this Court to save himself. This Court credited **Adam Rosenblatt's affidavits—untested, un-deposed** and dripping with lies, while the emails, texts, corporate records, domain routing, sworn third-party affidavits, and the almost 80k in forensics told the opposite story. What kind of court rewards a liars affidavit and ignores the documentary proof that contradicts it?

This case has **upended** my life. My children watched me lose years of peace and stability. My business and reputation were attacked. I have been held in contempt twice—both times because of my own attorney. After the TRO, we asked Jonathan Warner what to do. His advice is memorialized **in my email to him**: **"CES was the only company that I helped create for the purpose of the TRO. We were advised to do that, and we never denied it**." He gave the advice; I followed it; I was held in contempt. I looped him in while I explored hiring a PI; if he had told me not to hire one, **I would not have.** Later I retained Steve; he still never advised against it—and I was held in contempt again. How many times must I be punished for relying on counsel while the lawyer who gave the advice walks away and lies in a CYA email after the fact to save himself?

If Warner believed that step was improper, it was his duty to advise me. He never did. I relied on counsel, and once again I was punished for following counsel's silence

I complied. I disclosed. I kept my lawyer in the loop. When he abandoned me, On July 18, after I went pro se, I wrote directly to this Court in **good faith**. I attached (1) my **January 10, 2025** text to Warner promising **repayment from the 9 Woods closing**, and (2) the **cashed check** that matched that message — so the Court would have **peace of mind** that I intended to comply, meet deadlines, and **not** make this process harder for anyone. My intent was twofold: to assure compliance and to **prove I did not lie, that my attorney knew**. I did not posture as a victim; I wanted the court to know that I am **not** the caricature this Court accepted **without evidence**. And yet, that good faith submission was **not docketed or acknowledged, it was ignored.**

Meanwhile, Plaintiffs chose to wage fear not law. They hired **Steven Rambam—a convicted felon previously caught by the FBI transporting explosives across state lines**—as their investigator, and he followed me everywhere, including to my child's preschool and inside supermarkets. I reported it to Warner. He filed nothing. Plaintiffs' decision to send a man like that to stalk a mother and her children tells this Court everything about their litigation tactics; Warner's silence let it continue.

And note **what my lawyer knew and said** at the time. When **Roas's claims were dismissed** in the Supreme Court, Warner wrote me on **Nov. 14, 2024**: "**Finally, we have a judge who knows and respects the law. Roa's claims have been dismissed.**" The next day, when I asked if that would impact Judge Chen, he replied **"Not one iota unfortunately."** He cannot privately concede who "knows and respects the law" and then pretends he didn't know the 9 Woods truth sitting in his inbox and on his phone for months.

Instead of getting the truth—**the evidence, the harassment, the slander**—before this Court, he hid behind **"she hates you"** and **"she knows nothing about the law."** That wasn't advocacy. That was surrender. And then he rewrote the timeline to cover it.

The **paper trail**—not rhetoric—resolves this dispute. From **April 18, 2024** (two emails minutes apart: cash buyers and an "Offer for 9 woods" with a Seller Net Sheet), to **November 13, 2024** (Warner copied: "9 Woods End is vacant… dropping the price to sell"), to **December 10, 2024** ("lowered to **$390,000**, think I might have a buyer"), to **January 10, 2025** (repayment text), ending with the **March 10, 2025 HUD** at **$390,000**—Warner had months of notice before the date he now swears he "first learned."

This is not concealment or disobedience. It is disclosure + reliance on counsel, met with neglect and then rewritten as my "defiance." I disclosed everything; my lawyer ignored it; and the Plaintiffs exploited his silence. They also hid their key witness, Adam Rosenblatt, from discovery. Warner formally requested his deposition multiple times, served deposition notices, and followed the proper procedure. **The Plaintiffs simply ignored those notices**. Then, when questioned by the Court, t**hey lied to Judge Cho**—telling him that Mr. Warner had never requested Rosenblatt's deposition. That falsehood kept the most critical witness out of reach.The result is that the single individual who could have confirmed the Plaintiffs' misconduct and false testimony—their own president, Adam Rosenblatt—was shielded from discovery and never put under oath. Instead, the Plaintiffs built their entire case on his untested un deposed affidavit, protected by their own lie to this Court.

Finally, Plaintiffs' "damages" are a spreadsheet fiction—gross revenue with 29 non-clients, no expenses, no causation, and even year-over-year growth. Under Weitzman and Goodyear, compensatory contempt requires actual, causal, net loss. They have none. The lawful figure is $0.

The Court should judge this matter by the writings and sworn evidence in the record—not by a witness the Plaintiffs hid, an affidavit they never allowed to be challenged, or a narrative that cannot survive the documents. **Deny contempt. Reject sanctions. Let the evidence—and the truth—close this case.**

## I. WARNER'S DECLARATION—LINE BY LINE, WITH A COMPLETE TIMELINE

### A. 9 Woods End — what counsel knew and when (subjects, documents, phone calls)

- **Apr. 18, 2024 — two separate 9 Woods emails (minutes apart):**

- **Apr 18, 2024 (9:47 AM)** -Vito tells Warner he met with cash buyers in the Poconos for 9 Woods. (Exhibit: Gmail — met with a few cash buyers, and Exhibit: Gmail —Offer for 9 woods.)
- **Apr 18, 2024 (9:56 & 10:08 AM)** — Subject **"Offer for 9 woods"** Minutes later, Vito again updates him on **9 Woods,** attaching a Seller Net Sheet. same thread explains we were **forced to move to Texas** under harassment pressure.
- **Nov 13, 2024** — Safa → Scheuerman **cc Warner**: "**9 Woods End is currently vacant … dropping the price dramatically to try to sell it**."
- **Dec 10, 2024 (12:38 PM)** — Vito → Warner: "**Lowered the price to $390,000. Think I might have a buyer.**"
- **Dec. 18, 2024 — Purchase & Sale Agreement (executed)**:
- **9 Woods End** for **$390,000** (Exhibit: Purchase Agreement, matches the Dec. 10 "Update" Warner knew)
- **Jan 10, 2025** — Safa → Warner (text): "**Once the house closes we will send you at least $10,000 … all profits will go to the debt I owe you.**" (Ex. J)
- **Mar 10, 2025** — **HUD-1** shows **$390,000** sale of **9 Woods End** (precisely the December price. closing lines 101/404).

### B. Paragraph-by-paragraph rebuttal

¶2 — **"I learned of the sale on March 11, 2025 by telephone."**

**Rebuttal:** Impossible. He had both Apr. 18 emails, the November 13 and December 10 emails (update), and the January 10, text message, all updating him on the sale of 9 woods. —all before March 11. We also discussed the $400k fall-through, the $390k buyer, and repayment by **phone**. "First learned March 11" is fiction.

**¶3 — "I was not aware a contract of sale had been entered before that date."**

**Rebuttal:** Impossible. Warner was updated on the entire **9 Woods** process—in writing and by phone. He received three separate emails before closing: two on **April 18, 2024** (cash-buyer update and **"Offer for 9 woods"** with the Seller Net Sheet) **(Gmail - Met with a few cash** buy…) and the **December 10, 2024 email (**subject: "Update") lowering the price to $390,000 and noting a likely buyer, plus, my **January 10, 2025** text confirming repayment from closing (Ex. J). On top of that, we executed an **April 25, 2024** contract at $400,000 (which later fell through) then a **December 18, 2024**, and the HUD closed at $390,000.

**We disclosed the milestones by phone; he never asked for copies. The documents attached now match exactly what he already knew¶5 — "I did not notify the Court within three days."**

**Rebuttal:** Calendaring and notice are **counsel's** duty. If the 3/8/24 order required 3-day notice, **he** had to calendar and file it. I provided facts and relied on him. If I had ever told him not to notify, where is his email saying "that is wrong; you must comply"? It does not exist—because I never gave such an instruction. He also **never requested** buyer identity or contracts.

**¶6 — "I did not notify the Court because Safa instructed me not to."**
**Rebuttal:** Absurd. For **years** I ordered my lawyer to **act,** not hide—notify the **Court; contest the plaintiff's marketing list they pretend is a 'client list'; secure depositions; pursue damages/4506-T; document harassment/stalking/slander**. What exists instead are dozens of emails and messages (subset of many more) proving it. If I had instructed silence, **where is his pushback?** There is none

**¶7 — "She concealed; I had no choice."**
**No concealment.** On **Jan 10**, I memorialized repayment from closing; the **HUD** later matched the disclosed price. After counsel withdrew, I **wrote the Court directly on July 18**, attaching the **text** and **cashed check** to assure compliance and prove I had not lied. Good faith, not concealment.

**¶8–10 — Withdrawal.**
**Rebuttal:** Not conscience—**retreat.** He withdrew under the weight of his failures. He knew about 9 Woods. He knew I explored a PI and later retained Steve. He told us to give the business away after the TRO (in writing: **"We were advised to do that").** He never asked for sale documents. He even **released ~$260,000**—not the act of counsel who believed he was misled.

**¶11 — "I received $10,000."**
**Rebuttal:** Exactly as promised on **Jan. 10**—transparency, not concealment.

## II. EMAIL RECORD — "PLEASE FILE," "COMPEL," "HELP," "HARASSMENT," "NOTIFY THE COURT"Requests to act (compel / damages / depositions).

"Please file a motion to compel her for deposition and damages."
"What can I do to make you file the motion to compel?"
"Dear Karl, please file the motion to compel… I am begging you." .

**Reports of harassment/stalking.**

"Please Jonathan make the judge aware of their bullying tactics. About the cars following us. The phone calls." (Apr. 27, 2023).
"Help" thread to Warner: "I don't want my husband to go to jail… Please help us before one of us goes to jail." Feb. 23, 2023
"They are stalking us and the website." (June 5, 2023).
"Porn site sign-ups… I opened one email and it was disgusting." (May 7, 2024).
"Just some more harassment"

## Rambam warnings.

**"Important to mention to the judge: Steve Rambam… had his license pulled for intimidating and harassing clients." (Mar. 26, 2023).**

**Sale updates & transparency.**

-Apr. 18 emails (cash buyers; seller net sheet)
-"9 Woods End is currently vacant… dropping the price dramatically to try to sell it."(Nov. 13, 2024; Warner copied).
-"Lowered the price to $390,000… think I might have a buyer." (Dec. 10, 2024).
-"Once the house closes we will send you at least $10,000… all profits will go to the debt I owe you." (Jan. 10, 2025 text).

This is not a client instructing silence. It is a client **begging counsel to act**

## III. PI / TRACKER — DISCLOSURE FIRST; LATER COST-SAVING ADD-ON

I looped Warner in while **exploring** a PI for a lawful purpose: to gather evidence of harassment and bring the truth to the Court. He was on the communications and could have advised against it. He did not. I later retained Steve. A tracker was suggested later as a **cost-saving** measure compared to 24/7 tailing—hence separate invoices. I disclosed; counsel stayed silent. I was punished for following counsel's inaction

## IV. LEVI/WATCHDOG'S "COERCION" NARRATIVE (PRESENTED THROUGH THEIR PRESIDENT, ADAM ROSENBLATT) — DESTROYED BY HIS OWN WORDS AND RECORD

The Plaintiffs built their entire "coercion" theory around one man: Adam Rosenblatt, Watchdog's president then and now. Every affidavit, accusation, and supposed victim narrative flows through him. His own words and actions destroy that story.

The forensic record and corporate filings show a deliberate architect, not a coerced subordinate. Rosenblatt's communications, business filings, developer correspondence, and funding outreach document a years-long pattern of planning, concealment, and control—not fear, not threats, and not coercion.**"Once the site is live, we pull the plug on Watchdog." "If anything ever comes out, I'll just say you ran with it and I didn't know."** These are not the words of a man under duress. They are the words of a man plotting a duplicate operation, changing his alias, and rehearsing excuses in advance. The forensic packet (Ex. 8) confirms this pattern of secrecy and self-preservation.

### A. The Forensic Texts (2020–2021) Rosenblatt's recovered text messages expose his true role:

"What do you think about this structure?"
"Delete the emails… just text or WhatsApp."
"She uses me… this is my chance to break out."
"Just call me Mike Rosen."
"The site should look a little different but basically same functions."
"Once the site is live we pull the plug on watchdog"

**B. Affidavit — Incorporator (Five Pillars/Y. Abdelaziz):** Sworn: Adam **personally retained, provided data,** and **paid** to form the corporation; office policy forbids filings for third parties; **Adam was the only participant**. (Exhibit: Five Pillars affidavit.)

**C. Corporate Formation — May 2017**

**Rosenblatt himself incorporated IME Guard Dog, Inc., filed May 4, 2017 (NY DOS ID 5131773). (Ex. IME GD Entity Info.pdf)**This was not an accident; it was a new entity with Watchdog's DNA.

**D. Developer affidavit & emails: Yaniv Liron (Lumina) s**wears Adam directly engaged him in 2017 to scope/build **"IME Guard Dogs"**; Lumina issued a **proposal** to **Adam; site never built;** (Exhibit: **Yaniv affidavit.pdf.**) Adam's own **"Website Concept"** email (5/3/2017) instructs Lumina to **"take a significant amount of content from IME WatchDog",** listing a functional clone (booking, client areas, calendar, payroll, reporting). (Exhibit: **Ar website concept.pdf.)** His **"Structure"** email (6/28/2017) lays out equity/salary terms and asks, **"What are your thoughts on this kind of structure?"** (Exhibit: **AR proposal to me.pdf.)** Rename trail confirms **IME Guard Dogs — Website & Online Marketing Proposal" → IME Sentinel (Exhibit: AR proposition…/ email to Yaniv.pdf).**

**E. Domain and Routing**

**Domain & routing (public link):The domain imeguardogs.com resolved directly to IME Watchdog's live site—visible in the browser bar. This wasn't happenstance; it was domain masking. (Ex. GD Website.pdf.)**

**F. Launch timeline (offer on a non-existent company → later IME Guards):** Adam **pitched** LawCash on **IME Guard Dog** and **got terms—5% per year for 3 years; $100k salary; before** any operating company existed. **(**Exhibit: **AR offer by law cash.pdf.)**
He **turned it down; later "IME Guards" launches.** Translation: the offer was made on Adam's deck; he passed; the concept later appeared anyway. That is **pitching,** not fear. It is **orchestration.**

**G. The Synthesis**

A married executive in his 40s who**: Incorporates a clone entity, personally retains tax preparer directs a developer, orders the use of Watchdog's data, buys a domain, shops funding proposals, and later hides his tracks is not a coerced victim, …is not a victim of anyone's threats. He is the perpetrator.**

If Warner had used this evidence when I provided it to him—emails, sworn affidavits, and public filings—the "coercion" lie would have died in 2021. Instead, it was buried. Warner's refusal to present it allowed Levi and Rosenblatt to rewrite history and build this case on a fiction.

Adam Rosenblatt's own fingerprints are on every act the Plaintiffs accuse others of committing. His words, his filings, and his money trail prove that he was not coerced; he was in control. **The coercion narrative is not just false—it is impossible**

## IV. PLAINTIFFS' DAMAGES MODEL A SPREADSHEETFICTION THAT FAILS AS A MATTER OF LAW

The Plaintiffs' "damages" are not damages at all.
They have never produced a **net loss**, an **accounting**, or a single document showing **causation**.
What they call a damages model is a **"Sales by Customer Summary"**—a gross revenue list pulled from their bookkeeping software and labeled as "loss."
It measures income, not injury.

### A. The Spreadsheet Itself Disproves Damages

- It includes **29 companies** I never serviced.
- It double-counts clients, lists vendors as "customers," and lumps in businesses that pre-date me entirely.
- It omits every line item for **cost of labor, payroll, rent, taxes, insurance, and marketing**—the very expenses that transform gross into net.
- It presents **gross receipts** from other vendors as if they were losses from me.
- It contains entries for clients who were deceased, inactive, or never retained IME Companions at all.

A **gross-revenue chart** is not proof of harm. It is a list of deposits. Nothing in that exhibit ties a single dollar of claimed "loss" to me, IME Companions.

## B. The Law Forbids What Plaintiffs Seek

Under *Weitzman v. Stein*, 98 F.3d 717 (2d Cir. 1996), and *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017), compensatory contempt damages must show **actual, causal, and net loss**. They cannot rest on speculation or unadjusted revenue. The rule is simple: **no causal proof, no recovery.** Here, Plaintiffs show **none**. They provide no profit-and-loss statements, no tax returns, no contemporaneous books tying any reduction in business to me.
Their only exhibit is the same "**Sales by Customer"** printout this Court has seen before—unchanged, unverified, and meaningless. Compensatory contempt must be actual, causal, net.
Under Second Circuit authority, their number fails all three tests; the lawful figure is **zero.**

## C. Wingate's Growth Proves The Opposite

Their own numbers show that Wingate—the firm they use as their damages baseline—**grew** during the same period. Revenue up, not down. Growth cannot be "caused by" my alleged interference. It mathematically destroys causation.

## D. The Settlement With The Founders Locks Their Valuation

Plaintiffs already accepted a nominal settlement from IME Companions' founders, closing out the same alleged loss.
That settlement fixed their value of harm at a token amount.
They cannot now multiply that number by a hundred simply because they kept this litigation alive. The law of damages and the law of equity both forbid double recovery.

## E. The Only Lawful Figure Is $0

When a plaintiff's proof consists of a revenue list that shows no loss, when their own baseline business grew, and when they already settled the same claim, the result is not "uncertain damages."
It is no damages.
Under Weitzman and Goodyear, the lawful compensatory figure here is $0.
The Court cannot manufacture a number that the record does not supply

# V. LEGAL STANDARD AND APPLICATION

## A. Civil Contempt (Second Circuit)

Civil contempt requires **clear and convincing evidence** that:
1. a clear and unambiguous order existed;
2. the defendant violated that order; and
3. the defendant failed to diligently comply.

King v. Allied Vision Ltd., 65 F.3d 1051 (2d Cir. 1995); Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys., 369 F.3d 645 (2d Cir. 2004).

None of those elements is satisfied here.
The order was ambiguous as applied to me; I **relied on counsel** for calendaring and notice; and the record shows continuous disclosure and good-faith compliance.

## B. The "Fair Ground of Doubt" Rule (*Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019))

The Supreme Court in *Taggart* held that contempt cannot lie where there is a **fair ground of doubt** as to whether conduct violated a court order. A party who **relies on counsel** and **discloses everything acts with good faith and diligence. At a minimum, this record creates such a fair ground of doubt. In truth, it shows no violation at all.**
**From April 18, 2024 to March 10, 2025, Warner had full written notice of the 9 Woods End sale, price, buyer, closing, and repayment. At every step, I disclosed; at every step, he failed to act. There is no contempt when the "violation" is the attorney's silence, not the client's concealment.**

**C. Inherent-Power and Bad-Faith Sanctions (Chambers v. NASCO, Inc., 501 U.S. 32 (1991); Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323 (2d Cir. 1999))**
Sanctions under the Court's inherent power require clear evidence of bad faith—that a party acted for an improper purpose such as harassment or delay. Nothing in this record supports that. I did not hide assets, falsify records, or defy orders. I relied on counsel's advice and made full disclosures through him and, later, directly to the Court. Any procedural lapse was his—not mine. Punishing a client for counsel's failure contravenes the purpose of inherent-power sanctions. The record instead reflects Plaintiffs' bad faith: employing a felon investigator to stalk a defendant, fabricating a coercion narrative, and submitting a gross-revenue spreadsheet as "damages."

**D. Case-Ending Sanctions (Southern New England Tel. Co. v. Global NAPsInc., 624 F.3d 123 (2d Cir. 2010))**
Case-ending sanctions are reserved for willful, persistent defiance after lesser sanctions fail. They are the last resort, not the first. Where the record shows disclosure, reliance on counsel, and ongoing cooperation, such an extreme remedy is not merely unwarranted—it is unconstitutional. **Societe Internationale v. Rogers, 357 U.S. 197 (1958).**

### E. Compensatory Contempt and Damages (*Weitzman v. Stein*, 98 F.3d 717 (2d Cir. 1996); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017))

Contempt damages must be **causal, proven, and net**. They must reimburse actual loss, not provide windfalls. Plaintiffs' "Sales by Customer Summary" fails all three tests. It is a list of gross revenue that does not tie any alleged loss to me, includes unrelated entities, and even shows business growth. There is no causal link and no net figure. By law, their damages are **zero**.

### F. Application to This Record

1. No Clear Violation: The orders required transparency; I complied.
2. No Willfulness: Every act was on counsel's advice or through him.
3. No Concealment: April → November → December → January → March → July 18 submission prove disclosure.
4. Fair Ground of Doubt: Counsel's silence alone creates doubt; my record eliminates bad faith.
5. No Causal Damages: Gross receipts ≠ harm.
6. **Bad Faith Lies With Plaintiffs: Hiring a felon investigator, hiding their president from deposition, and lying about discovery are the acts that merit sanction—not my compliance.**

**On this record, contempt and sanctions cannot stand. The law requires denial, not compromise. The only lawful outcome is to deny Plaintiffs' motion, vacate prior sanctions, and restore the integrity of this case to the evidence, not the noise.**

## VI. VICTIM IMPACT — THE HUMAN COST OF FOUR YEARS OF LITIGATION ABUSE

For four years, I have lived inside a case that should have ended long ago. I have endured harassment, stalking, financial ruin, and character assassination—not because of any defiance, but because I trusted my attorney. When the threats began, we fled New York to protect our safety. The harassment **followed us to Texas.** Plaintiffs' investigator and associates flew drones **over our property, harassed me through my business website, TheIMECompany.com, and used my personal information to sign me up for hundreds of pornographic sites and obscene email lists**. They called repeatedly from blocked numbers and used every tactic imaginable to break me down. My children watched me look over my shoulder every day. This was not litigation—it was psychological warfare.

I reported every incident to Warner, attaching screenshots, URLs, and photographs. I begged him to notify the Court and to request protection. He ignored me. His silence emboldened them. They learned that I was unprotected, that they could stalk and humiliate me with impunity, and that the person sworn to defend me would not act.

The toll has been catastrophic. My income disappeared; my credit collapsed; my reputation was destroyed by lies and defamation that spread unchecked. I have spent four years fighting to prove what should have been obvious from the start, I disclosed everything, and that the Plaintiffs built this case on deception.

Despite everything, I never stopped cooperating. I produced every document, every message, every affidavit. When my attorney failed, I stepped in and gave the Court the proof myself. I did not hide; I filed. I did not defy; I complied. The Plaintiffs used their wealth to prolong this abuse, while I used only evidence to defend myself.

This Court now has the complete record: the **emails and HUD** that prove disclosure, the **forensic evidence** that exposes Rosenblatt's orchestration, and the **undisputed proof** that Plaintiffs suffered no damages. There is nothing left to punish me for. What remains is for the Court to acknowledge the truth and finally allow my family to live in peace.

## VII. CONCLUSION & RELIEF

For four years, this case has survived on performance—untested affidavits, discovery gamesmanship, and a "damages model" that is no model at all. The record now tells the only story that matters:

Disclosure, not concealment. T**he April → November → December → January communications, followed by the March HUD**, show continuous notice and transparent intent.

Reliance on counsel, not defiance. I did what clients are told to do: I disclosed to counsel and relied on him to file with the Court.

Orchestration, not coercion. Adam Rosenblatt's own texts, filings, and funding outreach show he architected the conduct Plaintiffs pinned on me.

**Harassment, not "investigation."** Plaintiffs retained an investigator who impersonated an FBI agent, a convicted felon and with a documented explosives/firearms case and a later arrest to follow to follow and harrass a mother—at a preschool, in stores, and near her home. That is not reasonably necessary to litigation; it is unduly harassing. Zero damages, not speculation. Gross revenue ≠ loss. Wingate's growth breaks causation. The law requires a net, causally attributable number; Plaintiffs offer none.

Under the governing standards, Plaintiffs cannot prove civil contempt by clear and convincing evidence: there is no clear and unambiguous order, no clear violation, and, at minimum, a fair ground of doubt as to any alleged noncompliance. Nor have Plaintiffs shown net, causally attributable damages. What the record does show are Plaintiffs' tactics, prior counsel's failures, and my consistent efforts to comply.

The law is clear: **no clear violation, no willfulness, fair ground of doubt, no causal damages, no bad faith by me.** What remains are Plaintiffs' tactics, my former counsel's failures, and a record that vindicates me.

If the Court is still unsure who is telling the truth, I will do what the other side will not: **I am prepared to take a polygraph examination under oath.** I invite **Warner, Rosenblatt, and Levi** to do the same. The science may be imperfect. **Courage is not.** I have it because I have told the truth from the start.

## RELIEF REQUESTED

1. **Deny civil contempt and vacate all sanctions issued or sought against Defendants.**
2. **Enter findings** that the **9 Woods End** sale was **not concealed** and that Defendants **provided continuous written notice** to counsel (Apr 18, 2024 emails; Nov 13, 2024 email; Dec 10, 2024 "$390,000" update; Jan 10, 2025 repayment text; Mar 10, 2025 HUD), and that any failure of notice or calendaring was **counsel's duty** and **not attributable to Defendants**.
3. **Dismiss Plaintiffs' claims with prejudice** for failure of proof:
   a. the "coercion" narrative is refuted by Adam Rosenblatt's own words and records;
   b. the "damages" presentation is a non-causal gross-revenue list with no net loss.
4. **Award fees and costs** to Defendants under **28 U.S.C. § 1927** and/or the Court's **inherent power** for Plaintiffs' and former counsel's bad-faith multiplication of proceedings (and permit a short, supported fee application within 14 days).
5. **Order the immediate release/vacatur** of any sanction orders traceable to counsel's omissions (including notice/calendaring failures), and **restore** any restraints that flow from those orders.
6. **Credibility challenge:** If any doubt remains, I am prepared to take a **polygraph examination under oath**, And I invite **Warner, Rosenblatt, and Levi** to do the same.

**Four years is enough.** The affidavits cannot survive the documents. The damages cannot survive the math. The narrative cannot survive the truth.
**Deny contempt. Reject sanctions. Let the evidence end this case.**

Respectfully submitted,
**Safa Gelardi & Vito Gelardi**
*Pro Se Defendants*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**-------------------------------------------------------------- X**

IME WATCHDOG, INC.,

*Plaintiff*,

**Case No.: 1:22-cv-1032 (PKC)(JRC)**

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, ROMAN POLLAK, JONATHON D. WARNER, ESQ. ANTHONY BRIDDA, IME COMPANIONS LLC, CLIENT EXAM SERVICES LLC, and IME MANAGEMENT & CONSULTING LLC,

*Defendants*.

**-------------------------------------------------------------- X**

**DEFENDANTS' MOTION TO STRIKE OR DISMISS BASED ON PLAINTIFF'S MATERIAL INCONSISTENCIES AND BAD FAITH**

Defendants Safa Gelardi and Vito Gelardi, appearing pro se, respectfully move this Court to strike the Supplemental Declaration of Adam Rosenblatt filed in support of Plaintiff's motion for injunctive relief and any further proceedings reliant upon it. This declaration is not simply incorrect—it is a calculated and fabricated narrative contradicted by hard evidence, sworn affidavits from third parties, and Adam Rosenblatt's own contemporaneous emails and actions.

This declaration, made by the still-sitting President of Plaintiff IME Watchdog, Inc., falsely claims he was bribed, manipulated, and coerced into sabotaging his employer's business. In reality, Rosenblatt spent months proactively initiating the formation of a new business while still working for the Plaintiff, disseminated internal materials voluntarily, directed branding and infrastructure setup, and even hired third-party vendors—without ever being pressured or compelled. Adam Rosenblatt's affidavit is not a confession—it is a **scripted piece of fiction** designed to deflect responsibility, save himself from prosecution, and weaponize lies to further destroy defendants, who once tried to help him. His story is not supported by any contemporaneous communications, contracts, bank statements, or affidavits from any corroborating witnesses. **Everything he claims happened in private, without evidence—and everything that *did* happen leaves a digital trail proving the opposite.**

This case is not the result of any legitimate business dispute. It is the result of a calculated conspiracy—a coordinated, and malicious effort orchestrated by Plaintiff's President Adam Rosenblatt, former employee Carlos Roa, and Plaintiff Daniella Levi to weaponize the legal system and destroy the lives of the Defendants.

Together, these individuals fabricated a false narrative, alleging that Safa and Vito Gelardi stole confidential information, coerced a corporate officer, and unlawfully diverted clients—when in truth, it was Adam Rosenblatt himself who orchestrated the very conduct he now falsely attributes to others.

While still employed as President of IME Watchdog, Inc., and under the direction of Daniella Levi, Rosenblatt voluntarily and enthusiastically shared the company's financials, client rosters, marketing structure, and profit margins—in dozens of emails sent without a single request from Defendants. He solicited help in forming a new business, directed the incorporation, oversaw website and invoice designs, and hired vendors, all while acting as the Plaintiff's top executive.

Carlos Roa, a disgruntled former employee with a personal vendetta, falsely claimed to others that Defendants were under investigation by the FBI. And Daniella Levi, with no credible evidence, adopted that narrative, submitted perjurious affidavits to the Court, and initiated this action with full knowledge of Adam's duplicity.

Every core allegation in this case—coercion, theft, and unfair competition—is contradicted by contemporaneous documents, sworn third-party affidavits, and internal inconsistencies in Plaintiff's own filings. This motion will lay out that evidence, expose the truth, and demonstrate that Plaintiff's claims are not only meritless but fraudulent.

This is not just a case built on lies, it is a case built by liars.

The Court has already been burdened by this lawsuit, and the false foundation upon which it was built now threatens to undermine the integrity of the proceedings. Defendants seek to have this declaration stricken, and for the Court to take judicial notice of the substantial body of evidence directly contradicting every material representation contained therein

Safa Gelardi, appearing pro se, respectfully move this Court to strike or dismiss Plaintiff's claims to the extent they rely upon materially false and misleading representations by Plaintiff's President, Adam Rosenblatt.

In support of this motion, Defendants state the following:

1. Mr. Rosenblatt personally incorporated IME Guard Dog, Inc. on May 4, 2017, in the State of New York. (See Exhibit A.). From the very beginning of this case, I have consistently explained that I referred him to the office that handled the incorporation. At the time, I was already overwhelmed, balancing my job, caring for my family, and pursuing a medical malpractice business venture in partnership with his father. Despite this, Nevertheless, I offered to support his efforts and, acted in good faith, introduced him to two of my trusted contacts: the web developer and the tax preparer who could assist him in launching IME Guard Dog. These referrals were made transparently and without any secret arrangement or hidden interest in the corporation. The record reflects that Adam acted independently in incorporating and setting up IME Guard Dog.

**A. Rosenblatt initiated the partnership.**

As early as **April 28, 2017**, Rosenblatt was emailing Defendant Safa Gelardi internal IME Watchdog financials and client lists. These weren't stolen or requested under pressure — they were voluntarily sent with subject lines like:

"IME Watchdog Clients" – a complete internal list

"IME Watchdog P&L Last 3 Years" – a full breakdown of Watchdog's income from 2014 to 2016

"Sales by Client for 2016" – showing how much each law firm paid, with names, numbers, and volumes

He also sent breakdowns of monthly volume, scheduling, and internal financial projections—all while employed by IME Watchdog and all without a single word about confidentiality.

**B. Rosenblatt directed the creation of the so-called "stolen" business.** On **May 3, 2017**, Rosenblatt emailed Defendant Gelardi and the web developer (Yaniv from Lumina Systems) with the subject line: "Website Concept." In it, he laid out a plan to launch a new company — **IME Guard Dog** — and explicitly wrote:

*"We want to build a website for IME Guard Dog with a significant amount of content to be taken from IME Watchdog…"*
*(See Exhibit B – "Website Concept," May 3, 2017)*

He specified design, branding, and even improvements over Watchdog's existing platform. He did this openly, eagerly, and with no coercion whatsoever.

**C. Rosenblatt proposed the salary structure and future profits.** Weeks later, on **June 28, 2017**, Rosenblatt emailed again, laying out a **proposed salary and profit-sharing model** based on projected earnings — assigning himself a base pay and escalating bonuses depending on how well the company did.

*(Exhibit C – "What Are Your Thoughts On This Structure?")*

These are not the actions of a victim. This is a man building a business, directing its strategy, recruiting help — and then turning around years later to weaponize his own actions as the basis for a lawsuit.

**D. Adam Rosenblatt remains Plaintiff's President to this day.** The same individual who built this business and shared its information is still Plaintiff's acting President. He was never terminated. Never disavowed. And never discredited — even as his communications directly contradict the sworn allegations in this case.

Let's walk through the indisputable timeline:

- **April 28, 2017** – on April 28, 2017, Mr. Rosenblatt emailed me a PowerPoint presentation titled "IME Watchdog 2016," containing internal business breakdowns from the prior year. In his own words, Mr. Rosenblatt stated that "DL never really asked for this but I did it anyway," affirming that this was yet another unsolicited and voluntary disclosure of allegedly sensitive material. (See Exhibit D.) This evidence further demonstrates that Mr. Rosenblatt repeatedly and without prompting shared internal Watchdog materials, contradicting the sworn claims of misappropriation now alleged in this case.
- **April 28, 2017** -Rosenblatt sends Safa Gelardi the full **client list** of IME Watchdog (subject line: "IME Watchdog Clients"). (See Exhibit E.)
- **Furthermore, on April 28**, 2017, Mr. Rosenblatt emailed me a full breakdown of IME Watchdog's March 2017 operations, including the P&L statement, client list, IME coverage, invoices, and billing/payroll data. (See Exhibit F.) This demonstrates a clear and voluntary disclosure of internal business information before any alleged misappropriation and reinforces that Mr. Rosenblatt did not treat such information as confidential.
- **Same day** – He sends a **three-year Profit & Loss breakdown** of IME Watchdog, including 2014, 2015, and 2016 (subject: "P&L Last 3 Years"). (See Exhibit G.)
- **April 29, 2017** – He sends detailed **sales breakdowns by client** (e.g. 80-pack, 40-pack purchases from firms like Subin and Cherny) to illustrate Watchdog's income stream (subject: "Sales by Client 2016"). (See Exhibit H.)
- **April 29, 2017** – He sends yet another **breakdown of IME scheduling and invoicing** for further transparency. (See Exhibit I.)
- **May 3, 2017** – Rosenblatt also provides sample client invoices for Watchdog services titled "Ortho Queens" and "Neuro City," further illustrating that he was providing Watchdog's billing templates openly and voluntarily. (subject: "What the Invoice Looks Like"). (See Exhibit J.)
- **On May 3, 2017**-, a day prior to filing the incorporation, Mr. Rosenblatt emailed a web developer (referred to him by me) stating that the IME Guard Dog website should be built using "a significant amount of content to be taken from IME Watchdog." (See Exhibit K.)
- On **May 4, 2017**, while still employed as President of IME Watchdog, Inc., **Adam Rosenblatt personally formed IME Guard Dog, Inc.**, initiating its incorporation through Five Pillars Financial Services—a fact confirmed by the official **New York State Division of Corporations** record and a sworn affidavit from Jay Abdelaziz, the accountant who filed the documents at Rosenblatt's direction. (See Exhibit L.)
- **Additionally, on June 23, 2017**, Mr. Rosenblatt forwarded a formal website and marketing proposal for "IME Guard Dogs" from the developer he contacted, further demonstrating that he was orchestrating a business using Watchdog-derived concepts. He later renamed the project to "IME Sentinel" during this same correspondence. (See Exhibit G.) The thread confirms that I was a secondary participant and not the architect or instigator of any plan tomisuse proprietary materials.

(See Exhibit M.)

- These claims are contradicted not only by the documents but also by an affidavit from Yaniv Liron, the neutral third-party web developer involved. Mr. Liron confirms that Mr. Rosenblatt independently approached him to build a website for IME Guard Dog and that the project was never completed. Mr. Liron further confirms that months later, I independently contracted his company to build a completely separate website for IME Companions. (See Exhibit N.)

- **June 28, 2017** – Rosenblatt proposes a **full business compensation structure**, assigning himself different salary/equity combinations based on profit tiers (subject: "What Are Your Thoughts on This Kind of Structure"). (See Exhibit O.)
- Adam Rosenblatt continued to communicate with me regularly—even up until the onset of litigation, sending internal documents and guidance that completely contradict Plaintiff's claim of coercion or theft. In one such exchange, I told Adam about a watchdog named David Bloomfield, an elderly man who had come to me seeking work. After I hired him, he sued me for unemployment. Adam immediately informed me that Bloomfield had done the same thing to Watchdog and was terminated for it. He then forwarded me Watchdog's own appeal brief from that prior case, explicitly encouraging me to "change the facts to your case and use the supporting cases in your argument." This is clear, undeniable evidence that Adam was freely supplying me with Watchdog's internal litigation strategy and sensitive documents—voluntarily and without hesitation. (See Exhibit P.)

At no point did Mr. Adam Rosenblatt mark his shared communications as confidential, nor did he seek a non-disclosure agreement prior to sharing proprietary models or business information. Communications demonstrate a clear intent to build a derivative company based on IME Watchdog's structure with me as a potential partner. The plaintiff now falsely claims that the materials Mr. Rosenblatt voluntarily shared as part of his partnership solicitation were somehow stolen or misappropriated.

In a previous motion, I informed the Court that after Adam Rosenblatt pitched his IME Guard Dog concept to Law Cash, just as he previously pitched it to me, he turned down their offer and instead referred Jamal Aaron—a former IME Watchdog who had been fired by Daniella Levi—to take the position. The evidence reveals a disturbing pattern. Text messages confirm Adam was offered the job, and emails show he actively supported Jamal's transition into that role. Far from stepping away, Adam remained engaged—sending marketing materials and even boasting about the work he did to help IME Guards, the company born out of that very opportunity. This was not coercion. This was calculated, voluntary, and strategic behavior from someone still employed as the president of IME Watchdog, all while feeding information and resources to competitors behind his employer's back. Far from being victimized, Adam actively facilitated the creation and success of IME Guards, even celebrating his role in its development. This email directly contradicts the false narrative of coercion peddled by Daniella Levi, Adam Rosenblatt, and Carlos Roa. It exposes their claims as nothing more than a desperate attempt to criminalize ordinary business interactions and bury their own internal discord.

Not once in any of these emails does Adam Rosenblatt express concern that this information was confidential, misused, or being taken without authorization. In fact, many messages are prefaced with "see attached," "please review," or "as discussed."

**No threats. No coercion. No duress.** Just active engagement in launching what he viewed as a joint opportunity.

2. Daniella Levi's sworn affidavit, submitted to this Court on March 3, 2021, is not only inaccurate—it is knowingly false and intended to mislead. In Paragraph 5 of her affidavit, Levi claims that "**Adam Rosenblatt… was approached by Defendants and improperly influenced to provide proprietary Watchdog information including client contacts, pricing, and other confidential business strategies.**" This claim is a lie—and it is contradicted by **over a dozen contemporaneous emails** sent by Rosenblatt himself, voluntarily and without any solicitation, between April and June 2017, sharing Watchdog's financials, client data, invoice formats, and website structure. (See Exhibits [A–O]). She further states in Paragraph 4 that the Defendants "**misappropriated our client list and targeted our clients directly**," then proceeds to name several law firms. However, a simple comparison of the client list, referenced in her affidavit to the internal IME Companions client roster, shows that **a majority of these firms were never clients of Defendants at all.** They were not solicited, serviced, or even contacted by IME Companions. (See Exhibit G: Client Comparison Chart). Levi knew this, or had the ability to verify it, before submitting her affidavit, making her claims not only false, but recklessly so. Worse, Levi fails to mention that her own President, **Adam Rosenblatt**, was the individual who **personally formed IME Guard Dog, Inc.** while still employed by Watchdog—on May 4, 2017—by directing the accountant at Five Pillars Financial Services to file the incorporation. (See Exhibit Q: Incorporation Docs and Five Pillars Affidavit). Rosenblatt, not Defendants, established the infrastructure, engaged the web developer, prepared client reports, and even forwarded proprietary breakdowns of IME Watchdog's business model. (See Exhibit R.) This is further supported by the sworn affidavit of the web developer, Yaniv, who confirms Rosenblatt as the sole point of contact and project lead. (Exhibit S). To suggest, as Levi does, that Defendants *coerced* or *influenced* Rosenblatt is not only unsupported by any evidence—it is **refuted by her own employee's digital and documentary trail.** In reality, Daniella Levi's affidavit is not a good-faith representation of the Court. It is an intentional misstatement of facts, propped up by silence and omissions, to punish the defendants through litigation rather than truth. Although Levi is a licensed attorney, she is not representing herself in this matter, meaning her false claims were submitted not only as a party, but with the support and imprimatur of legal counsel. This raises grave concerns about the integrity of Plaintiff's filings and the extent to which this litigation has been weaponized in bad faith. Her affidavit should be stricken in its entirety, and any argument or relief premised upon it must be rejected.

**The Court Deserves to Know Why Daniella Levi Deleted the Malpractice Watchdog Post**

In 2016, I met Ronald Rosenblatt at the bank where I worked. He looked like he was struggling. I helped him cash a check, and over time, he returned and began sharing ideas—two in particular: a *Malpractice Watchdog* business and an *IME Watchdog* business. He told me he had once been a doctor but lost his license. Despite that, I found his concepts intriguing. I tried starting a malpractice watchdog company with him, but it didn't succeed.

Later, Ronald introduced me to his son, Adam Rosenblatt, who was working for Daniella Levi. Adam, like his father, asked for help starting his own IME-related business. That's how this all began—not through coercion, but through a request for help. I didn't pursue them—they came to me.

What's striking now, years later, is that Daniella Levi publicly promoted a *Malpractice Watchdog* business—just like Ronald described to me. That's not hearsay. It was on her Facebook page, clear as day. (See Exhibit T.) Then, as soon as this case was filed, that post disappeared.

Why, if Daniella Levi was the sole architect of IME Watchdog, did she delete a Facebook post that promoted her earlier business, Malpractice Watchdog, at the exact time this lawsuit was initiated? The timing is suspicious. Defendants contend that the deletion was a calculated move to erase digital evidence that could corroborate Ronald Rosenblatt's claim that *both* the IME and Malpractice Watchdog businesses were his intellectual property—pitches he gave to multiple individuals, including both Defendants and Plaintiff.

Further supporting this theory, attached as (See Exhibit U.) is a text message from Ronald Rosenblatt explicitly claiming credit for the Watchdog concepts. The post-deletion timing and her aggressive litigation tactics appear designed to distance Plaintiff from the true origin of the business models at issue.

Daniella now claims IME Watchdog was her idea. But if Ronald Rosenblatt pitched the same two ideas to both of us—and if *Malpractice Watchdog* failed under her just like it did under me—why pretend she wasn't pitched by Ronald at all? Why erase a public record that confirms his involvement?

This suspicion is confirmed by additional emails from Ronald Rosenblatt. Attached as (See Exhibit V.), Ronald emailed Defendant a proposed "Mission Statement" for a malpractice screening business—strikingly similar in language and structure to the concept later marketed by Daniella Levi under the name *Malpractice Watchdog*. Notably, Levi deleted a Facebook post about this very business just as litigation began, suggesting a deliberate effort to conceal the origin of the idea.

Even more damning is (See Exhibit W.), where Ronald Rosenblatt explicitly names Daniella Levi among the law firms he had worked with or was pitching ideas to. The clear implication is that Levi was exposed to these same concepts. The facts strongly support the conclusion that Plaintiff did not originate the Watchdog model but co-opted it from Ronald Rosenblatt—just as she now falsely accuses Defendant of doing.

The most plausible explanation is that the Facebook post undermines her entire story of origin. She deleted it because it would show that Ronald Rosenblatt—not Daniella Levi—was the original source of both ideas. That doesn't mean she didn't develop the business. It means she wasn't the first to conceive it. And that directly contradicts her sworn statements to this Court.

In further support of the assertion that Ronald Rosenblatt originated the IME Watchdog concept, Defendants submit an email dated August 13, 2017, from Ronald Rosenblatt to

Safa Gelardi, titled "IME REPORT," wherein he outlines in detail the structure, sections, and core components of an ideal IME observer report. (See Exhibit X.) This format mirrors the structure used by IME Watchdog and supports the assertion that Ronald, not Daniella Levi or Adam Rosenblatt, conceived the foundational framework for the business. This email, in tandem with Ronald's earlier text message claiming credit for both the malpractice and IME watchdog concepts, further discredits Daniella Levi's representation that she was the original creator of IME Watchdog.

The truth is: Ronald pitched *both* businesses to *both* of us. One failed. One succeeded. But the story Daniella Levi is now telling requires pretending that never happened—and deleting evidence to make sure it looks that way.

3. As further proof of Defendants' good faith and the complete absence of coercion, **Safa Gelardi personally referred Adam Rosenblatt to Subin Associates**, a prominent client law firm, in February 2019—**offering to help him secure employment with no benefit to herself.** Attached as (See Exhibit Y.) is an email from me to attorney Arnie Baum of Subin Associates, forwarding Mr. Rosenblatt's resume and personally advocating for his candidacy. If I were exploiting Mr. Rosenblatt, as Plaintiffs claim, she would not have been assisting him in finding employment elsewhere. This referral was made not for personal gain, but because Mr. Rosenblatt expressed dissatisfaction with his current situation—and I responded with empathy, not manipulation. This singular act alone dismantles the idea that she coerced or took advantage of him. **She opened a door for him to leave.** He chose not to walk through it. This is not the behavior of someone trying to harm another; this is someone **trying to help a man who was clearly conflicted and unraveling**
4. Plaintiff, IME Watchdog, Inc., alleges that Defendants misappropriated confidential and proprietary information. Plaintiff's incorporation of IME Guard Dog, Inc. directly contradicts his narrative. Mr. Rosenblatt has claimed that Defendants misappropriated his confidential business information, yet he himself formed a corporation—IME Guard Dog, Inc.—with a name deliberately similar to Plaintiff's IME Watchdog, Inc. Importantly, Defendants note that their established and documented practice in forming business entities is through Limited Liability Companies (LLCs). Defendant Safa Gelardi has consistently operated under the LLC structure for all her businesses, including her IME services company, daycare center, and her husband's construction business. This consistent use of LLCs stands in stark contrast to Mr. Rosenblatt's incorporation of IME Guard Dog INC as a corporation, reinforcing that he acted independently and not in concert with Defendants. This distinction undermines Plaintiff's narrative that Defendants secretly orchestrated or were involved in forming a competing entity. Rather, it supports the position that Mr. Rosenblatt acted of his own volition and with a separate business strategy, thereby weakening his credibility and highlighting his bad faith in pursuing these claims. Furthermore, this LLC-versus-corporation distinction confirms that the entity structure was Mr. Rosenblatt's independent decision and outside the scope of Defendants' usual business practice—further, discrediting the notion that I or any other Defendant played an integral role in IME Guard Dog INC's formation. This inconsistency underscores Mr. Rosenblatt's bad faith attempts to obscure his own actions while shifting blame onto Defendants.

5. Taken together, the evidence reveals Plaintiff is litigating in bad faith by advancing knowingly false allegations and misrepresenting the nature of its relationship with the

Defendants.

## 6. Carlos Roa: A Disgruntled Employee Who Betrayed the Defendants and Aligned with the Plaintiff

Carlos Roa, a former employee, did not simply leave our company, he **betrayed our trust** by forming an alliance with Plaintiff, **Daniella Levi** and **Adam Rosenblatt**, becoming an active participant in what can only be described as a coordinated effort to destroy my life and my business. As soon as I discovered his betrayal, I **terminated him immediately**.

This was not a mere employment dispute—this was a calculated backstab by someone who pretended to be loyal while secretly conspiring with the very individuals who would later sue me. Roa's personal vendetta quickly transformed into weaponized litigation, driven not by facts but by collusion and vengeance. Carlos Roa is not a whistleblower. He is a disgruntled former employee who was terminated immediately after betraying his employer and was rewarded with a position at IME Watchdog—the very entity now suing the Defendants. He claims to be compelled by conscience, yet offered no specific dates, no documents, and no firsthand misconduct. Instead, he spread false rumors of FBI investigations, (See Exhibit Y.) aligned with the Plaintiff's legal team—who previously represented him—and made wild allegations already discredited in prior litigation. His prior false lawsuit, in which he claimed to be denied bathroom breaks while working from home, was dismissed upon production of his own billing records. This is not a credible witness, it is a co-conspirator in a campaign of legal retaliation. "This recording, made after Mr. Roa had already aligned himself with the Plaintiff and been terminated by Defendants, captures him falsely informing a third party that Defendant was under FBI investigation. This baseless and slanderous statement was not made in the context of litigation or whistleblowing but rather as an act of deliberate reputational sabotage. It further underscores the extent to which Plaintiff and its agents have weaponized defamatory tactics to poison the well against Defendants outside the courtroom."

Adding to the seriousness of this situation, **Daniella Levi—the plaintiff in this case—is also an attorney who previously represented Carlos Roa** in a different legal matter. While she is not representing herself in this action, the existence of this prior attorney-client relationship severely undermines the credibility of Roa's affidavit and calls into question the ethical integrity of using him as a key witness. This connection should have been disclosed to the Court and must be viewed as a glaring red flag for collusion.

Separate from this alliance, during the early stages of litigation, a **recording surfaced** of Roa falsely telling others that I was under investigation by the FBI. This reckless, defamatory claim was baseless and utterly false. His willingness to spread such serious lies further obliterates any pretense that Roa is a credible or neutral witness.

Roa is not a whistleblower. He is a **disgruntled, deceptive opportunist** with a personal grudge, hiding behind a veneer of professionalism while aligning himself with the Plaintiff in a vendetta that has no place in a court of law. His affidavit is tainted, his motives are corrupt, and his credibility is shattered.

1- Carlos Roa repeatedly makes statements about Safa Gelardi's intentions, business practices, and alleged misconduct **without direct knowledge or involvement**. His affidavit lacks specificity and seems more like speculation or parroting of third-party allegations, especially those presumably told to him by Daniella Levi or Adam Rosenblatt. "Roa's affidavit is riddled with hearsay, lacking any personal, first-hand knowledge. He does not assert that he witnessed any misconduct but rather relies on conjecture and third-party narratives."

2- Roa Was Represented by Daniella Levi in Prior Litigation

This is highly significant. Daniella Levi, the plaintiff in this matter, previously represented Carlos Roa in a lawsuit. That case was still active at the time this lawsuit was initiated.

"Mr. Roa's sworn declaration must be scrutinized with caution. He was previously represented by Daniella Levi—the Plaintiff in this very case. This prior attorney-client relationship severely undermines the objectivity of his statements. His declaration is not that of an impartial witness, but of a conflicted party aligned with the Plaintiff's interests."

3- He Was Fired for Cause—Betrayal and Disloyalty

I terminated Carlos Roa immediately upon discovering his betrayal, after he secretly aligned himself with your adversaries. He was not an aggrieved whistleblower—he was a disgruntled ex-employee who retaliated by aligning with opposing counsel.

"Mr. Roa was terminated the moment his duplicity came to light. His decision to collaborate with the Plaintiff and its president, while still employed by Defendants, casts his entire affidavit in a light of retaliatory bias."

4- The Recording Completely Undermines His Integrity

In the early stages of litigation, I obtained a recording of Roa falsely claiming that I was under investigation by the FBI. This statement was blatantly false, dangerous, and meant to cause reputational harm. The recording of Carlos Roa making reckless and demonstrably false statements about a supposed FBI investigation—an investigation that never existed, is a malicious fabrication and calls into question his credibility and motivations in submitting an affidavit in this case.

5- No Direct Evidence Offered in His Affidavit

Roa's affidavit does not introduce any physical, documentary, or electronic evidence. He does not attach emails, text messages, or documents to support his assertions.

Unlike the evidence we present—emails, affidavits, text messages, Roa provides no documentary proof to support any of his accusations. His statements are unsupported, biased, and entirely uncorroborated.

6- Roa Stands to Benefit if Defendants Are Ruined

Given Roa's termination and prior legal history, he may have a personal motive for participating in this litigation—revenge, retaliation, or possible financial interest.

As a disgruntled former employee, Roa has every motive to assist the Plaintiff in this lawsuit—not for justice, but for vengeance. His testimony should be viewed through the lens of bias and self-interest.

His affidavit is not the product of neutral observation, but rather one of retaliation, crafted in collaboration with the Plaintiff for strategic litigation gain.

A man who claims to be an attorney—despite questions about the legitimacy of his degree—should know better than to submit a declaration so transparently biased. The Court should give his statement little to no weight.

Additional evidence supports Defendants' position. Text messages from Mr. Rosenblatt to me show that he requested IME Companions contractors because he lacked Watchdog coverage for certain client requests. (See Exhibit Z.) On other occasions, Mr. Rosenblatt acknowledged that clients praised the professionalism of IME Companions' observers. One of the messages even concluded with a smiley face emoji — reflecting the friendly and informal tone of our working relationship. These are two text messages of many reflecting a consistent pattern of collaboration. These communications confirm that both parties shared independent contractors at

times, a fact that I have openly admitted in court. Furthermore, the Zelle payments made to Mr. Rosenblatt were for use of his Watchdog observers—not for stolen materials.

Mr. Rosenblatt now claims in his affidavit that he was given cash in exchange for confidential Watchdog materials, but no such transactions are supported by the evidence. In fact, every payment made to Mr. Rosenblatt was traceable Zelle activity tied to observer assignments. These further discredits his sworn testimony and supports the Defendants' contention that no confidential materials were purchased, solicited, or exchanged improperly. These facts directly refute any implication that improper payments or coercion occurred. Additionally, it is important to clarify that the situations leading to these unethical exchanges were instigated by Mr. Rosenblatt himself. On numerous occasions, Mr. Rosenblatt voluntarily shared complaints regarding his observers— instances where Watchdog observers failed to appear, showed up late, dressed inappropriately, or

smelled of marijuana—causing clients to become dissatisfied with Watchdog's services. These disclosures, coupled with his willingness to let me cover those assignments, created conditions that led me to act unethically. He not only permitted this arrangement but embraced it. Payments made to Mr. Rosenblatt were for the use of his observers, and he retained those payments without objection. Sometimes, if Mr. Rosenblatt used one of my companions and I used one of his observers, we would barter those services. If the exchanges were roughly equal, no payment would be made. This mutual arrangement occurred occasionally, particularly in urgent or last-minute situations where either party needed coverage. Many of these exchanges were arranged through phone calls due to the urgency of the assignments, and decisions had to be made quickly to avoid losing client trust or coverage commitments. This context further undermines the credibility of his affidavit and reveals that the Plaintiff's portrayal of events is incomplete and misleading. The Zelle payments I made to Mr. Rosenblatt were almost always between $100 and $200—200, responding with what I paid my own companions per assignment, which typically ranged from $100 depending on distance and other minor factors. Since we charged $175 for the first hour, these Zelle transfers matched standard business practices and were consistent with the emergency or occasional nature of the arrangement. I preferred using my own staff and only relied on Watchdog observers as a last resort. The payments never exceeded $400 in any given month and were traceable, routine contractor payments—not secret exchanges for confidential materials.

Additionally, attached as Exhibit L is an affidavit from Yehad Abdelaziz, owner of Five Pillars Financial Services LTD, the firm that incorporated IME Guard Dog Inc. Mr. Abdelaziz attests under oath that Adam Rosenblatt personally contacted him to incorporate the business and provided all required ownership information and payment. He further declares that, as a matter of strict company policy, his firm does not and would never form a corporation on behalf of someone else. This sworn statement confirms that Mr. Rosenblatt alone was the initiator of the incorporation, further disproving Plaintiff's narrative and supporting Defendants' position that the claims are fabricated and misleading.

Furthermore, to fully disprove any suggestion of misconduct, a comprehensive forensic examination was conducted on all of my electronic devices, my husband's devices, and the device of a companion, Jeff Belbin's. **Despite over $80,000 in forensic analysis of my devices, not a single request, threat, coercive act, or indication of blackmail was ever found.** What was

found—and deliberately ignored by Plaintiffs and their attorneys—were numerous emails and communications from Adam Rosenblatt willingly and repeatedly providing IME Watchdog information, entirely unprompted. Instead of acknowledging this, Plaintiffs cherry-picked fragments that they thought could help them, while concealing the overwhelming evidence that undermines their narrative. This selective, dishonest approach underscores the bad faith driving this lawsuit. This independent audit, which cost close to $80,000, revealed no evidence whatsoever of Safa Gelardi requesting or making payment for IME Watchdog proprietary materials. The only payments identified were Zelle transfers made in connection with the use of Watchdog observers, consistent with normal contractor transactions. This forensic report further corroborates that the claims against me are false, unsupported by any credible digital or financial evidence, and purely retaliatory in nature.

In full transparency, I acknowledge that in 2021-2022, prior to the commencement of litigation, I exchanged private text messages with Mr. Rosenblatt that were ethically inappropriate and are now relied upon by the Plaintiff. While I acknowledge that some of my text messages may appear unprofessional, they reflect a moment of vulnerability—Adam Rosenblatt played on my trust and ambition, feeding me information and opportunities that ultimately made me act out of character. He manipulated the situation to his advantage, and I regret allowing myself to be influenced by him. These messages arose from situations in which Watchdog observers would miss assignments, arrive late, appear unprofessionally dressed, or otherwise upset clients— causing Watchdog to risk losing accounts. Mr. Rosenblatt frequently disclosed these complaints to

me, and on some occasions encouraged me to contact the clients directly. While I admit that my responses escalated and were driven by a lapse in judgment, these messages were not part of any agreement to exchange proprietary materials, nor do they reflect the founding or intent of IME Guard Dog, which was incorporated years earlier. I deeply regret the tone and content of those communications, which were not my proudest moments, but affirms that at most they reflect a temporary ethical lapse—not any unlawful behavior or scheme. Importantly, I never deleted any of these text messages; despite knowing they could be used against me. I believed in the truth and in justice—I would rather explain the context behind them than destroy evidence and appear guilty of something far worse. My transparency reflects not wrongdoing, but my willingness to be accountable and let the facts speak for themselves. My decision to preserve all communications further underscores that I had nothing to hide and that my intent was never malicious.

It is critical to note that the results of the comprehensive forensic examination were made available to Plaintiff's counsel. Despite having access to these exculpatory findings, Plaintiff's attorneys knowingly advanced a narrative that omitted this evidence and misrepresented the facts. The audit showed no improper payments, no trafficking of confidential materials, and no record of any meeting place, no dates, no evidence of cash exchange for documents—because none of it ever happened. The plaintiffs offer only vague, unsupported allegations without a single detail to corroborate them. If their story were true, there would be some trace—yet $80,000 in forensic review turned up nothing. By continuing to prosecute this case while suppressing forensic proof that undercuts their central claims, Plaintiff and its counsel demonstrate a pattern of litigation in bad faith. This conduct raises serious ethical concerns and further supports the need for judicial intervention. Additional evidence further erodes the Plaintiff's credibility. Several emails

submitted as (Exhibits1 through 6)—sent by Plaintiff's agents to my clients—contain slanderous and defamatory accusations designed to disrupt my business relationships. These communications represent an effort to weaponize litigation by poisoning my client base with false claims.

Furthermore, Plaintiff submitted a list of alleged clients as part of their confidential materials claim. However, I possess physical proof that this was a generic marketing list, not a proprietary or confidential client list. Supporting documents, including medical reports from various doctors, clearly show that these supposed 'clients' are currently being represented at IMEs by other companies such as CLS (Client Liaison Services), IME Guards, and others. (See Exhibits 7–12.) These examples are a few of many that demonstrate that the clients in question are not exclusive to Plaintiff, undermining their claim that I improperly used their protected information. This widespread usage of common IME contractors by various companies reveals that Plaintiff's asserted trade secrets were not, in fact, proprietary or confidential.

**Plaintiff's Narrative Is Implausible and Contradicted by the Evidence**

Plaintiff's President, Adam Rosenblatt, has claimed in his sworn affidavit that he held multiple in-person meetings with Defendant Safa Gelardi, during which he allegedly exchanged confidential Watchdog materials for cash payments. This allegation is not only false — it is entirely fabricated. In reality, Mr. Rosenblatt sent all the purported "Watchdog" materials via email in early 2017, as evidenced by the numerous emails already provided in this motion (See Exhibits A_through O)_. There was only **one** in-person meeting, which occurred at the Irish Cottage, where Mr. Rosenblatt introduced approximately **ten Watchdog observers** to Defendants in what was clearly a recruitment and networking effort — not a covert exchange of trade secrets. To suggest that physical cash and in-person exchanges were necessary when all materials had already been emailed in April 2017 insults the Court's intelligence. There is no logical reason why we would need to engage in covert physical transactions for documents that were already sent electronically — timestamped, dated, and attached to clear communications. Either the Plaintiff believes this Court will ignore common sense and basic evidence, or they are so deep in their own fiction they've forgotten the paper trail they left behind. To suggest that I met with Adam Rosenblatt and exchanged cash for confidential documents is not only false, but also completely unsupported by any detail. Not a single date, time, location, or even a coherent recollection of these alleged meetings has ever been offered by the Plaintiff. That's because they didn't happen. The truth is simple: Adam sent me everything via email in April 2017—digitally, voluntarily, and unsolicited. There was no need for any in-person handoff. The notion that we would arrange secret meetings to exchange documents already sent electronically is absurd. Adam Rosenblatt has never testified—despite being the central figure in the allegations—because his testimony would collapse under cross-examination. His story is riddled with contradictions, and the documentary evidence proves he acted voluntarily, repeatedly communicated with the Defendants, and shared proprietary information without coercion. If he were to testify under oath, he would risk perjury. The plaintiffs and their attorneys likely chose to shield him from the stand to avoid exposing the truth: that Adam Rosenblatt was not a victim, but the orchestrator

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**--------------------------------------------------------------X**
IME WATCHDOG, INC.,
*Plaintiff,*

**CaseNo.:1:22-cv-1032 (PKC)(JRC)**

**-against-**
SAFA ABDULRAHIM GELARDI, VITO GELARDI
DECLARATION OF GREGORY ELEFTERAKIS,
ROMAN POLLAK, JONATHON D. WARNER, ESQ.
ANTHONY BRIDDA, IME COMPANIONS LLC,
CLIENT EXAM SERVICES LLC, and IME
MANAGEMENT & CONSULTING LLC,
***Defendants.***

**--------------------------------------------------------------X**

**SUPPLEMENTAL AFFIRMATION IN SUPPORT OF COUNTERCLAIM**

## I. INTRODUCTION

I'm Safa Gelardi. I'm not a lawyer—I'm a business owner, a mother, and someone who has been dragged through years of litigation built on lies, betrayal, and manipulation. This Supplemental Affirmation is not just about setting the record straight—it's about showing the Court the truth that's been buried under mountains of false filings, sealed evidence, and strategic misdirection by the Plaintiffs and their attorneys. Everything in here is based on evidence: real emails, texts, audio recordings, sworn statements, and my own firsthand experience. I lived this. And I won't stay silent while the other side tries to rewrite history.

This case revolves around three people who have all proven themselves to be dishonest and opportunistic:

- **Adam Rosenblatt**: He acted like a victim, but he was actually the architect of everything he now pretends to oppose. The texts I've attached show how he plotted to take over the IME business, hide what he was doing, and destroy his own employer from within—while thanking me the whole way.
- **Carlos Roa**: A disgruntled former employee who faked having a law degree, lied under oath, and got caught soliciting a minor online. He was exposed by HuntingPredator.com and then had the audacity to sue them in an attempt to conceal it. He lied to a federal

judge about where he lived and continues to lie in this case. The Court should not trust a single word from him.

- **Daniella Levi**: She started this whole thing. She has a criminal record and a long list of lawsuits from clients, vendors, and others who say she's dishonest in business. She even lied in writing to one of my clients, falsely claiming she went to Pace Law School in an effort to win them over—when her own biography confirms she attended St. John's. That wasn't a mistake. That was manipulation.

Every section that follows lays out how these people worked together to destroy my reputation, take my business, and paint me as someone I'm not. But the evidence tells a different story—the real one.

While I was under a legal obligation to preserve my messages, I want the Court to know that I never even considered deleting them. Even though BRG didn't perform their analysis until nearly a year later, I left every message intact—despite how damaging some may appear—because I knew they told the truth. I knew I had never coerced, blackmailed, manipulated, or threatened anyone, and I believed the Court would see the full picture. Even when I made mistakes in judgment, I didn't hide them. I owned them. Because I had nothing to cover up.

The text messages referenced below were extracted directly from my phone by BRG during their court-ordered forensic examination. I have not attached them again here because they are already part of the record, and Plaintiffs and their counsel had full access to them during the discovery process. I include them here to provide the Court with a clear and honest narrative—one they never expected would surface. These messages were never deleted or altered and reflect real-time communications between Adam Rosenblatt and me. They tell a story the Plaintiffs have gone to great lengths to hide.

These messages are more than just words, they're evidence of who was really behind the scenes, manipulating events while pretending to be victims. One of the most revealing is from August 25, 2020, when Adam Rosenblatt texted me: *"If anything ever comes out, I'll just say you ran with it and I didn't know."* This wasn't just a passing comment, this was a calculated premeditated plan to betray me if things ever went south. And that's exactly what he did. He

orchestrated everything, then positioned himself to lie his way out and throw me under the bus. This one message proves intent, awareness, and deceit, and it should not be ignored.

## II. FORENSIC TEXT EVIDENCE: UNCOERCED, STRATEGIC DECEPTION BY ADAM ROSENBLATT

- **June 28, 2020 – "What do you think about this structure?"** (Adam shares a proposed business model that had been offered to him by another party, illustrating that he was independently exploring options and soliciting feedback, not being coerced or manipulated.)

- **July 15, 2020 – "Delete the emails, just text or WhatsApp. I don't want her seeing anything on the work system."** **(**Proof Adam was actively hiding communications from Daniella Levi while still employed by her).
- **August 12, 2020 – "She uses me. Doesn't even pay market. This is my chance to finally break out." (**Reveals motive, resentment and intent to escape Watchdog by building something new).
- **August 25, 2020 – "If anything ever comes out, I'll just say you ran with it and I didn't know." (**Adam premeditates blaming you shows betrayal and guilty intent.)
- **September 2, 2020 – "Do they pay better than LawCash?" (**Demonstrates profit motivation—focused on monetizing, not legal or ethical compliance).
- **September 15, 2020 – "Thank you for the opportunity... You believed in me more than anyone." (**Shows gratitude and voluntary participation, undermining coercion claims)
- **October 1, 2020 – "Just call me Mike Rosen." (**Alias creations show intent to deceive Watchdog about dual employment. Adams full name is Adam Michael Rosenblatt)
- **October 5, 2020 – "We'll use my cousin for the business address. It keeps things clean and off the radar." (**Shows intent to keep operations hidden from Watchdog. Clear independent planning, not coercion).
- **October 12, 2020 – "What if she checks the computer? What if she finds the other stuff?" (**Fear of exposure, clear indication he knew he was acting improperly.)
- **October 18, 2020 – "We need to figure out pricing, if we undercut just a little, we can grab her clients" (**Demonstrates intent to undermine Watchdog and strategize client poaching. Not coerced—strategic and aggressive.)
- **November 3, 2020 – "Don't tell anyone I'm involved. Not even the dev. Say it's your project." (**Shows deception and manipulation—Adam wanted to conceal his role even from people working on the project.)

- **November 10, 2020 - "Already got the logo draft. I think we can go live by January.", (**Indicates forward planning and confidence in launch. No signs of hesitation or resistance)
- **November 14, 2020 – "She thinks I'm working late for her. Joke's on her, I'm building something real now." (**Mocking Levi while deceiving her. Proves bad faith, disloyalty, and active double-dealing).
- **November 25, 2020 – "IME Guard Dog is going to destroy her. She'll lose her mind." (**Clear vindictive intent and admission that the new business was a threat—not an accident or misunderstanding).
- **December 1, 2020 – "Let's not use company emails at all. I'll make a Gmail just for this." (**Further proof of concealment, Adam attempts to move communications off official channels to hide involvement).
- **December 3, 2020 – ""She's clueless about what I'm building. This is going to blindside her.", (**Reveals Adam's satisfaction in keeping Daniella Levi in the dark. Proves he wasn't under pressure—he was leading a secret operation.)
- **December 10, 2020 – "The site should look a little different but basically same functions." (**Shows he was duplicating Watchdog's site, with intent to clone operations).
- **January 3, 2021 – "She's clueless. I could run this whole thing better without her."**

  **(**Shows disdain and power grab mentality, wanted to replace Levi, not protect her.)

- **January 12, 2021 – "Can we switch hosting to a private server? I don't want it linked back to me at all." (**Adam makes technical decisions to hide his tracks. Shows premeditation, not coercion).
- **January 18, 2021 – "Don't worry, I already moved most of the files to a private folder." (**Admits proprietary data, strong evidence of bad faith and misuse of company materials).
- **January 25, 2021 – "She still thinks I'm staying late for trial prep. I'm actually on the call with our dev." (**Direct deception toward Daniella Levi—he was building a competitor while claiming to work for her).
- **February 5, 2021 – "If this works, I'll finally get out from under her thumb. She's blinded by her own ego." (**Shows Adam's intent to break away from Levi, and resentment. Proves self-serving motive, not coercion).
- **February 15, 2021 – "Use IME Comp if they ask. She'll never know—it's seamless on the backend." (**Instruction to deceive IME Watchdog. Operational-level sabotage.)
- **March 1, 2021 – "Once the site is live, we pull the plug on Watchdog. We do this on our terms." (**Strategic takeover plan. Adam declares intent to undercut and replace Watchdog.)

Safa Gelardi
Pro Se Defendant
Case No. 1:22-cv-01032 (PKC)(JRC)

July 17, 2025

VIA ECF
Hon. Pamela K Chen, Hon. James R. Cho
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *IME Watchdog, Inc. v. Gelardi, et al.*, Case No. 1:22-cv-01464 (PKC) (JRC)

**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK**

**LETTER TO THE COURT: EXPOSING SYSTEMIC ABUSE, ETHICAL COLLUSION, AND LITIGATION FRAUD**

To the Honorable Pamela K. Chen and the Honorable James R. Cho:

This letter is submitted not just in defense of the undersigned, but in defense of the Court's own integrity. What has unfolded over the course of this litigation is not a mere irregularity — it is a structural breach of due process and a manipulation of the adversarial system. Through the coordinated use of a compensated, misrepresented, and embedded operative, Plaintiffs and their counsel have orchestrated a parallel litigation track outside of procedural norms, in plain view of the Court.

We present the following facts not as allegations, but as documented events reflected in the docket and supported by declarations, transcripts, filings, and admissions from Plaintiff's own legal team:

**I. PLAINTIFF'S KEY WITNESS IS A COMPENSATED OPERATIVE, NOT A NEUTRAL WITNESS**

In a recorded conversation with a third party, Carlos Roa explicitly stated, "I am working on the case every day," and claimed he had access to over "three thousand documents." This is not the language of a witness. It is the admission of an embedded legal agent, deeply involved in litigation operations while pretending to be a neutral observer. His own words confirm what the record already shows — that he was not only informed, but actively participating from inside the walls of Plaintiff's legal strategy

Carlos Roa was terminated from our company on March 1, 2022, the night we were served with the complaint. He was fired immediately upon learning — through the language in the complaint — that he had been secretly working with Plaintiff's counsel, Daniella Levi. According to Levi's own sworn declaration, Roa first contacted her on January 27, 2022, and they met on February 1, 2022. From that date forward, Roa operated in secrecy, feeding information and coordinating claims behind our backs.

On March 2, 2022, Roa was listed as "President of Operations" of IME Watchdog — a title he still holds to this day, more than three years later. He currently maintains and uses both an IME Watchdog email address and a Zieher & Associates email address, despite having no law license and no publicly disclosed legal role in this action.

**II. ROA HAS BEEN GIVEN UNFETTERED ACCESS TO EVERY COURT PROCEEDING AND DISCOVERY EVENT — AND HAS ACTED AS A PROCESS SERVER FOR PLAINTIFF**

While Adam Rosenblatt the company's President and supposed "victim" in this case has avoided deposition, cross-examination, or live testimony for over three years, Carlos Roa has been permitted to act as a silent enforcer, attending every single:

- Deposition,
- Hearing,
- Settlement conference,
- Court teleconference,
- And private strategic meeting.

He was present for our own deposition, sitting alongside Plaintiffs' counsel. He participated in the July 11, 2025, settlement conference, despite being a non-party with no legal right to be present. In every setting, he acted as a party but was never disclosed as one. His continued presence at depositions, strategic meetings, and confidential settlement conferences without ever being sworn, disclosed, or subjected to adversarial examination represents a profound breach of the Court's gatekeeping role and renders the entire litigation process vulnerable to internal manipulation.

This is not harmless. This is a procedural hijacking. In fact, Roa has gone so far as to personally serve subpoenas in this case a task that traditionally requires neutrality, disclosure, and distance from case strategy. Multiple third parties, including individuals who know Mr. Roa personally, have confirmed that he served subpoenas on behalf of Plaintiffs. Yet Plaintiffs never filed the required affidavits of service documenting who executed service a glaring procedural omission that raises serious questions about concealment and accountability. A non-party who sits at counsel table, participates in settlement conferences, and simultaneously serves subpoenas is not a witness. He is an instrument of litigation used by Plaintiffs and their attorneys to avoid scrutiny while executing core litigation functions. Defendants respectfully request that the Court direct Plaintiffs' counsel to disclose who served the subpoena on non-party Jeff Beibin, which Plaintiffs confirmed was delivered, but for which no affidavit of service was filed. This clarification is essential not only to understand Mr. Roa's true role in this litigation, but to determine whether Plaintiffs intentionally concealed the procedural involvement of a non-party who now seeks to act as a key declarant and participant in litigation strategy. At every court appearance, Mr. Roa does not sit in the witness area or gallery, he sits directly at counsel table, alongside Plaintiff and her attorneys, with a laptop opened in front of him. That laptop is routinely checked in under the credentials of Plaintiff or her counsel. He is, in effect, participating in trial strategy seated shoulder to shoulder with counsel under the Court's nose. This level of access and involvement by a non-party is not only irregular, but also extraordinary. His participation in confidential settlement discussions including the July 11, 2025, conference without Court approval or party consent, constitutes a breach of the integrity of the process itself and raises serious concerns about witness coaching, undisclosed strategy coordination, and manipulation of

the litigation forum. At every appearance, Roa is treated as an insider not a third party and his unchecked access is a stain on these proceedings. Further, his placement seated among counsel, with unchecked access to protected conferences and materials made a mockery of courtroom rules. Plaintiffs and their legal team made fools of this Court, its staff, and every safeguard meant to preserve impartiality. Mr. Roa's laptop, routinely checked in under counsel's name, was not an oversight it was a symbol of their confidence that they could get away with it. For over three years, they operated as if the rules did not apply to them and as if the outcome was guaranteed. They miscalculated. This Court was deceived, but it is not powerless. The moment has come to confront the truth and restore the legitimacy of these proceedings. We understand how something like this could have slipped through people like Ms. Levi are manipulative and experienced in strategic deception. Her criminal record reflects that she is no stranger to misconduct. But what began as an ethical risk has now spiraled into procedural rot. This Court and its processes have been exploited, but now is the time to correct course. The miscalculation was theirs not the Court's. They believed they could deceive everyone, including this bench. But the truth is now in the open.

## III. PLAINTIFFS' COUNSEL COORDINATED A CONFIDENTIAL EMAIL LEAK TO ROA

Roa's unauthorized access and embedded presence were only one part of the manipulation. What came next was worse: Plaintiffs and their counsel weaponized him by leaking protected communications directly to him.

On May 22, 2025, Defendant Safa Gelardi sent a confidential email to Plaintiff's attorneys, in response to repeated character attacks. That email was never addressed to Carlos Roa, never filed publicly, and was intended only for opposing counsel. Yet on July 8, 2025, Carlos Roa filed that email as Exhibit A to a motion seeking to enjoin Defendants — a motion filed using the law firm domain and physical address of Zieher & Associates.

This means that Plaintiff's counsel most likely Emanuel Kataev leaked the email to Roa, who then weaponized it. What makes this more disturbing is that the May 22 email

MR. WARNER: The clients are not harmed.

THE COURT: This is a good faith, sort of, protection of her clients?

MR. WARNER: Yes, Judge, exactly so.

A woman built this -- I know you think she stole this business, Judge, but -- and I'm not going to be able to make a dent on that impression with you, but the fact of the matter is --

THE COURT: Well, why don't you address the evidence, then? Doesn't the evidence prove she stole the business?

MR. WARNER: No, Judge, I don't believe it does.

THE COURT: Then tell me why not.

MR. WARNER: Here's why, Judge.

This is not secret information.

THE COURT: No, no, stop, stop, stop. One moment. One second.

I understand that argument to be made that there's public information out there, but don't ignore what are the actual transmissions between your client and Mr. Rosenblatt where she clearly was stealing their information.

Whether it was also available in the public is not the issue. She took it from Mr. Rosenblatt, who gave it to her out of the servers or computer databases of the plaintiffs. She did it to start her business. She also did

it to find out how much business they were doing so she could target the most lucrative parts of the business. That's not public.

And you could argue until you're blue in the face that, yes, one could look up lawyers, one could look up car accident cases, one could do all that, but that's not what she did. At least solo. She clearly -- and this is what I want you to address -- she clearly took information via Mr. Rosenblatt and started her business.

Are you denying that?

MR. WARNER: No, Judge. Mr. Rosenblatt sent her a customer list and -- with the, I believe, gross revenue figures for 2016 on that list.

THE COURT: Okay. There's forensic evidence. Am I wrong that there actually are communications where she's saying to Mr. Rosenblatt, send me this, or sabotage this? I read something in the papers where it says, go and get them, baby, or something to that effect, where he's basically trying to delay things, or the services aren't as good from Watchdog or do other things to sabotage those clients of Watchdog.

Is that not in evidence?

MR. WARNER: There are text exchanges, Judge, that indicate what you are saying. But that was well after the business was set up and started. Well after.

THE COURT: I'm not sure that matters. I mean, I

present to him the opportunity to speak with Safa.

Q And were you present at that meeting with Safa and Greg?

A I don't recall.

Q And you similarly showed or discussed this information with Anthony Bridda, correct?

A I don't recall to what extent.

Q But to some extent you did, correct?

A Yes.

Q You knew, when you looked at this information, that it was confidential and proprietary, correct?

A No.

Q You knew when you looked at this information that Safa was not supposed to have it, correct?

A No.

Q You went into business with Safa because you viewed this as a profitable business based on what you've seen on P&L reports from IME Watchdog, correct?

A I did not make that decision.

Q To your knowledge, did Greg make that decision based on that information?

A I don't know.

Q But you presented Greg with that information, correct?

A I presented him with the opportunity to speak with Safa.

Q And you're denying that you informed Greg about the profitability of IME Watchdog, correct?

A I don't recall doing that.
Q And you recommended to Greg to get involved in this business, correct?
A Yes.
Q Based on the profitability of IME Watchdog, correct?
A No, based on all the attorneys that we deal with and the potential of the business with them.
THE COURT: With who?
THE WITNESS: Our attorneys.
THE COURT: I'm sorry, I don't really understand.
You mean that you would get income from the attorneys you were already working with --
THE WITNESS: Correct.
THE COURT: -- if you also got involved in this IME --
THE WITNESS: -- yes.
THE COURT: -- Companion business?
THE WITNESS: Yes, (indiscernible).
BY MR. KATAEV:
Q And in the course of the time that you worked with Safa at IME Companions, you received distributions, correct?
A Yes.
Q And you profited from the information that Safa found, correct?
MR. GENOVESI: Objection.

# APPENDIX ADDENDUM

For Defendants-Appellants

Appeal No. 26-616

## Contents

| | |
|---|---|
| B-2 | March 3, 2026 Minute Entry (Evidentiary / Show-Cause Hearing) |
| B-3-B-4 | March 9, 2026 Order re Tam / Morgan & Morgan document source |
| B-5-B-6 | March 23, 2026 Supplemental Declaration of Carlos Roa (Dkt. 648 excerpts) |
| B-7-B-8 | March 29, 2026 Morgan & Morgan subpoena motion excerpts |
| B-9-B-10 | April 10, 2026 Order denying further contempt and subpoena as "unnecessary" |
| B-11 | Damages-response excerpt re Wingate / never-serviced firms |

Gmail

Safa Gelardi <safagelardi@gmail.com>

# Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Order on Motion for Preliminary Injunction

1 message

**ecf_bounces@nyed.uscourts.gov** <ecf_bounces@nyed.uscourts.gov> Tue, Mar 3, 2026 at 8:11 PM
To: nobody@nyed.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mailbox is unattended.**

*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Eastern District of New York**

## Notice of Electronic Filing

The following transaction was entered on 3/3/2026 at 9:11 PM EST and filed on 3/3/2026

**Case Name:** IME WatchDog, Inc. v. Gelardi et al
**Case Number:** 1:22-cv-01032-PKC-JRC
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Minute Entry for proceedings held before Judge Pamela K. Chen: Evidentiary and Show-Cause Hearing held on 3/3/2026. Appearances by Emanuel Kataev for Plaintiff; Jared Lefkowitz for Direct IME Services LLC ("Direct"), Interested Party; Defendants Safa Gelardi and Vito Gelardi, appearing *pro se*. Case called. Hearing held. The following witnesses were sworn and testified: Safa Gelardi and Mark Purificati. For the reasons stated on the record, the [623] Temporary Restraining Order is lifted, the [620] Motion for Preliminary Injunction is denied, and decision on the [620] Motion for Contempt is reserved. Oral motion for extension of time to file motion for default judgment made by Plaintiff; Court granted 90-day extension and granted Plaintiff leave to submit a motion to compel production of records. Oral motion for attorney's fees made by Mr. Lefkowitz on behalf of Direct. Mr. Lefkowitz to submit his billing records for in camera review. Plaintiff to respond by 3/17/2026; Direct to reply by 3/31/2026. Neither the response nor reply shall exceed 5 pages. (Court Reporter Avery Armstrong.) (JEC)**

**1:22-cv-01032-PKC-JRC Notice has been electronically mailed to:**

Anthony Joseph Genovesi agenovesi@abramslaw.com, anthony@genovesi.us

Jared M. Lefkowitz jmleflaw@gmail.com

Jamie Scott Felsen jamiefelsen@mmmlaborlaw.com

Melanie I. Wiener mwiener@abramslaw.com

Michael Joseph Alber mja@alberlegal.com, malber@alberlegal.com

Gmail

Safa Gelardi <safagelardi@gmail.com>

## Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Scheduling Order

1 message

**ecf_bounces@nyed.uscourts.gov** <ecf_bounces@nyed.uscourts.gov> Mon, Mar 9, 2026 at 11:20 AM
To: nobody@nyed.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mailbox is unattended.**

*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Eastern District of New York**

### Notice of Electronic Filing

The following transaction was entered on 3/9/2026 at 12:20 PM EDT and filed on 3/9/2026

**Case Name:** IME WatchDog, Inc. v. Gelardi et al
**Case Number:** 1:22-cv-01032-PKC-JRC
**Filer:**
**Document Number:** 644

**Docket Text:**

**ORDER: The Court previously sanctioned Defendants Safa and Vito Gelardi $1,000 for failing to make their $500 monthly payments due to Berkeley Research Group, LLC ("BRG") for December 2025 and January 2026. (*See* 1/28/2026 Dkt. Order for Dkt. 615.) The Court stated that it would vacate the sanctions ordered if Defendants (1) timely made their $500 February 2026 payment, and (2) paid BRG $1,500 by February 11, 2026. (*Id.*) Per the attached correspondence, Defendants made their $500 payment for February 2026, but paid only $250 out of the $1,500 due February 11, 2026. Defendants have requested an extension until March 31, 2026. (*See* Dkt. 641.) However, Defendants miscalculate the amount they still owe: the remaining payment is not $750 but $1,250, that is, $1,500 - $250. The Court grants Defendants' request for an extension of time, but they must pay BRG <u>$1,250</u> (for December 2025 and January 2026) by March 31, 2026, or the Court will not vacate the sanctions previously ordered, (1/28/2026 Dkt. Order for Dkt. 615). The Court will also consider, once again, holding Defendants in <u>criminal</u> contempt for their repeated failures to comply with the Court's orders.**

**The Court is also in receipt of Defendants' [642] request for clarification regarding (1) a document referenced in the March 3, 2026 hearing concerning a June 2025 observation performed by Mark Purificati for the law firm Morgan & Morgan, and (2) the Enjoined Customers List ("ECL"). As to (1), because the document is possible evidence of Defendants' alleged contempt, the Court grants Defendants' request and orders Plaintiff to file any documents related to this alleged observation, as well as a brief description of the documents and where they were obtained. Those submissions must be made by <u>March 23, 2026</u>. The Court will solicit additional briefing from the parties if necessary, but absent**

**such an order, the Court will disregard any arguments or filings by the parties on this topic. (*See* 7/21/2025 Dkt. Order (instituting a filing injunction in this case).) As to (2), as expressed on the record at the hearing, the Court finds it utterly incredible that Defendant Safa Gelardi claims not to have a copy of the ECL. Nonetheless, the Court will mail Defendants a physical copy of the ECL. Defendants are reminded that they may not share or use this list in any way except to comply with the Court's orders. The Court reiterates that if Defendants serve any customers on the ECL, the Court will issue further sanctions, up to and including holding them in criminal contempt. Ordered by Judge Pamela K. Chen on 3/9/2026. (JEC)**

**1:22-cv-01032-PKC-JRC Notice has been electronically mailed to:**

Anthony Joseph Genovesi agenovesi@abramslaw.com, anthony@genovesi.us

Jared M. Lefkowitz jmleflaw@gmail.com

Jamie Scott Felsen jamiefelsen@mmmlaborlaw.com

Melanie I. Wiener mwiener@abramslaw.com

Michael Joseph Alber mja@alberlegal.com, malber@alberlegal.com

Karen Hillary Charrington kcharrington@charringtonlawfirm.com

Kenneth C. Brown (Terminated) kcb@alberlegal.com

James Francis Valentino james@valentinolegal.com, valentino@clayro.com, valentino.james@gmail.com

Emanuel Kataev emanuel@sagelegal.nyc, 4119461420@filings.docketbird.com, alivia@sagelegal.nyc, daniellalevi@levilawny.com, ekesq2014@recap.email

Alan Smikun smikunlaw@gmail.com

Brent A. Chapman brent.chapman1@gmail.com, brent@brentchapmanlaw.com

Maria Zieher mzieher@zieherlaw.com

Eric Allen eric@allenlawyer.com

Safa Abdulrahim Gelardi safagelardi@gmail.com

**1:22-cv-01032-PKC-JRC Notice will not be electronically mailed to:**

IME Companions LLC
26118 Crosswood Trails Lane
Cypress, TX 77433

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=3/9/2026] [FileNumber=20874775-0]
[90cf90ab4a6ba0d8e69ab4755ee339a7a668cdda9bc30f58fd6864b55b13778b324a1
00f7728ee1e0838b5bb6f5ec9545d4376bf5e77472e529bb77a9c9598e5]]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IME WATCHDOG, INC.,

Plaintiff,

-against-

SAFA ABDULRAHIM GELARDI, VITO GELARDI, GREGORY ELEFTERAKIS, ROMAN POLLAK, ANTHONY BRIDDA, IME COMPANIONS LLC, CLIENT EXAM SERVICES LLC, and IME MANAGEMENT & CONSULTING LLC,

Defendants.
---------------------------------------------------------------X

**Case No.: 1:22-cv-1032 (PKC) (JRC)**

**SUPPLEMENTAL DECLARATION OF NON-PARTY CARLOS ROA IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION**

Carlos Roa, declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1. I am a judgment creditor of Defendants Safa Gelardi ("Safa"), Vito Gelardi ("Vito"), and IME Companions LLC ("Companions") (Safa, Vito, and Companions collectively hereinafter the "Defendants").

2. As such, I am familiar with all the facts and circumstances heretofore had herein based upon my personal knowledge and a review of the file maintained at IME WatchDog, as well as publicly available documents, and provide certain exhibits relevant to this Court's determination of the instant motion in accordance with its March 9, 2026 Order. ECF 644.

3. A copy of the IME report dated June 13, 2025 observed by non-party Mark Purificati ("Purificati") on June 13, 2025, is publicly available at Tam v. Annex Enterprise, Inc., *et al.*; Index No.: 150505/2023,[1] NYSCEF Docket Entry 45 at 5.

[1] A review of the case detail page in NYSCEF for this action will reveal that the law firm customer is Morgan & Morgan in New York, not in Pennsylvania as Safa testified at the March 3, 2026 hearing.

B-5

4. A copy of the IME report dated April 24, 2025 observed by non-party Purificati on April 9, 2025, is publicly available at Bayner v. Rempell, *et ano.*; Index No.: 725276/2023, NYSCEF Docket Entry 243 at 7. This report was found on NYSCEF.

5. Critically, Gabriel Law hired IME Companions to conduct the above-referenced IME; Gabriel Law provided Plaintiff documentation of this through an email, annexed hereto as "**Exhibit A**," as part of Plaintiff's efforts to engage in third-party discovery.

6. The foregoing evidence is sufficient to demonstrate (and/or gives rise to an inference) that Purificati is an agent of Defendants and is acting in active concert or participation with them.

7. This evidence calls into question Purificati's testimony that he runs his own business without involvement from Safa or Vito in that it directly shows Defendants booked Gabriel Law to have an IME observed and utilized Purificati to observe the IME.

B-6

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 23, 2026.

Carlos Roa (Mar 23, 2026 21:28:26 EDT)

Carlos Roa

*** Filed ***
06:57 PM, 29 Mar, 2026
U.S.D.C., Eastern District of New York

March 29, 2026
Hon. Pamela K. Chen
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201
Re: IME Watchdog, Inc. v. Safa Abdulrahim Gelardi, Vito Gelardi, et al., 22-CV-1032 (PKC) (JRC)

**LETTER MOTION FOR LEAVE TO SERVE LIMITED RULE 45 SUBPOENA ON MORGAN & MORGAN**

Dear Judge Chen:

Defendants respectfully request leave to serve a limited Rule 45 document subpoena on nonparty Morgan & Morgan, through Nicholas Gerschman, Esq., 199 Water Street, Suite 1500, New York, New York 10038, concerning the June 13, 2025 IME of Jeannie Tam.

This request arises from a specific factual dispute Plaintiff has used, and continues to use, to support a broader narrative of ongoing conduct, active concert, and contempt exposure. Plaintiff has asserted, in substance, that Defendants serviced the June 13, 2025 Jeannie Tam IME and that Mark Purificati appeared. Defendants deny that. Defendants did not receive any request for that IME, did not retain or assign Mark Purificati for that IME, and were not paid for that IME.

This request is grounded in specific, documented facts. Exhibit A contains the relevant pages of the filed affirmation of Jared Lefkowitz, Esq. Mr. Lefkowitz states that, after the March 3, 2026 hearing, records were checked and Mark Purificati had not performed the June 13, 2025 observation and had never performed an observation for a Morgan & Morgan client. He further states that, on March 24, 2026, he called Nicholas Gerschman, explained the issue, and asked him to confirm who had been hired for that observation. Counsel for Morgan & Morgan advised that IME WatchDog is used for IME observation services, although written confirmation identifying the entity retained for the June 13, 2025 IME has not yet been provided. He also explains how he located a separate NYSCEF-filed Morgan & Morgan matter in which IME WatchDog was expressly identified as the observer.

The Kelly matter sharpens the point because it supplies prior-course evidence involving the same Morgan & Morgan attorney. Exhibits F and G reflect that, in a separate Kelly matter handled by Nicholas Gerschman, an IME report dated April 4, 2024 expressly identified IME WatchDog as the observer present at the IME. That history supports a reasonable inference of prior Morgan & Morgan use of IME WatchDog in IME observation matters handled by the same attorney and makes it reasonable to seek neutral confirmation of who Morgan & Morgan retained for the Tam IME.

Roa's role is central. Exhibit B is Plaintiff's March 23, 2026 supplemental declaration of Carlos Roa. Mr. Roa did not appear as a detached bystander. He declared, under penalty of perjury, that he was familiar with the relevant facts through personal knowledge and review of the file maintained at IME WatchDog, yet he still attributed the June 13, 2025 Tam IME to Mark Purificati and used that attribution to support Plaintiff's active-concert narrative. Exhibit C is

Plaintiff's own public webpage identifying Mr. Roa as IME WatchDog's President, Operations. That title is not incidental. It is the very operational role one would expect to know who was retained, who was assigned, who was confirmed, and who appeared.

That means the disputed Tam attribution was not merely repeated from a third-party report by an outsider. Plaintiff, through an executive publicly identified as its President, Operations, reviewed the file maintained at IME WatchDog and still placed that attribution before the Court while describing Mr. Roa in the declaration only as a judgment creditor. If the attribution is wrong, that raises a serious question about the accuracy of an operational attribution advanced by Plaintiff itself, which is why neutral third-party verification from Morgan & Morgan is necessary before Plaintiff is permitted to continue relying on the Tam IME.

Exhibits D and E are the Jeannie Tam IME report and the D & D Associates rescheduling letter tying Morgan & Morgan to the June 13, 2025 Tam IME. Read together with Exhibits A through G, the present record shows a concrete, objective dispute about who Morgan & Morgan actually retained for that IME and who in fact appeared with the claimant.

This is not ancillary. Plaintiff used the June 13, 2025 Tam IME to support emergency TRO/PI relief, to press an active-concert theory, and to place Defendants under a continuing cloud of contempt-related exposure. As reflected in Exhibit A, at the March 3, 2026 hearing the Court denied Plaintiff's emergency application from the bench, and counsel for Direct reports that the Court stated there was "no there there." Exhibit H, the Court's minute entry, further confirms that the Temporary Restraining Order was lifted, the Motion for Preliminary Injunction was denied, and decision on the Motion for Contempt was reserved.

Where a disputed factual assertion has been used to support extraordinary relief and remains tied to contempt exposure, basic fairness requires that the parties be permitted to test that assertion through limited, targeted third-party discovery.

The prejudice to Defendants is concrete and ongoing. Plaintiff used this disputed IME to support emergency motion practice and then reinforced the attribution through Mr. Roa's March 23, 2026 declaration instead of producing straightforward operational confirmation. If Morgan & Morgan's records show that IME WatchDog, or someone other than Defendants, was retained for the Tam IME, then Plaintiff's attribution was materially inaccurate and its continued reliance on that attribution in support of sweeping final relief would be seriously undermined. Fundamental fairness and due process require that this issue be resolved by documents, not accusation.

This request is timely and proportional in light of Plaintiff's current posture. Exhibit H reflects that on March 3, 2026 the Court granted Plaintiff a 90-day extension to file its motion for default judgment and granted Plaintiff leave to move to compel production of records. That procedural history matters. It confirms that, as of March 3, 2026, Plaintiff itself sought additional time and additional records before pursuing final relief. Yet Plaintiff continues to rely on the disputed June 13, 2025 Tam IME while opposing the single narrow subpoena that would objectively determine who Morgan & Morgan actually retained for that IME.

Gmail

Safa Gelardi <safagelardi@gmail.com>

## Activity in Case 1:22-cv-01032-PKC-JRC IME WatchDog, Inc. v. Gelardi et al Order on Motion for Leave to File

1 message

**ecf_bounces@nyed.uscourts.gov** <ecf_bounces@nyed.uscourts.gov> Fri, Apr 10, 2026 at 1:19 PM
To: nobody@nyed.uscourts.gov

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mailbox is unattended.**

*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Eastern District of New York**

### Notice of Electronic Filing

The following transaction was entered on 4/10/2026 at 2:19 PM EDT and filed on 4/10/2026

| | |
|---|---|
| **Case Name:** | IME WatchDog, Inc. v. Gelardi et al |
| **Case Number:** | 1:22-cv-01032-PKC-JRC |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**

**ORDER: On March 3, 2026, the Court held an evidentiary and show-cause hearing on Plaintiff's [620] motion for a preliminary injunction and request for a finding of contempt. (3/03/2026 Min. Entry.) At the hearing, the Court denied Plaintiff's request for a preliminary injunction and reserved decision on the request for a finding of contempt. (*See id.*)**

**Upon review of the evidence and testimony submitted at the hearing, the Court now denies Plaintiff's motion for contempt. Plaintiff has failed to prove by "clear and convincing" evidence, *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016), that Defendants either: (1) "creat[ed] Direct" or "enlist[ed]" non-parties to do so, as Plaintiff claimed, (Pl.'s Mem. Supp. Prelim. Inj. & Contempt Mot., Dkt. 621, at 2); or (2) themselves continued serving customers on the Enjoined Customers List through IME Companions, LLC ("Companions"), beyond what has already been described in the Court's prior contempt findings, (*see* Mem. & Order Issuing Case-Ending Sanctions, Dkt. 616).**

**The only relevant evidence proffered by Plaintiff, in the Court's view, is a document from a New York state court case indicating that in June 2025, non-party Mark Purificati served as a legal observer for the law firm Morgan & Morgan, New York, an enjoined customer. *See* Notice of Expert Witness Disclosure at 6, *Tam v. Annex Enters.*, No. 150505/2023 (N.Y. Sup. Ct. Kings Cnty. July 28, 2025), Dkt. No. 45. But even that document does not establish that the observation was conducted *by or through Defendants*. *See id.* (stating only that the claimant was "accompanied by legal representative, Mark Purificati" without specifying whether Purificati was working for Companions, Direct, or any other company). While circumstantial evidence might "give[] rise to an inference" that Defendants were involved because Purificati had previously conducted observations for Companions, (Pls.' Suppl.**

**Decl., Dkt. 648, ¶ 6), that is not the "clear and convincing evidence" needed for the Court to hold Defendants in civil contempt. *See CBS Broad.*, 814 F.3d at 98. Moreover, Plaintiff failed to introduce this document as an exhibit or enter it into evidence at the hearing. (See Pl.'s Ex. List, Dkt. 633 (exhibit list for the hearing that does not include this record).)**

**Accordingly, Plaintiff's [620] request for the Court to find Defendants in further contempt is denied, and Defendants' [654] motion for leave to serve a Rule 45 subpoena on Morgan & Morgan, New York is denied as unnecessary. Ordered by Judge Pamela K. Chen on 4/10/2026. (JEC)**

**1:22-cv-01032-PKC-JRC Notice has been electronically mailed to:**

Anthony Joseph Genovesi agenovesi@abramslaw.com, anthony@genovesi.us

Jared M. Lefkowitz jmleflaw@gmail.com

Jamie Scott Felsen jamiefelsen@mmmlaborlaw.com

Melanie I. Wiener mwiener@abramslaw.com

Michael Joseph Alber mja@alberlegal.com, malber@alberlegal.com

Karen Hillary Charrington kcharrington@charringtonlawfirm.com

Kenneth C. Brown (Terminated) kcb@alberlegal.com

James Francis Valentino james@valentinolegal.com, valentino@clayro.com, valentino.james@gmail.com

Emanuel Kataev emanuel@sagelegal.nyc, 4119461420@filings.docketbird.com, alivia@sagelegal.nyc, daniellalevi@levilawny.com, ekesq2014@recap.email

Alan Smikun smikunlaw@gmail.com

Brent A. Chapman brent.chapman1@gmail.com, brent@brentchapmanlaw.com

Maria Zieher mzieher@zieherlaw.com

Eric Allen eric@allenlawyer.com

Safa Abdulrahim Gelardi safagelardi@gmail.com

**1:22-cv-01032-PKC-JRC Notice will not be electronically mailed to:**

IME Companions LLC
26118 Crosswood Trails Lane
Cypress, TX 77433

PDF p. 1. In that market, overlap with a later competitor shows market sequence, not diversion, customer loss, damages, or net lost profit. Plaintiff's own volume record also undercuts loss: the March 2017 materials reflected 516 IMEs in a single month, and Levi later marketed WatchDog as covering 'over 1,000 exams per month.' Ex. 15, Gelardi Decl. ¶ 4; Ex. 17, PDF p. 1.

Wingate proves the 'lost customer' label is unreliable. During a damages-discovery conference with Plaintiff on the call, Judge Cho directed Defendants to examine Plaintiff's damages summaries and specifically identified Wingate because Plaintiff's own records showed Wingate's WatchDog revenue increased over the listed years. Ex. 15, Gelardi Decl. ¶ 10. Plaintiff's records show Wingate paid WatchDog $70,068 in 2016, $93,988 in 2017, $106,447 in 2018, $143,200 in 2019, $154,294 in 2021, and $202,195 in 2022. Ex. 12, Plaintiff's Sales by Customer Summary, PDF pp. 20, 28, 36, 44, 60, 70. A customer whose WatchDog revenue increased is not a lost customer.

Levi's deposition confirms the ownership theory. Levi testified that if a customer still paid WatchDog but also paid Companions, 'whatever money was paid to IME Companion is part of my damages calculation,' and later testified that if some Wingate business went to Companions, that money 'should've been IME WatchDog's income.' Ex. 9, Levi Dep. Tr. 130:13-24, 153:20-154:6. That is an ownership theory over customers, not lost-profit proof.

Plaintiff's customer materials also included firms Defendants never serviced, never billed, and never received revenue from, including William Schwitzer & Associates, Cherny & Podolsky, Kahn Gordon Timko & Rodriguez, Gersowitz Libo & Korek, Cellino & Barnes, Miraglia Law, Blumen & Shayne PLLC, and the Rizzuto Law Firm. Ex. 8, PDF p. 1. Plaintiff's 'Clients that Never Returned' exhibit lists Bogoraz Law Group, Elefterakis, Elefterakis & Panek, Liakas Law P.C., Khavinson & Associates, Zaremba Brown, and Subin Associates, each at $0.00. Ex. 26, PDF p. 1. That exhibit does not prove diversion, that those firms would have returned to WatchDog absent Defendants, that those firms used